**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| THE LYCRA COMPANY LLC, *et al.*,[1] | ) | Case No. 26-26-90399 (CML) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF
THE LYCRA COMPANY LLC AND ITS DEBTOR AFFILIATES
<u>PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE</u>**

<div style="border:1px solid">

**THIS PREPACKAGED CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

</div>

**HAYNES AND BOONE, LLP**

Charles A. Beckham, Jr. (TX Bar No. 02016600)
Kenric D. Kattner (TX Bar No. 11108400)
Arsalan Muhammad (TX Bar No. 24074771)
Kourtney Lyda (TX Bar No. 24013330)
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile:  (713) 547-2600
Email:  charles.beckham@haynesboone.com
        kenric.kattner@haynesboone.com
        arsalan.muhammad@haynesboone.com
        kourtney.lyda@haynesboone.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**LINKLATERS LLP**

Michael H. Torkin (*pro hac vice* pending)
Daniel J. Guyder (*pro hac vice* pending)
Christopher J. Hunker (*pro hac vice* pending)
Clark L. Xue (*pro hac vice* pending)
Ramsey Scofield (*pro hac vice* pending)
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 903-9000
Facsimile:  (212) 903-9100
Email:  michael.torkin@linklaters.com
        daniel.guyder@linklaters.com
        christopher.hunker@linklaters.com
        clark.xue@linklaters.com
        ramsey.scofield@linklaters.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/lycra. The location of Debtor The LYCRA Company LLC's corporate headquarters and the Debtors' service address in these chapter 11 cases is 2711 Centerville Road, Suite 300, Wilmington, Delaware 19808.

**TABLE OF CONTENTS**

| Contents | Page |
|---|---|

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ................................................................................................**1**

A. Defined Terms. .............................................................................................................1

B. Rules of Interpretation.................................................................................................16

C. Computation of Time. ..................................................................................................17

D. Governing Law.............................................................................................................17

E. Reference to the Debtors or the Reorganized Debtors. ...............................................18

F. Nonconsolidated Plan..................................................................................................18

G. Controlling Document. ................................................................................................18

H. Consultation, Notice, Information, and Consent Rights..............................................18

**ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, DIP CLAIMS, PROFESSIONAL FEE CLAIMS, AND RESTRUCTURING EXPENSES** ..........................**18**

A. Administrative Claims. ................................................................................................19

B. Priority Tax Claims. ....................................................................................................19

C. DIP Claims, DIP Commitment Premium, and DIP Exit Premium. .............................19

D. Professional Fee Claims. .............................................................................................20

E. Payment of Restructuring Expenses............................................................................21

F. Non-U.S. Facility. ........................................................................................................21

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ........................**21**

A. Classification of Claims and Interests. ........................................................................21

B. Treatment of Claims and Interests...............................................................................22

C. Special Provision Governing Unimpaired Claims. .....................................................26

D. Elimination of Vacant Classes.....................................................................................26

E. Voting Classes, Presumed Acceptance by Non-Voting Classes...................................27

F. Intercompany Interests. ...............................................................................................27

G. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.................27

H. Controversy Concerning Impairment...........................................................................27

I. Subordinated Claims and Interests. .............................................................................27

**ARTICLE IV. MEANS FOR IMPLEMENTATION** .........................................................................**27**

A. General Settlement of Claims and Interests. ...............................................................27

B. Restructuring Transactions...........................................................................................28

C. The Reorganized Debtors.............................................................................................29

D. Sources of Consideration for Plan Distributions. .......................................................29

E. Corporate Existence. ....................................................................................................31

F. Vesting of Assets in the Reorganized Debtors..............................................................31

G. Cancellation of Existing Securities, Agreements, and Interests. .................................32

H. Corporate Action. ........................................................................................................32

I. New LYCRA Holdco Organizational Documents.........................................................32

J. Directors and Officers of the Reorganized Debtors. ....................................................33

K. Effectuating Documents; Further Transactions. ..........................................................33

L. Certain Securities Law Matters....................................................................................33

M. Section 1146 Exemption. .............................................................................................36

| | | |
|---|---|---|
| N. | Employee Compensation and Benefits. | 37 |
| O. | Director and Officer Liability Insurance. | 38 |
| P. | Management Incentive Plan. | 38 |
| Q. | Preservation of Causes of Action. | 38 |
| R. | Cashless Transactions. | 39 |
| S. | Helm Agreements. | 39 |

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ... 39**

| | | |
|---|---|---|
| A. | Assumption and Rejection of Executory Contracts and Unexpired Leases. | 39 |
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases. | 40 |
| C. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | 41 |
| D. | Indemnification Obligations. | 42 |
| E. | Insurance Policies. | 42 |
| F. | Reservation of Rights. | 42 |
| G. | Nonoccurrence of Effective Date. | 42 |
| H. | Contracts and Leases Entered Into After the Petition Date. | 42 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ... 43**

| | | |
|---|---|---|
| A. | Timing and Calculation of Amounts to Be Distributed. | 43 |
| B. | Disbursing Agent. | 43 |
| C. | Rights and Powers of Disbursing Agent. | 43 |
| D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 44 |
| E. | Surrender of Cancelled Instruments or Securities. | 45 |
| F. | Manner of Payment. | 45 |
| G. | Compliance with Tax Requirements. | 45 |
| H. | Allocations. | 46 |
| I. | No Postpetition Interest on Claims. | 46 |
| J. | Foreign Currency Exchange Rate. | 46 |
| K. | Setoffs and Recoupment. | 46 |
| L. | Claims Paid or Payable by Third Parties. | 46 |

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ... 47**

| | | |
|---|---|---|
| A. | Disputed Claims Process. | 47 |
| B. | Allowance of Claims. | 48 |
| C. | Claims Administration Responsibilities. | 48 |
| D. | Estimation of Claims. | 48 |
| E. | Adjustment to Claims Without Objection. | 49 |
| F. | Disallowance of Claims. | 49 |
| G. | No Distributions Pending Allowance. | 49 |
| H. | Distributions After Allowance. | 49 |

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ... 49**

| | | |
|---|---|---|
| A. | Discharge of Claims and Termination of Interests. | 49 |
| B. | Release of Liens. | 50 |
| C. | Releases by the Debtors. | 50 |
| D. | Releases by the Releasing Parties. | 52 |
| E. | Exculpation. | 53 |

F.      Injunction. ........................................................................................................54
G.      Protections Against Discriminatory Treatment. .............................................55
H.      Document Retention..........................................................................................55
I.      Reimbursement or Contribution.......................................................................55

**ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN............................55**
A.      Conditions Precedent to the Effective Date......................................................55
B.      Waiver of Conditions. ......................................................................................57
C.      Effect of Failure of Conditions.........................................................................57

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN ..........................57**
A.      Modification and Amendments. ........................................................................57
B.      Effect of Confirmation on Modifications. ........................................................57
C.      Revocation or Withdrawal of Plan. ..................................................................57

**ARTICLE XI. RETENTION OF JURISDICTION...........................................................................58**

**ARTICLE XII. MISCELLANEOUS PROVISIONS........................................................................60**
A.      Immediate Binding Effect. ...............................................................................60
B.      Additional Documents. ....................................................................................60
C.      Payment of Statutory Fees...............................................................................60
D.      Statutory Committee and Cessation of Fee and Expense Payment. ...............................60
E.      Reservation of Rights........................................................................................60
F.      Successors and Assigns. ...................................................................................61
G.      Notices. ...........................................................................................................61
H.      Term of Injunctions or Stays. ..........................................................................63
I.      Entire Agreement. ...........................................................................................63
J.      Exhibits. ..........................................................................................................63
K.      Nonseverability of Plan Provisions. ................................................................63
L.      Votes Solicited in Good Faith..........................................................................64
M.      Closing of Prepackaged Cases. .......................................................................64
N.      Waiver or Estoppel...........................................................................................64

**INTRODUCTION**

The LYCRA Company LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") propose this joint prepackaged chapter 11 plan of reorganization (as amended, supplemented, or otherwise modified from time to time, this "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I.A of this Plan. This Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS PLAN (INCLUDING UNDER ARTICLE IV.M HEREOF) IN FULL.**

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*Ad Hoc Group*" means that certain ad hoc group of creditors represented by the Ad Hoc Group Advisors.

2.      "*Ad Hoc Group Advisors*" means (a) Gibson, Dunn & Crutcher LLP, as legal counsel to the Ad Hoc Group, (b) Porter Hedges, LLP, as Texas counsel to the Ad Hoc Group, (c) PJT Partners, Inc., as investment banker to the Ad Hoc Group, (d) Niederer Kraft Frey Ltd, as Swiss legal counsel to the Ad Hoc Group, (e) Stibbe London B.V., as Dutch legal counsel to the Ad Hoc Group, (f) A&L Goodbody Northern Ireland LLP, as Northern Irish legal counsel to the Ad Hoc Group, (g) Shin & Kim LLC, as Korean legal counsel to the Ad Hoc Group, (h) Holland & Knight LLP, as Virginian legal counsel to the Ad Hoc Group; (i) Appleby (Jersey) LLP, as Jersey legal counsel to the Ad Hoc Group, (j) Pinheiro Neto Advogados, as Brazilian legal counsel to the Ad Hoc Group, (k) Cuatrecasas, as Mexican legal counsel to the Ad Hoc Group, and (l) any other professionals or advisors retained by the Ad Hoc Group, in each case for this clause (l), with the consent of the Debtors, not to be unreasonably withheld.

3.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Prepackaged Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred by the Debtors on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) the Restructuring Expenses; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

4.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity was a debtor in a case under the Bankruptcy Code.

1

5.       "*Agents/Trustees*" means, collectively, the DIP Agent, the ssTL Agent, the Euro Notes Trustee, the Dollar Notes Trustee, and the Security Agent.

6.       "*Agreed Transfer Process*" means the legal process necessary to implement the Share Transfer in accordance with applicable Law, as reasonably determined by the Debtors and the Required Consenting Creditor, which the Debtors may (but shall not be required to) summarize in the form of steps plan to be filed as a Plan Supplement.

7.       "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest expressly allowed under this Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under this Plan, and (b) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy Law; *provided* that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to this Plan.

8.       "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common Law, including fraudulent transfer Laws.

9.       "*Ballot*" means the ballot included in the Solicitation Materials transmitted by the Claims and Noticing Agent to a Holder of an Impaired Claim entitled to vote on the Plan, by which such Holder may cast a vote to accept or reject the Plan and, if applicable, make the elections and opt-out elections set forth therein.

10.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

11.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or another United States Bankruptcy Court with jurisdiction over the Prepackaged Cases.

12.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

13.      "*Business Day*" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, (a) the states of New York or Texas, (b) London, England, (c) Amsterdam, The Netherlands or (c) St Helier, Jersey.

14.      "*Cash*," "*$*," or "*€*" means cash and cash equivalents, including bank deposits, checks, and other similar items in the applicable currency.

15.      "*Cash Collateral*" has the meaning ascribed to it under section 363(a) of the Bankruptcy Code.

16.      "*Causes of Action*" means any and all actions, Claims, interests, remedies, causes of action, controversies, demands, proceedings, agreements, rights, Liens, indemnities, contributions, guaranties, suits, obligations, liabilities, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in Law

2

or in equity, or pursuant to any other theory of Law. Causes of Action also include: (a) any and all rights of setoff, counterclaim, or recoupment, and Claims for breach of contract or for breach of duties imposed by Law or in equity; (b) any and all rights to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate, or disallow Claims against or Interests in the Debtors; (c) any and all Claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any and all Claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any and all state or foreign Law fraudulent transfer or similar Claims.

17. "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

18. "*Claims and Noticing Agent*" means Kroll Restructuring Administration LLC in its capacity as claims, noticing, and solicitation agent for the Debtors.

19. "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the clerk of the Bankruptcy Court or the Claims and Noticing Agent.

20. "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to sections 1122(a) and 1123 of the Bankruptcy Code.

21. "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

22. "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, wages, compensation, and benefit plans and policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs, and payments, life and accidental death and dismemberment insurance plans and programs, for all employees who are current employees of the Debtors as of the Petition Date, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and managers, in each case existing with the Debtors as of immediately prior to the Effective Date.

23. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Prepackaged Cases.

24. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Prepackaged Cases within the meaning of Bankruptcy Rules 5003 and 9021.

25. "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code to consider Confirmation of this Plan and approval of the Disclosure Statement, as such hearing(s) may be adjourned or continued from time to time.

26. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the adequacy of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, which shall be in form and substance acceptable to the Required Consenting Creditors.

27. "*Consenting Creditors*" means, collectively, the holders (or beneficial holders), or nominees, investment advisors, sub-advisors, or managers of certain funds or discretionary accounts of holders, that are party to the RSA.

28. "*Consummation*" means the occurrence of the Effective Date.

29. "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of

the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

30.      "*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

31.      "*Debtor Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

32.      "*Debtor Release*" means the release set forth in Article VIII.C of this Plan.

33.      "*Debtors*" means, collectively, The LYCRA Company LLC, a Delaware limited liability company and its debtor affiliates.

34.      "*Definitive Documents*" means all material documents in respect of the Restructuring Transactions including: (a) this Plan; (b) the Confirmation Order; (c) the Disclosure Statement (and the motion seeking approval thereof); (d) the Solicitation Materials; (e) the DIP Documents; (f) the Plan Supplement; (g) the New LYCRA Holdco Organizational Documents; (h) the New Warrant Agreements; (i) the New Debt Documents; (j) any employee retention or incentive plans; (k) all material pleadings and motions Filed by the Debtors in connection with the Prepackaged Cases (and related orders), including the First Day Pleadings, any "second day" pleadings, and all orders sought pursuant thereto; (l) any other agreements, instruments, or documentation as may be agreed in writing to document and consummate the Restructuring Transactions; and (m) any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents, motions, pleadings, and/or agreements relating to any of the foregoing, which shall be in form and substance acceptable to the Debtors and the Reorganized Debtors and acceptable to the Required Consenting Creditors.

35.      "*DIP Agent*" means GLAS USA LLC, in its capacity as administrative agent, and GLAS Trust Corporation Limited, in its capacity as collateral agent, under the DIP Note Purchase Agreement, and any successors and permitted assigns, in such capacity.

36.      "*DIP Claim*" means any Claim on account of indebtedness under the DIP Notes Facility and/or DIP Note Purchase Agreement, other than the DIP Commitment Premium and DIP Exit Premium. DIP Claims include Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Documents, which, for the avoidance of doubt, shall include all "DIP Obligations" as such term is defined in the DIP Orders, but shall not include the DIP Commitment Premium or DIP Exit Premium.

37.      "*DIP Commitment Premium*" means the commitment premium under the DIP Notes Facility and/or DIP Note Purchase Agreement.

38.      "*DIP Documents*" means, collectively, the documentation governing the DIP Notes Facility, including the DIP Note Purchase Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, budgets, and other security documents, the DIP Orders, the DIP Motion, and any amendments, modifications and supplements to any of the foregoing, which shall be in form and substance acceptable to the Required Consenting Creditors.

39.      "*DIP Exit Premium*" means the exit premium under the DIP Notes Facility and/or DIP Note Purchase Agreement.

40.      "*DIP Exit Note*" means the $10,000,000 junior unsecured promissory note to be issued by New LYCRA Holdco to the DIP Noteholders, with allocations to be determined and agreed among the DIP Noteholders

4

(and communicated in writing to the Debtors prior to the Effective Date), in full and final satisfaction of the DIP Exit Premium, which promissory note shall contain the other terms and conditions set forth in the DIP Note Purchase Agreement, and shall otherwise be in form and substance satisfactory to the Debtors and the DIP Noteholders entitled to receive such promissory note. A substantially final form of the DIP Exit Note shall be filed as a Plan Supplement.

41. "*DIP Motion*" means any motion filed with the Bankruptcy Court seeking approval of the DIP Notes Facility, which shall be in form and substance acceptable to the Required Consenting Creditors.

42. "*DIP Noteholders*" shall mean the Purchasers under the DIP Note Purchase Agreement.

43. "*DIP Note Purchase Agreement*" means that certain superpriority debtor-in-possession note purchase agreement, filed as an attachment to the DIP Orders (as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time), by and among Eagle Intermediate, as issuer, each of the Debtors as guarantors, GLAS USA LLC, as administrative agent, GLAS Trust Corporation Limited, as collateral agent, and the purchasers party thereto setting forth the terms and conditions of the DIP Notes Facility, which shall be in form and substance acceptable to the Required Consenting Creditors.

44. "*DIP Notes Facility*" means the new superpriority senior secured debtor-in-possession notes facility to be issued in accordance with the DIP Note Purchase Agreement.

45. "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

46. "*Disbursing Agent*" means the Debtors or the Reorganized Debtors, as applicable, or the Entity or Entities selected by the Debtors or the Reorganized Debtors (with the reasonable consent of the Required Consenting Creditors) to make or facilitate distributions contemplated under this Plan.

47. "*Disclosure Statement*" means the disclosure statement with respect to this Plan, including all exhibits, schedules, supplements, modifications, and amendments thereto, to be approved by the Confirmation Order, which shall be in form and substance acceptable to the Required Consenting Creditors.

48. "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest: (a) that is not Allowed; (b) that is not disallowed under this Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

49. "*Distribution Date*" means, except as otherwise set forth in this Plan, the date or dates determined by the Debtors or the Reorganized Debtors, as applicable, in consultation with the Required Consenting Creditors, on or after the Effective Date upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under this Plan.

50. "*Distribution Record Date*" means the record date for purposes of making distributions under this Plan on account of Allowed Claims, which date shall be a date in advance of the Effective Date that is selected by the Debtors in consultation with the Required Consenting Creditors. For the avoidance of doubt, the Distribution Record Date shall not apply to Securities held through DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., as applicable, which shall receive distributions in accordance with the applicable procedures of DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., as applicable.

51. "*Dollar Notes*" means the senior secured notes issued pursuant to the Dollar Notes Indenture.

52. "*Dollar Notes Advisors*" means Milbank LLP and Moelis & Company, as advisors to certain holders of Dollar Notes.

53. "*Dollar Notes Advisor Cap*" means (a) all accrued and unpaid fees, costs, and expenses of (i) Milbank LLP in the amount of $3,106,967.04 to be paid from the proceeds of the DIP Notes Facility and (ii) Moelis & Company in the amount of $3,600,000 to be paid on the Effective Date, in each case for the period up to the "Effective Date" (as defined in the RSA), plus (b) up to $250,000 for fees and expenses incurred by Milbank LLP after the "Effective Date" (as defined in the RSA).

54. "*Dollar Notes Claims*" means any Claims on account of indebtedness under the Dollar Notes.

55. "*Dollar Notes Indenture*" means that certain senior secured notes indenture, dated May 4, 2018, by and among Eagle Intermediate and Eagle Finance Co. B.V. as co-issuers, certain of the Debtors as guarantors, and Wilmington Trust, National Association as trustee, paying agent, registrar, and transfer agent.

56. "Dollar Notes Trustee" means Wilmington Trust, National Association, in its capacity as the trustee, paying agent, registrar, and transfer agent in respect of the Dollar Notes.

57. "*DPI*" means the distributable proceeds paid from New LYCRA Holdco to holders of New LYCRA Holdco Common Stock and New Warrant Shares and proceeds from a sale of New LYCRA Holdco Common Stock and New Warrant Shares in which the holders of New Warrants (or a class thereof) participate (in each case on account of such shares) less distributable proceeds paid from New LYCRA Holdco to MIP Shares on account of such MIP Shares.

58. "*DTC*" means the Depository Trust Company.

59. "*Eagle Finance BV*" means Eagle Finance Co B.V.

60. "*Eagle Finance Entities*" means Eagle Finance BV and Eagle Finance UK.

61. "*Eagle Finance UK*" means Eagle UK Finance Limited.

62. "*Eagle Global*" means Eagle Global Holding B.V.

63. "*Eagle Holding*" means Eagle Holding Co B.V.

64. "*Eagle Holding Companies*" means Eagle Holding, Eagle Intermediate or Eagle Global.

65. "*Eagle Intermediate*" means Eagle Intermediate Global Holding B.V.

66. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of this Plan have been satisfied or waived in accordance with Article IX.B of this Plan; and (c) this Plan is declared effective by the Debtors. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

67. "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

68. "*Estate*" means, as to each Debtor, the estate created for such Debtor pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

69. "*Euro/Dollar Claims*" means the Euro Notes Non-Priority Tranche Claims and the Dollar Notes Claims.

70. "*Euro Notes*" means the senior secured notes issued pursuant to the Euro Notes Indenture.

71. "*Euro Notes Claims*" means the Euro Notes Priority Tranche Claims and the Euro Notes Non-Priority Tranche Claims.

72.      "*Euro Notes Indenture*" means that certain senior secured notes indenture, dated April 25, 2023, by and among Eagle UK Finance Limited as issuer, certain of the Debtors as guarantors, and Kroll Trustee Services Limited as trustee.

73.      "*Euro Notes Non-Priority Tranche*" means Euro Notes equal to the difference between (a) the aggregate amount of Euro Notes less (b) the Euro Notes comprising the Euro Notes Priority Tranche.

74.      "*Euro Notes Non-Priority Tranche Claims*" means any Claims on account of indebtedness under the Euro Notes Non-Priority Tranche.

75.      "*Euro Notes Priority Tranche*" means the $120,000,000 of Euro Notes that rank senior in recovery of any proceeds of enforcement to the Euro/Dollar Claims.

76.      "*Euro Notes Priority Tranche Claims*" means any Claims on account of indebtedness under the Euro Notes Priority Tranche.

77.      "*Euro Notes Trustee*" means, collectively, Kroll Trustee Services Limited as trustee, U.S. Bank Europe DAC, UK Branch as paying agent, and U.S. Bank Europe DAC as registrar and transfer agent in respect of the Euro Notes.

78.      "*Exculpated Partie*s" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; and (b) the independent directors or managers of any Debtor.

79.      "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

80.      "*Exit Notes Facility*" means the secured exit notes facility, in an amount not less than $75,000,000 (which, for the avoidance of doubt, shall be sufficient to satisfy in full all requisite payments under this Plan, including all Professional Fees, DIP Claims, and Administrative Claims) to be entered into by certain of the Reorganized Debtors on or around the Effective Date, which exit notes facility (or other credit agreement) shall contain the other terms and conditions as set forth on Schedule 1 to the RSA, and/or shall otherwise be in form and substance satisfactory to the Debtors and the Required Consenting Lenders. A substantially final form of the Exit Notes Facility shall be filed as a Plan Supplement.

81.      "*Exit Notes Facility Documents*" means any documents governing the Exit Notes Facility, including the credit agreement and/or indenture governing the Exit Notes Facility, and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

82.      "*Federal Judgment Rate*" means the federal judgment rate specified by 28 U.S.C. § 1961 in effect as of the Petition Date.

83.      "*File*," "*Filed*," "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Prepackaged Cases.

84.      "*Final DIP Order*" means any order entered by the Bankruptcy Court on a final basis approving the DIP Motion, which shall be in form and substance acceptable to the Required Consenting Creditors.

85.      "*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has

been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, re-argument, leave to appeal or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable rule under the Bankruptcy Rules, the Local Bankruptcy Rules, or applicable non-bankruptcy Law may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

86.     "*FinanceCo Dissolution*" means the dissolution of each of the Eagle Finance Entities under applicable Law.

87.     "*First Day Pleadings*" means the motions and related pleadings that the Debtors shall have filed upon the commencement of the Prepackaged Cases, which shall be in form and substance acceptable to the Required Consenting Creditors.

88.     "*General Unsecured Claim*" means any Claim that is not (a) an Other Secured Claim, (b) an Administrative Claim; (c) an Other Priority Claim, (d) a Priority Tax Claim, (e) a DIP Claim (or a Claim for the DIP Commitment Premium or DIP Exit Premium), (f) an ssTL Claim, (g) a Euro Notes Claim, (h) a Dollar Notes Claim, (i) a Promissory Note Claim, (j) an Intercompany Claim, (k) a Section 510(b) Claim, or (l) otherwise secured by collateral or entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court.

89.     "*Governing Body*" means, in each case in its capacity as such, a board of directors, board of managers, manager, managing member, general partner, special committee, or any other similar governing body of any of the Debtors.

90.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

91.     "*Helm Agreements*" means, collectively (i) the Helm License Agreement (ii) the Helm Settlement Agreement.

92.     "*Helm Entities*" means, collectively (i) Helm US Corporation and (ii) Qore LLC.

93.     "*Helm License Agreement*" means that certain Non-Exclusive Patent License Agreement, dated as of March 10, 2026, by and between (i) The LYCRA Company LLC and The LYCRA Company UK Limited and (ii) the Helm Entities.

94.     "*Helm Settlement Agreement*" means that certain Settlement and Release Agreement, dated as of March 10, 2026, by and between The LYCRA Company LLC and the Helm Entities.

95.     "*Holdco Dissolution*" means the dissolution of each of the Holdco Entities under applicable Law.

96.     "*Holdco Entities*" means (i) in the event a Share Transfer of Eagle Global is effectuated, Eagle Intermediate and Eagle Holding or (ii) in the event a Share Transfer of Eagle Intermediate is effectuated, Eagle Holding.

97.     "*Holdco Interests*" means any Interest in any Holdco Entity or Eagle Finance Entity.

98.     "*Holder*" means a Person or Entity that is the record owner of a Claim against, or an Interest in, any Debtor, as applicable.

99.     "*Impaired*" means, with respect to a Claim or Interest, or a Class of Claims against or Interests in the Debtors, a Class of Claims against or Interests in the Debtors that is impaired within the meaning of section 1124 of the Bankruptcy Code.

100.     "*Intercompany Claim*" means any Debtor Intercompany Claim and any Non-Debtor Intercompany Claim.

101.     "*Intercompany Interest*" means any Interest in a Debtor held by another Debtor.

102.     "*Intercreditor Agreement*" means that certain that certain Intercreditor Agreement, originally dated as of May 4, 2018, by and among, Eagle Holding Co B.V., Eagle Intermediate, Wilmington Trust (London) Limited (as security agent), and any other creditors that may from time to time accede thereto (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

103.     "*Interest*" means the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor (or any Holdco Entity, as applicable), and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (or any Holdco Entity, as applicable) (in each case whether or not arising under or in connection with any employment agreement).

104.     "*Interim DIP Order*" means any order entered by the Bankruptcy Court on an interim basis approving the DIP Motion, which shall be in form and substance acceptable to the Required Consenting Creditors.

105.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time, and as applicable to the Prepackaged Cases.

106.     "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

107.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

108.     "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules for the Southern District of Texas.

109.     "*Management Incentive Plan*" has the meaning set forth in Article IV.P of this Plan.

110.     "*MIP Shares*" means shares of New LYCRA Holdco Common Stock, representing up to 10% of the aggregate number of shares of New LYCRA Holdco Common Stock issued on the Effective Date calculated on a fully diluted basis, after taking into account the issuance of all New Warrant Shares, which such shares shall be of a separate class of New LYCRA Holdco Common Stock reserved for issuance under the Management Incentive Plan, as determined by the New LYCRA Holdco Board.

111.     "*New Class A Warrant DPI Pool*" means the aggregate DPI up to the New Class A Warrant Equity Cap, to be distributed to holders of (a) New LYCRA Holdco Common Stock, excluding the MIP Shares, (b) New Class A Warrant Shares, and (c) after DPI representing the New Class B Warrant Participation Threshold is reached, New Class B Warrant Shares, as set forth in the New Warrants and New Warrants Agreements.

112.     "*New Class A Warrant Equity Cap*" means $480,000,000.

113.     "*New Class A Warrant Shares*" means the shares of a separate class of New LYCRA Holdco Common Stock issued upon exercise of the New Class A Warrants.

114.     "*New Class A Warrant Strike Price*" means $0.01.

115.     "*New Class A Warrants*" means the New Class A1 Warrants, New Class A2 Warrants and New Class A3 Warrants.

9

116.    "*New Class A Warrant DPI Pool Participating Shares*" means the following shares entitled to participate in the Class A Warrant DPI Pool, all of the then issued and outstanding shares of (a) New LYCRA Holdco Common Stock, excluding the MIP Shares, plus (b) New Class A Warrant Shares plus (c) after DPI representing the New Class B Warrant Participation Threshold is reached, the New Class B Warrant Shares.

117.    "*New Class A1 Warrants*" means warrants convertible into New Class A Warrant Shares (subject to dilution on account of the MIP Shares), at the New Class A Warrant Strike Price, and in the form attached to the applicable New Warrant Agreement, which shall be consistent with the RSA. The New Class A Warrant Shares issued upon exercise of the New Class A1 Warrants shall be treated as fully paid-up and ranking *pari passu* in all respects with the New LYCRA Holdco Common Stock, subject to the following: the New Class A Warrant Shares issued upon exercise of the New Class A1 Warrants shall: (a) not be entitled to voting rights, (b) only be entitled to participate in the Class A Warrant DPI Pool, (c) represent 9% of the total Class A Warrant DPI Pool Participating Shares at the time of issuance of the New Class A Warrants (subject to any antidilution adjustments set forth in the New Warrant Agreement, but subject to dilution by any issued and outstanding MIP Shares), and (d) following receipt of their distributions in full from the Class A Warrant DPI Pool, such New Class A Warrant shares shall have no further economic rights. For the avoidance of doubt, all Class A Warrants shall be structured to be fungible with each other.

118.    "*New Class A2 Warrants*" means warrants convertible into New Class A Warrant Shares (subject to dilution on account of the MIP Shares), at the New Class A Warrant Strike Price, and in the form attached to the applicable New Warrant Agreement, which shall be consistent with the RSA. The New Class A Warrant Shares issued upon exercise of the New Class A2 Warrants shall be treated as fully paid-up and ranking *pari passu* in all respects with the New LYCRA Holdco Common Stock, subject to the following: the New Class A Warrant Shares issued upon exercise of the New Class A2 Warrants shall: (a) not be entitled to voting rights, (b) only be entitled to participate in the Class A Warrant DPI Pool, (c) represent 20% of the total Class A Warrant DPI Pool Participating Shares at the time of issuance of the New Class A Warrants (subject to any antidilution adjustments set forth in the New Warrant Agreement, but subject to dilution by any issued and outstanding MIP Shares), and (d) following receipt of their distributions in full from the Class A Warrant DPI Pool, such New Class A Warrant shares shall have no further economic rights. For the avoidance of doubt, all Class A Warrants shall be structured to be fungible with each other.

119.    "*New Class A3 Warrants*" means warrants convertible into New Class A Warrant Shares (subject to dilution on account of the MIP Shares), at the New Class A Warrant Strike Price, and in the form attached to the applicable New Warrant Agreement, which shall be consistent with the RSA. The New Class A Warrant Shares issued upon exercise of the New Class A3 Warrants shall be treated as fully paid-up and ranking *pari passu* in all respects with the New LYCRA Holdco Common Stock, subject to the following: the New Class A Warrant Shares issued upon exercise of the New Class A3 Warrants shall: (a) not be entitled to voting rights, (b) only be entitled to participate in the Class A Warrant DPI Pool, (c) represent 1% of the total Class A Warrant DPI Pool Participating Shares at the time of issuance of the New Class A Warrants (subject to any antidilution adjustments set forth in the New Warrant Agreement, but subject to dilution by any issued and outstanding MIP Shares), and (d) following receipt of their distributions in full from the Class A Warrant DPI Pool, such New Class A Warrant shares shall have no further economic rights. For the avoidance of doubt, all Class A Warrants shall be structured to be fungible with each other.

120.    "*New Class B Warrant DPI Pool*" means the aggregate DPI exceeding the New Class A Warrant Equity Cap, to be distributed to holders of (a) New LYCRA Holdco Common Stock, excluding the MIP Shares and (b) New Class B Warrant Shares, as set forth in the New Class B Warrants and New Warrant Agreements applicable thereto.

121.    "*New Class B Warrant DPI Pool Participating Shares*" means the following shares entitled to participate in the Class B Warrant DPI Pool, all of the then issued and outstanding shares of (a) New LYCRA Holdco Common Stock, excluding the MIP Shares, plus (b) the New Class B Warrant Shares.

122.  "*New Class B Warrant Participation Threshold*" means $120,000,000.

123.  "*New Class B Warrant Shares*" means the shares of a separate class of New LYCRA Holdco Common Stock issued upon exercise of the New Class B Warrants.

124.  "*New Class B Warrant Strike Price*" means $0.01.

125.  "*New Class B Warrants*" means warrants convertible into New Class B Warrant Shares (subject to dilution on account of the MIP Shares), at the New Class B Warrant Strike Price, and in the form attached to the applicable New Warrant Agreement, which shall be consistent with the RSA. The New Class B Warrant Shares issued upon exercise of the New Class B Warrants shall be treated as fully paid-up and ranking *pari passu* in all respects with the New LYCRA Holdco Common Stock, subject to the following: the New Class B Warrant Shares issued upon exercise of the New Class B Warrants shall: (a) not be entitled to voting rights, (b) only be entitled to participate in the New Class A Warrant DPI Pool after DPI representing the New Class B Warrant Participation Threshold is reached, (c) entitled to participate in the New Class B Warrant DPI Pool, (d) represent 6% of the total Class A Warrant DPI Pool Participating Shares (once the New Class B Warrant Participation Threshold is reached) and 6% of the total Class B DPI Pool Participating Shares (in each case at the time of issuance of the New Class B Warrants and subject to any antidilution adjustments set forth in the New Warrant Agreement, but subject to dilution by any issued and outstanding MIP Shares), and (d) until the New Class B Warrant Participation Threshold is met, such New Class B Warrant shares shall have no economic rights. For the avoidance of doubt, all Class B Warrants shall be structured to be fungible with each other.

126.  "*New D&O Policies*" means (a) an extended reporting period policy or endorsement (or replacement "run-off" policy) to the Debtors' existing directors' and officers' liability insurance policies, providing coverage, on terms no less favorable in the aggregate than those in effect immediately prior to the Effective Date (including with respect to limits, scope, and priority of payments), for Claims made after the Effective Date that relate to any act, omission, event, or occurrence taking place on or prior to the Effective Date, with a reporting period of not less than six (6) years and (b) a new go-forward new director's and officer's liability insurance policy, providing for coverage substantially similar to the coverage under the policies in effect prior to the Petition Date.

127.  "*New Debt*" means, collectively, the Exit Notes Facility, the New LYCRA Holdco Notes, and the DIP Exit Note.

128.  "*New Debt Agents/Trustee*" means, collectively, any agent, collateral agent, trustee, or similar Entity under the New Debt, including any successors thereto.

129.  "*New Debt Documents*" means, collectively, the Exit Notes Facility Documents, the New LYCRA Holdco Notes Documents, and any documents relating to, evidencing, or governing the DIP Exit Note, which shall be in form and substance acceptable to the Debtors or Reorganized Debtors, as applicable, and the Required Consenting Creditors.

130.  "*New LYCRA Holdco*" means an Entity to incorporated in England & Wales, or such other jurisdiction as determined by the Debtors which shall be acceptable to the Required Consenting Creditors, that will be the recipient of the Share Transfer.

131.  "*New LYCRA Holdco Board*" means the new board of directors of New LYCRA Holdco, which shall be selected in accordance with the New LYCRA Holdco Organizational Documents. The members of the New LYCRA Holdco Board shall be filed as a Plan Supplement to the extent known.

132.  "*New LYCRA Holdco Common Stock*" means the common equity in New LYCRA Holdco, but excluding the New Warrant Shares.

133.     "*New LYCRA Holdco Investor Agreement*" means the investment agreement of New LYCRA Holdco containing the terms and conditions set forth in Schedule 4 to the RSA, in form and substance acceptable to the Debtors and the Required Consenting Creditors. A substantially final form of the New LYCRA Holdco Investor Agreement shall be filed as a Plan Supplement.

134.     "*New LYCRA Holdco Notes*" means the new secured notes in an amount equal to 95% of the Allowed amount of ssTL Claims (i.e., $214,051,828), to be issued by New LYCRA Holdco on the Effective Date pursuant to the New LYCRA Holdco Notes Purchase Agreement, which note shall contain the other terms and conditions set forth on Schedule 6 to the RSA and shall otherwise be in form and substance satisfactory to the Debtors and the Required Consenting Creditors. A substantially final form of the New LYCRA Holdco Notes shall be filed as a Plan Supplement.

135.     "*New LYCRA Holdco Notes Documents*" means collectively, the New LYCRA Holdco Notes Purchase Agreement and any other documents governing the New LYCRA Holdco Notes and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, consistent with the terms and conditions set forth in the RSA, which documents shall be in form and substance acceptable to the Required Consenting Creditors and contain the other terms and conditions set forth on Schedule 6 to the RSA.

136.     "*New LYCRA Holdco Notes Purchase Agreement*" means that certain note purchase agreement or indenture memorializing the New LYCRA Holdco Notes (including any amendments, restatements, supplements, or modifications thereof) to be entered into on the Effective Date, consistent with the terms and conditions set forth in the RSA, and otherwise in form and substance acceptable to the Debtors and the Required Consenting Creditors.

137.     "*New LYCRA Holdco Organizational Documents*" means the documents providing for corporate governance of New LYCRA Holdco, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements (including the New LYCRA Holdco Investor Agreement), as applicable, which shall be consistent with this Plan and section 1123(a)(6) of the Bankruptcy Code (as applicable), and shall be included in the Plan Supplement, which shall be in form and substance acceptable to the Debtors and the Required Consenting Creditors.

138.     "*New LYCRA Holdco ssTL Common Stock*" means that number of shares of New LYCRA Holdco Common Stock as determined by the Debtors and the Required Consenting Creditors prior to the Effective Date.

139.     "*New Warrants*" means the New Class A1 Warrants, the New Class A2 Warrants, the New Class A3 Warrants, and the New Class B Warrants.

140.     "*New Warrant Agreements*" means the warrant agreements for the issuance of the New Warrants, the form of which shall be included in the Plan Supplement and the terms of which shall be consistent with the RSA, and otherwise in form and substance acceptable to the Required Consenting Creditors.

141.     "*New Warrant Shares*" means those shares of specific class or series of New LYCRA Holdco Common Stock issued upon the exercise of the New Warrants, which have limitations on economic and voting rights as set forth in the applicable New Warrants and New Warrants Agreements.

142.     "*Non-Debtor*" means all direct and indirect subsidiaries of any Debtor that are not Debtors in these Prepackaged Cases.

143.     "*Non-Debtor Intercompany Claim*" means any Claim against a Debtor held by a Non-Debtor.

144.     "*Non-U.S. Facility*" means that certain short-term borrowing facility between Debtor The LYCRA Company Industria E Comercio Textil Ltda, as borrower, and Itaú Unibanco S.A. Nassau Branch (Bahamas), as lender.

145. "*Non-U.S. Facility Claims*" means any Claims on account of the Non-U.S. Facility.

146. "*Opt-Out Form*" means the notice of non-voting status and opt-out form included in the Solicitation Materials transmitted by the Claims and Noticing Agent to Holders of Claims or Interests that are not entitled to vote on the Plan, by which such Holders may elect to opt out of the Third-Party Release.

147. "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right to payment under section 507(a) of the Bankruptcy Code.

148. "*Other Secured Claim*" means any other secured Claim against the Debtors that is not a DIP Claim, an ssTL Claim, a Euro Notes Claim, or a Dollar Notes Claim.

149. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

150. "*Petition Date*" means the date on which each of the Debtors commence the Prepackaged Cases.

151. "*Plan*" means this joint chapter 11 plan, including all exhibits, supplements (including the Plan Supplement), appendices, annexes, schedules, and attachments hereto, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and the RSA, and otherwise in form and substance reasonably acceptable to the Required Consenting Creditors.

152. "*Plan Distribution*" means a payment or distribution to holders of Allowed Claims, Allowed Interests, or other eligible Entities under and in accordance with this Plan.

153. "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and the RSA) that will be filed by the Debtors with the Bankruptcy Court, which shall be in form and substance acceptable to the Required Consenting Creditors.

154. "*Prepackaged Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, any procedurally consolidated and jointly administered cases Filed for the Debtors under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

155. "*Priority Tax Claim*" means a Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

156. "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

157. "*Professional*" means an Entity (other than an ordinary course professional): (a) employed, or proposed to be employed prior to the Confirmation Date, in the Prepackaged Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

158. "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.D of this Plan.

159.    "*Professional Fee Claim*" means any Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred on or after the Petition Date by such Professional through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

160.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors on the Effective Date with the Professional Fee Amount.

161.    "*Promissory Note*" means that certain unsecured $19,446,000 promissory note entered into between, among others, Eagle Intermediate and Eagle Finance Co. B.V. and certain payees that are holders of the Dollar Notes.

162.    "*Promissory Note Claims*" means any Claim on account of indebtedness under the Promissory Note.

163.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Prepackaged Cases.

164.    "*Regulation S*" means Regulations S under the Securities Act.

165.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to a Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

166.    "*Rejected Executory Contracts and Unexpired Leases List*" means the schedule of Executory Contracts and Unexpired Leases, if any, to be rejected by the Debtors pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time; *provided*, however, the Rejected Helm Agreements shall be deemed rejected in accordance with and subject to the terms of the Helm Settlement Agreement.

167.    "*Rejected Helm Agreements*" means that (i) certain supply contract, dated July 10, 2023, by and between Debtor The LYCRA Company LLC and Helm US Corporation, as may have been amended, modified or restated from time to time  and (ii) that certain trademark license agreement, dated July 10, 2023, by and between Debtor The LYCRA Company LLC and Qore LLC, as may have been amended, modified or restated from time to time.

168.    "*Related Party*" means, each of, and in each case solely in its capacity as such, current and former directors, managers, officers, committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors.

169.    "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Noteholders; (d) the Agents/Trustees (including the DIP Agent); (e) each Consenting Creditor; (f) Holders of Claims or Interests who vote to accept this Plan and do not affirmatively opt out of the releases set forth herein; (g) Holders of Claims or Interests who are presumed to accept this Plan, have been served with an Opt-Out Form, and do not affirmatively opt out of the releases set forth herein; (h) Holders of Claims or Interests who are entitled to vote but abstain from voting on this Plan, and do not affirmatively opt out of the releases set forth herein; (i) Holders of Claims or Interests who vote to reject this Plan or are deemed to reject this Plan, and have been served with an Opt-Out Form or a Ballot, but do not affirmatively opt out of the releases set forth herein; (j) the Helm Entities; (k) Linx Capital Limited (*provided* that Linx Capital Limited shall not be a Released Party in its

14

capacity as SPV Notes Issuer with respect to the 1L SPV Note Documents and 2L SPV Note Documents (each as defined in the RSA)); (l) each current and former Affiliate of each Entity in clause (a) through the following clause (m); and (m) each Related Party of each Entity in clause (a) through clause (l); *provided* that, in each case, an Entity shall not be a Released Party if it: (i) affirmatively opts out of the releases in this Plan; or (ii) timely objects to the releases in this Plan, and such objection is not withdrawn before the Confirmation Hearing.

170.    "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Noteholders; (d) the Agents/Trustees (including the DIP Agent); (e) each Consenting Creditor; (f) Holders of Claims or Interests who vote to accept this Plan and do not affirmatively opt out of the releases set forth herein; (g) Holders of Claims or Interests who are presumed to accept this Plan, have been served with an Opt-Out Form, and do not affirmatively opt out of the releases set forth herein; (h) Holders of Claims or Interests who are entitled to vote but abstain from voting on this Plan, and do not affirmatively opt out of the releases set forth herein; (i) Holders of Claims or Interests who vote to reject this Plan or are deemed to reject this Plan, and have been served with an Opt-Out Form or a Ballot, but do not affirmatively opt out of the releases set forth herein; (j) the Helm Entities; (k) Linx Capital Limited (*provided* that Linx Capital Limited shall not be a Releasing Party in its capacity as SPV Notes Issuer with respect to the 1L SPV Note Documents and 2L SPV Note Documents (each as defined in the RSA)); (l) each current and former Affiliate of each Entity in clause (a) through the following clause (m); and (m) each Related Party of each Entity in clause (a) through clause (l); *provided* that, in each case, an Entity shall not be a Releasing Party if it: (i) affirmatively opts out of the releases in this Plan; or (ii) timely objects to the releases in this Plan, and such objection is not withdrawn before the Confirmation Hearing.

171.    "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under this Plan, on and after the Effective Date, or any successors or assigns thereto including by transfer, merger, consolidation, or otherwise, and including any new Entity established in connection with the implementation of the Restructuring Transactions.

172.    "*Required Consenting Creditors*" means the Majority Euro Consenting Creditors as defined in the RSA.

173.    "*Restructuring Expense Parties*" means, collectively: (a) the Ad Hoc Group Advisors, (b) the DIP Noteholders, (c) the DIP Agent, (d) the ssTL Agent, (e) the Euro Notes Trustee, (f) the Dollar Notes Trustee, (g) the Security Agent, (h) the advisors to each of the foregoing set forth in clauses (a) through (g), and (i) the Dollar Notes Advisors (subject to the Dollar Notes Advisor Cap).

174.    "*Restructuring Expenses*" means the reasonable, documented, and due and owing fees and out-of-pocket expenses of the Restructuring Expense Parties (subject to the Dollar Notes Advisor Cap with respect to the Dollar Notes Advisors), in each case incurred prior to the Effective Date in accordance with their respective engagement letters or fee letters with the Debtors, the RSA, and/or any applicable order of the Bankruptcy Court, including the DIP Orders. For the avoidance of doubt, any Restructuring Expenses incurred by the Restructuring Expense Parties after the Effective Date shall be paid by the Reorganized Debtors in the ordinary course of business (subject to the Dollar Notes Advisor Cap with respect to the Dollar Notes Advisors).

175.    "*Restructuring Transactions*" means the transactions described in Article IV.B of this Plan.

176.    "*RSA*" means that certain Short-Form Lock-Up Deed, dated as of March 13, 2026, by and among the Debtors and the Consenting Creditors, including all exhibits thereto, as may be amended, modified, or supplemented from time to time, in accordance with its terms.

177.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to this Plan and which shall be filed with the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

178.    "*Section 510(b) Claim*" means any Claim on account of, arising from or related to any Security issued by, or offered and/or sold by any Debtor, which Claim is subject to subordination under section 510(b) of the Bankruptcy Code.

179.    "*Secured Claim*" means a Claim: (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code to the extent of the amount subject to setoff.

180.    "*Securities Act*" means the Securities Act of 1933, as amended.

181.    "*Security*" or "*Securities*" has the meaning set forth in section 2(a)(1) of the Securities Act.

182.    "*Security Agent*" means Wilmington Trust (London) Limited, as security agent under the Intercreditor Agreement, the ssTL Facilities Agreement, the Euro Notes Indenture, and the Dollar Notes Indenture.

183.    "*Share Transfer*" means the Transfer or issuance of 100% of the outstanding capital stock of one of the Eagle Holding Companies to New LYCRA Holdco, free and clear of all Liens, Claims and other encumbrances, other than Liens, Claims and other encumbrances created under the terms of this Plan or the Exit Notes Facility.

184.    "*Solicitation Materials*" means, as applicable, any documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on this Plan.

185.    "*ssTL*" means the loans issued under the ssTL Facilities Agreement.

186.    "*ssTL Agent*" means Kroll Agency Services Limited, in its capacity as agent under the ssTL Facilities Agreement.

187.    "*ssTL Claims*" means any Claim against any Debtor derived from, based upon, or arising under the ssTL Facilities Agreement and the other Finance Documents (as defined therein).

188.    "*ssTL Facilities Agreement*" means that certain super senior term loan facility between Eagle Intermediate, as borrower, certain of the other Debtors as guarantors, Kroll Agency Services Limited as agent, and Wilmington Truste (London) Limited, as security agent under the Intercreditor Agreement.

189.    "*Third-Party Release*" means the release set forth in Article VIII.D of this Plan.

190.    "*Transfer*" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions); *provided* that any pledge in favor of a bank or broker dealer at which a Consenting Creditor maintains an account, where such bank or broker dealer holds a security interest or other encumbrance over property in the account generally shall not be deemed a "Transfer" for any purposes hereunder. When used as a noun, "Transfer" shall have a correlative meaning.

191.    "*Unexpired Lease*" means a lease of non-residential, real property to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

192.    "*Unimpaired*" means, with respect to a Claim against or an Interest in a Debtor, not impaired within the meaning of section 1124 of the Bankruptcy Code.

B.    *Rules of Interpretation.*

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall

include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan or the Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan (including the exhibits and Plan Supplement) in its entirety rather than to a particular portion of this Plan; (8) subject to the provisions of any contract, charter, bylaws, limited liability company agreements, operating agreements, certificates of incorporation, or other organizational documents or shareholders' agreements, as applicable, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable Law, including the Bankruptcy Code and the Bankruptcy Rules; (9) any immaterial effectuating provisions may be interpreted by the Debtors or Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval, of the Bankruptcy Court or any other Entity; (10) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (11) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (12) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (13) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (14) all references to docket numbers of documents Filed in the Prepackaged Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (15) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Prepackaged Cases, unless otherwise stated; (16) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; (18) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective Person or Entity that have such consent, acceptance, or approval rights, including by electronic mail; and (19) except as otherwise provided in this Plan, any reference to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Except as set forth herein or in any DIP Order, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Except to the extent a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code or the Bankruptcy Rules) and subject to the provisions of any contract, lease, instrument, release, indenture, or other

agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed, implemented, and enforced in accordance with, the Laws of the State of New York, without giving effect to the principles of conflict of Laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law); *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the Laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

F.      *Nonconsolidated Plan.*

Although for purposes of administrative convenience and efficiency, this Plan has been proposed as a joint plan for each of the Debtors and presents Classes of Claims against and Interests in the Debtors, this Plan does not provide for the substantive consolidation of any of the Debtors. The classification of Claims against and Interest in any Debtor shall not affect such Debtor's status as a separate legal Entity, change the organizational structure of such Debtors' business enterprise, constitute a change of control of such Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under this Plan, each Reorganized Debtor shall continue to exist as separate legal Entity from and after the Effective Date.

G.      *Controlling Document.*

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects. In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and this Plan or the Disclosure Statement, the Confirmation Order shall control.

H.      *Consultation, Notice, Information, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all respective consultation, information, notice, and consent rights set forth in the RSA (including the exhibits thereto), including with respect to the form and substance of this Plan, all exhibits to this Plan, the Plan Supplement, and all other applicable Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I hereof) and fully enforceable as if stated in full herein until such time as the RSA is terminated in accordance with its terms.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, DIP CLAIMS, PROFESSIONAL FEE CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, DIP Claims (and the DIP Commitment Premium and DIP Exit Premium) and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Except with respect to the Professional Fee Claims, Restructuring Expenses, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtors against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtors on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

C.      *DIP Claims, DIP Commitment Premium, and DIP Exit Premium.*

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP Notes Facility on such date, (b) all interest accrued and unpaid thereon to the date of payment, and (c) all accrued and unpaid fees, premiums, expenses, and non-contingent indemnification obligations payable under the DIP Documents and the DIP Orders. On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, each Allowed DIP Claim shall be, in full and final satisfaction of such Allowed DIP Claim, paid in full in Cash from proceeds in connection with the Exit Notes Facility, *provided* that, if a Holder of an Allowed DIP Claim is also a lender under the Exit Notes Facility, such Holder may elect to exchange its Allowed DIP Claim into the Exit Notes Facility on a dollar-for-dollar basis.

The Reorganized Debtors are authorized and directed, upon the Effective Date, to (x) issue the New Class A1 Warrants in full and final satisfaction of the DIP Commitment Premium and (y) issue the DIP Exit Note in full and final satisfaction of the DIP Exit Premium, in each case, with allocation to be determined and agreed as among the DIP Noteholders.

Upon the satisfaction of the Allowed DIP Claims in accordance with the terms of this Plan, or other such treatment as contemplated by this Article II.C of this Plan, all guarantees provided and all Liens and security interests granted, in each case, to secure such obligations shall be automatically released, terminated, and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. The DIP Agent and the DIP Noteholders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

19

D.     *Professional Fee Claims.*

      1.     <u>Final Fee Applications and Payment of Professional Fee Claims</u>.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with <u>Article II.A</u> of this Plan.

      2.     <u>Professional Fee Escrow Account</u>.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

      3.     <u>Professional Fee Amount</u>.

Professionals shall reasonably estimate in good faith their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than three (3) Business Days before the Effective Date; *provided* that such estimates shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or the Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

      4.     <u>Post-Confirmation Fees and Expenses</u>.

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors or the Reorganized Debtors as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of this Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ and pay any Professional without any further notice to or action, order, or approval of the Bankruptcy Court.

*E.      Payment of Restructuring Expenses.*

Any time that a Restructuring Expense Party seeks payment of Restructuring Expenses from the Debtors or the Reorganized Debtors, such Restructuring Expense Party shall deliver to the Debtors or the Reorganized Debtors (as applicable) and their counsel an invoice for such Restructuring Expenses in summary form, which shall be reasonably acceptable to the Debtors or Reorganized Debtors, as applicable. The Debtors reserve the right to request additional detail regarding the services rendered and expenses incurred by such Restructuring Expense Party.

To the extent not otherwise paid, and subject to the preceding paragraph, the Debtors or the Reorganized Debtors, as applicable, shall promptly pay in Cash in full outstanding and invoiced Restructuring Expenses as follows: (i) on the Effective Date, Restructuring Expenses incurred, or estimated to be incurred, during the period prior to the Effective Date to the extent invoiced to the Debtors at least three (3) Business Days in advance of the Effective Date following the Debtors' delivery of prior written notice of the date on which they anticipate the Effective Date will occur, and (ii) after the Effective Date, any unpaid Restructuring Expenses within ten (10) Business Days of receiving an invoice; *provided* that, such Restructuring Expenses shall be paid in accordance with the terms of any applicable engagement letters or other contractual arrangements without the requirement for the filing of retention applications, fee applications, or any other applications in the Prepackaged Cases, and without any requirement for further notice or Bankruptcy Court review or approval; *provided further* that, to the extent timely invoiced, Restructuring Expenses that are not paid by the Debtors or the Reorganized Debtors, as applicable, within the timeframes set forth in this Article II.D of this Plan, such Restructuring Expenses shall not be deemed waived and shall be included in a subsequent invoice. After the Effective Date, the Debtors and Reorganized Debtors (as applicable) shall continue to pay when due and payable in the ordinary course of their business any unpaid Restructuring Expenses that were incurred on, before or after the Effective Date.

*F.      Non-U.S. Facility.*

All Non-U.S. Facility Claims shall be Allowed Claims. On the Effective Date, the Allowed Non-U.S. Facility Claims shall be Reinstated and the New Debt Documents shall provide for and allow the continuation of the Non-U.S. Facility.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*A.      Classification of Claims and Interests.*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to this Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | ssTL Claims | Impaired | Entitled to Vote |
| Class 4 | Euro Notes Claims | Impaired | Entitled to Vote |
| Class 5 | Dollar Notes Claims | Impaired | Entitled to Vote |
| Class 6 | Promissory Note Claims | Impaired | Entitled to Vote |
| Class 7 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Debtor Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| Class 10 | Non-Debtor Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| Class 11 | Intercompany Interests | Unimpaired/ Impaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| Class 12 | Holdco Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with such Claim's terms in the ordinary course of business) or as soon as reasonably practicable thereafter.

1.      Class 1 – Other Secured Claims.

(a)     *Classification*: Class 1 consists of all Allowed Other Secured Claims against any Debtor.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Other Secured Claim, at the option of the applicable Debtor or the Reorganized Debtor with the reasonable consent of the Required Consenting Creditors, either:

(i)      payment in full in Cash of its Allowed Other Secured Claim;

(ii)     the collateral securing its Allowed Other Secured Claim;

(iii)    Reinstatement of its Allowed Other Secured Claim; or

(iv)     such other treatment rendering its Allowed Other Secured Claim Unimpaired.

22

(c) *Voting*: Class 1 is Unimpaired under this Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

2.   <u>Class 2 – Other Priority Claims</u>.

(a) *Classification*: Class 2 consists of all Allowed Other Priority Claims against any Debtor.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c) *Voting*: Class 2 is Unimpaired under this Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

3.   <u>Class 3 – ssTL Claims</u>.

(a) *Classification*: Class 3 consists of all Allowed ssTL Claims against any Debtor.

(b) *Allowance*: On the Effective Date, all ssTL Claims shall be deemed Allowed and not subject to any counterclaim, defense, offset, or reduction of any kind, in the aggregate amount of $214,051,828.

(c) *Treatment*: Except to the extent that a Holder of an Allowed ssTL Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed ssTL Claim shall receive, in full and final satisfaction of such ssTL Claim, its Pro Rata share of (x) the New LYCRA Holdco Notes and (y) the New LYCRA Holdco ssTL Common Stock; *provided* that, distribution of any New LYCRA Holdco ssTL Common Stock to the Holders of the ssTL Claims shall be conditioned upon execution of the New LYCRA Holdco Investor Agreement by such Holders of ssTL Claims.

(d) *Voting*: Class 3 is Impaired under this Plan. Holders of Allowed ssTL Claims are entitled to vote to accept or reject this Plan.

4.   <u>Class 4 – Euro Notes Claims</u>.

(a) *Classification*: Class 4 consists of all Allowed Euro Notes Claims against any Debtor.

(b) *Allowance*: On the Effective Date, all Euro Notes Claims shall be deemed Allowed and not subject to any counterclaim, defense, offset, or reduction of any kind, in the aggregate amount of €448,615,157.

(c) *Treatment*: Except to the extent that Linx Capital Limited, as the Holder of the Allowed Euro Notes Claims, agrees to less favorable treatment, on the Effective Date Linx Capital Limited shall receive (i) 95% of the New Class A2 Warrants in respect of the Allowed Euro Notes Priority Tranche Claims and (ii)(a) 5% of the New Class A2 Warrants and (b) 100% of the New Class A3 Warrants in respect of the Allowed Euro Non-Priority Tranche Claims.

(d)     *Voting*: Class 4 is Impaired under this Plan. Holders of Allowed Euro Notes Claims are entitled to vote to accept or reject this Plan.

5.      Class 5 – Dollar Notes Claims.

(a)     *Classification*: Class 5 consists of all Allowed Dollar Notes Claims against any Debtor.

(b)     *Allowance*: On the Effective Date, all Dollar Notes Claims shall be deemed Allowed and not subject to any counterclaim, defense, offset, or reduction of any kind, in the aggregate amount of $779,907,149.

(c)     *Treatment*: Except to the extent that a Holder of an Allowed Dollar Notes Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed Dollar Notes Claim shall receive its Pro Rata share of the New Class B Warrants.

(d)     *Voting*: Class 5 is Impaired under this Plan. Holders of Allowed Dollar Notes Claims are entitled to vote to accept or reject this Plan.

6.      Class 6 – Promissory Note Claims.

(a)     *Classification*: Class 6 consists of all Allowed Promissory Note Claims against any Debtor.

(b)     *Allowance*: On the Effective Date, all Promissory Note Claims shall be deemed Allowed and not subject to any counterclaim, defense, offset, or reduction of any kind, in the aggregate amount of $19,446,000.

(c)     *Treatment*: Except to the extent that a Holder of an Allowed Promissory Note Claim agrees to less favorable treatment, each Holder of an Allowed Promissory Note Claim shall receive, in full and final satisfaction of such Promissory Note Claim, its Pro Rata share of $1,000.

(d)     *Voting* Class 6 is Impaired under this Plan. Holders of Allowed Promissory Note Claims are entitled to vote to accept or reject this Plan.

7.      Class 7 – General Unsecured Claims.

(a)     *Classification*: Class 7 consists of all Allowed General Unsecured Claims against any Debtor.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such General Unsecured Claim, Reinstatement of its Allowed General Unsecured Claim or such other treatment rendering such Allowed General Unsecured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting*: Class 7 is Unimpaired under this Plan. Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

8.      Class 8 – Section 510(b) Claims.

(a)     *Classification*: Class 8 consists of all Section 510(b) Claims.

24

(b)    *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

(c)    *Treatment*: On the Effective Date, all Section 510(b) Claims will be cancelled, released, discharged, extinguished, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims.

(d)    *Voting*: Class 8 is Impaired under this Plan. Holders of Allowed Section 510(b) Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

9.    <u>Class 9 – Debtor Intercompany Claims</u>.

(a)    *Classification*: Class 9 consists of all Debtor Intercompany Claims.

(b)    *Treatment*: Each Allowed Debtor Intercompany Claim shall be, at the option of the applicable Debtor or the Reorganized Debtor with the reasonable consent of the Required Consenting Creditors, either:

    (i)    Reinstated;

    (ii)    adjusted, converted to equity, set off, settled, distributed, or contributed;

    (iii)    discharged, cancelled, and released without any distribution on account of such Allowed Debtor Intercompany Claims; or

    (iv)    otherwise addressed at the Debtors' election.

(c)    *Voting*: Class 9 is Unimpaired if the Allowed Debtor Intercompany Claims are Reinstated or Impaired if the Allowed Debtor Intercompany Claims in Class 9 are cancelled. Holders of Allowed Debtor Intercompany Claims in Class 9 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

10.    <u>Class 10 – Non-Debtor Intercompany Claims</u>.

(a)    *Classification*: Class 10 consists of all Non-Debtor Intercompany Claims.

(b)    *Treatment*: Each Allowed Non-Debtor Intercompany Claim shall be, at the option of the applicable Debtor or the Reorganized Debtor, with the reasonable consent of the Required Consenting Creditors, either:

    (i)    Reinstated;

    (ii)    adjusted, converted to equity, set off, settled, distributed, or contributed;

    (iii)    discharged, cancelled, and released without any distribution on account of such Allowed Non-Debtor Intercompany Claims; or

    (iv)    otherwise addressed at the Debtors' election.

(c)    *Voting*: Class 10 is Unimpaired if the Allowed Non-Debtor Intercompany Claims are Reinstated or Impaired if the Allowed Non-Debtor Intercompany Claims are cancelled. Holders of Allowed Non-Debtor Intercompany Claims are conclusively presumed to have

25

accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

11.    <u>Class 11 – Intercompany Interests</u>.

 (a) *Classification*: Class 11 consists of all Intercompany Interests.

 (b) *Treatment*: Each Allowed Intercompany Interest shall be, at the option of the applicable Debtor or the Reorganized Debtor, with the reasonable consent of the Required Consenting Creditors, either:

  (i) Reinstated;

  (ii) adjusted, converted to equity, set off, settled, distributed, or contributed;

  (iii) discharged, cancelled, and released without any distribution on account of such Intercompany Interests; or

  (iv) otherwise addressed at the Debtors' election.

 (c) *Voting*: Class 11 is Unimpaired if the Allowed Intercompany Interests are Reinstated or Impaired if the Allowed Intercompany Interests are cancelled. Holders of Allowed Intercompany Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

12.    <u>Class 12 – Holdco Interests</u>.

 (a) *Classification*: Class 12 consists of all Holdco Interests.

 (b) *Treatment*: Each Allowed Holdco Interest shall be discharged, cancelled, and released without any distribution on account of such Holdco Interests.

 (c) *Voting*: Class 12 is Impaired under this Plan. Holders of Allowed Holdco Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

C. *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan or the Plan Supplement shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D. *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

26

E.      *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class votes to accept or reject this Plan, the Holders of such Claims or Interests in such Class shall be presumed to have accepted this Plan.

F.      *Intercompany Interests.*

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure, for the ultimate benefit of the Holders of shares of New LYCRA Holdco Common Stock and the New Warrant Shares in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims. For the avoidance of doubt, to the extent Reinstated pursuant to this Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

G.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to Article III.B of this Plan. The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify this Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date or such other date as fixed by the Bankruptcy Court.

I.      *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to this Plan.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION

A.      *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to this Plan, including any challenge to the amount, validity, perfection,

enforceability, priority, or extent of the ssTL Claims, the Euro Notes Claims, and the Dollar Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, based on any equitable theory, or otherwise. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be, and shall be, final.

B.      *Restructuring Transactions.*

On or before the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, are authorized (subject to the consent of the Required Consenting Creditors and consistent with the RSA) to: (a) execute and deliver any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, formation, organization, dissolution, sale, purchase, transfers of shares of any direct or indirect wholly-owned subsidiaries of the Debtors' among such subsidiaries, or liquidation containing terms that are consistent with the terms of this Plan, the Plan Supplement, and the RSA; and (b) consummate the Restructuring Transactions and to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan that are consistent with and pursuant to the terms and conditions of this Plan, including: (1) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan, the Plan Supplement, and the RSA and having other terms to which the applicable Entities may agree; (2) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state Law, including any applicable New LYCRA Holdco Organizational Documents; (3) the issuance, allotment, and distribution of the New LYCRA Holdco Common Stock, excluding the MIP Shares; (4) the consummation of the New Debt, including the execution, delivery, and filing of all New Debt Documents; (5) the reservation of the MIP Shares and New Warrant Shares; (6) such other transactions that are required to effectuate the Restructuring Transactions; and (7) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with this Plan.

On or before the Effective Date, the Debtors and Reorganized Debtors (with the consent of the Required Consenting Creditors, acting reasonably) may implement this Plan, including effectuating the Share Transfer, through any one or more restructuring steps (including in accordance with any Agreed Transfer Process), in any order and at any time, to achieve tax and corporate efficiency, including mergers/conversions, asset and equity transfers, intercompany debt arrangements, dissolutions/formations, entity classification elections, and other step transactions. No further Court order or re-solicitation is required; *provided*, that such steps shall not (a) materially and adversely affect the recoveries, distributions, or treatment of any Holder of an Allowed Claim or Interest, (b) increase the aggregate consideration required under this Plan, or (c) alter the relative priorities of Allowed Claims or Interests. The Debtors and Reorganized Debtors (with the consent of the Required Consenting Creditors, acting reasonably) are authorized to make or revoke any tax elections and implement transactions intended to preserve or optimize tax attributes and minimize limitations or disallowance.

The Consenting Creditors shall take commercially reasonable steps necessary and reasonably requested by the Debtors or Reorganized Debtors to consummate the Share Transfer, consistent with the terms hereof and the RSA.

The Reorganized Debtors shall have the authority to effectuate the FinanceCo Dissolution from and after the Effective Date subject to local Law requirements. If a Share Transfer of Eagle Global or Eagle Intermediate is effectuated, then, following the Effective Date, each Person or Entity with requisite authority shall take all actions reasonably requested by the Reorganized Debtors to effectuate the Holdco Dissolution as soon as reasonably practicable following the Effective Date, but in no event later than 60 days thereafter. For the avoidance of doubt, the Reorganized Debtors shall have the authority to take any actions to cause the Holdco Dissolution. The Consenting

Creditors shall take all actions reasonably necessary and requested by the Reorganized Debtors to effectuate the Holdco Dissolution and the FinanceCo Dissolution, as applicable; *provided, that* such actions are not inconsistent with the terms of this Plan or the RSA.

The Confirmation Order shall, and shall be deemed to, pursuant to both sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan. The Confirmation Order shall authorize the Debtors, the Reorganized Debtors, and the Consenting Creditors, as applicable, to undertake the Restructuring Transactions contemplated by this Plan, the RSA and the other applicable Definitive Documents.

C.      *The Reorganized Debtors.*

On the Effective Date, the New LYCRA Holdco Board shall be appointed and, subject to local Law requirements, each Reorganized Debtor shall adopt its New LYCRA Holdco Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under this Plan as necessary to consummate this Plan. Cash payments to be made pursuant to this Plan will be made by the Debtors or the Reorganized Debtors, as applicable. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or the Reorganized Debtors, as applicable, to satisfy their obligations under this Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of this Plan.

D.      *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under this Plan and the Restructuring Transactions contemplated thereby with: (1) the Debtors' Cash on hand as of the Effective Date; (2) the New LYCRA Holdco Common Stock (excluding the MIP Shares) and the New Warrant Shares; and (3) the New Debt. Each distribution and issuance referred to in Article VI shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with this Plan, including the shares of New LYCRA Holdco Common Stock, the New Warrants, and the New Warrant Shares will be exempt from registration under the Securities Act, as described more fully in Article IV.M hereof.

1.      Use of Cash.

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand to fund distributions to Holders of Allowed Claims, consistent with the terms of this Plan.

2.      New LYCRA Holdco Common Stock and New Warrants.

(a)      *Issuance of the New LYCRA Holdco Common Stock*

New LYCRA Holdco shall be authorized to issue the New LYCRA Holdco Common Stock and the New Warrant Shares pursuant to the New LYCRA Holdco Organizational Documents and (in relation to the New Warrant Shares) the New Warrant Agreements. Pursuant to New LYCRA Topco corporate authorizations adopted prior to the Effective Date, the issuance of the New LYCRA Holdco Common Stock, including the MIP Shares, and the New Warrant Shares, shall be authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors. On the Effective Date, the New LYCRA Holdco Common Stock (excluding the

29

MIP Shares) shall be issued, allotted, and distributed as provided for, and in accordance with, this Plan and the New LYCRA Holdco Organizational Documents.

The MIP Shares and New Warrant Shares (which are authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors) will be reserved on the Effective Date and shall be issued, allotted, and distributed pursuant to the terms of the New LYCRA Holdco Organizational Documents and (in relation to the New Warrant Shares) the New Warrant Agreements.

All of the shares (or comparable units) of New LYCRA Holdco Common Stock and New Warrant Shares issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution, issuance, and allotment of New LYCRA Holdco Common Stock or New Warrant Shares shall be governed by the terms and conditions set forth in this Plan applicable to such distribution, issuance, or allotment and by the terms and conditions of the instruments evidencing or relating to such distribution, issuance, or allotment, including the New LYCRA Holdco Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution, issuance, or allotment. Any Entity's acceptance of New LYCRA Holdco Common Stock or New Warrants or New Warrant Shares shall be deemed as its agreement to the New LYCRA Holdco Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. The New LYCRA Holdco Common Stock and New Warrant Shares will not be registered under the Securities Act or listed on any exchange as of the Effective Date and will not meet the eligibility requirements of DTC, Euroclear Bank SA/NV, and/or Clearstream Banking S.A. Additional information relating to the applicability of the securities law is available in Article IV.M.

(b)     *Issuance of the New Warrants*

The issuance of the New Warrants shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims other than as set forth herein. Each distribution and issuance of the New Warrants under this Plan shall be governed by the New Warrant Agreements. Any claimant's acceptance of the New Warrants (including any New Warrant Shares) shall be deemed as its agreement to the applicable New Warrant Agreement and the New LYCRA Holdco Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

3.     New Debt.

On the Effective Date, the relevant Reorganized Debtors shall (a) enter into the Exit Notes Facility, pursuant to the Exit Notes Facility Documents, (b) issue the New LYCRA Holdco Notes pursuant to the New LYCRA Holdco Notes Documents, and (c) issue the DIP Exit Note pursuant to the DIP Note Purchase Agreement and any documents relating to, evidencing, or governing the DIP Exit Note. Confirmation of this Plan shall constitute (x) final approval of the New Debt and the New Debt Documents; and (y) authorization for the Debtors and the Reorganized Debtors, as applicable, to take any and all actions necessary or appropriate to consummate the New Debt, including executing and delivering the New Debt Documents, in each case, without any further notice to or order of the Bankruptcy Court. On the Effective Date, the New Debt shall be issued and distributed as provided for, and in accordance with, this Plan.

As of the Effective Date, subject to local Law requirements, all of the Liens and security interests to be granted by the Debtors or Reorganized Debtors, as applicable in accordance with the New LYCRA Holdco Notes Documents and the Exit Notes Facility Documents: (a) shall be deemed to be granted; (b) shall be legal, valid, binding, automatically perfected, non-avoidable, first-priority and enforceable Liens on, and security interests in, the applicable collateral specified in the New LYCRA Holdco Notes Documents and the Exit Notes Facility Documents; and (c) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law. To the extent provided in the New LYCRA Holdco Notes Documents and the Exit

Notes Facility Documents, the New Debt Agents/Trustee are authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The priorities of such Liens and security interests shall be as set forth in the New LYCRA Holdco Notes Documents and the Exit Notes Facility Documents. The applicable New Debt Agents/Trustee shall be authorized to make all filings and recordings necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties. The guarantees granted under the New Debt Documents, as applicable, have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed to not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy Law.

E.      *Corporate Existence.*

Except as otherwise provided in this Plan, the Confirmation Order, the New LYCRA Holdco Organizational Documents, or any agreement, instrument, or other document incorporated therein, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, company with limited liability, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, company with limited liability, or other form, as the case may be, pursuant to the applicable Law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under this Plan or otherwise, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings, approvals, or consents required under applicable state, provincial, federal, or local Law). After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. For the avoidance of doubt, no Reorganized Debtor shall be treated as being liable on any Claim that is discharged pursuant to this Plan.

G.      *Cancellation of Existing Securities, Agreements, and Interests.*

On the Effective Date and subject to local Law requirements, other than the New Debt, or to the extent otherwise provided in this Plan or the Confirmation Order (including to the extent any DIP Claim is refinanced and/or converted into the Exit Notes Facility), as applicable, all notes, instruments, certificates, credit agreements, note purchase agreements, indentures, and other documents evidencing Claims (including, for the avoidance of doubt, the ssTL Facility Agreement, the Euro Notes Indenture, the Dollar Notes Indenture, and the Promissory Note, and all related collateral and credit documentation) shall hereby be cancelled/waived, and any rights of any Holder in respect thereof shall be deemed cancelled and of no force or effect, and all prior, present and future obligations and liabilities, actions, suits, accounts or demands, covenants, and indemnities (both actual and contingent), of the Debtors and any non-Debtor Affiliates, or any other parties thereunder, or in any way related thereto, shall be deemed satisfied in full, released, cancelled, discharged, and of no force or effect, as the amounts thereunder are considered uncollectable (*niet voor verwezenlijking vatbaar*), and the Agents/Trustees and each of the lenders and holders and their respective agents, successors and assigns, shall each be automatically and fully released and discharged of and from all duties and obligations thereunder without any need for further action or approval by the Bankruptcy Court or for a Holder to take further action.

H.      *Corporate Action.*

Upon the Confirmation Date, all actions contemplated under this Plan (including the other documents contained in the Plan Supplement) shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action, including, as applicable: (1) adoption or assumption, as applicable, of the employment agreements; (2) selection of the directors, officers, or managers for the Reorganized Debtors in accordance with the New LYCRA Holdco Organizational Documents; (3) the issuance and distribution of the New LYCRA Holdco Common Stock (excluding the MIP Shares); (4) implementation of the Restructuring Transactions; (5) the entry into the New Debt Documents, as applicable, and the execution, delivery, and filing of any documents pertaining thereto; (6) all other actions contemplated under this Plan (whether to occur before, on, or after the Effective Date); (7) adoption of the New LYCRA Holdco Organizational Documents; (8) the entry into the New Warrant Agreements, (9) the assumption or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases that have not been rejected or subject to a motion to reject as of the Confirmation Hearing; and (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by this Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors, as applicable, in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security Holders, members, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable. On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors and the Reorganized Debtors shall be authorized and directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Reorganized Debtors, including the New LYCRA Holdco Common Stock, the New Debt Documents, the New LYCRA Holdco Organizational Documents, any other applicable Definitive Document, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy Law.

I.      *New LYCRA Holdco Organizational Documents.*

On or immediately prior to the Effective Date, except as otherwise provided in this Plan and subject to local Law requirements, the New LYCRA Holdco Organizational Documents shall be automatically adopted or amended

by the Reorganized Debtors as may be necessary to effectuate the transactions contemplated by this Plan. To the extent required under this Plan or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New LYCRA Holdco Organizational Documents with the Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate Laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document. The New LYCRA Holdco Organizational Documents and New LYCRA Topco corporate authorizations adopted prior to the Effective Date will, among other things (a) authorize the issuance of the New LYCRA Holdco Common Stock and (b) prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their respective New LYCRA Holdco Organizational Documents as permitted by the Laws of its jurisdiction of incorporation or formation and in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the Laws of the respective states, provinces, or countries of incorporation or formation and the New LYCRA Holdco Organizational Documents.

*J.*     *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, subject to local Law requirements, the term of the current members of the board of directors or other Governing Body of each of the Debtors shall expire, such current directors shall be deemed to have resigned, and all of the directors for the initial term of the New LYCRA Holdco Board and the other Governing Bodies shall be appointed in accordance with the New LYCRA Holdco Organizational Documents. The initial members of the New LYCRA Holdco Board will be identified in the Plan Supplement, to the extent known and determined at the time of filing and shall be consistent with the New LYCRA Holdco Organizational Documents. Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New LYCRA Holdco Organizational Documents and other constituent documents of the Reorganized Debtors.

*K.*     *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers, as applicable, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan and the Securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

*L.*     *Certain Securities Law Matters.*

Before the Petition Date, the offering, issuance, allotment, and distribution of any shares of New LYCRA Holdco Common Stock and/or the offering, issuance, and distribution of any other debt or equity securities as contemplated herein and/or pursuant to this Plan (including, for the avoidance of doubt, the New Warrants (including the New Warrant Shares received with respect thereto) and the New Debt) (any such debt or equity securities, the "Other Securities") shall only be made to Holders of Claims that can certify that they are (i) located inside of the United States and are (a) "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) or (b) "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act), or (ii) located outside the United States and are not "U.S. persons" (as defined in Rule 902 under the Securities Act) and shall be exempt from, or not subject to, the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or in reliance on Regulation S under the Securities Act.

On and after the Petition Date, pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration,

the offering, issuance, allotment, and distribution of the New LYCRA Holdco Common Stock as contemplated herein and/or the offering, issuance, allotment, and distribution of the New Warrants and the New Warrant Shares, if any, shall be exempt from, or not subject to, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. federal, state, or local Laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.

The New LYCRA Holdco Common Stock, the New Warrants (other than the New Class A1 Warrants), and the New Warrant Shares received with respect thereto, if any, to be issued under this Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof, subject to: (a) such recipients not being, and have not been within ninety (90) days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (b) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, (c) compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission or state or local securities laws, if any, applicable at the time of any future transfer of such Securities or instruments; and (d) any restrictions on the transferability of such New LYCRA Holdco Common Stock, New Warrants, and New Warrant Shares in the New LYCRA Holdco Organizational Documents or New Warrant Agreements, as applicable.

To the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, the New LYCRA Holdco Common Stock, New Warrants, and New Warrant Shares, if any, will be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from or in a transaction not subject to the registration requirements of the Securities Act and subject to any restrictions on the transferability of such New LYCRA Holdco Common Stock, New Warrants, and New Warrant Shares in the New LYCRA Holdco Organizational Documents or New Warrant Agreements, as applicable.

On and after the Petition Date, pursuant to section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, the offering, issuance, allotment and distribution of the New Debt, the New Class A1 Warrants (issued in satisfaction of the DIP Commitment Premium), and the MIP Shares (issued pursuant to the Management Incentive Plan), if any, shall only be made to Holders that can certify that they are (i) located inside of the United States and are (a) "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) or (b) "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act), or (ii) located outside the United States and are not "U.S. persons" (as defined in Rule 902 under the Securities Act) and will be exempt from, or not subject to, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. federal, state, or local Laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.

The New Debt, the New Class A1 Warrants (issued in satisfaction of the DIP Commitment Premium), and the MIP Shares to be issued under this Plan on account of Allowed Claims in accordance with, and pursuant to, the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act, will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from or in a transaction not subject to the registration requirements of the Securities Act and subject to any restrictions on the transferability of such New LYCRA Holdco Organizational Documents, New Warrant Agreements, New LYCRA Holdco Notes Documents or Exit Notes Facility Documents, as applicable.

Recipients of the New LYCRA Holdco Common Stock, New Warrants and New Warrant Shares, if any, are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws for resales of New LYCRA Holdco Common Stock, New Warrants and New Warrant Shares.

On and after the Effective Date, a recipient who is eligible to receive the Other Securities:

i.      if resident in, located in, or has a registered office in a Member State of the EEA, is not a retail investor (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU (as amended, "MiFID II"); (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a qualified investor as defined in Article 2 of the Prospectus Regulation (each, an "**EEA Retail Investor**")); and

ii.     if resident in, located in, or has a registered office in the United Kingdom, not a retail investor (defined as a person who is neither (x) a professional client, as defined in point (8) of Article 2(1) of regulation (EU) no 600/2014 as it forms part of domestic law by virtue of the European Union Withdrawal Act (the "EUWA"); nor (y) a qualified investor as defined in paragraph 15 of schedule 1 to The Public Offers and Admissions to Trading Regulations 2024 (the "UK POATRs") (each, a "**UK Retail Investor**" and, together with an EEA Retail Investor, a "**Retail Investor**").

The Reorganized Debtors need not provide any further evidence other than this Plan or the Confirmation Order to any Entity (including DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., any nominee thereof or any transfer agent for the New LYCRA Holdco Common Stock or the New Warrant Shares) with respect to the treatment of the New LYCRA Holdco Common Stock and any New Warrant Shares to be issued under this Plan under applicable securities laws. DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., any nominee thereof and any transfer agent for the New LYCRA Holdco Common Stock or the New Warrant Shares shall be required to accept and conclusively rely upon this Plan and Confirmation Order in lieu of a legal opinion regarding whether the New LYCRA Holdco Common Stock or the New Warrant Shares to be issued under this Plan are exempt from registration and/or eligible for DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., book-entry delivery, settlement, and depository (to the extent applicable). Notwithstanding anything to the contrary in this Plan, no Entity (including DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., any nominee thereof and any transfer agent for the New LYCRA Holdco Common Stock or the New Warrant Shares) may require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether the New LYCRA Holdco Common Stock or the New Warrant Shares to be issued under this Plan are exempt from registration.

Notwithstanding any policies, practices, or procedures of DTC, Euroclear, or Clearstream, DTC, Euroclear, and Clearstream shall cooperate with and take all actions reasonably requested by a distribution agent or an indenture trustee to facilitate distribution to Holders of Allowed Claims without requiring that such distributions be characterized as repayments of principal or interest.  No distribution agent or indenture trustee shall be required to provide indemnification or other security to DTC, Euroclear, or Clearstream in connection with any distributions to Holders of Allowed Claims through the facilities of DTC, Euroclear, or Clearstream.

This Plan is not a prospectus within the meaning and for the purposes of the Regulation 2017/1129/EU (as amended, the "Prospectus Regulation") or the UK POATRs.

This Plan has been prepared on the basis that any offer or sale of securities issued in connection with this Plan within any Member State of the EEA will be made pursuant to an exemption under the Prospectus Regulation from the requirement to publish a prospectus for the offer of transferable securities to the public. In relation to each EEA Member State, no offer or sale of the Other Securities issued in connection with this Plan may be made to the public

35

at any time other than pursuant to an exemption under the Prospectus Regulation. In any EEA Member State, this Plan and documents related thereto are only addressed to and directed at qualified investors in that jurisdiction within the meaning of the Prospectus Regulation.

Accordingly, the Other Securities are not being offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to a retail investor in the EEA (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of MiFID II; (y) a customer within the meaning of the Directive 2016/97/EU (as amended, the "Insurance Distribution Directive"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a qualified investor as defined in Article 2 of the Prospectus Regulation.

Further, no key information document is required to be prepared and none has been prepared in line with the requirements of the Regulation 1286/2014/EU (as amended, the "PRIIPs Regulation") in relation to any issue of the Other Securities.

This Plan has been prepared on the basis that any offer or sale of securities issued in connection with this Plan in the United Kingdom will be made pursuant to an exception from the general prohibition of offers to the public under the UK POATRs. In relation to the United Kingdom, no offer or sale of any Other Securities issued in connection with this Plan may be made to the public at any time other than pursuant to an exception from the general prohibition of offers to the public under the UK POATRS. In the United Kingdom, this Plan and documents related thereto are only addressed to and directed at qualified investors within the meaning of the UK POATRS. Accordingly, Other Securities are not being offered, sold, or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the United Kingdom (defined as a person who is neither (x) a professional client, as defined in point (8) of Article 2(1) of regulation (EU) no 600/2014 as it forms part of domestic law by virtue of the EUWA; nor (y) a qualified investor as defined in paragraph 15 of schedule 1 to the UK POATRS (each, a "UK Retail Investor")).

Further, no key information document is required to be prepared, and none has been prepared in line with the requirements of the PRIIPs Regulation as it forms part of United Kingdom domestic law by virtue of the EUWA (the "UK PRIIPs Regulation") in relation to any issue of the Other Securities.

In the United Kingdom, the information contained in this Plan or any documents related thereto (including, without limitation, this Plan) is intended only for use and may only be relied upon in relation to any investment activity by, and any investment activity to which such information relates may only be engaged in by, persons who are at the relevant time: (i) Investment Professionals within the meaning of Article 19(5) of The Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 of the United Kingdom (the "Order"); (ii) persons falling within the meaning of Articles 49(2)(a) to (d) of the Order; or (iii) persons to whom the communication may otherwise lawfully be communicated under FSMA (together, the "Permitted UK Persons"). Any person in the United Kingdom that is not a Permitted UK Person is not, for the purposes of any investment or investment decision, an intended recipient of the information contained in this Plan or any document related thereto and should not use such information as the basis for taking any investment activity or investment action. This Plan and any document related thereto should not (insofar as they relate to any investment or investment activity) be distributed, communicated to, or directed at the general public in the United Kingdom otherwise than as described above.

M.    *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under this Plan or pursuant to (1) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New LYCRA Holdco Common Stock, (2) the Restructuring Transactions, (3) the

creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (4) the making, assignment, or recording of any lease or sublease, (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the New Debt, or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

*N.*     *Employee Compensation and Benefits.*

1.     <u>Compensation and Benefits Programs</u>.

Except as otherwise set forth herein, on the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall (a) assume all employment agreements, indemnification agreements, or other employment-related agreements entered into with current or former employees who are employees as of the Petition Date or (b) solely with the consent of the Required Consenting Creditors, enter into new agreements with such employees on terms and conditions acceptable to the Reorganized Debtors and such employees.

A counterparty to or participant in a Compensation and Benefits Program assumed pursuant to this Plan shall have the same rights under such Compensation and Benefits Program as such counterparty had thereunder immediately prior to such assumption (unless otherwise agreed by such counterparty and the applicable Reorganized Debtor(s)); *provided* that any assumption of Compensation and Benefits Programs pursuant to this Plan or any of the Restructuring Transactions shall not (a) trigger or be deemed to trigger any change of control, change in control immediate vesting, termination, or similar provisions therein or (b) trigger or be deemed to trigger an event of "Good Reason" (or a term of like import) as a result of the consummation of the Restructuring Transactions or any other transactions contemplated by this Plan.

2.     <u>Workers' Compensation Programs</u>.

As of the Effective Date, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation Laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in this Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable Law, including non-bankruptcy Law with respect to any such contracts, agreements, policies, programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable non-bankruptcy Law.

O.       *Director and Officer Liability Insurance.*

Notwithstanding anything in this Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in this Plan, Confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under this Plan as to which no Proof of Claim need be Filed.

The Reorganized Debtors shall not terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies in effect or purchased as of the Petition Date (including any policy or endorsement providing for an extended claims-reporting period to the extent procured prior to the Petition Date), and all "Insureds" of the Debtors who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions on or after the Effective Date. The Debtors shall procure and pay for any New D&O Policies to become effective as of the Effective Date.

P.       *Management Incentive Plan.*

Following the Effective Date, the New LYCRA Holdco Board shall adopt the Management Incentive Plan, which will provide for the grants of equity and equity-based awards to employees, directors, consultants, and/or other service providers of the Reorganized Debtors, as determined at the discretion of the New LYCRA Holdco Board. The terms and conditions, including with respect to participants, allocation, timing, and the form and structure of the equity or equity-based awards, shall be determined at the discretion of the New LYCRA Holdco Board after the Effective Date.

Q.       *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of this Plan to the contrary, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in this Plan, including in Article VIII hereof.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the RSA, this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available retained Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity, except as otherwise expressly provided in this Plan.** The Reorganized Debtors may settle any such retained Cause of Action without further notice to or action, order, or approval of the Bankruptcy Court. Unless any retained Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial,

equitable, or otherwise), or laches, shall apply to such retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Prepackaged Cases or pursuant to this Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any retained Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in this Plan, including Article VIII hereof, or pursuant to a Bankruptcy Court order. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such retained Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

R.      *Cashless Transactions.*

Notwithstanding anything to the contrary set forth herein, the treatment of Claims, distributions, and other transactions contemplated hereby, including, without limitation, the funding of the New Debt, if any, may, at the election of the applicable participating parties, be effectuated by netting or other form of cashless implementation.

S.      *Helm Agreements.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to this Plan, the provisions of the Helm Agreements constitute a good-faith compromise and settlement of all Claims, Causes of Action, controversies, and other matters resolved pursuant to the Helm Agreements. The entry of the Confirmation Order shall constitute the Bankruptcy Court's final approval and assumption of the Helm Agreements pursuant to sections 365 and 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that the Helm Agreements are in the best interests of the Debtors, their estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. As of the Effective Date, the Helm Entities are directed to comply with their obligations under the Helm Agreements. Subject to the terms of the Helm Agreements, the Debtors, with the consent of the Required Consenting Creditors, reserve the right to modify or amend the Helm Agreements without further notice to or action, order, or approval of the Bankruptcy Court in accordance with the terms thereof.

## ARTICLE V.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, all Executory Contracts and Unexpired Leases that have not been rejected or subject to a motion to reject as of the Confirmation Hearing (other than the Rejected Helm Agreements, which shall be deemed rejected in accordance with and subject to the Helm Settlement Agreement) shall be deemed assumed by the applicable Reorganized Debtor without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease was: (a) previously assumed, amended and assumed, assumed and assigned, or rejected by the applicable Debtors; (b) previously expired or terminated pursuant to its own terms; (c) the subject of a motion to reject such executory contract or unexpired lease that is pending on the Effective Date; or (d) is identified on the Rejected Executory Contract and Unexpired Lease List; *provided* that neither the Restructuring Transactions or any actions contemplated by this Plan shall be deemed a "change of control" or other acceleration event for purposes of any Executory Contract or Unexpired Lease of the Debtors.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in this Plan, the Assumed Executory Contract and Unexpired Lease List, or the Rejected Executory Contract and Unexpired Lease List, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to this Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors, with the reasonable consent of the Required Consenting Creditors.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption of the RSA pursuant to sections 365 and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date. The RSA shall be binding and enforceable against the parties to the RSA in accordance with its terms. For the avoidance of doubt, the assumption of the RSA herein shall not otherwise modify, alter, amend, or supersede any of the terms or conditions of the RSA including, without limitation, any termination events or provisions thereunder.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Prepackaged Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in this Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contract and Unexpired Lease List and Rejected Executory Contract and Unexpired Lease List (with the reasonable consent of the Required Consenting Creditors) at any time through and including forty-five (45) days after the Effective Date.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the

40

Confirmation Order, if any, must be Filed with the Bankruptcy Court no later than thirty (30) days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.F of this Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to Article III.B of this Plan and may be objected to in accordance with the provisions of Article VII of this Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

The Debtors or the Reorganized Debtors, as applicable, shall pay the Cure amounts, if any, on the Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated by the underlying agreements and/or the ordinary course of business among the parties thereto, as applicable. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Claims and Noticing Agent on or before thirty (30) days after the Effective Date. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure in the Debtors' ordinary course of business; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under this Plan must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure amount, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure amount shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise and full payment of any applicable Cure pursuant to this Article V, in the amount and at the time dictated by the Debtors' ordinary course of business, shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest

composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Prepackaged Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this <u>Article V</u>, in the amount and at the time dictated by the Debtors' ordinary course of business, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.      *Indemnification Obligations.*

To the fullest extent permitted under applicable Law, all indemnification obligations in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, articles of association, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the benefit of current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, creditors, and other professionals of, or acting on behalf of, the Debtors (each in their capacities as such), as applicable, shall be (a) reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date, and (b)  assumed by the Reorganized Debtors.

E.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under this Plan. Unless otherwise provided in this Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

F.      *Reservation of Rights.*

Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under this Plan.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtor liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.       *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in this Plan, on, or as soon as reasonably practicable after, the Effective Date (or, if a Claim or Interest is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim, as applicable, shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided in this Plan, Holders of Allowed Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding the foregoing, (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Prepackaged Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Allowed Priority Tax Claims shall be paid in accordance with Article II.B of this Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy Law or in the ordinary course of business.

B.       *Disbursing Agent.*

All distributions under this Plan shall be made by the Disbursing Agent on the Effective Date. The Disbursing Agent shall not be required to give any bond or surety or other Security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

All Plan Distributions to any Disbursing Agent on behalf of the Holders of Claims listed on the Claims Register (or the designees of such Holders, as applicable) shall be deemed completed by the Debtors when received by such Disbursing Agent. Distributions under this Plan shall be made to any such Holders (or the designees of such Holders, as applicable) by the applicable Disbursing Agent.

C.       *Rights and Powers of Disbursing Agent.*

1.       Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.       Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent (including the Agents/Trustees) on or after the Effective Date (including taxes), and

any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

*D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

        1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date (or the designees of such Holders, as applicable).

For the avoidance of doubt, the Distribution Record Date shall not apply to Securities held through DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., as applicable, which shall receive distributions in accordance with the applicable procedures of DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., as applicable.

        2.      Delivery of Distributions in General.

Except as otherwise provided herein or in the Plan Supplement, the Disbursing Agent shall make distributions to Holders of Allowed Claims, as of the Distribution Record Date, or, if applicable, to such Holder's designee, as appropriate: (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date; (b) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Prepackaged Cases on the Holder's behalf; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

For the avoidance of doubt, the Distribution Record Date shall not apply to Securities held through DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., as applicable, which shall receive distributions in accordance with the applicable procedures of DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., as applicable.

Notwithstanding the foregoing, (a) all distributions on account of DIP Claims will be made to the applicable DIP Agent, and the DIP Agent will be, and will act as, the distribution agent with respect to the DIP Claims in accordance with the terms and conditions of this Plan and the applicable debt documents; (b) all distributions on account of ssTL Claims will be made to the ssTL Agent, and the ssTL Agent will be, and will act as, the distribution agent with respect to the ssTL Claims in accordance with the terms and conditions of this Plan and the applicable debt documents; (c) all distributions on account of Euro Notes Claims will be made to the Euro Notes Trustee and the Euro Notes Trustee will be, and will act as, the distribution agent with respect to the Euro Notes Claims in accordance with the terms and conditions of this Plan and the applicable debt documents; and (d) all distributions on account of Dollar Notes Claims will be made to the Dollar Notes Trustee, and the Dollar Notes Trustee will be, and will act as, the distribution agent with respect to the Dollar Notes Claims in accordance with the terms and conditions of this Plan and the applicable debt documents.

        3.      No Fractional Distributions.

No fractional New LYCRA Holdco Notes, fractional New Warrants or fractional shares of New LYCRA Holdco Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to this Plan on account of an Allowed Claim, as applicable, would otherwise result in the issuance of a number of New LYCRA Holdco Notes, New Warrants or shares of New LYCRA Holdco Common Stock

44

that is not a whole number, the actual distribution of New LYCRA Holdco Notes, New Warrants or shares of New LYCRA Holdco Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor. To the minimum extent necessary, the total number of New LYCRA Holdco Notes, New Warrants and authorized shares of New LYCRA Holdco Common Stock to be distributed under this Plan shall be adjusted as necessary to account for the foregoing rounding.

4.      Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property Laws to the contrary), and the Claim of any Holder of Claims to such property or interest in property shall be cancelled, released, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws, or any provisions in any document governing the distribution of such unclaimed property.

E.      *Surrender of Cancelled Instruments or Securities.*

On the Effective Date, or as soon as reasonably practicable thereafter, each Holder (and the applicable agents for such Holder, including the Agents/Trustees) of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.G hereof, shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors and any non-Debtor Affiliates, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties (other than the non-Debtor Affiliates) in respect of one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for the purposes of allowing Holders to receive distributions under this Plan, charging Liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary in this Plan, the foregoing shall not apply to certificates or instruments evidencing Claims or Interests that are Unimpaired under this Plan.

F.      *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

G.      *Compliance with Tax Requirements.*

In connection with this Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the Disbursing Agent, and any applicable withholding or reporting agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, any applicable withholding or reporting agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are

reasonable and appropriate. The Debtors and the Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

H.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the RSA, this Plan, the DIP Orders, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy Law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

J.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than United States dollars shall be automatically deemed converted to the equivalent United States dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Effective Date.

K.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all Claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all Claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

L.      *Claims Paid or Payable by Third Parties.*

1.      Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a

Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within five (5) Business Days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the five (5) Business Days grace period specified above until the amount is fully repaid.

2.     Claims Payable by Third Parties.

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy or is found liable for satisfying in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then, immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.     Applicability of Insurance Policies.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article III of this Plan), nothing contained in this Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers, under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### ARTICLE VII.
### PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.     *Disputed Claims Process.*

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under this Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Prepackaged Cases had not been commenced, except that (unless expressly waived pursuant to this Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. All Proofs of Claim Filed in these Prepackaged Cases shall be considered objected to and Disputed without further action by the Debtors or Reorganized Debtors. Upon the Effective Date, all Proofs of Claim Filed against the Debtors, regardless of the time of filing, and including Proofs of Claim Filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim, as applicable, under this Plan. Notwithstanding the foregoing, Entities must File Cure objections as set forth in Article V.C of this Plan to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty. **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred,**

**estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Allowance of Claims.*

After the Effective Date and subject to the terms of this Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date. The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be Allowed under applicable non-bankruptcy Law.

C.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in this Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to this Plan.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable non-bankruptcy Law. If the Debtors or Reorganized Debtors, as applicable, dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Prepackaged Cases had not been commenced and shall survive the Effective Date. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all Claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Prepackaged Cases had not been commenced.

To the maximum extent required by applicable Law, any Person or Entity who the Debtors or Reorganized Debtors reasonably believe has relevant information related to any Disputed Claim shall provide such assistance, cooperation or testimony as the Debtors or the Reorganized Debtors may request from time to time.

D.      *Estimation of Claims.*

Before or after the Effective Date, the Debtors, with the reasonable consent of the Required Consenting Creditors, or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in this Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under this Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

48

*E.      Adjustment to Claims Without Objection.*

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged (including pursuant to this Plan) on the Claims Register by the Debtors or Reorganized Debtors or the Claims and Noticing Agent without the Debtors or Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

*F.      Disallowance of Claims.*

Except as otherwise expressly set forth herein, and subject to the terms hereof, including Article VIII, all Claims of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

*G.      No Distributions Pending Allowance.*

Notwithstanding any other provision of this Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; *provided* that if only the Allowed amount of an otherwise valid Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount pending resolution of the dispute.

*H.      Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan. On or as soon as reasonably practicable after the next Distribution Date after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

*A.      Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided herein, or in any contract, instrument, or other agreement or document created pursuant to this Plan, the distributions, rights, and treatment that are provided herein shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims that the Debtors resolve or compromise after the Effective Date), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services that employees of the Debtors have performed prior to the Effective Date,

and that arise from a termination of employment, any contingent or noncontingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted this Plan. Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the filing of the Prepackaged Cases shall be deemed cured (and no longer continuing) as of the Effective Date. Without prejudice to the distributions, rights, and treatment that are provided by this Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date, and, upon the Effective Date, all Holders of such Claims and Interests shall be forever precluded and enjoined, pursuant to Section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim or Interest against the Debtors, Reorganized Debtors, or any of their assets or property.

B.      *Release of Liens.*

**Except as otherwise provided in the New Debt Documents, this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, benefit, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder, including the Agents/Trustees) and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors or the Reorganized Debtors, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

C.      *Releases by the Debtors.*

**Except as otherwise provided in this Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors under this Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by this Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, their Estates, the Reorganized Debtors, and any Person seeking to exercise the rights of the Debtors or their Estates, including**

50

any successors to the Debtors or any Estates or any Estate representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever, including any Avoidance Actions and any derivative Claims, asserted or assertable on behalf of any of the Debtors, Reorganized Debtors, and their Estates, whether liquidated or unliquidated, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, contingent or noncontingent, in Law, equity, contract, tort or otherwise, that the Debtors, their Estates, or the Reorganized Debtors, including any successors to the Debtors or any Estate representatives appointed or selected, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Reorganized Debtors, their Estates, or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, any related adversary proceedings, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the decision to file the Prepackaged Cases, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into or filing of the RSA, the DIP Notes Facility, the DIP Documents, the New LYCRA Holdco Common Stock, the New Warrants, the New Debt, the New Debt Documents, the Disclosure Statement, this Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Prepackaged Cases, any other Definitive Document or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by this Plan or the reliance by any Released Party on this Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the DIP Notes Facility, the DIP Documents, the New LYCRA Holdco Common Stock, the New Warrants, the New Debt, the New Debt Documents, the Disclosure Statement, this Plan, the Plan Supplement, any other Definitive Document, or any Restructuring Transactions before or during the Prepackaged Cases, the filing of the Prepackaged Cases, the Disclosure Statement or this Plan, the solicitation of votes with respect to this Plan, the pursuit of Confirmation, the pursuit of Consummation of the Restructuring Transactions, the administration and implementation of this Plan and the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any Causes of Action identified in the Schedule of Retained Causes of Action, *provided* that, for the avoidance of doubt, no Causes of Action against any Consenting Creditor shall be included on such Schedule of Retained Causes of Action, (ii) any post-Effective Date obligations of any party or Entity under this Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including any Definitive Document, the Helm Agreements, the New Debt Documents, the New LYCRA Holdco

51

Organizational Documents, and other documents set forth in the Plan Supplement) executed to implement this Plan or any Claim or obligation arising under this Plan, (iii) any Released Party from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, or (iv) any of the Debtors', Reorganized Debtors' and wholly-owned non-Debtor affiliates (as applicable) claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing this Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.      *Releases by the Releasing Parties.*

Except as otherwise provided in this Plan or the Confirmation Order to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under this Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by this Plan, the adequacy of which is hereby confirmed, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for Claims arising under, or preserved by, this Plan, to the fullest extent permitted under applicable Law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each and every Releasing Party, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever, including any Avoidance Actions and any derivative claims asserted, whether liquidated or unliquidated, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, contingent or noncontingent, in Law, equity, contract, tort, or otherwise, including any derivative Claims asserted or assertable on behalf of any of the Debtors, that such Entities would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Reorganized Debtors, or their Estates or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, and their Estates (including the capital structure, management, ownership, or operation thereof), the Prepackaged Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, any related adversary proceedings, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the decision to file the Prepackaged Cases, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or Filing of the RSA, the DIP Notes Facility, the DIP Documents, the New LYCRA Holdco Common

52

**Stock, the New Warrants, the New Debt, the New Debt Documents, the Disclosure Statement, this Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Prepackaged Cases, any other Definitive Document or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by this Plan or the reliance by any Released Party on this Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the DIP Notes Facility, the DIP Documents, the New LYCRA Holdco Common Stock, the New Warrants, the New Debt, the New Debt Documents, the Disclosure Statement, this Plan, the Plan Supplement, any other Definitive Document, or any Restructuring Transactions before or during the Prepackaged Cases, the filing of the Prepackaged Cases, the Disclosure Statement, or this Plan, the solicitation of votes with respect to this Plan, the pursuit of Confirmation, the pursuit of Consummation of the Restructuring Transactions, the administration and implementation of this Plan and the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) to the extent that any Causes of Action against any releasing Party are not released or discharged pursuant to this Plan, any rights of such Releasing Party to assert any and all counterclaims, crossclaims, claims for contribution, defenses, and similar claims in response to such Causes of Action (provided that no such third-party claims or claims for contribution or similar claims may be asserted against the Debtors or the Reorganized Debtors to the extent such claims have been released or discharged pursuant to this Plan), (b) any post-Effective Date obligations of any party or Entity under this Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including any Definitive Document, the Helm Agreements, the New Debt Documents, the New LYCRA Holdco Organizational Documents, and other documents set forth in the Plan Supplement) executed to implement this Plan or any Claim or obligation arising under this Plan, or (c) any Released Party from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of this Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing this Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.**

E.      *Exculpation.*

**Notwithstanding anything contained in this Plan to the contrary, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or Third-Party Release, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any Claim arising from the Petition Date**

through the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Prepackaged Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Definitive Documents, the New LYCRA Holdco Common Stock, the New Warrants, the New Debt, the New Debt Documents, the Disclosure Statement, this Plan, the Plan Supplement, the Restructuring Transactions, the DIP Notes Facility, the DIP Documents, or any wind down transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by this Plan or the reliance by any Released Party on this Plan or the Confirmation Order in lieu of such legal opinion) in connection with the RSA and related prepetition transactions, the Definitive Documents, the New LYCRA Holdco Common Stock, the New Warrants, the New Debt, the New Debt Documents, the Disclosure Statement, this Plan, the Plan Supplement, the Restructuring Transactions, the DIP Notes Facility, the DIP Documents, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable Law, the filing of the Prepackaged Cases, the pursuit of Confirmation, the pursuit of consummation of the Restructuring Transactions, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.

F.      *Injunction.*

Except as otherwise expressly provided in this Plan or in the Confirmation Order, or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been extinguished, released, discharged, or are subject to exculpation, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, and the Released Parties: (1) commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (2) enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has timely filed a motion with the Bankruptcy Court expressly requesting the right to perform such setoff, subrogation or recoupment on or before the Effective Date, and notwithstanding an indication of a Claim, Interest, or Cause of Action or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to this Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising

out of a Claim or Cause of Action, as applicable, subject to <u>Article VIII.C</u>, <u>Article VIII.D</u>, and <u>Article VIII.E</u> hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim not released or subject to exculpation under this Plan, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party. The injunction in this Plan shall extend to any successors and assigns of the Debtors and the Reorganized Debtors and their respective property and interests in property.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Prepackaged Cases (or during the Prepackaged Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Prepackaged Cases.

H.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of <u>Article IX.B</u> hereof:

1.      there shall not have been instituted or be pending any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) (or there shall not have been any material adverse development to any action, application, claim, counterclaim, or proceeding currently instituted, threatened, or pending) before or by any court, governmental, regulatory, or administrative agency or instrumentality, domestic or foreign, or by any other Person, domestic or foreign, in connection with the Restructuring Transactions that, in the

reasonable judgment of the Debtors (or the Required Consenting Creditors), would prohibit, prevent, or restrict Consummation of the Restructuring Transactions;

2.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate this Plan and Restructuring Transactions, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

3.      an order, statute, rule, regulation, executive order, stay, decree, judgment, or injunction shall not have been enacted, entered, issued, promulgated, enforced, or deemed applicable by any court or governmental, regulatory, or administrative agency or instrumentality, domestic or foreign, that, in the reasonable judgment of the Debtors, would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

4.      each document or agreement constituting a Definitive Document shall have been executed or otherwise effectuated as contemplated, shall be in form and substance consistent with the RSA, and otherwise reasonably acceptable to the Required Consenting Creditors, and any and all conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived pursuant to the terms of the applicable Definitive Document;

5.      to the extent invoiced, the payment of all reasonable and documented fees and expenses of the Debtors' professionals (solely if payment of such fees and expenses has been authorized by the Bankruptcy Court, including under the DIP Orders);

6.      all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account;

7.      the Bankruptcy Court shall have entered the Interim DIP Order and the Final DIP Order, each of which shall not have been reversed, stayed, modified, dismissed, vacated, or reconsidered, and the Final DIP Order shall have become a Final Order;

8.      the Bankruptcy Court shall have entered the Confirmation Order, the entered Confirmation Order shall be consistent with the RSA and otherwise in compliance with the consent rights contained therein, the Confirmation Order shall not have been reversed, stayed, modified, dismissed, vacated, or reconsidered, and the Confirmation Order shall have become a Final Order;

9.      the RSA shall not have been terminated as to the Required Consenting Creditors and shall be in full force and effect, and all conditions and terms set forth in the RSA shall have been satisfied or waived in accordance with its terms;

10.      all of the shares of New LYCRA Holdco Common Stock required to be issued hereunder, have been duly issued, allotted, and delivered;

11.      all of the New Warrants shall have been duly issued and delivered;

12.      the Debtors have provided evidence reasonably satisfactory to the Required Consenting Creditors that the Share Transfer has been effectuated in accordance with the Agreed Transfer Process;

13.      the New LYCRA Holdco Organizational Documents shall have been adopted in a manner consistent in all respects with this Plan and the RSA and the consent rights contained herein and therein;

14.      all accrued and unpaid Restructuring Expenses shall have been paid in full in accordance with the RSA;

15. the Debtors have procured and paid for the New D&O Policies (and the "tail" or "run-off" policy shall be purchased on a prepaid, non-cancelable premium basis), and such policies will become effective as of the Effective Date; and

16. all conditions precedent to the issuance or incurrence of the New Debt shall have been satisfied or duly waived, and the New Debt, including all documentation related thereto, shall be in form and substance satisfactory to the Debtors and in effect.

B. *Waiver of Conditions.*

The conditions to the Effective Date set forth in this Article IX may be waived only if waived in writing (email from counsel shall suffice) by the Debtors, with the prior written consent of the Required Consenting Creditors, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.

C. *Effect of Failure of Conditions.*

If Consummation does not occur, this Plan shall be null and void in all respects and nothing contained in the RSA, this Plan, or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors or any Holder of Claims or Interests of any Claim or Interest; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.

# ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

A. *Modification and Amendments.*

Except as otherwise specifically provided in this Plan, the Debtors reserve the right to modify this Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in this Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, alter, amend, or modify this Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan, or remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan. Notwithstanding anything to the contrary herein, the Debtors shall not amend or modify this Plan in a manner inconsistent with the RSA.

B. *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C. *Revocation or Withdrawal of Plan.*

Subject to the RSA, the Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or

compromise embodied in this Plan (including the fixing or limiting to an amount certain, and including the Allowance or disallowance, of all or any portion of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Prepackaged Cases, the Confirmation Order, and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan;

3. resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims are accomplished (as applicable) pursuant to the provisions of this Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7. enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with this Plan, the Confirmation Order, or the Disclosure Statement;

8. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.  resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan or otherwise in connection with the Prepackaged Cases;

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan or the Confirmation Order;

11. adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, releases, injunctions, discharges, exculpations, and other provisions contained in this Plan, including under Article VIII hereof, whether arising prior to or after the Effective Date, and enter such orders as may be necessary or appropriate to implement and enforce such releases, injunctions, exculpations, and other provisions;

12. adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.L hereof;

13. enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14. determine any other matters that may arise in connection with or relate to this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan, the Plan Supplement, or the Disclosure Statement; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning any Definitive Document contained in the Plan Supplement that has a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court or arbitration forum;

15. enter an order concluding or closing the Prepackaged Cases;

16. adjudicate any and all disputes arising from or relating to distributions under this Plan or any transactions contemplated herein;

17. consider any modifications of this Plan, to Cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18. determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

20. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

22. enforce all orders previously entered by the Bankruptcy Court in connection with the Prepackaged Cases; and

23. hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article IX to the contrary, the New LYCRA Holdco Organizational Documents shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A. Immediate Binding Effect.*

Subject to Article IX.A hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims or Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim or Interest has voted on this Plan.

*B. Additional Documents.*

On or before the Effective Date, and consistent in all respects with the terms of the RSA, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

*C. Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Prepackaged Cases are converted, dismissed, or closed, whichever occurs first.

*D. Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Prepackaged Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Prepackaged Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

*E. Reservation of Rights.*

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

*F.*    *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, Related Party, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

*G.*    *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.    <u>If to the Debtors, to</u>:

**The LYCRA Company LLC**
2711 Centerville Road, Suite 300
Wilmington, Delaware 19808
Attention:    Catherine Spicer (catherine.spicer@lycra.com)
              Dean Williams (dean.williams@lycra.com)


with copies to:

**Linklaters LLP**
1290 Avenue of the Americas
New York, New York, 10104
Attention:    Michael H. Torkin (michael.torkin@linklaters.com)
              Daniel J. Guyder (daniel.guyder@linklaters.com)
              Christopher J. Hunker (christopher.hunkder@linklaters.com)


– and –

**Linklaters LLP**
20 Ropemaker Street
London, EC2Y 9AR
United Kingdom
Attention:    James Warboys (james.warboys@linklaters.com)
              Liam Robinson (liam.robinson@linklaters.com)


– and –

**Haynes and Boone LLP**
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Attention:    Charles A. Beckham, Jr. (charles.beckham@haynesboone.com)
              Kenric Kattner (kenric.kattner@haynesboone.com)
              Arsalan Muhammad (arsalan.muhammad@haynesboone.com)

2.      If to a member of the Ad Hoc Group or a DIP Noteholder, to:

**Gibson, Dunn & Crutcher UK LLP**
Telephone House
2-4 Temple Avenue
Temple, London EC4Y 0HB
United Kingdom
Attention:    Matthew Squire (msquire@gibsondunn.com)
                    Christopher J. Howard (choward@gibsondunn.com)

– and –

**Gibson, Dunn & Crutcher LLP**
200 Park Avenue
New York, NY 10166
Attention:    Keith R. Martorana (kmartorana@gibsondunn.com)

– and –

**Gibson, Dunn & Crutcher LLP**
333 South Grand Avenue
Los Angeles, CA 90071
Attention:    Michael G. Farag (mfarag@gibsondunn.com)

– and –

**Gibson, Dunn & Crutcher LLP**
3161 Michelson Drive
Suite 1200
Irvine, CA 92612
Attention:    Suzanne Span (sspan@gibsondunn.com)

3.      If to the DIP Agent, to:

**GLAS USA LLC**
3 Second Street
Suite 203
Jersey City, New Jersey 07311
United States
Attention:    tmg@glas.agency

– and –

**GLAS Trust Corporation Limited**
2nd Floor,
10 Old Bailey
London, EC4M 7NG
United Kingdom

Attention:   tmg@glas.agency

with copies to:

**Hogan Lovells US LLP**
390 Madison Avenue
New York, New York, 10017
Attention:   Robert Ripin (robert.ripin@hoganlovells.com)

4.   <u>If to a Consenting Creditor, to the notice parties listed on its signature page to the RSA.</u>

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

*H.      Term of Injunctions or Stays.*

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Prepackaged Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect from and after the Effective Date in accordance with their terms.

*I.      Entire Agreement.*

Except as otherwise indicated, this Plan (including the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

*J.      Exhibits.*

All exhibits and documents included in the Plan Supplement are an integral part of this Plan and are incorporated into and are a part of this Plan as if set forth in full in this Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://restructuring.ra.kroll.com/lycra or the Bankruptcy Court's website at https://www.txs.uscourts.gov/page/ bankruptcy-court. To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the Plan Supplement exhibit or document shall control.

*K.      Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions

of this Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Exculpated Parties, the directors and officers of any of the Debtors, each of the Debtors and Reorganized Debtors, the DIP Agents and DIP Noteholders, and with respect to the foregoing, the Related Parties thereto will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under this Plan and any previous plan, and, therefore, no such parties nor individuals or the Reorganized Debtors will have any liability for the violation of any applicable Law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and any previous plan.

M.      *Closing of Prepackaged Cases.*

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Prepackaged Cases except for one of the Prepackaged Cases, as determined by the Reorganized Debtors, and all contested matters (if any) relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case. The Reorganized Debtors shall, promptly after the full administration of the Prepackaged Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Prepackaged Cases.

N.      *Waiver or Estoppel.*

On the Effective Date, each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

[*Remainder of page intentionally left blank.*]

65

Dated: March 17, 2026                            **THE LYCRA COMPANY LLC**

on behalf of itself and all other Debtors


By:     */s/ Dean Williams*

Name: Dean Williams
Title: Chief Financial Officer