**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| THE LYCRA COMPANY LLC, *et al.*,[1] | ) | Case No. 26-26-90399(CML) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**DISCLOSURE STATEMENT FOR THE
JOINT PREPACKAGED PLAN OF REORGANIZATION OF
THE LYCRA COMPANY LLC AND ITS DEBTOR AFFILIATES
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**HAYNES AND BOONE, LLP**

Charles A. Beckham, Jr. (TX Bar No. 02016600)
Kenric D. Kattner (TX Bar No. 11108400)
Arsalan Muhammad (TX Bar No. 24074771)
Kourtney Lyda (TX Bar No. 24013330)
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile:  (713) 547-2600
Email:  charles.beckham@haynesboone.com
      kenric.kattner@haynesboone.com
      arsalan.muhammad@haynesboone.com
      kourtney.lyda@haynesboone.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**LINKLATERS LLP**

Michael H. Torkin (*pro hac vice* pending)
Daniel J. Guyder (*pro hac vice* pending)
Christopher J. Hunker (*pro hac vice* pending)
Clark L. Xue (*pro hac vice* pending)
Ramsey Scofield (*pro hac vice* pending)
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 903-9000
Facsimile:  (212) 903-9100
Email:  michael.torkin@linklaters.com
      daniel.guyder@linklaters.com
      christopher.hunker@linklaters.com
      clark.xue@linklaters.com
      ramsey.scofield@linklaters.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

---

[1]  A complete list of each of the Debtors in the chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/lycra.  The location of Debtor The LYCRA Company LLC's corporate headquarters and the Debtors' service address in the chapter 11 cases is 2711 Centerville Road, Suite 300, Wilmington, Delaware 19808.

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE *JOINT PREPACKAGED PLAN OF REORGANIZATION OF THE LYCRA COMPANY LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE* (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, AND INCLUDING ALL EXHIBITS AND SUPPLEMENTS THERETO, THE "PREPACKAGED PLAN")[2] IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125, 11 U.S.C. § 1125, AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. § 1126. THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THE SOLICITATION MATERIALS ARE BEING DISTRIBUTED PRIOR TO THE PETITION DATE TO HOLDERS OF CLAIMS IN CLASS 3, CLASS 4, CLASS 5 AND CLASS 6. HOWEVER, HOLDERS OF SUCH CLAIMS SHOULD ONLY VOTE PRIOR TO THE ENTRY OF AN ORDER APPROVING THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT IF THEY CAN CERTIFY THAT THEY ARE (I) LOCATED INSIDE OF THE UNITED STATES AND ARE (A) "QUALIFIED INSTITUTIONAL BUYERS" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT (AS DEFINED BELOW)) OR (B) "ACCREDITED INVESTORS" (AS DEFINED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT), OR (II) LOCATED OUTSIDE THE UNITED STATES AND ARE NOT "U.S. PERSONS" (AS DEFINED IN RULE 902 UNDER THE SECURITIES ACT) (COLLECTIVELY, THE "ELIGIBLE HOLDERS"). NON-ELIGIBLE HOLDERS WILL BE ENTITLED TO VOTE FOLLOWING THE ENTRY OF AN ORDER APPROVING THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT. THE DEBTORS WILL PROMPTLY NOTIFY NON-ELIGIBLE HOLDERS OF SUCH APPROVAL. NON-ELIGIBLE HOLDERS OF CLAIMS IN CLASS 3, CLASS 4, CLASS 5 AND CLASS 6 WILL BE ENTITLED TO VOTE ON THE PREPACKAGED PLAN AND RETURN THEIR APPLICABLE BALLOTS AT THAT TIME.

THE DEADLINE TO ACCEPT OR REJECT THE PREPACKAGED PLAN IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON APRIL 17, 2026, UNLESS EXTENDED BY THE DEBTORS (THE "VOTING DEADLINE").

THE RECORD DATE FOR DETERMINING THE PARTIES ELIGIBLE TO VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN IS MARCH 13, 2026 (THE "VOTING RECORD DATE").

---

[2]   Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Prepackaged Plan. The summary of the Prepackaged Plan provided herein is qualified in its entirety by reference to the Prepackaged Plan. In the case of any inconsistency between this Disclosure Statement and the Prepackaged Plan, the Prepackaged Plan shall govern.

**DELIVERY OF BALLOTS**

THE BALLOTS MUST BE RETURNED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS DESCRIBED IN THE SOLICITATION MATERIALS.

---

**IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING TO ACCEPT OR REJECT THE PREPACKAGED PLAN:**

YOU CAN CONTACT KROLL RESTRUCTURING ADMINISTRATION LLC ("**KROLL**" OR THE "**CLAIMS AND NOTICING AGENT**") BY E-MAIL AT: LYCRAINFO@RA.KROLL.COM (REFERENCING "**IN RE: LYCRA – SOLICITATION INQUIRY**" IN THE SUBJECT LINE).

YOU CAN ALSO CONTACT THE CLAIMS AND NOTICING AGENT BY PHONE TOLL- FREE AT (888) 498-1399 (USA OR CANADA, TOLL FREE) OR (347) 338-6514 (INTERNATIONAL, TOLL).

---

VOTES TO ACCEPT OR REJECT THE PREPACKAGED PLAN WILL BE SOLICITED FROM HOLDERS OF CLAIMS IN THE FOLLOWING CLASSES:

| VOTING CLASS | NAME OF CLASS UNDER THE PREPACKAGED PLAN |
|---|---|
| 3 | SSTL CLAIMS |
| 4 | EURO NOTES CLAIMS |
| 5 | DOLLAR NOTES CLAIMS |
| 6 | PROMISSORY NOTE CLAIMS |

IF YOU ARE A HOLDER OF CLAIMS IN CLASS 3, CLASS 4, CLASS 5 OR CLASS 6, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING SOLICITATION MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PREPACKAGED PLAN. THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. FUTURE APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PREPACKAGED PLAN. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FROM HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN AND MAY NOT BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN, EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE X HEREIN.

THE DEBTORS AND CERTAIN HOLDERS OF CLAIMS HAVE AGREED TO SUPPORT THE PREPACKAGED PLAN IN ACCORDANCE WITH THE TERMS OF THE RSA, WHICH THE DEBTORS BELIEVE WILL RESULT IN 100% OF THE SSTL CLAIMS, 100% OF THE EURO NOTES CLAIMS, MORE THAN 76% OF THE DOLLAR NOTES CLAIMS AND MORE THAN 90% OF THE PROMISSORY NOTE CLAIMS VOTING TO ACCEPT THE PLAN. EACH OF THESE HOLDERS OF CLAIMS (OR THE PARTIES WITH THE REQUISITE AUTHORITY TO INSTRUCT OR DIRECT SUCH HOLDERS OF CLAIMS UNDER APPLICABLE LAW) HAVE EXECUTED OR ACCEDED TO THE RSA. BASED ON THE FOREGOING, THE DEBTORS FURTHER BELIEVE THAT ONCE THE VOTES ARE TABULATED, EACH CLASS OF CLAIMS ENTITLED TO VOTE ON THE PREPACKAGED PLAN (CLASSES 3, 4, 5, AND 6 ARE THE ONLY CLASSES ENTITLED TO VOTE ON THE PREPACKAGED PLAN), WILL HAVE RECEIVED VOTES TO ACCEPT THE PLAN FROM HOLDERS OF CLAIMS REPRESENTING MORE THAN 66 2/3% IN AMOUNT AND 50% IN NUMBER OF CLAIMS IN SUCH CLASS THAT VOTED ON THE PREPACAKGED PLAN. THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PREPACKAGED PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST POSSIBLE RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THE PREPACKAGED PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE PREPACKAGED CASES. THE DEBTORS STRONGLY RECOMMEND THAT HOLDERS ENTITLED TO VOTE ON THE PREPACKAGED PLAN, VOTE TO ACCEPT THE PREPACKAGED PLAN.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PREPACKAGED PLAN, AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (IF APPROVED) DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PREPACKAGED PLAN.

iii

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PREPACKAGED PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS FORTHCOMING PREPACKAGED CASES.

ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PREPACKAGED PLAN, THE RSA, OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PREPACKAGED PLAN, THE RSA, OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION. EXCEPT AS OTHERWISE PROVIDED IN THE PREPACKAGED PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PREPACKAGED PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS

REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE OR DISTRIBUTE AN AMENDED OR MODIFIED PREPACKAGED PLAN AND RELATED DISCLOSURE STATEMENT, FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PREPACKAGED PLAN AND THE RSA.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PREPACKAGED PLAN OR THE RSA OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY DISCLOSURE OR REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PREPACKAGED PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PREPACKAGED PLAN, WHO VOTE TO REJECT THE PREPACKAGED PLAN, OR WHO ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN) WILL BE BOUND BY THE TERMS OF THE PREPACKAGED PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PREPACKAGED PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PREPACKAGED PLAN. THERE IS NO ASSURANCE THAT THE PREPACKAGED PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PREPACKAGED PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PREPACKAGED PLAN, THE RSA, AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE X HEREIN, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT (IF AND ONCE OBTAINED) DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PREPACKAGED PLAN. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FROM HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PREPACKAGED PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS

CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.

UPON CONFIRMATION OF THE PREPACKAGED PLAN, THE SECURITIES DESCRIBED OR OTHERWISE CONTEMPLATED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER, THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, SECTION 4(A)(2) OF THE SECURITIES ACT, REGULATION D PROMULGATED THEREUNDER, REGULATION S UNDER THE SECURITIES ACT, AND/OR OTHER AVAILABLE EXEMPTIONS FROM REGISTRATION. OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS. IF EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT, REGULATION D PROMULGATED THEREUNDER, REGULATION S UNDER THE SECURITIES ACT, OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES DESCRIBED OR OTHERWISE CONTEMPLATED IN THIS DISCLOSURE STATEMENT MAY NOT BE OFFERED OR SOLD EXCEPT UNDER A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES ISSUED UNDER THE PREPACKAGED PLAN CONSULT THEIR OWN LAWYER CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES IN COMPLIANCE WITH THE FEDERAL SECURITIES LAWS AND ANY APPLICABLE "BLUE SKY" LAWS. THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF SUCH SECURITIES.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS, INCLUDING THE FOLLOWING, TO BE FORWARD-LOOKING STATEMENTS. ALTHOUGH THE DEBTORS BELIEVE THE EXPECTATIONS REFLECTED IN SUCH FORWARD LOOKING STATEMENTS ARE BASED ON REASONABLE ASSUMPTIONS, THE DEBTORS CAN GIVE NO ASSURANCE THAT THEIR EXPECTATIONS WILL BE ATTAINED, AND IT IS POSSIBLE THAT ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE INDICATED BY THESE FORWARD LOOKING STATEMENTS DUE TO A VARIETY OF RISKS AND UNCERTAINTIES. FORWARD LOOKING STATEMENTS MAY INCLUDE, BUT ARE NOT LIMITED TO, STATEMENTS ABOUT:

- THE DEBTORS' PLANS, OBJECTIVES, INTENTIONS, AND EXPECTATIONS;

- THE DEBTORS' BUSINESS STRATEGY;

- THE DEBTORS' FINANCIAL STRATEGY, BUDGET, AND PROJECTIONS;

- THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- THE DEBTORS' LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- THE SUCCESS AND COSTS OF THE DEBTORS' OPERATIONS;

- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;

- THE AMOUNT, NATURE, AND TIMING OF THE DEBTORS' CAPITAL EXPENDITURES;

- AVAILABILITY AND TERMS OF CAPITAL;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS (INCLUDING WITH RESPECT TO NON-U.S. CURRENCY FLUCTUATIONS, TARIFFS, AND/OR TRADE NEGOTIATIONS, PARTICULARLY WITH RESPECT TO ANY NON-U.S. MARKETS WHERE THE DEBTORS CONDUCT BUSINESS);

- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- THE DEBTORS' COUNTERPARTIES CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION CLAIMS OR ANY REGULATORY PROCEEDINGS;

- THE GOVERNMENTAL REGULATIONS AND TAXATION APPLICABLE TO THE DEBTORS, INCLUDING ANY CHANGES THERETO;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS; AND

- THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' OR COMPANY'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PREPACKAGED PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PREPACKAGED PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE PREPACKAGED CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE PREPACKAGED CASES; THE DEBTORS' INABILITY TO MAINTAIN RELATIONSHIPS WITH SUPPLIERS, EMPLOYEES, AND OTHER THIRD PARTIES AS A RESULT OF THIS CHAPTER 11 FILING OR THOSE PARTIES' FAILURE TO COMPLY WITH THEIR CONTRACTUAL OBLIGATIONS; CUSTOMER RESPONSES TO THE PREPACKAGED CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE PREPACKAGED CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES

vii

IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; THE POSSIBILITY THAT FOREIGN COURTS WILL NOT ENFORCE THE CONFIRMATION ORDER; TRADE BALANCE; NATURAL DISASTERS; PANDEMICS; GEOPOLITICAL INSTABILITY; GOVERNMENT SHUTDOWNS; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESS.

YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. THE PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED OR INCORPORATED BY REFERENCE HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS AND ALLOWED INTERESTS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

---

**RECOMMENDATION BY THE DEBTORS**

EACH DEBTOR'S BOARD OF MANAGERS, BOARD OF DIRECTORS, DIRECTOR, MANAGING DIRECTOR, OR MANAGER, AS APPLICABLE, HAS APPROVED THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE PREPACKAGED PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED BY THE RESTRUCTURING TRANSACTIONS ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH DEBTOR'S ASSETS, AND PROVIDE THE BEST RECOVERY TO THE DEBTORS' STAKEHOLDERS. AT THIS TIME, EACH DEBTOR BELIEVES THAT THE RESTRUCTURING TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.

EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PREPACKAGED PLAN, VOTE TO <u>ACCEPT</u> THE PREPACKAGED PLAN BY RETURNING THEIR BALLOTS (IN EACH CASE ACCEPTING THE PREPACKAGED PLAN) SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE CLAIMS AND NOTICING AGENT NO LATER THAN THE VOTING DEADLINE (<u>APRIL 17, 2026, AT 4:00 P.M. (PREVAILING CENTRAL TIME)</u>) PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND IN THE SOLICITATION MATERIALS, INCLUDING IN YOUR BALLOTS.

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS AND CERTAIN OTHER JURISDICTIONAL RESTRICTIONS**

The Bankruptcy Court has not reviewed this Disclosure Statement or the Prepackaged Plan, and the securities to be issued pursuant to the Prepackaged Plan, the DIP Commitment Premium and the Exit Notes Facility on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act, any state securities law ("Blue Sky Laws"), or the securities laws of any other jurisdiction. The Prepackaged Plan has not been approved or disapproved by the SEC, any state regulatory authority, or the regulatory authority of any jurisdiction and neither the SEC, any state regulatory authority, nor any other regulatory authority in any jurisdiction has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Prepackaged Plan. Any representation to the contrary is a criminal offense. The securities may not be offered or sold within the United States or to, or for the account or benefit of, United States persons (as defined in Regulation S under the Securities Act), except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable laws of other jurisdictions.

The Debtors will rely on certain exemptions from registration under the Securities Act and Blue-Sky Laws to exempt the offer, issuance, and distribution, if applicable, of securities under the Prepackaged Plan, including section 1145(a) of the Bankruptcy Code Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other applicable exemptions from registration under the Securities Act and any other applicable securities laws. Before the Petition Date, the Debtors will rely on section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act to exempt from registration the offer, issuance, and distribution, if applicable, of securities under the Prepackaged Plan, which will only be made to Holders of Claims that can certify that they are (i) located inside of the United States and are (a) "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) or (b) "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act), or (ii) located outside the United States and are not "U.S. persons" (as defined in Rule 902 under the Securities Act). Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

Securities issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and may be subject to any additional restrictions on the transferability of such securities pursuant to the applicable underlying documentation.

EXCEPT TO THE EXTENT PUBLICLY AVAILABLE, THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, THE PREPACKAGED PLAN, AND THE INFORMATION SET FORTH HEREIN AND IN THE PREPACKAGED PLAN ARE CONFIDENTIAL. THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, AND THE PREPACKAGED PLAN MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION CONCERNING THE DEBTORS, THEIR SUBSIDIARIES, AND THEIR RESPECTIVE DEBT AND SECURITIES. EACH RECIPIENT HEREBY ACKNOWLEDGES THAT IT (A) IS AWARE THAT THE FEDERAL SECURITIES LAWS OF THE UNITED STATES PROHIBIT ANY PERSON (AS DEFINED IN SECTION 101(41) OF THE BANKRUPTCY CODE, A "PERSON") WHO HAS MATERIAL

NON-PUBLIC INFORMATION ABOUT A COMPANY, WHICH IS OBTAINED FROM THE COMPANY OR ITS REPRESENTATIVES, FROM PURCHASING OR SELLING SECURITIES OF SUCH COMPANY OR FROM COMMUNICATING THE INFORMATION TO ANY OTHER PERSON UNDER CIRCUMSTANCES IN WHICH IT IS REASONABLY FORESEEABLE THAT SUCH PERSON IS LIKELY TO PURCHASE OR SELL SUCH SECURITIES AND (B) IS FAMILIAR WITH THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED (THE "EXCHANGE ACT"), AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER, AND AGREES THAT IT WILL NOT USE OR COMMUNICATE TO ANY PERSON OR ENTITY, UNDER CIRCUMSTANCES WHERE IT IS REASONABLY LIKELY THAT SUCH PERSON OR ENTITY IS LIKELY TO USE OR CAUSE ANY PERSON OR ENTITY TO USE, ANY CONFIDENTIAL INFORMATION IN CONTRAVENTION OF THE EXCHANGE ACT OR ANY OF ITS RULES AND REGULATIONS, INCLUDING RULE 10B-5 PROMULGATED THEREUNDER.

THE SECURITIES DESCRIBED OR OTHERWISE CONTEMPLATED IN THIS DISCLOSURE STATEMENT MAY ONLY BE OFFERED TO CONSENTING CREDITORS THAT ARE NOT (I) RETAIL INVESTORS IN THE EUROPEAN ECONOMIC AREA (THE "EEA") (DEFINED AS A PERSON WHO IS ONE (OR MORE) OF: (X) A RETAIL CLIENT AS DEFINED IN POINT (11) OF ARTICLE 4(1) OF DIRECTIVE 2014/65/EU (AS AMENDED, "MIFID II"); (Y) A CUSTOMER WITHIN THE MEANING OF DIRECTIVE 2016/97/EU (AS AMENDED, THE "INSURANCE DISTRIBUTION DIRECTIVE"), WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT AS DEFINED IN POINT (10) OF ARTICLE 4(1) OF MIFID II; OR (Z) NOT A QUALIFIED INVESTOR AS DEFINED IN ARTICLE 2 OF REGULATION 2017/1129/EU (AS AMENDED, THE "PROSPECTUS REGULATION")) OR (II) RETAIL INVESTORS IN THE UNITED KINGDOM (DEFINED AS A PERSON WHO IS NEITHER (X) A PROFESSIONAL CLIENT, AS DEFINED IN POINT (8) OF ARTICLE 2(1) OF REGULATION (EU) No 600/2014 AS IT FORMS PART OF DOMESTIC LAW BY VIRTUE OF THE EUROPEAN UNION (WITHDRAWAL) ACT 2018 (THE "EUWA"); NOR (Y) A QUALIFIED INVESTOR AS DEFINED IN PARAGRAPH 15 OF SCHEDULE 1 TO THE PUBLIC OFFERS AND ADMISSIONS TO TRADING REGULATIONS 2024 (THE "UK POATRS")).

ACCORDINGLY, THIS DISCLOSURE STATEMENT AND ANY DOCUMENTS RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PREPACKAGED PLAN) HAVE BEEN PREPARED ON THE BASIS THAT ANY OFFER OR SALE OF SECURITIES ISSUED IN CONNECTION WITH THE PREPACKAGED PLAN WITHIN (I) ANY MEMBER STATE OF THE EEA WILL BE MADE PURSUANT TO AN EXEMPTION UNDER THE PROSPECTUS REGULATION FROM THE REQUIREMENT TO PUBLISH A PROSPECTUS FOR THE OFFER OF TRANSFERABLE SECURITIES TO THE PUBLIC AND (II) THE UNITED KINGDOM WILL BE MADE PURSUANT TO AN EXCEPTION FROM THE GENERAL PROHIBITION OF OFFERS TO THE PUBLIC UNDER THE UK POATRS. IN RELATION TO EACH EEA MEMBER STATE OR THE UNITED KINGDOM, NO OFFER OF SECURITIES ISSUED IN CONNECTION WITH THE PREPACKAGED PLAN MAY BE MADE TO THE PUBLIC AT ANY TIME OTHER THAN PURSUANT TO AN EXEMPTION UNDER THE PROSPECTUS REGULATION OR IN ACCORDANCE WITH THE UK POATRS.

IN ANY EEA MEMBER STATE OR THE UNITED KINGDOM, THIS DISCLOSURE STATEMENT AND DOCUMENTS RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PREPACKAGED PLAN) ARE ONLY ADDRESSED TO AND DIRECTED AT QUALIFIED INVESTORS IN THAT JURISDICTION WITHIN THE MEANING OF THE PROSPECTUS REGULATION OR THE UNITED KINGDOM POATRS, AS APPLICABLE.

FURTHER, NO KEY INFORMATION DOCUMENT IS REQUIRED TO BE PREPARED AND NONE HAS BEEN PREPARED IN LINE WITH THE REQUIREMENTS OF REGULATION 1286/2014/EU (AS AMENDED, THE "PRIIPS REGULATION") AND THE PRIIPS REGULATION AS IT FORMS PART OF UNITED KINGDOM DOMESTIC LAW BY VIRTUE OF THE EUWA (THE "UK PRIIPS REGULATION") IN RESPECT OF THE SECURITIES AS THE SECURITIES WILL NOT BE MADE AVAILABLE TO RETAIL INVESTORS IN THE EEA OR UNITED KINGDOM.

IN THE UNITED KINGDOM, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR ANY DOCUMENTS RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PREPACKAGED PLAN) IS INTENDED ONLY FOR USE AND MAY ONLY BE RELIED UPON IN RELATION TO ANY INVESTMENT ACTIVITY BY, AND ANY INVESTMENT ACTIVITY TO WHICH SUCH INFORMATION RELATES MAY ONLY BE ENGAGED IN BY, PERSONS WHO ARE AT THE RELEVANT TIME: (I) INVESTMENT PROFESSIONALS WITHIN THE MEANING OF ARTICLE 19(5) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2005 OF THE UNITED KINGDOM (THE "ORDER"); (II) PERSONS FALLING WITHIN THE MEANING OF ARTICLE 49(2)(A) TO (D) OF THE ORDER; OR (III) PERSONS TO WHOM THE COMMUNICATION MAY OTHERWISE LAWFULLY BE COMMUNICATED UNDER FSMA (TOGETHER, THE "PERMITTED UK PERSONS"). ANY PERSON IN THE UNITED KINGDOM THAT IS NOT A PERMITTED UK PERSON IS NOT, FOR THE PURPOSES OF ANY INVESTMENT OR INVESTMENT DECISION, AN INTENDED RECIPIENT OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR ANY DOCUMENT RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PREPACKAGED PLAN) AND SHOULD NOT USE SUCH INFORMATION AS THE BASIS FOR TAKING ANY INVESTMENT ACTIVITY OR INVESTMENT ACTION. THIS DISCLOSURE STATEMENT AND ANY DOCUMENT RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PREPACKAGED PLAN) SHOULD NOT (INSOFAR AS THEY RELATE TO ANY INVESTMENT OR INVESTMENT ACTIVITY) BE DISTRIBUTED, COMMUNICATED TO, OR DIRECTED AT THE GENERAL PUBLIC IN THE UNITED KINGDOM OTHERWISE THAN AS DESCRIBED ABOVE.

THE DEBTORS MUST RELY ON THEIR OWN EXAMINATION OF THE TERMS OF THE PREPACKAGED PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. THIS DOCUMENT WILL NOT BE FILED WITH THE UK FINANCIAL CONDUCT AUTHORITY (THE "FCA") AND THE PREPACKAGED PLAN DOCUMENTS WILL NOT BE REVIEWED BY THE FCA.

The distribution of this Disclosure Statement in other jurisdictions may be restricted by law, and persons into whose possession this Disclosure Statement comes should inform themselves about, and observe, any such restriction. Any failure to comply with these restrictions may constitute a violation of the laws of any such other jurisdiction.

**TABLE OF CONTENTS**

Section.                                                                                                                                         Page

I.       INTRODUCTION. ...................................................................................................................1

II.      PRELIMINARY STATEMENT. ............................................................................................1

III.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE
         PREPACKAGED PLAN...........................................................................................................3

         A.      What is chapter 11?.........................................................................................................3
         B.      Why are the Debtors sending me this Disclosure Statement?.........................................3
         C.      Why are votes being Solicited prior to Bankruptcy Court approval of the Disclosure Statement?...3
         D.      What are the Restructuring Transactions Under the Prepackaged Plan?.........................4
         E.      Am I entitled to vote to accept or reject the Prepackaged Plan? ....................................4
         F.      Controversy Concerning Impairment.............................................................................5
         G.      Special Provision Governing Unimpaired Claims. .........................................................5
         H.      What is the deadline to vote to accept or reject the Prepackaged Plan?..........................5
         I.      How do I vote for or against the Prepackaged Plan?......................................................5
         J.      Why is the Bankruptcy Court holding a Confirmation Hearing? ....................................6
         K.      What is the purpose of the Confirmation Hearing?.........................................................6
         L.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the
                 Prepackaged Plan? .........................................................................................................6
         M.      What will I receive from the Debtors if the Prepackaged Plan is consummated?............7
         N.      What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority Tax
                 Claim, DIP Claim and Professional Fee Claim? .........................................................9
         O.      Are any regulatory approvals required to consummate the Prepackaged Plan?..............12
         P.      What happens to my recovery if the Prepackaged Plan is not confirmed or does not go effective?12
         Q.      If the Prepackaged Plan provides that I get a distribution, do I get it upon Confirmation or when
                 the Prepackaged Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
                 "Consummation?".........................................................................................................12
         R.      What are the sources of Cash and other consideration required to fund the Prepackaged Plan? ....13
         S.      Are there risks to owning the New LYCRA Holdco Common Stock upon the Debtors' emergence
                 from chapter 11?...........................................................................................................13
         T.      Is there potential litigation related to the Prepackaged Plan?........................................13
         U.      What is the Management Incentive Plan and how will it affect the distribution I receive under the
                 Prepackaged Plan? .......................................................................................................13
         V.      Does the Prepackaged Plan preserve Causes of Action?...............................................13
         W.      Will there be releases, exculpation, and injunction granted to parties in interest as part of the
                 Prepackaged Plan? .......................................................................................................14
         X.      What Are the Consequences of Opting Out of the Releases Provided by the Prepackaged Plan? ..22
         Y.      Does the Bankruptcy Code protect against discriminatory treatment?...........................22
         Z.      Will the Company retain documents after any Effective Date? ......................................22
         AA.     What is the effect of Reimbursement or Contribution?..................................................22
         BB.     What is the effect of the Prepackaged Plan on the Debtors' capital structure? ..............22
         CC.     What is the effect of the Prepackaged Plan on the Debtors' ongoing business? .............23
         DD.     Will any party have significant influence over the corporate governance and operations of the
                 Reorganized Debtors? ...................................................................................................23
         EE.     Do the Debtors recommend voting in favor of the Prepackaged Plan?..........................24
         FF.     Who Supports the Prepackaged Plan?...........................................................................24

IV.      CORPORATE HISTORY AND BUSINESS OPERATIONS. ...............................................24

         A.      Corporate History...........................................................................................................24
         B.      The LYCRA Company's Business and Operations. ......................................................28

V.     THE COMPANY'S PREPETITION CORPORATE AND CAPITAL STRUCTURE. ......................29

    A.     The LYCRA Company's Corporate Structure. ..................................................................29
    B.     The LYCRA Company's Capital Structure. ......................................................................29
    C.     Other Financial Indebtedness ..........................................................................................32

VI.    EVENTS LEADING TO THE PREPACKAGED CASES AND THE ANTICIPATED PATH

    FORWARD. .............................................................................................................................33

    A.     Prepetition Challenges. ....................................................................................................33
    B.     Prepetition Initiatives. ......................................................................................................37
    C.     Path Forward in Chapter 11 ..............................................................................................39

VII.   MATERIAL DEVELOPMENTS OF THE PREPACKAGED CASES. ...............................40

    A.     First Day Relief. ...............................................................................................................40
    B.     Proposed Confirmation Schedule. ....................................................................................40

VIII.  THE DEBTORS' RSA AND PREPACKAGED PLAN. ......................................................42

    A.     The RSA. ...........................................................................................................................42
    B.     The Prepackaged Plan. .....................................................................................................43

IX.    OTHER KEY ASPECTS OF THE PREPACKAGED PLAN. .............................................56

    A.     Treatment of Executory Contracts and Unexpired Leases. ..............................................56
    B.     Provisions Governing Distributions. ................................................................................59
    C.     Procedures for Resolving Contingent, Unliquidated, and Disputed Claims....................64
    D.     Conditions Precedent to Confirmation and Consummation of the Prepackaged Plan......66
    E.     Modification, Revocation, or Withdrawal of the Prepackaged Plan. ...............................68
    F.     Other Claims and Interest Classification and Treatment Features....................................69

X.     RISK FACTORS. ...................................................................................................................70

    A.     Bankruptcy Law Considerations. .....................................................................................70
    B.     Risks Related to Recoveries Under the Prepackaged Plan. ..............................................77
    C.     Risks Related to the Debtors' and the Reorganized Debtors' Business............................78
    D.     Risks Related to the Offer and Issuance of Securities Under the Prepackaged Plan........84

XI.    SOLICITATION AND VOTING PROCEDURES. ..............................................................86

    A.     Holders of Claims Entitled to Vote to Accept or Reject the Prepackaged Plan. ..............86
    B.     Voting Record Date. .........................................................................................................86
    C.     Voting on the Prepackaged Plan. ......................................................................................87
    D.     Ballots Not Counted. .........................................................................................................87
    E.     Votes Required for Acceptance by a Class. ......................................................................87
    F.     How to Opt Out of the Releases........................................................................................87

XII.   CONFIRMATION OF THE PREPACKAGED PLAN.........................................................88

    A.     The Confirmation Hearing. ...............................................................................................88
    B.     Requirements for Confirmation of the Prepackaged Plan. ...............................................88
    C.     Best Interests of Creditors/Liquidation Analysis.............................................................88
    D.     Feasibility. ........................................................................................................................89
    E.     Acceptance by Impaired Classes.......................................................................................89
    F.     Confirmation Without Acceptance by All Impaired Classes. ...........................................90

XIII.  CERTAIN SECURITIES LAW MATTERS...........................................................................91

    A.     New LYCRA Holdco Common Stock, New Warrants and New Debt. ............................91
    B.     Exemption from Registration Requirements; Issuance of Securities Under the Prepackaged Plan.91

     C.      Resales of Securities; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code. ................................................................................................................................................93

     D.      Financial Performance. ..........................................................................................................97

**XIV.**   **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PREPACKAGED PLAN..................................................................................................................97**

     A.      Introduction..............................................................................................................................98

     B.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of DIP Claims of the Consummation of the Prepackaged Plan.......................................................................................100

     C.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed ssTL Claims. ........104

     D.      Certain U.S. Federal Income Tax Consequences to Linx Capital Limited, as the Holder of the Allowed Euro Notes Claims...........................................................................................................108

     E.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Dollar Notes Claims. ................................................................................................................................................108

     F.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Promissory Notes Claims. ........................................................................................................................................110

     G.      PFIC Status of New LYCRA Holdco ..........................................................................................111

     H.      Characterization of the Restructuring Transactions With Respect to the Debtors........................112

**XV.**    **RECOMMENDATION.......................................................................................................................113**

**EXHIBITS**[3]

EXHIBIT A          Prepackaged Plan of Reorganization

EXHIBIT B          RSA

EXHIBIT C          Financial Projections

EXHIBIT D          Liquidation Analysis

EXHIBIT E          Organizational Chart

---

[3]   Each Exhibit is incorporated herein by reference.

## I.    INTRODUCTION.

The LYCRA Company LLC and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" and, together with their non-Debtor affiliates, "LYCRA" or the "Company"), are pursuing proposed Restructuring Transactions as described in the Prepackaged Plan and pursuant to the terms and conditions set forth in that certain Short-Form Lock-Up Deed, dated as of March 13, 2026, by and among the Debtors and the Consenting Creditors (as may be amended, supplemented, or otherwise modified from time to time, and including all schedules, exhibits, and annexes thereto, the "RSA"), attached hereto as **Exhibit B**.

Pursuant to the RSA, the Debtors have launched a solicitation of votes to accept or reject the Prepackaged Plan (such solicitation, the "Solicitation") to Holders of Claims in Class 3, Class 4, Class 5 and Class 6. The Debtors intend to distribute this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code, to Holders of ssTL Claims, Euro Notes Claims, Dollar Notes Claims and Promissory Note Claims in connection with the Solicitation. A copy of the Prepackaged Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

In connection with the RSA, and to seek Confirmation and Consummation of the Prepackaged Plan, the Debtors will commence voluntary cases (the "Prepackaged Cases") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

THE DEBTORS AND THE CONSENTING CREDITORS THAT HAVE EXECUTED OR ACCEDED TO THE RSA, ATTACHED HERETO AS **EXHIBIT B**, BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PREPACKAGED PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST AVAILABLE RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THE PREPACKAGED PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE PREPACKAGED CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PREPACKAGED PLAN.

## II.    PRELIMINARY STATEMENT.

The Debtors will file the Prepackaged Cases to implement a comprehensive financial restructuring that will enable it to continue its long history of innovation and success.

The Company traces its origins to 1958, when a team of pioneering chemical scientists at DuPont, led by Dr. Joseph Shivers, invented LYCRA® fiber—the original spandex (elastane) yarn. This groundbreaking innovation fundamentally transformed the apparel industry, and, in the decades that followed, the Company evolved into a leading global innovator and producer of fiber and technology solutions for the apparel and personal care industries, operating through a sophisticated portfolio of consumer brands, including LYCRA®, LYCRA HyFit®, COOLMAX®, and THERMOLITE®, which are integral to virtually every apparel category—from activewear to everyday denim and medical compression garments. The Company operates today through a global manufacturing and processing footprint spanning North America, Europe, Asia, and South America, serving customers in dozens of countries around the world.

Despite the Company's leading market position and diversified brand portfolio, the Company has faced increasing financial pressure due to industry headwinds and the Company's highly leveraged balance sheet. To address these challenges, the Debtors will file the Prepackaged Cases with the overwhelming support of their largest and most significant economic stakeholders to implement the Restructuring Transactions outlined in the RSA, a copy of which is attached hereto as **Exhibit B**, that will see LYCRA continue to build upon its heritage of

innovating and manufacturing high-quality, market-leading apparel ingredients. The Restructuring Transactions will maximize the value of the business, and position the Company for go-forward success, while minimizing any disruption for critical business partners, customers, and suppliers.

The key terms of the RSA include:

- the DIP Noteholders will provide up to $75 million in new money through the DIP Notes Facility, a superpriority senior secured debtor-in-possession notes facility, which will provide the Debtors with liquidity to fund the administration of the Prepackaged Cases;

- upon the Debtors' emergence from the Prepackaged Cases, certain of the Consenting Creditors and/or third parties will provide the Exit Notes Facility to Eagle Intermediate to refinance the DIP Notes Facility and to fund the Company's post-emergence operations;

- the DIP Noteholders will receive, (i) at the option of each DIP Noteholder, payment in cash in full or Exit Notes Facility notes in satisfaction of the DIP Claims; (ii) the DIP Commitment Premium consisting of certain New Class A1 Warrants; and (iii) the DIP Exit Premium;

- each Holder of an Allowed ssTL Claim will receive its pro rata share of (A) the New LYCRA Holdco Notes and (B) the New LYCRA Holdco ssTL Common Stock;

- the Holder of the Euro Notes Claims will receive (i) 95% of the New Class A2 Warrants in respect of the Allowed Euro Notes Priority Tranche Claims and (ii)(a) 5% of the New Class A2 Warrants and (b) 100% of the New Class A3 Warrants in respect of the Allowed Euro Non-Priority Tranche Claims;

- each Holder of an Allowed Dollar Notes Claim will receive its pro rata share of the New Class B Warrants;

- each Holder of an Allowed Promissory Note Claim will receive its pro rata share of $1,000;

- General Unsecured Claims will be Unimpaired and paid in the ordinary course of business, subject to all retained rights and defenses of the Debtors;

- all Holdco Interests will be cancelled and receive no distribution; and

- customary Debtor Release and consensual Third-Party Release.

The RSA and Prepackaged Plan are structured to support the Company's ongoing commitment to its customers, business partners, and stakeholders while strengthening the business as a going-concern. With the support of their lenders and other key stakeholders, the Debtors seek authority to move through the chapter 11 process efficiently. The Debtors seek to proceed through the Prepackaged Cases on an approximately 45-day timeline, subject to Court approval, to minimize disruption to the business and accrual of administrative expenses. The Debtors intend to use the proceeds of the DIP Notes Facility to, among other things, facilitate a smooth landing into chapter 11 and fund go-forward business operations in the ordinary course, thereby preserving the value inherent in the Company without prejudicing the ability for any party to assert its rights in the Prepackaged Cases.

The Debtors strongly believe that the deleveraging and liquidity-enhancing Restructuring Transactions contemplated by the RSA and the Prepackaged Plan are in the best interests of the Debtors' Estates and represent the best available alternative to the Company at this time. Given the Debtors' core strengths and strong customer relationships, the Debtors are confident that they can implement the Restructuring Transactions contemplated by the Prepackaged Plan and the RSA to ensure the Debtors' long-term viability. Ultimately, confirmation of the

Prepackaged Plan will result in the deleveraging of more than $1.2 billion of the Company's funded debt obligations and allow the Company to emerge from chapter 11 in a better position than ever to remain a global leader in the fiber industry.

> **FOR THESE REASONS, THE DEBTORS STRONGLY RECOMMEND THAT HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PREPACKAGED PLAN <u>VOTE TO ACCEPT</u> THE PREPACKAGED PLAN.**

**III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PREPACKAGED PLAN.**

**A.      What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equal treatment for similarly-situated creditors and equity holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity holder of the debtor (whether or not such creditor or equity holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Prepackaged Plan. Before soliciting acceptances of the Prepackaged Plan, section 1125 of the Bankruptcy Code requires that the Debtors prepare a disclosure statement containing adequate information sufficient to enable a hypothetical reasonable investor to make an informed decision regarding acceptance of the Prepackaged Plan and to share such Disclosure Statement with all Holders of Claims whose votes to accept or reject the Prepackaged Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Why are votes being Solicited prior to Bankruptcy Court approval of the Disclosure Statement?**

By sending this Disclosure Statement and soliciting votes for the Prepackaged Plan prior to approval by the Bankruptcy Court, the Debtors are preparing to seek Confirmation of the Prepackaged Plan shortly after commencing the Prepackaged Cases. The Debtors will ask the Bankruptcy Court to approve this Disclosure Statement on a final basis together with Confirmation of the Prepackaged Plan at the same hearing, which may be scheduled as shortly as forty-five (45) days after commencing the Prepackaged Cases, all subject to the Bankruptcy Court's approval and availability.

**D.        What are the Restructuring Transactions Under the Prepackaged Plan?**

The RSA and the Prepackaged Plan contemplate a recapitalization of the Debtors, through which the Debtors will issue, allot, and distribute the New LYCRA Holdco Common Stock, the New Warrants and the New LYCRA Holdco Notes, and enter into the Exit Notes Facility.

**E.        Am I entitled to vote to accept or reject the Prepackaged Plan?**

Your ability to vote to accept or reject, and your distribution under, the Prepackaged Plan, if any, depends on what type of Claim or Interest you hold as of the Voting Record Date (*i.e.*, as of, March 13, 2026). For Class 3, Class 4, Class 5 and Class 6, the amount of your claims entitled to vote under the Prepackaged Plan is determined on the date you submit your vote. Each category of Holders of Claims or Interests, as set forth in Article III of the Prepackaged Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | ssTL Claims | Impaired | Entitled to Vote |
| Class 4 | Euro Notes Claims | Impaired | Entitled to Vote |
| Class 5 | Dollar Notes Claims | Impaired | Entitled to Vote |
| Class 6 | Promissory Note Claims | Impaired | Entitled to Vote |
| Class 7 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| Class 10 | Non-Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| Class 11 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| Class 12 | Holdco Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

Except for the Claims addressed in Article II of the Prepackaged Plan, all Claims and Interests are classified in the Classes set forth above in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim is classified in a particular Class for the purpose of receiving distributions under the Prepackaged Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

Although for purposes of administrative convenience and efficiency, the Prepackaged Plan has been proposed as a joint plan for each of the Debtors and presents Classes of Claims against and Interests in the Debtors, the Prepackaged Plan does not provide for the substantive consolidation of any of the Debtors. The classification of Claims against and Interest in any Debtor will not affect such Debtor's status as a separate legal Entity, change the organizational structure of such Debtors' business enterprise, constitute a change of control of such Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under the Prepackaged Plan, each Reorganized Debtor will continue to exist as separate legal Entity from and after the Effective Date.

### F.      Controversy Concerning Impairment.

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court will, after notice and a hearing, determine such controversy on or before the Confirmation Date or such other date as fixed by the Bankruptcy Court.

### G.      Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Prepackaged Plan, nothing under the Prepackaged Plan or the Plan Supplement will affect the rights of the Debtors or the Reorganized Debtors, as applicable, regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### H.      What is the deadline to vote to accept or reject the Prepackaged Plan?

The Voting Deadline is April 17, 2026, at 4:00 p.m. (prevailing Central Time).  Please note that for your vote to be considered timely, it must be **actually received** by the Claims and Noticing Agent by 4:00 p.m. (prevailing Central Time) on April 17, 2026.  Therefore, you are encouraged to submit your vote with sufficient time to account for any delivery delays.

### I.      How do I vote for or against the Prepackaged Plan?

Detailed instructions regarding how to vote to accept or reject the Prepackaged Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Prepackaged Plan (the "Ballots"). For your vote to be counted, your Ballot must be properly completed, executed, and delivered as directed, so that the Ballot containing your vote is **actually received** by the Claims and Noticing Agent **on or before the Voting Deadline,** *i.e.*, **April 17, 2026 at 4:00 p.m., prevailing Central Time**.

Holders of the Debtors' securities that are entitled to vote are encouraged to coordinate with the bank, broker, or other financial institution that holds your securities on your behalf "in street name" at one of the securities depositories (your "Nominee") for the purpose of casting your vote through a master ballot.  Nominees will be authorized to use their customary methods of collecting votes from their beneficial holder clients, which

may include (but are not limited to) via e-mail, dedicated portal, telephone, voter information form, or other acceptable methods in lieu of an actual paper Ballot.[4]

**J.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Prepackaged Plan and recognizes that any party in interest may object to Confirmation of the Prepackaged Plan. Shortly after the commencement of the Prepackaged Cases, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing, at which time the Debtors will seek, among other things, Confirmation of the Prepackaged Plan. At the Confirmation Hearing, the Debtors will also seek Bankruptcy Court approval of this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code as containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Prepackaged Plan and that the Debtors shared this Disclosure Statement with all Holders of Claims whose votes to accept or reject the Prepackaged Plan are being solicited. All parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled. The Confirmation Hearing may be adjourned from time-to-time without further notice.

**K.      What is the purpose of the Confirmation Hearing?**

The purpose of the Confirmation Hearing is to seek approval of the Prepackaged Plan and this Disclosure Statement. If so approved, the Bankruptcy Court will have held that this Disclosure Statement has provided the Voting Classes with adequate information to make an informed decision as to whether to vote to accept or reject the Prepackaged Plan in accordance with section 1125(a)(1) of the Bankruptcy Code.

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**L.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Prepackaged Plan?**

If you have any questions regarding this Disclosure Statement or the Prepackaged Plan, please contact the Claims and Noticing Agent, Kroll, by calling (888) 498-1399 (Toll free from US / Canada) OR (347) 338-6514 (International, Toll), or e-mailing Lycrainfo@ra.kroll.com with "In re: LYCRA – Solicitation Inquiry" in the subject line.  Copies of the Prepackaged Plan, this Disclosure Statement, and any other publicly-filed documents in the Prepackaged Cases are available free of charge, as applicable, by: (i) visiting the Debtors' restructuring website at https://restructuring.ra.kroll.com/lycra after the Petition Date; (ii) emailing using Lycrainfo@ra.kroll.com (with "In re: Lycra – Solicitation Inquiry" in the subject line); or (iii) calling the Claims

---

[4]    Votes for the Euro-denominated securities will be collected through Euroclear Bank SA/NV ("Euroclear") and/or Clearstream Banking S.A. ("Clearstream") via those depositories' electronic platforms.  Euroclear and/or Clearstream will forward the voting results to the Claim and Noticing Agent's European affiliate, Kroll Isser Services Limited ("KIS (UK)"), which will (in turn and with Euroclear's and/or Clearstream's authorization) affix such results to a master ballot and submit such master ballot to the Claims and Noticing Agent.  The aforementioned process is being employed strictly for administrative purposes and KIS (UK) is serving as a conduit for the transfer of the voting results collected by Euroclear and Clearstream to the Claims and Noticing Agent.

and Noticing Agent at the number(s) listed above. You may also obtain copies of any pleadings filed in the Prepackaged Cases via PACER at https://www.pacer.gov (for a fee).

**M.      What will I receive from the Debtors if the Prepackaged Plan is consummated?**

The following chart provides a summary of the anticipated distributions to Holders of Claims or Interests under the Prepackaged Plan. Your ability to receive distributions under the Prepackaged Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Prepackaged Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, will receive under the Prepackaged Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, will receive such treatment on the Effective Date (or, if payment is not then due, in accordance with such Claim's terms in the ordinary course of business) or as soon as reasonably practicable thereafter.

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Prepackaged Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Any such contractual, legal, or equitable subordination rights will be settled, compromised, and released pursuant to the Prepackaged Plan.

| Summary of Projected Distributions | | |
|---|---|---|
| **Class** | **Claim/Interest** | **Treatment of Claim / Interest** |
| Class 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Secured Claim will receive, in full and final satisfaction of such Other Secured Claim, at the option of the applicable Debtor or the Reorganized Debtor with the reasonable consent of the Required Consenting Creditors, either: <br><br>(i)   payment in full in Cash of its Allowed Other Secured Claim; <br><br>(ii)  the collateral securing its Allowed Other Secured Claim; <br><br>(iii) Reinstatement of its Allowed Other Secured Claim; or <br><br>(iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired. |
| Class 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Priority Claim will receive, in full and final satisfaction of such Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| Class 3 | ssTL Claims | Except to the extent that a Holder of an Allowed ssTL Claim agrees to less favorable treatment of its Allowed Claim, each |

| | Summary of Projected Distributions | |
|---|---|---|
| | | Holder of an Allowed ssTL Claim will receive, in full and final satisfaction of such ssTL Claim, its Pro Rata share of (i) the New LYCRA Holdco Notes and (ii) the New LYCRA Holdco ssTL Common Stock; *provided* that, distribution of any New LYCRA Holdco ssTL Common Stock to the Holders of the ssTL Claims will be conditioned upon execution of the New LYCRA Holdco Investor Agreement by such Holders of ssTL Claims. |
| Class 4 | Euro Notes Claims | Except to the extent that Linx Capital Limited, as the Holder of the Allowed Euro Notes Claims, agrees to less favorable treatment, on the Effective Date Linx Capital Limited will receive (i) 95% of the New Class A2 Warrants in respect of the Allowed Euro Notes Priority Tranche Claims and (ii)(a) 5% of the New Class A2 Warrants and (b) 100% of the New Class A3 Warrants in respect of the Allowed Euro Non-Priority Tranche Claims. |
| Class 5 | Dollar Notes Claims | Except to the extent that a Holder of an Allowed Dollar Notes Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed Dollar Notes Claim will receive its Pro Rata share of the New Class B Warrants. |
| Class 6 | Promissory Note Claims | Except to the extent that a Holder of a Promissory Note Claim agrees to less favorable treatment, each Holder of an Allowed Promissory Note Claim will receive, in full and final satisfaction of such Promissory Note Claim, its Pro Rata share of $1,000. |
| Class 7 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed General Unsecured Claim will receive, in full and final satisfaction of such General Unsecured Claim, Reinstatement of its Allowed General Unsecured Claim or such other treatment rendering such Allowed General Unsecured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| Class 8 | Section 510(b) Claims | On the Effective Date, all Section 510(b) Claims will be cancelled, released, discharged, extinguished, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims. |
| Class 9 | Debtor Intercompany Claims | Each Allowed Debtor Intercompany Claim will be, at the option of the applicable Debtor or the Reorganized Debtor with the reasonable consent of the Required Consenting Creditors, either:<br>(i) Reinstated;<br>(ii) adjusted, converted to equity, set off, settled, distributed, or contributed;<br>(iii) discharged, cancelled, and released without any distribution on account of such Allowed Debtor Intercompany Claims; or<br>(iv) otherwise addressed at the Debtors' election. |
| Class 10 | Non-Debtor Intercompany Claims | Each Allowed Non-Debtor Intercompany Claim will be, at the option of the applicable Debtor or the Reorganized Debtor, with the reasonable consent of the Required Consenting Creditors, either: |

8

| Summary of Projected Distributions | | |
|---|---|---|
| | | (i) Reinstated;<br><br>(ii) adjusted, converted to equity, set off, settled, distributed, or contributed;<br><br>(iii) discharged, cancelled, and released without any distribution on account of such Allowed Non-Debtor Intercompany Claims; or<br><br>(iv) otherwise addressed at the Debtors' election. |
| Class 11 | Intercompany Interests | Each Allowed Intercompany Interest will be, at the option of the applicable Debtor or the Reorganized Debtor, with the reasonable consent of the Required Consenting Creditors, either:<br><br>(i) Reinstated;<br><br>(ii) adjusted, converted to equity, set off, settled, distributed, or contributed;<br><br>(iii) discharged, cancelled, and released without any distribution on account of such Allowed Intercompany Interests; or<br><br>(iv) otherwise addressed at the Debtors' election. |
| Class 12 | Holdco Interests | Each Allowed Holdco Interest will be discharged, cancelled, and released without any distribution on account of such Holdco Interests. |

**N.      What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority Tax Claim, DIP Claim and Professional Fee Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, DIP Claims (and the DIP Commitment Premium and DIP Exit Premium) and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Prepackaged Plan.

**1.      Administrative Claims.**

Except with respect to the Professional Fee Claims, Restructuring Expenses, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtors against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtors on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed

upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

### 2. Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### 3. DIP Claims, DIP Commitment Premium, and the DIP Exit Premium.

All DIP Claims will be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP Notes Facility on such date, (b) all interest accrued and unpaid thereon to the date of payment, and (c) all accrued and unpaid fees, premiums, expenses, and non-contingent indemnification obligations payable under the DIP Documents and the DIP Orders. On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, each Allowed DIP Claim will be, in full and final satisfaction of such Allowed DIP Claim, paid in full in Cash from proceeds in connection with the Exit Notes Facility, *provided* that, if a Holder of an Allowed DIP Claim is also a lender under the Exit Notes Facility, such Holder may elect to exchange its Allowed DIP Claim into the Exit Notes Facility on a dollar-for-dollar basis.

The Reorganized Debtors are authorized and directed, upon the Effective Date, to (x) issue the New Class A1 Warrants in full and final satisfaction of the DIP Commitment Premium, and (y) issue the DIP Exit Note in full and final satisfaction of the DIP Exit Premium, in each case, with allocation to be determined and agreed as among the DIP Noteholders.

Upon the satisfaction of the Allowed DIP Claims in accordance with the terms of the Prepackaged Plan, or other such treatment as contemplated by Article II.C of the Prepackaged Plan, all guarantees provided and all Liens and security interests granted, in each case, to secure such obligations will be automatically released, terminated, and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. The DIP Agent and the DIP Noteholders will take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

### 4. Professional Fee Claims.

#### (a) Final Fee Applications and Payment of Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court will determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors will pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount will not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals will have an Allowed Administrative Claim for any such deficiency, which will be satisfied in accordance with Article II.A of the Prepackaged Plan.

**(b)** **Professional Fee Escrow Account.**

On the Effective Date, the Reorganized Debtors will establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account will be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders. Such funds will not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Fee Claims owing to the Professionals will be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims will not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account will promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

**(c)** **Professional Fee Amount.**

Professionals will reasonably estimate in good faith their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date, and will deliver such estimate to the Debtors no later than three (3) Business Days before the Effective Date; *provided* that such estimates will not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or the Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

**(d)** **Post-Confirmation Fees and Expenses.**

Except as otherwise specifically provided in the Prepackaged Plan, from and after the Confirmation Date, the Debtors or the Reorganized Debtors as applicable, will, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Prepackaged Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ and pay any Professional without any further notice to or action, order, or approval of the Bankruptcy Court.

**5.** **Payment of Restructuring Expenses.**

Any time that a Restructuring Expense Party seeks payment of Restructuring Expenses from the Debtors or the Reorganized Debtors, such Restructuring Expense Party will deliver to the Debtors or the Reorganized Debtors (as applicable) and their counsel an invoice for such Restructuring Expenses in summary form, which will be reasonably acceptable to the Debtors or Reorganized Debtors, as applicable. The Debtors reserve the right to request additional detail regarding the services rendered and expenses incurred by such Restructuring Expense Party.

To the extent not otherwise paid, and subject to the preceding paragraph, the Debtors or the Reorganized Debtors, as applicable, will promptly pay in Cash in full outstanding and invoiced Restructuring Expenses as follows: (i) on the Effective Date, Restructuring Expenses incurred, or estimated to be incurred, during the period prior to the Effective Date to the extent invoiced to the Debtors at least three (3) Business Days in advance of the

Effective Date following the Debtors' delivery of prior written notice of the date on which they anticipate the Effective Date will occur, and (ii) after the Effective Date, any unpaid Restructuring Expenses within ten (10) Business Days of receiving an invoice; *provided* that, such Restructuring Expenses will be paid in accordance with the terms of any applicable engagement letters or other contractual arrangements without the requirement for the filing of retention applications, fee applications, or any other applications in the Prepackaged Cases, and without any requirement for further notice or Bankruptcy Court review or approval; *provided further* that, to the extent timely invoiced, Restructuring Expenses that are not paid by the Debtors or the Reorganized Debtors, as applicable, within the timeframes set forth in Article II.D of the Prepackaged Plan, such Restructuring Expenses will not be deemed waived and will be included in a subsequent invoice. After the Effective Date, the Debtors and Reorganized Debtors (as applicable) will continue to pay when due and payable in the ordinary course of their business any unpaid Restructuring Expenses that were incurred, before or after the Effective Date.

### 6. Non-U.S. Facility.

All Non-U.S. Facility Claims will be Allowed Claims. On the Effective Date, the Allowed Non-U.S. Facility Claims will be Reinstated and the New Debt Documents will provide for and allow the continuation of the Non-U.S. Facility.

### O. Are any regulatory approvals required to consummate the Prepackaged Plan?

At this time, the Debtors are evaluating which, if any, regulatory approvals are required to consummate the Prepackaged Plan. To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Prepackaged Plan, however, it is a condition precedent to the Effective Date that they be obtained.

### P. What happens to my recovery if the Prepackaged Plan is not confirmed or does not go effective?

In the event that the Prepackaged Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their business. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Prepackaged Plan. For a more detailed description of the consequences of an extended Chapter 11 Case, or of a liquidation scenario, see Article X.B of this Disclosure Statement, and the Liquidation Analysis attached hereto as **Exhibit D**.

### Q. If the Prepackaged Plan provides that I get a distribution, do I get it upon Confirmation or when the Prepackaged Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Prepackaged Plan refers to approval of the Prepackaged Plan by the Bankruptcy Court. Confirmation of the Prepackaged Plan does not guarantee that you will receive the distribution indicated under the Prepackaged Plan. After Confirmation of the Prepackaged Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived before the Prepackaged Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Prepackaged Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Prepackaged Plan. "Consummation" of the Prepackaged Plan refers to the occurrence of the Effective Date. *See* Article IX.D of this Disclosure Statement, entitled "Conditions Precedent to Confirmation and Consummation of the Prepackaged Plan," for a discussion of conditions precedent to Confirmation and Consummation of the Prepackaged Plan.

**R.      What are the sources of Cash and other consideration required to fund the Prepackaged Plan?**

The Debtors and the Reorganized Debtors, as applicable, will fund distributions under the Prepackaged Plan and the Restructuring Transactions contemplated thereby with: (1) the Debtors' Cash on hand as of the Effective Date; (2) the New LYCRA Holdco Common Stock; and (3) the New Debt. Each distribution and issuance referred to in Article VI of the Prepackaged Plan will be governed by the terms and conditions set forth in the Prepackaged Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions will bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Prepackaged Plan, including the shares of New LYCRA Holdco Common Stock, the New Warrants, and the New Warrant Shares will be exempt from registration under the Securities Act, as described more fully in Article IV.M of the Prepackaged Plan.

**S.      Are there risks to owning the New LYCRA Holdco Common Stock upon the Debtors' emergence from chapter 11?**

Yes. *See* Article X of this Disclosure Statement, entitled "Risk Factors," for a discussion of such risks.

**T.      Is there potential litigation related to the Prepackaged Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Prepackaged Plan, which objections potentially could give rise to litigation. *See* Article X.C.6 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Prepackaged Cases."

In the event that it becomes necessary to confirm the Prepackaged Plan over the rejection of certain Classes, the Debtors may seek Confirmation of the Prepackaged Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Prepackaged Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a Prepackaged Plan that has been rejected by an impaired Class if it determines that the Prepackaged Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article XII.F of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes."

**U.      What is the Management Incentive Plan and how will it affect the distribution I receive under the Prepackaged Plan?**

Following the Effective Date, the New LYCRA Holdco Board will adopt the Management Incentive Plan, which will provide for the grants of equity and equity-based awards to employees, directors, consultants, and/or other service providers of the Reorganized Debtors, as determined at the discretion of the New LYCRA Holdco Board. The terms and conditions, including with respect to participants, allocation, timing, and the form and structure of the equity or equity-based awards, will be determined at the discretion of the New LYCRA Holdco Board after the Effective Date.

**V.      Does the Prepackaged Plan preserve Causes of Action?**

The Prepackaged Plan provides for the retention of Causes of Action that are not expressly waived, relinquished, exculpated, released, compromised or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Prepackaged Plan, the Reorganized Debtors will retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions

specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such retained Causes of Action will be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Prepackaged Plan to the contrary, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Prepackaged Plan, including in Article VIII of the Prepackaged Plan.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the RSA, the Prepackaged Plan, the Plan Supplement, or this Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available retained Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity, except as otherwise expressly provided in the Prepackaged Plan.** The Reorganized Debtors may settle any such retained Cause of Action without further notice to or action, order, or approval of the Bankruptcy Court. Unless any retained Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Prepackaged Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, will apply to such retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and will retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Prepackaged Cases or pursuant to the Prepackaged Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any retained Causes of Action that a Debtor may hold against any Entity will vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in the Prepackaged Plan, including Article VIII of the Prepackaged Plan, or pursuant to Bankruptcy Court order. The Reorganized Debtors, through their authorized agents or representatives, will retain and may exclusively enforce any and all such retained Causes of Action. The Reorganized Debtors will have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

W.     **Will there be releases, exculpation, and injunction granted to parties in interest as part of the Prepackaged Plan?**

Yes, the Prepackaged Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtor Release, Third-Party Release, exculpation, and injunction provisions included in the Prepackaged Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Parties to the RSA in obtaining their support for the Restructuring Transactions.

The Released Parties and the Exculpated Parties have made or are expected to make substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Prepackaged Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Releasing Parties are each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Noteholders; (d) the Agents/Trustees (including the DIP Agent); (e) each

14

Consenting Creditor; (f) Holders of Claims or Interests who vote to accept the Prepackaged Plan and do not affirmatively opt out of the releases set forth in the Prepackaged Plan; (g) Holders of Claims or Interests who are presumed to accept the Prepackaged Plan, have been served with an Opt-Out Form, and do not affirmatively opt out of the releases set forth in the Prepackaged Plan; (h) Holders of Claims or Interests who are entitled to vote but abstain from voting on the Prepackaged Plan, and do not affirmatively opt out of the releases set forth in the Prepackaged Plan; (i) Holders of Claims or Interests who vote to reject the Prepackaged Plan or are deemed to reject the Prepackaged Plan, and have been served with an Opt-Out Form or a Ballot, but do not affirmatively opt out of the releases set forth in the Prepackaged Plan; (j) the Helm Entities; (k) Linx Capital Limited (*provided* that Linx Capital Limited will not be a Releasing Party in its capacity as SPV Notes Issuer with respect to the 1L SPV Note Documents and 2L SPV Note Documents (each as defined in the RSA)); (l) each current and former Affiliate of each Entity in clause (a) through the following clause (m); and (m) each Related Party of each Entity in clause (a) through clause (l); *provided* that, in each case, an Entity will not be a Releasing Party if it: (i) affirmatively opts out of the releases in the Prepackaged Plan; or (ii) timely objects to the releases in the Prepackaged Plan, and such objection is not withdrawn before the Confirmation Hearing.

The Released Parties are each of, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Noteholders; (d) the Agents/Trustees (including the DIP Agent); (e) each Consenting Creditor; (f) Holders of Claims or Interests who vote to accept the Prepackaged Plan and do not affirmatively opt out of the releases set forth in the Prepackaged Plan; (g) Holders of Claims or Interests who are presumed to accept the Prepackaged Plan, have been served with an Opt-Out Form, and do not affirmatively opt out of the releases set forth in the Prepackaged Plan; (h) Holders of Claims or Interests who are entitled to vote but abstain from voting on the Prepackaged Plan, and do not affirmatively opt out of the releases set forth in the Prepackaged Plan; (i) Holders of Claims or Interests who vote to reject the Prepackaged Plan or are deemed to reject the Prepackaged Plan, and have been served with an Opt-Out Form or a Ballot, but do not affirmatively opt out of the releases set forth in the Prepackaged Plan; (j) the Helm Entities; (k) Linx Capital Limited (*provided* that Linx Capital Limited will not be a Released Party in its capacity as SPV Notes Issuer with respect to the 1L SPV Note Documents and 2L SPV Note Documents (each as defined in the RSA)); (l) each current and former Affiliate of each Entity in clause (a) through the following clause (m); and (m) each Related Party of each Entity in clause (a) through clause (l); *provided* that, in each case, an Entity will not be a Released Party if it: (i) affirmatively opts out of the releases in the Prepackaged Plan; or (ii) timely objects to the releases in the Prepackaged Plan, and such objection is not withdrawn before the Confirmation Hearing.

The Debtor Release is a release of the Debtors' claims against third parties. By contrast, the Third-Party Release is a release of direct claims a Holder of a Claim or Interest has against the Debtors and third parties unless a Holder of such Claim or Interest affirmatively elects to opt out of the Third-Party Release. You may choose to opt out of the Third-Party Release. If you opt out of the Third-Party Release, you will not receive a release pursuant to the Prepackaged Plan.

Based on the foregoing, the Debtors believe that the releases, exculpation, and injunction provisions in the Prepackaged Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Prepackaged Plan are copied in pertinent part below.

1.      **Discharge of Claims and Termination of Interests.**

Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Prepackaged Plan, or in any contract, instrument, or other agreement or document created pursuant to the Prepackaged Plan, the distributions, rights, and treatment that are provided in the Prepackaged Plan will be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims that the Debtors resolve or compromise after the Effective Date), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property will have been distributed or retained pursuant to the Prepackaged Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services that employees of the Debtors have performed prior to the Effective Date, and that arise from a termination of employment, any contingent or noncontingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Prepackaged Plan. Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the filing of the Prepackaged Cases will be deemed cured (and no longer continuing) as of the Effective Date. Without prejudice to the distributions, rights, and treatment that are provided by the Prepackaged Plan, the Confirmation Order will be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date, and, upon the Effective Date, all Holders of such Claims and Interests will be forever precluded and enjoined, pursuant to Section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim or Interest against the Debtors, Reorganized Debtors, or any of their assets or property.

2.      **Release of Liens.**

**Except as otherwise provided in the New Debt Documents, the Prepackaged Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Prepackaged Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Prepackaged Plan and, in the case of a Secured Claim satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Prepackaged Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates will be fully released and discharged, and all of the right, benefit, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests will revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim will be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder, including the Agents/Trustees) and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department will constitute good and sufficient evidence of, but will not be required to effect, the termination of such Liens.**

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Prepackaged Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) will take any and all steps reasonably requested by the Debtors or the Reorganized Debtors, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors will be entitled to make any such filings or recordings on such Holder's behalf.

3.       Releases by the Debtors.

Except as otherwise provided in the Prepackaged Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors under the Prepackaged Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Prepackaged Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, their Estates, the Reorganized Debtors, and any Person seeking to exercise the rights of the Debtors or their Estates, including any successors to the Debtors or any Estates or any Estate representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever, including any Avoidance Actions and any derivative Claims, asserted or assertable on behalf of any of the Debtors, Reorganized Debtors, and their Estates, whether liquidated or unliquidated, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, contingent or noncontingent, in Law, equity, contract, tort or otherwise, that the Debtors, their Estates, or the Reorganized Debtors, including any successors to the Debtors or any Estate representatives appointed or selected, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Reorganized Debtors, their Estates, or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Prepackaged Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, any related adversary proceedings, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the decision to file the Prepackaged Cases, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into or filing of the RSA, the DIP Notes Facility, the DIP Documents, the New LYCRA Holdco Common Stock, the New Warrants, the New Debt, the New Debt Documents, this Disclosure Statement, the Prepackaged Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Prepackaged Cases, any other Definitive Document or any Restructuring Transaction, contract, instrument, release, or other agreement or document

17

**(including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Prepackaged Plan or the reliance by any Released Party on the Prepackaged Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the DIP Notes Facility, the DIP Documents, the New LYCRA Holdco Common Stock, the New Warrants, the New Debt, the New Debt Documents, this Disclosure Statement, the Prepackaged Plan, the Plan Supplement, any other Definitive Document, or any Restructuring Transactions before or during the Prepackaged Cases, the filing of the Prepackaged Cases, this Disclosure Statement or the Prepackaged Plan, the solicitation of votes with respect to the Prepackaged Plan, the pursuit of Confirmation, the pursuit of Consummation of the Restructuring Transactions, the administration and implementation of the Prepackaged Plan and the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Prepackaged Plan, or the distribution of property under the Prepackaged Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any Causes of Action identified in the Schedule of Retained Causes of Action, *provided* that, for the avoidance of doubt, no Causes of Action against any Consenting Creditor will be included on such Schedule of Retained Causes of Action, (b) any post-Effective Date obligations of any party or Entity under the Prepackaged Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including any Definitive Document, the Helm Agreements, the New Debt Documents, the New LYCRA Holdco Organizational Documents, and other documents set forth in the Plan Supplement) executed to implement the Prepackaged Plan or any Claim or obligation arising under the Prepackaged Plan, (c) any Released Party from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, wilful misconduct, or gross negligence, or (d) any of the Debtors', Reorganized Debtors' and wholly-owned non-Debtor affiliates' (as applicable) claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Prepackaged Plan**

**Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Prepackaged Plan, and further, will constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Prepackaged Plan; (ii) a good faith settlement and compromise of the Claims released by the Debtor Release; (iii) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

> **4.      Releases by the Releasing Parties.**

**Except as otherwise provided in the Prepackaged Plan or the Confirmation Order to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Prepackaged Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by the Prepackaged Plan, the adequacy of which is hereby confirmed, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for**

Claims arising under, or preserved by, the Prepackaged Plan, to the fullest extent permitted under applicable Law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each and every Releasing Party, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever, including any Avoidance Actions and any derivative claims asserted, whether liquidated or unliquidated, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, contingent or noncontingent, in Law, equity, contract, tort, or otherwise, including any derivative Claims asserted or assertable on behalf of any of the Debtors, that such Entities would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Reorganized Debtors, or their Estates or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, and their Estates (including the capital structure, management, ownership, or operation thereof), the Prepackaged Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Prepackaged Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions,  any related adversary proceedings, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the decision to file the Prepackaged Cases, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or Filing of the RSA, the DIP Notes Facility, the DIP Documents, the New LYCRA Holdco Common Stock, the New Warrants, the New Debt, the New Debt Documents, this Disclosure Statement, the Prepackaged Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Prepackaged Cases, any other Definitive Document or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Prepackaged Plan or the reliance by any Released Party on the Prepackaged Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the DIP Notes Facility, the DIP Documents, the New LYCRA Holdco Common Stock, the New Warrants, the New Debt, the New Debt Documents, this Disclosure Statement, the Prepackaged Plan, the Plan Supplement, any other Definitive Document, or any Restructuring Transactions before or during the Prepackaged Cases, the filing of the Prepackaged Cases, this Disclosure Statement, or the Prepackaged Plan, the solicitation of votes with respect to the Prepackaged Plan, the pursuit of Confirmation, the pursuit of Consummation of the Restructuring Transactions, the administration and implementation of the Prepackaged Plan and the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Prepackaged Plan, or the distribution of property under the Prepackaged Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) to the extent that any Causes of Action against any releasing Party are not released or discharged pursuant to the Prepackaged Plan, any rights of such Releasing Party to assert any and all counterclaims,

19

crossclaims, claims for contribution, defenses, and similar claims in response to such Causes of Action (provided that no such third-party claims or claims for contribution or similar claims may be asserted against the Debtors or the Reorganized Debtors to the extent such claims have been released or discharged pursuant to the Prepackaged Plan), (b) any post-Effective Date obligations of any party or Entity under the Prepackaged Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including any Definitive Document, the Helm Agreements, the New Debt Documents, the New LYCRA Holdco Organizational Documents, and other documents set forth in the Plan Supplement) executed to implement the Prepackaged Plan or any Claim or obligation arising under the Prepackaged Plan, or (c) any Released Party from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Prepackaged Plan, and, further, will constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the Confirmation of the Prepackaged Plan; (iii) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Prepackaged Plan; (iv) a good faith settlement and compromise of the Claims released by the Third-Party Release; (v) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

5.     Exculpation.

Notwithstanding anything contained in the Prepackaged Plan to the contrary, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or Third-Party Release, effective as of the Effective Date, no Exculpated Party will have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any Claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Prepackaged Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Definitive Documents, the New LYCRA Holdco Common Stock, the New Warrants, the New Debt, the New Debt Documents, this Disclosure Statement, the Prepackaged Plan, the Plan Supplement, the Restructuring Transactions, the DIP Notes Facility, the DIP Documents, or any wind down transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Prepackaged Plan or the reliance by any Released Party on the Prepackaged Plan or the Confirmation Order in lieu of such legal opinion) in connection with the RSA and related prepetition transactions, the Definitive Documents, the New LYCRA Holdco Common Stock, the New Warrants, the New Debt, the New Debt Documents, this Disclosure Statement, the Prepackaged Plan, the Plan Supplement, the Restructuring Transactions, the DIP Notes Facility, the DIP Documents, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable Law, the filing of the Prepackaged Cases, the pursuit of Confirmation, the pursuit of consummation of the Restructuring Transactions, the administration and implementation of the Prepackaged Plan, including the issuance or distribution of Securities pursuant to the Prepackaged Plan, or the distribution of property under the Prepackaged Plan or any other related agreement, or upon any

other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Prepackaged Plan.

6.     Injunction.

Except as otherwise expressly provided in the Prepackaged Plan or in the Confirmation Order, or for obligations issued or required to be paid pursuant to the Prepackaged Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been extinguished, released, discharged, or are subject to exculpation, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, and the Released Parties: (a) commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (b) enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has timely filed a motion with the Bankruptcy Court expressly requesting the right to perform such setoff, subrogation or recoupment on or before the Effective Date, and notwithstanding an indication of a Claim, Interest, or Cause of Action or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Prepackaged Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to Article VIII.C, Article VIII.D, and Article VIII.E of the Prepackaged Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim not released or subject to exculpation under the Prepackaged Plan, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party. The injunction in the Prepackaged Plan will extend to any successors and assigns of the Debtors and the Reorganized Debtors and their respective property and interests in property.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.

For more detail, see Article VIII of the Prepackaged Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

X.     **What Are the Consequences of Opting Out of the Releases Provided by the Prepackaged Plan?**

If a Holder of a Claim or Interest opts out of the Third-Party Releases, such Holder will not be a "Releasing Party" and will preserve any direct Causes of Action that it may have against the Released Parties. Such Holder will also not be a "Released Party," and the Reorganized Debtors and any third party that is a Releasing Party will preserve all Causes of Action against such Holder.

Upon the Effective Date, the Reorganized Debtors will be vested with authority to commence, litigate, and settle any and all retained Causes of Action. By opting out of providing the Third-Party Releases under the Prepackaged Plan, a Holder also forgoes the opportunity to receive the Debtor Release under the Prepackaged Plan. As a result, after the Effective Date, the Reorganized Debtors may pursue any Causes of Action held by the Debtors that are preserved under the Prepackaged Plan against a Holder that opts out of the Third-Party Releases.

Y.     **Does the Bankruptcy Code protect against discriminatory treatment?**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, will not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Prepackaged Cases (or during the Prepackaged Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Prepackaged Cases.

Z.     **Will the Company retain documents after any Effective Date?**

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

AA.     **What is the effect of Reimbursement or Contribution?**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim will be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

BB.     **What is the effect of the Prepackaged Plan on the Debtors' capital structure?**

Assuming that the Effective Date occurs and the Restructuring Transactions are successfully implemented, when the Debtors emerge from chapter 11, the Debtors' capital structure (excluding the Non-U.S. Facility) will look substantially similar to the following:[5]

---

[5]     The Debtors' prepetition capital structure is included in Section V.B of this Disclosure Statement.

| Funded Debt | Maturity | Amount Outstanding (in millions) |
|---|---|---|
| New LYCRA Holdco Notes | Effective Date plus 7 years | $203 |
| Exit Notes Facility | Effective Date plus 5 years | Not less than $75[6] |
| Total Post-Emergence Debt | | $278 |

**CC.     What is the effect of the Prepackaged Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. As a result, the occurrence of the Effective Date of the Prepackaged Plan means that the Debtors will *not* be liquidated or forced to go out of business. Following Confirmation, the Prepackaged Plan will be consummated on the Effective Date, which is the date that is the first Business Day after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect; (ii) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Prepackaged Plan have been satisfied or waived in accordance with Article IX.B of the Prepackaged Plan; and (iii) the Prepackaged Plan is declared effective by the Debtors. On or after the Effective Date, and unless otherwise provided in the Prepackaged Plan, the Reorganized Debtors may operate their business and, except as otherwise provided by the Prepackaged Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Prepackaged Plan will be deemed authorized and approved.

**DD.     Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

On the Effective Date, subject to local Law requirements, the term of the current members of the board of directors or other Governing Body of each of the Debtors will expire, such current directors will be deemed to have resigned, and all of the directors for the initial term of the New LYCRA Holdco Board and the other Governing Bodies will be appointed in accordance with the New LYCRA Holdco Organizational Documents. The initial members of the New LYCRA Holdco Board will be identified in the Plan Supplement, to the extent known and determined at the time of filing and will be consistent with the New LYCRA Holdco Organizational Documents. Each such member and officer of the Reorganized Debtors will serve from and after the Effective Date pursuant to the terms of the New LYCRA Holdco Organizational Documents and other constituent documents of the Reorganized Debtors.

Assuming that the Effective Date occurs, Holders of Allowed Claims that receive distributions representing (or convertible into) a substantial percentage of outstanding shares of the New LYCRA Holdco Common Stock may be in a position to influence matters requiring approval by the holders of shares of New LYCRA Holdco Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors, subject to the terms of the New LYCRA Holdco Organizational Documents.

---

[6]   The Exit Notes Facility will be not less than $75 million (which, for the avoidance of doubt, will be sufficient to satisfy in full all requisite payments under this Plan, including all Professional Fees, DIP Claims, and Administrative Claims).

**EE.     Do the Debtors recommend voting in favor of the Prepackaged Plan?**

Yes. The Debtors believe that the Restructuring Transactions provide for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative. The Debtors believe that the Prepackaged Plan, which contemplate a significant deleveraging of the Debtors' balance sheet and will allow them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under and pursuant the Prepackaged Plan.

**FF.     Who Supports the Prepackaged Plan?**

*The Prepackaged Plan is supported by the Debtors and the Consenting Creditors that have executed or acceded to the RSA.*

**IV.     CORPORATE HISTORY AND BUSINESS OPERATIONS.**

**A.     Corporate History.**

The LYCRA Company is one of the world's leading spandex producers, commanding unparalleled brand recognition with end customers. Spandex is a specialty fiber with exceptional stretch and recovery properties used to produce elastomeric fabrics, which provide garments with superior comfort and fit. Although spandex was initially used in women's intimate apparel and hosiery, it is now a universal component providing comfort and fit in men's and women's denim, activewear, underwear, and hygiene products such as baby diapers and adult incontinence products.

*Founding and Expansion*. The LYCRA Company traces its origins to 1958, when a team of pioneering chemical scientists at DuPont, led by Dr. Joseph Shivers, invented LYCRA® fiber—the original spandex (elastane) yarn. This groundbreaking innovation fundamentally transformed the apparel industry, which had long been dominated by structured, restrictive designs. Before Dr. Shivers' invention, garments requiring stretch and support relied heavily on natural rubber or rubberized materials, which were restrictive and deteriorated quickly. Initially adopted in foundation garments and swimwear, LYCRA® fiber quickly expanded into hosiery, activewear, and eventually into nearly every category of apparel. The fiber's remarkable versatility meant it could be incorporated into fabrics in small percentages—often just 2%–5%—while still delivering dramatic improvements in fit, comfort, and shape retention.

Beginning in the 1980s through the early 2000s, DuPont continued to invest heavily in research and development, introducing new fiber technologies and expanding its brand portfolio beyond LYCRA® spandex. During this period, DuPont developed and acquired several complementary fiber brands that would become integral to the business, including COOLMAX® brand moisture-wicking fibers for active and performance wear, THERMOLITE® brand lightweight warming fibers and insulations, SUPPLEX® and TACTEL® brand nylon fibers for apparel applications, and ELASPAN® elastomeric offerings. These brands allowed the Company to serve a broader range of customer needs across multiple segments of the apparel and textile industries.

In 2004, Koch acquired DuPont's textiles and interiors business for approximately $4.4 billion. This acquisition included the LYCRA® spandex business along with other textile fiber operations. Following the acquisition, Koch consolidated these textile businesses under a new entity called INVISTA, which became one of the world's largest integrated fiber, resin, and intermediates companies. Throughout this time, the Company continued to make major investments to increase its manufacturing capacity, expand its product line, and grow the LYCRA® brand globally. The Company anticipated the shift of fabric production to Asia and strategically built capabilities in China and throughout the region. By the mid-2010s, The LYCRA Company had evolved into a truly

global enterprise with manufacturing operations across multiple continents, sales in more than 80 countries, and a diversified portfolio of leading fiber brands. The business has maintained strong brand recognition, with the LYCRA® brand remaining one of the most recognized ingredient brands in the apparel industry.

*2019 Sale to Ruyi.* In January 2019, The LYCRA Company was acquired by Ruyi from Koch (the "Ruyi Acquisition") where it operated as an independent subsidiary business within the Ruyi conglomerate. In connection with the Ruyi Acquisition: (i) Eagle Intermediate Global Holding B.V. ("EIGH BV"), as borrower, entered into a $100 million revolving credit facility dated May 4, 2018 with J.P. Morgan Chase Bank N.A. and Barclays Bank Plc, as original lenders (the "Acquisition RCF"); (ii) EIGH BV and Eagle US Finance LLC (together, the "Co-Issuers") issued €250 million of 5.375% senior secured notes due May 2023 (the "2019 Acquisition Notes"); (iii) the Co-Issuers issued $690 million of 7.500% senior secured notes due May 1, 2025 (the "Dollar Notes"); and (iv) Ruyi, as borrower (the "Mezzanine Borrower"), entered into a $400 million mezzanine financing (the "Mezzanine Financing") dated September 21, 2018 with certain affiliates of Lindeman Asia Investment Co. Ltd, Lindeman Partners Asset Management Co. Ltd, Tor Investment Management (Hong Kong) Limited and China Everbright Limited, as lenders (the "Mezzanine Lenders"). The Mezzanine Financing was secured by, among other things, a Dutch law share pledge by the Mezzanine Borrower's direct subsidiary, Eagle Ultimate Global Holdings B.V., of its equity interests in Eagle Super Global Holding B.V. ("ESGH BV").

The following is the post-Ruyi Acquisition holding structure:



*Negotiations and Alleged China Asset Transfers*. In November 2019, nine months following the closing of the Ruyi Acquisition, the Mezzanine Borrower defaulted on the Mezzanine Financing. Throughout 2020 and 2021, Ruyi and the Mezzanine Lenders attempted to reach a consensual solution to the defaults; however, in December 2021, the Mezzanine Lenders learned that Ruyi had allegedly transferred (or would imminently transfer) certain of the Company's valuable Chinese assets, including onshore cash, plants, equipment, raw materials, and intellectual property rights (the "Alleged China Asset Transfers") out from the LYCRA group and therefore beyond the recourse of the Mezzanine Lenders, the holders of the Dollar Notes (the "Dollar Noteholders"), the holders of

the 2019 Acquisition Notes (the "2019 Acquisition Noteholders"), and the lenders under the Acquisition RCF. As described below, litigation in respect of the Alleged China Asset Transfers remains ongoing.

*Mezzanine Lender Enforcement*. As a result of the ongoing defaults under the Mezzanine Financing and the Alleged China Asset Transfers, the Mezzanine Lenders took ownership of the Company through a share pledge enforcement over the equity of ESGH BV, which was approved by the Netherlands Commercial Court pursuant to the judgment entered on June 23, 2022 in Case Number NCC 22/011 (C/13/718393) (the "Dutch Share Pledge Enforcement"). Post-enforcement, the Mezzanine Lenders held the ESGH BV equity through Eagle Investments Holdco, in which the Mezzanine Lenders held 100% of the Class A shares (in such capacity, the "Post-Enforcement Shareholders").[7] In connection with the Dutch Share Pledge Enforcement, a group of noteholders holding more than 50.01% of the Dollar Notes and 2019 Acquisition Notes in aggregate (the "2022 Consenting Noteholders") agreed to waive a change of control put option under each series of notes in exchange for the issuance to the 2022 Consenting Noteholders of: (i) $14,584,000 of additional Dollar Notes by the Co-Issuers; (ii) a $19,446,000 unsecured promissory note due May 1, 2025 by the Co-Issuers (the "Promissory Note," and the payees thereof in such capacity, the "Promissory Note Payees"); and (iii) certain non-voting Class B shares in Eagle Investments Holdco (the holders of such Class B shares in such capacity, the "Class B Shareholders").

Following the Dutch Share Pledge Enforcement, the ownership structure was:



*2023 Refinancing Transactions*. Following the Dutch Share Pledge Enforcement, the Company continued to face financial difficulties due to a confluence of headwinds described below. In Q4 2022, ahead of the maturities of the Acquisition RCF and the 2019 Acquisition Notes, the Company approached the 2022 Consenting Noteholders to negotiate a maturity extension of the 2019 Acquisition Notes or an alternative solution to the Company's financial difficulties. The 2022 Consenting Noteholders were not supportive of the extension on the terms proposed, and negotiations stalled. Thereafter, the Company commenced negotiations with a group of 2019 Acquisition Noteholders (the "Consenting 2019 Acquisition Noteholders") on the terms of a potential refinancing, culminating in a transaction pursuant to which the Consenting 2019 Acquisition Noteholders agreed

---

[7]   ESGH BV and Eagle Investments Holdco will not be Debtors in the Prepackaged Cases.

to refinance the Acquisition RCF and provide the Company with incremental liquidity through the issuance by EIGH BV of a super senior term loan in an original principal amount of $109 million (the "ssTL").

Following the issuance of the ssTL, the Company refinanced the 2019 Acquisition Notes in May 2023 by implementing an exchange and financing transaction (the "2023 Refinancing") with certain 2019 Acquisition Noteholders ("Exchanging Noteholders"), certain of the Post-Enforcement Shareholders, and certain third-party investors.[8] In connection with the 2023 Refinancing, Eagle UK Finance Limited ("Eagle UK Finance") issued €300,161,202 in aggregate principal amount of 16.000% senior secured notes due April 1, 2025 (the "Euro Notes")[9] to Linx Capital Limited ("Linx Capital SPV"), a non-Debtor Jersey entity formed as a special purpose vehicle in a securitization-style structure that is not an affiliate of the Company. In turn, Linx Capital SPV issued: (x) 15.200% first lien senior secured notes initially due April 1, 2025 (the "1L Linx Notes") to the Exchanging Noteholders and certain participating Post-Enforcement Shareholders and third-party investors (collectively, the "1L Linx Noteholders"); and (y) 20.000% second lien senior secured notes initially due April 1, 2025 (the "2L Linx Notes," and together with the 1L Linx Notes, the "Linx Notes") to certain other participating Post-Enforcement Shareholders and third-party investors (collectively, the "2L Linx Noteholders," and together with the 1L Linx Noteholders, the "Linx Noteholders"). The Linx Notes were issued to the Linx Noteholders so that Linx Capital SPV could subscribe for the Euro Notes issued by Eagle UK Finance (and, in turn, upstream funds to the Co-Issuers in order to refinance the 2019 Acquisition Notes as part of the overall 2023 Refinancing).

As described below, following the failure of a proposed sale of the Company to a third-party buyer, the Company underwent a subsequent change of control in September 2025 in furtherance of the Backstop Restructuring (as defined below), whereby the Post-Enforcement Shareholders and the Class B Shareholders ceded control of EIGH BV and its subsidiaries to a new ultimate holding company, Debtor Eagle Holding Co B.V. ("Eagle Holding"). The equity interests in Eagle Holding are currently held in trust by GLAS Trustees Limited for the benefit of certain Prepetition Lenders and Post-Enforcement Shareholders in the following proportions: (1) Dollar Noteholders (76.3%); (2) 2L Linx Noteholders (11.9%); (3) Post-Enforcement Shareholders (7.0%); and (4) Promissory Note Payees (4.8%) (collectively, the "Current Shareholders"). However, the Lock-Up Agreement (as defined below)—which provided for this beneficial interest pending the implementation of a restructuring transaction described therein—was terminated on March 12, 2026.

Presently, the Company's capital structure consists of: (i) secured financing composed of the ssTL, the Euro Notes, and the Dollar Notes (collectively, the "Prepetition Secured Debt," and the holders thereof (in addition to the Linx Noteholders), the "Prepetition Secured Lenders"); and (ii) unsecured financing composed of the Promissory Note (together with the Prepetition Secured Debt, the "Prepetition Debt," and the holders thereof, the "Prepetition Lenders"). As discussed below, the Prepetition Debt remains the Company's primary financial indebtedness.

As described below, the Prepetition Secured Debt is secured by Shared Collateral (as defined below) and ranks *pari passu* in right of payment and lien priority; however, the proceeds of enforcement of the Shared

---

[8]   The 2019 Acquisition Notes held by Exchanging Noteholders were exchanged for 1L Linx Notes pursuant to this 2023 Refinancing. The 2019 Acquisition Notes not held by Exchanging Noteholders (and thus not exchanged for 1L Linx Notes) were redeemed in cash at par.

[9]   As discussed in greater detail below, the Euro Notes include a priority tranche in the equivalent principal amount of $120 million, which ranks senior to the balance of the Euro Notes (and Dollar Notes) with respect to enforcement proceeds.

Collateral are to be distributed in accordance with an agreed waterfall pursuant to an Intercreditor Agreement (as defined below) and the distributions contemplated by the Prepackaged Plan respect the agreed waterfall.[10]

**B.      The LYCRA Company's Business and Operations.**

Today, The LYCRA Company is one of the world's leading spandex innovators and producers in the apparel and personal care industries, with approximately 2,000 employees, eight (8) manufacturing facilities, and eleven offices across North America, Europe, Asia, and South America, along with additional fiber processing operations in various locations around the world. These employees and this global footprint are essential to the Company's business, which operates through its integrated portfolio of leading fiber brands that include (i) LYCRA® Spandex Fibers, (ii) LYCRA HyFit® Personal Care Fibers, (iii) LYCRA® T400® Stretch Fibers, (iv) COOLMAX® Performance Fibers, (v) THERMOLITE® Insulation Fibers, (vi) ELASPAN® Elastomeric Fibers, and (vii) SUPPLEX® and TACTEL® Nylon Fibers.

In fiscal year 2025, the Company had sales to customers in more than 80 countries throughout North America, Europe, Asia, South America, and Central America. Approximately 57% of global sales were concentrated in four countries: China (29%), the United States (15%), Brazil (7%), and Italy (6%). The LYCRA Company's commercial approach begins at the very start of the value chain—selling to yarn processors and fabric mills—while maintaining strong connections and partnerships with garment makers, brands, retailers, and ultimately, end consumers. The Company's business model involves "pushing" innovation from mills to brands to retailers, while simultaneously "pulling" demand by having brands specify LYCRA® fibers to their suppliers.

The LYCRA Company manufactures fiber products directly through eight manufacturing and processing facilities (two of which are majority-owned joint ventures) and two additional 50%-owned joint ventures across nine countries, consisting of the following facilities and headcounts: (i) Waynesboro, Virginia (321 employees), (ii) Monterrey, Mexico (345 employees), (iii) Paulina, Brazil (362 employees), (iv) Maydown, Northern Ireland (323 employees), (v) Tuas, Singapore (90%-owned joint venture with 262 employees), (vi) Kerkrade, Netherlands (107 employees), (vii) Foshan, China (471 employees), (viii) Yinchuan, China (75%-owned joint venture with 292 employees), (ix) Shiga, Japan (50%-owned joint venture), and (x) Taipei, Taiwan (50%-owned joint venture). The Company also operates a distribution hub and eleven (11) offices located around the world.

Even with decades of global expansion, the Company has consistently maintained its unwavering focus on excellence and innovation by continuing to invest in the development of novel products across all of its product portfolios. Today, The LYCRA Company maintains and actively defends over 1,000 patents and applications comprising more than 100 unique patent families, in addition to a portfolio of approximately 2,400 trademarks that protect approximately 105 unique brands, marks, and logos.

**1.      The LYCRA Company's Products**

The LYCRA Company's main product lines consist of the following:

- *LYCRA® fiber:* The original spandex (elastane) brand now boasts more than 200 fibers that add lasting comfort, fit, and performance benefits to apparel.

- *LYCRA HyFit® fiber:* Spandex fiber used in diapers and incontinence products to provide a snug fit that helps prevent leaks.

---

[10]   As described below, the 1L Linx Notes and the 2L Linx Notes are secured by a shared collateral package (principally the Euro Notes).  The 1L Linx Notes rank senior to the 2L Linx Notes in right of payment, lien priority, and proceeds of enforcement.

- *COOLMAX®, THERMOLITE®, LYCRA® T400®:* Specialty polyester fibers produced from primarily recycled or renewable feedstocks, with production outsourced to partners (primarily in Asia) for an asset-light approach.

- *SUPPLEX®, TACTEL®:* Single nylon 6 and nylon 6,6 fiber used in warp knit and circular knit for higher end activewear and intimate apparel, manufactured in Monterrey, Mexico.

The fiber products produced by the Company allow downstream customers to co-brand their garments with the Company's LYCRA® brand and deliver innovative garments to their end-customers.

### 2.      The LYCRA Company's Research and Development Activity

Research and development are core components of The LYCRA Company's business model, serving as the primary driver for its "ingredient branding" strategy. The Company's continuous cycle of innovation strengthens its position as a leading technology solutions innovator in the industry. The LYCRA Company conducts R&D at three state-of-the-art labs: (a) Waynesboro, Virginia (polymer/fiber development), (b) Casaloldo, Italy, and (c) Foshan, China (apparel textile innovation). By integrating polymer science with proprietary consumer insights, the Company's research and development ensures that new products are not only technically advanced but commercially viable and responsive to global trends in activewear, personal care, and medical textiles.

### V.      THE COMPANY'S PREPETITION CORPORATE AND CAPITAL STRUCTURE.

#### A.      The LYCRA Company's Corporate Structure.

The LYCRA Company's corporate structure includes forty-three (43) entities, twenty-six (26) of which will be Debtors in the Prepackaged Cases. The LYCRA Company's corporate family includes entities incorporated in Brazil, China, Germany, Hong Kong, India, Italy, Japan, Jersey, Mexico, the Netherlands, Singapore, South Korea, Spain, Switzerland, Taiwan, Turkey, the United Kingdom, and the United States.

#### B.      The LYCRA Company's Capital Structure.

As of the Petition Date, the Debtors have approximately $1,534,000,000 in Prepetition Debt. The approximate amounts and relative priorities of each Prepetition Debt obligation are as follows:

| Funded Debt | Maturity | Amount Outstanding (in millions)[11] |
|---|---|---|
| Super Senior Term Loan (ssTL) | March 31, 2026 | $214.1 |
| Euro Notes | March 31, 2026 | $520.4 |
| • Priority Tranche | | ($120.0) |
| • Non-Priority Tranche | | ($400.4) |
| Dollar Notes (rank *pari passu* with the Euro Notes Non-Priority Tranche) | March 31, 2026 | $780.0 |
| *Total Prepetition Secured Debt* | | *$1,514.5* |
| Promissory Note (unsecured) | March 31, 2026 | $19.4 |
| *Total Prepetition Debt* | | *$1,533.9* |

### 1. Super Senior Term Loan

On March 1, 2023, EIGH BV, as borrower, entered into a super senior term loan facility agreement for the ssTL with, among others, certain of the other Debtors as guarantors, Kroll Agency Services Limited as agent, and the lenders from time-to-time party thereto (the "ssTL Lenders"). At issuance, the ssTL had an aggregate principal amount of approximately $109 million, which was later upsized to $139 million in April 2023. The ssTL had an initial maturity date of February 1, 2025, which has since been extended on various occasions including most recently until March 31, 2026. The ssTL bears interest at Term SOFR plus 9.000% per year, payable in kind, and is secured by the Shared Collateral.

As of the Petition Date, approximately $214.1 million, inclusive of accrued but unpaid interest, is outstanding under the ssTL. As provided in the Intercreditor Agreement, the ssTL ranks *pari passu* with the Euro Notes and the Dollar Notes in right of payment and lien priority but ranks senior to the Euro Notes and the Dollar Notes in respect of the proceeds of enforcement of the Shared Collateral. As set forth above, the distributions contemplated by the Prepackaged Plan respect the agreed waterfall.

### 2. Euro Notes and Linx Notes

On April 25, 2023, in connection with the 2023 Refinancing, an indenture was entered into between, among others, Eagle UK Finance Limited as issuer ("Eagle UK Finance"), Kroll Trustee Services Limited as trustee, U.S. Bank Europe DAC, UK Branch (formerly Elavon Financial Services DAC, UK Branch), as initial paying agent and authenticating agent, and U.S. Bank Europe DAC (formerly Elavon Financial Services DAC) as registrar and transfer agent, for the issuance by Eagle UK Finance of the Euro Notes in the aggregate principal amount of €300,161,202. The Euro Notes were issued to Linx Capital SPV which, as noted above, will not be a Debtor and is not a part of the Company. The Euro Notes had an initial maturity date of April 1, 2025, which has since been extended on various occasions, including most recently until March 31, 2026. The Euro Notes bear interest at 16.000% per year, payable in kind, and are secured by the Shared Collateral.

---

[11]   Debt amounts for facilities denominated in euro, including the Euro Notes and the Linx Notes, assume a EUR/USD exchange rate of 1.162.

On April 25, 2023, an indenture was entered into between, among others, Linx Capital SPV as issuer, Kroll Trustee Services Limited as trustee (the "1L Linx Notes Trustee"), U.S. Bank Europe DAC, UK Branch (formerly Elavon Financial Services DAC, UK Branch) as initial paying agent and authenticating agent, and U.S. Bank Europe DAC (formerly Elavon Financial Services DAC) as registrar and transfer agent, for the issuance by Linx Capital SPV of the 15.200% 1L Linx Notes to the 1L Linx Noteholders. At the same time, another indenture was entered into between, among others, Linx Capital SPV as issuer, Kroll Trustee Services Limited as trustee (the "2L Linx Notes Trustee," and together with the 1L Linx Notes Trustee, the "Linx Notes Trustees"), U.S. Bank Europe DAC, UK Branch (formerly Elavon Financial Services DAC, UK Branch) as initial paying agent and authenticating agent, and U.S. Bank Europe DAC (formerly Elavon Financial Services DAC) as registrar and transfer agent, for the issuance by Linx Capital SPV of the 20.000% 2L Linx Notes to the 2L Linx Noteholders. The Linx Notes had an initial maturity date of April 1, 2025, which has since been extended on various occasions, including most recently until March 31, 2026. The 1L Linx Notes and 2L Linx Notes benefit from a shared security package consisting of liens on the shares and bank accounts of Linx Capital SPV as well as Linx Capital SPV's rights under the Euro Notes (collectively, the "Linx Notes Collateral"). The 1L Linx Notes rank senior to the 2L Linx Notes in terms of payment priority, lien priority, and proceeds of enforcement and, as discussed further below, have the authority to direct the actions of Linx Capital SPV in connection with the exercise of its voting rights.

As of the Petition Date, approximately $520.4 million, inclusive of accrued but unpaid interest, is outstanding under the Euro Notes. As provided in the Intercreditor Agreement, the Euro Notes rank *pari passu* with the ssTL and the Dollar Notes in right of payment and lien priority. However, in respect of proceeds of enforcement of the Shared Collateral: (a) $120 million in equivalent principal amount of Euro Notes (referred to as the "Euro Notes Priority Tranche") ranks junior to the ssTL but senior to the balance of the Euro Notes (referred to as the "Euro Notes Non-Priority Tranche") and the Dollar Notes; and (b) the Euro Notes Non-Priority Tranche ranks junior to both the ssTL and the Euro Notes Priority Tranche, but *pari passu* with the Dollar Notes.

### 3. Dollar Notes

On May 4, 2018, in connection with the Ruyi Acquisition, an indenture was entered into between, among others, the Co-Issuers (*i.e.*, EIGH BV and Eagle US Finance LLC) as issuers, and Wilmington Trust, National Association as trustee, paying agent, registrar and transfer agent (the "Dollar Notes Indenture"). Eagle Finance Co B.V. later replaced Eagle US Finance LLC as Co-Issuer following the 2025 Change in Control Transaction (as defined below). The Dollar Notes Indenture provides for the issuance of $704,584,000 in aggregate principal amount of 7.500% senior secured notes with an initial maturity date of May 1, 2025, which has since been extended on various occasions, including most recently until March 31, 2026.

As of the Petition Date, approximately $780.0 million, inclusive of accrued but unpaid interest, is outstanding under the Dollar Notes. The Dollar Notes rank *pari passu* with the ssTL and the Euro Notes in right of payment and lien priority but rank junior to the ssTL and the Euro Notes Priority Tranche and *pari passu* with the Euro Notes Non-Priority Tranche in respect of proceeds on account of the Shared Collateral. The Dollar Notes bear interest at 7.500% per year, payable in kind.

### 4. The Intercreditor Agreement

The Prepetition Secured Debt benefits from a shared collateral package consisting of substantially all of the Debtors' assets (the "Shared Collateral"), and is subject to an intercreditor agreement originally dated May 4, 2018 (as amended and/or restated on August 25, 2023 and as further amended on December 30, 2025) governed by English law (the "Intercreditor Agreement"). The Intercreditor Agreement governs the relationship between the Prepetition Secured Lenders and their respective rights with respect to, among other things, the Shared

Collateral. As referenced above, the Intercreditor Agreement sets forth the agreed waterfall in the event of any enforcement action whereby net proceeds of the Shared Collateral will be distributed in the following order of priority: (a) first, in repayment of the ssTL; (b) second, in repayment of the Euro Notes Priority Tranche; and (c) third, in repayment of the Euro Notes Non-Priority Tranche and the Dollar Notes (which rank *pari passu* with each other).[12]

### 5. Promissory Note

On June 28, 2022, in connection with the Dutch Share Pledge Enforcement, the Co-Issuers issued the unsecured Promissory Note to the Promissory Note Payees, which were made up of Dollar Noteholders. The Promissory Note provides for the payment of an amount equal to $19,446,000 initially due May 1, 2025. On April 17, 2025, the Promissory Note was amended so that its maturity date would automatically be extended in line with the maturity date of the Dollar Notes and, thus, the maturity date of the Promissory Note is currently March 31, 2026.

As of the Petition Date, the amount outstanding under the Promissory Note remains at $19,446,000 and the Promissory Note does not accrue interest. The Promissory Note is not subject to the Intercreditor Agreement.

### C. Other Financial Indebtedness

### 1. Local Facilities in Foreign Jurisdictions

***Brazil Short-Term Borrowing Facility***. The LYCRA Company Industria E Comercio Textil Ltda, a Debtor, has established an unsecured, short-term borrowing facility with Itaú Unibanco S.A., Nassau Branch (Bahamas) to cover imports of raw materials (the "Brazil Borrowing Facility"). The borrowing arrangement includes variable interest which is adjusted based on the U.S. inflation index, averaging 9.28% for borrowings outstanding at December 31, 2024. As of the Petition Date, approximately $7.8 million, inclusive of accrued but unpaid interest, is outstanding under the Brazil Borrowing Facility.

***China Working Capital Facilities***. Chuanglai Fiber (Foshan) Co., Ltd., a non-Debtor member of the Company, has established unsecured working capital facilities with China Merchants Bank for up to RMB 100 million with a two-year term at an interest rate of 3.0% annually. LYCRA Fiber (Yinchuan) Co. Ltd., another non-Debtor member of the Company, has established unsecured working capital facilities with (a) China Merchants Bank for up to RMB 100 million with a three-year term at an interest rate of 3.0% annually, and (b) Bank of Communication China for RMB 100 million with a two-year term at an interest rate of 3.3% annually.

### 2. Cash Pooling Arrangements

***Foshan Cash Pooling***. Chuanglai Fiber (Foshan) Co., Ltd. (a non-Debtor), was approved on August 2, 2019 by the Cross-border Office of the Guangzhou Branch of the People's Bank of China to act as the master enterprise of a cross-border two-way RMB cash pool, with Bank of China Foshan Branch as the settlement bank. Together with three offshore member companies (each a Debtor)—The LYCRA Company Hong Kong Limited,

---

[12]   As noted above, the 1L Linx Notes and the 2L Linx Notes, issued by non-Debtor Linx Capital SPV, are subject to an intercreditor agreement dated April 25, 2023 (as amended and/or restated on August 25, 2023 and from time-to-time, the "Linx Intercreditor Agreement"). The Linx Intercreditor Agreement governs the relationship among the creditors of Linx Capital SPV and provides that the 1L Linx Notes rank senior to the 2L Linx Notes in right of payment, lien priority, and entitlement to Linx Notes Collateral. Accordingly, in the event Linx Capital SPV receives proceeds of the Shared Collateral as holder of the Euro Notes, such proceeds (including the entirety of any proceeds received in repayment of the Euro Notes Priority Tranche) would be applied by Linx Capital SPV first to repay the 1L Linx Notes in full, and thereafter to repay the 2L Linx Notes. Any residual value in Linx Capital SPV remaining after satisfaction of the Linx Notes would revert to Eagle UK Finance (as issuer of the Euro Notes). The Linx Intercreditor Agreement also provides that 66.67% in value of the 1L Linx Notes (being the applicable instructing group thereunder) have the authority to direct the actions of Linx Capital SPV in connection with the exercise of voting rights by Linx Capital SPV as creditor under the Prepackaged Plan.

CH Hong Kong Holdings II Limited, and The LYCRA Company Singapore Trading Pte. Ltd—the Company carries out cross-border two-way RMB cash pool operations.

As described in greater detail in the First Day Pleadings, certain Debtors are party to additional cash pooling arrangements, including a central cash pool with Bank of America, London Branch (denominated in U.S. dollars) (the "USD Cash Pool"), for the Company's global operations, a EUR-denominated companion pool to the USD Cash Pool with Bank of America, London Branch, and a cash pool with HSBC Asia to consolidate liquidity across the Company's Asia operations (denominated in U.S. dollars). These cash pools primarily operate for the benefit of the Debtors, although certain non-Debtors participate from time to time.

## VI.   EVENTS LEADING TO THE PREPACKAGED CASES AND THE ANTICIPATED PATH FORWARD.

### A.   Prepetition Challenges.

#### 1.   Industry Headwinds

Since the Ruyi Acquisition, the Company has faced significant and persistent financial difficulties due to a confluence of industry headwinds. The global spandex and apparel industries have experienced prolonged periods of weakening demand and soft sales trends, beginning with the disruptions caused by the COVID-19 pandemic, which resulted in extended market closures, supply chain disruptions, and reduced consumer demand. Although demand partially recovered following the easing of pandemic restrictions, the anticipated rebound in key Western markets did not materialize as quickly as expected. Over the last several years, demand from mills has continued to be impacted as most producers have sought to destock and reduce inventory levels throughout the supply chain, while overall market uncertainty persisted in a higher interest rate and inflationary environment.

The industry has also experienced significant capacity expansions by competitors, altering the competitive dynamics and leading to decreased utilization rates across the Company's manufacturing facilities, from approximately 80% in mid-2024 to approximately 60% by the end of 2025, as the Company was forced to curtail production to control inventory levels in response to softening demand. Concurrently, the Company has faced intensifying competition from low-cost manufacturers, particularly in Asia, which has placed downward pressure on pricing and eroded market share in certain segments. Generic spandex prices have fallen to near cash-cost levels, compressing margins across the industry. In the personal care segment, the market for baby diapers has both softened and fragmented, with private-label products gaining market share, and increased pricing pressure from lower-cost Asian competitors affecting both volume and price.

Macroeconomic uncertainties have further compounded these challenges. Tariff volatility and uncertainty and changing trade policies have created significant uncertainty throughout the value chain, causing brands to adopt cautious ordering practices and conservative inventory management strategies. These effects have cascaded through the supply chain, with particularly acute impacts in South Asia and Central America. Fluctuating raw material costs and inflationary pressures have also strained the Company's margins, while the lingering effects of COVID-19-related supply chain disruptions—including high garment inventory levels throughout the global value chain—have continued to suppress demand for fibers. Additionally, fluctuating commodity prices, particularly for energy and raw materials essential for spandex production, significantly raised the Company's operational costs.

The Company also incurred substantial costs in managing its capital structure, including through refinancing efforts and the various restructuring transactions described above. These industry-wide and company-specific pressures have collectively contributed to the deterioration of the Company's financial performance and the urgent need for the restructuring contemplated by the Prepackaged Cases. In particular, the Company's

EBITDA declined from approximately $132 million in 2024 to a projected EBITDA of approximately $44 million for 2026.

### 2.   Raw Material Purchase Obligations Under "Take-or-Pay" Supply Agreements

In 2023, as part of the Company's sustainability initiatives, TLC entered into a collaboration with Qore LLC ("Qore"), a joint venture between Cargill, Incorporated and HELM US Corporation ("HELM"), to produce sustainable, bio-derived spandex fibers utilizing QIRA, Qore's brand-name for bio-derived 1,4 butanediol. In connection with this collaboration, the Company entered into a long-term supply agreement with HELM dated July 10, 2023 (as amended on May 14, 2025, the "HELM Supply Agreement"), for the purchase of QIRA. The HELM Supply Agreement requires TLC to purchase substantial volumes of QIRA or otherwise to pay HELM a significant portion of the contractual product price for any QIRA that TLC does not purchase.[13]

The HELM Supply Agreement presented significant challenges for the Company as the current market demand cannot sustain the volume commitments provided in the agreement. In addition, (i) production of QIRA was delayed beyond the originally anticipated start-up date under the contract, weakening any potential market advantage to TLC arising from early production of bio-derived spandex from QIRA; and (ii) broader industry headwinds, including changing consumer preferences and the impact of restrictive trade policies discussed above, have rendered the high-volume take-or-pay commitments in the HELM Supply Agreement unsustainable for the Company's business. Accordingly, the Company determined that the HELM Supply Agreement is not economically viable.

Accordingly, beginning in December 2025, TLC initiated discussions with HELM around a possible restructuring of the HELM Supply Agreement to resolve disputes around TLC's allegations of delays and HELM's mitigation obligation.  Good-faith and hard-fought negotiations with HELM ensued for several months, which culminated in the execution of the settlement agreement and mutual release between TLC, HELM, and Qore (the "HELM Settlement Agreement"), which provides for the termination of the HELM Supply Agreement in exchange for a settlement payment of $4.75 million (including $750,000 in respect of existing payables owed to HELM) and a license agreement between certain of the Debtors, as licensors, and HELM and Qore, as licensees (the "HELM License Agreement," and together with the HELM Settlement Agreement, the "HELM Settlement").  The Debtors will seek Court approval of the HELM Settlement pursuant to the *Debtors' Emergency Motion for an Order Authorizing the Debtors' Pre-Assumption Performance of a Settlement Agreement and License Agreement by and among the Debtors, HELM US Corporation, and QORE, LLC,* filed on the Petition Date (the "HELM Settlement Motion").

Pursuant to the HELM License Agreement, TLC and The LYCRA Company UK Limited have licensed to HELM and Qore on a non-exclusive basis certain patents related to QIRA.  The HELM License Agreement was an integral component of the HELM Settlement and provides a path forward for the reorganized Debtors to continue a collaborative relationship with HELM and Qore, notwithstanding the termination of the HELM Supply Agreement.

The HELM Settlement will resolve one of the Debtors' most significant and burdensome operating liabilities on extremely favorable terms, while preserving the Company's optionality to conduct business with HELM in the future, and is unanimously supported by the Debtors' key stakeholders. Absent the HELM

---

[13]   Concurrently with the HELM Supply Agreement, Qore and TLC entered into a trademark license agreement (the "Existing HELM License Agreement"), pursuant to which Qore sublicensed certain QIRA trademarks owned by HELM AG, the parent company of HELM, to TLC to market and promote the use of QIRA in its products.  The Existing HELM License Agreement is non-exclusive and royalty-bearing, with fees charged based on the volume of QIRA purchased by TLC, and has the same duration as the HELM Supply Agreement.

Settlement, the HELM Supply Agreement could pose a significant risk to the Debtors' reorganization efforts and the Restructuring Transactions given HELM has alleged potential rejection damages significantly exceeding $100 million. Calculation of rejection damages and related issues would also likely be highly contested, including whether the take-or-pay obligations represent enforceable liquidated damages.  By entering into the HELM Settlement Agreement, the parties resolve such potential claims and eliminate attendant uncertainty. Moreover, the HELM Settlement secures the support of HELM, one of the Debtors' major trade creditors, for the Debtors' Prepackaged Plan and removes an obstacle to the Restructuring Transactions. Based upon an assessment of the potential for a significant rejection damages claim – which could have impaired the Company's ability to pursue a prepackaged chapter 11 case in which it will continue to operate in the ordinary course prior to confirmation – the Debtors' board of directors, in the exercise of their business judgment, determined that the resolution, payments, and agreements set forth in the HELM Settlement (including the HELM License Agreement) are in the best interests of the Debtors, their estates, and all stakeholders.

### 3.    Foshan China Litigation

In addition to the Company's other business challenges highlighted above, the Company remains embroiled in litigation in China resulting from the Alleged China Asset Transfers (initiated by Ruyi as former shareholder and which precipitated the Dutch Share Pledge Enforcement in June 2022, as outlined above), and which has created a number of operational risks for the Company. As background, in August 2021, Laika New Material (Foshan) Co., Ltd. (the "Foshan JV") was jointly established by Chuanglai Fiber (Foshan) Co., Ltd. ("CFF"), the Company's wholly-owned China subsidiary, and Jining Ruyi Wanzhong Venture Capital Investment Management Partnership (L.P.) ("Wanzhong"), an affiliate of Ruyi. At the time of establishment, the Foshan JV was effectively under the control of Ruyi, with Ruyi-affiliated persons occupying all positions of legal representative, directors, supervisor, and general manager. On December 15, 2021, CFF, Wanzhong, and the Foshan JV entered into a capital increase agreement (the "CIA"), pursuant to which the registered capital of the Foshan JV was to be increased by RMB 574,393,909.22, to be fully subscribed by CFF with its physical assets. Given that the capital contribution obligation would effectively deprive CFF of all of its assets and business, and in light of the fact that the transaction constituted a related party transaction, the Company's management became concerned about the fairness and validity of the arrangement, and whether it was in the best interests of the Company. Consequently, actions were taken by the Mezzanine Lenders and Company management to gain control over the Foshan JV, and claims were filed with arbitration commissions and courts by both CFF and Wanzhong concerning the performance and validity of the CIA.

There are currently four ongoing legal proceedings pending in connection with the Foshan JV (collectively, the "China Litigation"). First, CFF initiated arbitration before the Beihai Arbitration Committee (the "BAC") in July 2023 challenging the validity of the CIA. Following a re-arbitration, on February 25, 2025, CFF obtained a favorable arbitral award holding that the CIA is not established and CFF is not required to make any capital contribution to the Foshan JV. Second, in July 2025, Wanzhong initiated proceedings before the Nanning Court seeking to set aside the re-arbitration award, alleging that the BAC lacked jurisdiction. Just prior to the Petition Date, in February 2026, the Nanning Court overturned the re-arbitration award in favor of CFF, which gives Wanzhong the ability to commence litigation to compel CFF to perform its capital contribution obligations. Those proceedings could take at least two years to resolve. Third, CFF filed a claim before the Foshan Sanshui District Court seeking access to all books, records, and accounts of the Foshan JV. A final ruling was rendered in favor of CFF; however, enforcement proceedings are currently suspended as the current controller of the Foshan JV could not be contacted. Fourth, CFF filed a lawsuit for company dissolution with the Foshan Sanshui Court on July 1, 2024. Although the first instance judgment was rendered in favor of CFF on December 28, 2024, the Foshan Court issued a second instance judgment in September 2025 reversing the first instance judgment and concluding

that the Foshan JV did not satisfy the statutory requirements for corporate dissolution. CFF is currently considering whether to initiate re-trial proceedings in this matter.

Although the Company strongly believes in the merits of its case and intends to robustly defend its position in the China Litigation, the ultimate outcome remains uncertain, and the proceedings represent material operational and financial risks for the Company. Given the Nanning Court's overturning of the re-arbitration award, there is a strong likelihood that Wanzhong will pursue litigation to compel CFF's performance of the CIA. If successful, CFF could be required to fulfill its obligations under the CIA, including the transfer of RMB 574 million worth of assets to the Foshan JV (with no ability to settle via cash) and the payment of significant liquidated damages calculated at a penalty of 0.03% per day from February 16, 2022 to the date of actual performance. Moreover, the ongoing and protracted nature of the China Litigation and the lack of a conclusive ruling or a ruling in CFF's favor on the validity of the CIA have created uncertainty that has impacted the willingness of potential capital providers to extend further capital to the Company. Additionally, the Company has expended significant management time and Company resources in connection with oversight of the China Litigation, diverting attention from core business operations. Finally, the China Litigation has posed continued uncertainties and risks of disruptions to the Company's assets and operations in China, given the importance of the Foshan JV facility's role in the procurement of raw materials, global cash management, production, and as a capital provider to the Company.

### 4.     M&A Process and Backstop Restructuring

In 2024, ahead of the Prepetition Debt's then pending 2025 maturities, the Company and the Post-Enforcement Shareholders progressed an M&A process to sell the Company (the "M&A Process") to a potential third-party buyer. In parallel, the Company and the Post-Enforcement Shareholders engaged with an ad hoc group of 1L Linx Noteholders and ssTL Lenders (the "Euro Ad Hoc Group") and an ad hoc group of Dollar Noteholders (who also became holders of a portion of the ssTL) (the "Dollar Ad Hoc Group") in relation to a potential refinancing, restructuring, or similar transaction in respect of the ssTL, the Dollar Notes, the Euro Notes (and in turn, the Linx Notes), and the Promissory Note, given the instruments' looming maturities and the challenges associated with implementing an "at-par" refinancing given the Company's operational challenges.

The Euro Ad Hoc Group and the Dollar Ad Hoc Group (the "Ad Hoc Groups") entered into a lock-up agreement originally dated October 24, 2024 (as amended and restated, the "Lock-Up Agreement") amongst themselves, which, among other things, provided for the terms of a restructuring of the ssTL, the Dollar Notes, the Euro Notes (and in turn, the Linx Notes) and the Promissory Note in the event a sale transaction could not be consummated. The Company and the Post-Enforcement Shareholders continued negotiations with the Ad Hoc Groups in relation to the Lock-Up Agreement and the terms of a potential restructuring transaction in parallel with the M&A Process.

In January 2025, the Post-Enforcement Shareholders entered into an agreement to sell the Company to a Chinese state-owned enterprise, subject to satisfaction of certain conditions precedent, including regulatory approval by the National Development and Reform Commission of the PRC and the purchaser obtaining sufficient acquisition financing (the "Proposed Sale").

On March 31, 2025, although it was anticipated that the Proposed Sale would be consummated, the Company and certain of the Post-Enforcement Shareholders acceded to the Lock-Up Agreement, and amended it to provide for, among other things: (a) maturity extensions of the Prepetition Debt to provide runway for the Proposed Sale to complete; (b) a change of control trigger whereby the share capital of EIGH BV would be transferred to a trust for the benefit of certain parties in the event that the Proposed Sale was not consummated by a certain trigger date; and (c) a comprehensive debt and equity restructuring following such a change of control (the "Backstop Restructuring").

By August 2025, it appeared that the Proposed Sale would not likely be consummated given the absence of meaningful progress by the proposed purchaser towards completion of the Proposed Sale. As a result, on September 5, 2025, the Ad Hoc Groups proceeded with implementing the first stage of the Backstop Restructuring, whereby the Post-Enforcement Shareholders transferred the shares of EIGH BV (and, thereby, transferring ownership of the Company) to Eagle Holding, which would serve as the new ultimate holding company (the "2025 Change in Control Transaction"). Upon completion of the 2025 Change in Control Transaction, the equity interests in Eagle Holding—and by extension, the ownership of the Company—were beneficially held in trust by GLAS Trustees Limited for the benefit of the Current Shareholders, in accordance with the terms of the Backstop Restructuring. This ownership structure remains in place as of the Petition Date, though, as discussed above, the Lock-Up Agreement that provided for this beneficial interest pending the implementation of a restructuring transaction described therein was terminated on March 12, 2026.

### B.  Prepetition Initiatives.

#### 1.  Engagement with Stakeholders.

Following the 2025 Change in Control Transaction, the Company and the Ad Hoc Groups continued to pursue the Backstop Restructuring. However, by November 2025, it became clear that the Company's financial position had deteriorated further, and the Ad Hoc Groups raised questions regarding whether the Backstop Restructuring was still viable.

When the Backstop Restructuring was paused, the Prepetition Debt was scheduled to mature on December 30, 2025. Prior to the maturity date, the Company obtained consents to extend the maturity dates of the Prepetition Debt to March 31, 2026, and the long-stop date and other milestones under the Lock-Up Agreement to give the Company additional time to renegotiate the terms of the Backstop Restructuring with the Ad Hoc Groups. The amended Lock-Up Agreement permitted the Euro Ad Hoc Group or the Dollar Ad Hoc Group to provide notice that an Alternative Restructuring (as defined therein) is necessary (an "Alternative Restructuring Notice"), after which the parties would have a further twenty-five (25) business days to agree and execute any amendments to the Lock-Up Agreement needed to implement the Alternative Restructuring; otherwise, each party would have a unilateral termination right. On January 9, 2026, the Euro Ad Hoc Group delivered an Alternative Restructuring Notice in accordance with the Lock-Up Agreement, and accordingly the parties proceeded with negotiating an Alternative Restructuring and were required to execute any necessary amendments to the Lock-Up Agreement by February 16, 2026 (subject to extension).

#### 2.  Restructuring Support Agreement.[14]

The Debtors explored a range of Alternative Restructuring transactions, including both out-of-court and in-court transactions that might be supported by the Ad Hoc Groups and other key stakeholders. Meanwhile, the Company continued to experience severe near-term liquidity issues, notwithstanding its short debt maturity extension through March 31, 2026. As a result of months of intense, good-faith negotiations, (a) on March 12, 2026, the Euro Ad Hoc Group issued a notice for the termination of the Lock-Up Agreement (which therefore terminated on such date in accordance with its terms); and (b) on March 13, 2026, the Company and each of the lenders party to the RSA (collectively, the "RSA Parties") subsequently entered into the RSA.

The RSA provides for a comprehensive deleveraging of the Company's prepetition capital structure and an injection of new liquidity through debtor-in-possession financing in the form of $75 million of committed new money notes (the "DIP Notes Facility"), and, upon emergence from chapter 11, an exit notes facility (the "Exit

---

[14]  Capitalized terms used but not defined in this section have the meanings ascribed to such terms in the RSA.

Notes Facility") consisting of: (a) a committed facility in an amount of not less than $75 million to satisfy all required payments under the Prepackaged Plan, including the DIP Notes Facility, certain professional fees, and administrative expenses; and (b) an uncommitted $25 million incremental facility. The RSA Parties hold or have the power to direct more than two-thirds of the claims under each class of Prepetition Debt, including (i) 100% of the ssTL Claims (Class 3 Claims); (ii) 100% of the Euro Notes Claims (Class 4 Claims); (iii) more than 76% of the Dollar Notes Claims (Class 5 Claims); and (iv) more than 90% of the Promissory Note Claims (Class 6 Claims) (and more than 50% of the Holders in each Class) voting on the Prepackaged Plan . The transaction contemplated by the RSA will result in the net deleveraging of approximately $1.2 billion of funded debt obligations while providing the Company with a sustainable capital structure positioned for long-term operational success.[15]

The RSA contemplates the following in connection with the Prepackaged Plan:

- the Debtors will seek approval of the DIP Notes Facility to be provided by certain of the RSA Parties (in such capacity, the "DIP Noteholders") to EIGH BV to fund the operations of the business during the Prepackaged Cases and the administration of the cases;

- upon the Debtors' emergence from the Prepackaged Cases, certain of the RSA Parties will provide the Exit Notes Facility to EIGH BV to refinance the DIP Notes Facility and to fund the Company's post-emergence operations, in accordance with the Exit Notes Facility Documents;

- each DIP Noteholder will receive, at the option of each DIP Noteholder, payment in cash in full or notes under the Exit Notes Facility in satisfaction of the DIP Notes Facility claims;

- each ssTL Lender will receive its *pro rata* share of (i) 100% of the New LYCRA Holdco Notes and (ii) 100% of the New LYCRA Holdco Common Stock;

- with respect to the Euro Notes, (i) holders of the Euro Notes Priority Tranche will receive their *pro rata* share of 95% of the Class A2 Warrants; and (ii) holders of the Euro Notes Non-Priority Tranche will receive their *pro rata* share of 5% of the Class A2 Warrants and 100% of the Class A3 Warrants;[16]

- each Dollar Noteholder will receive its *pro rata* share of 100% of the Class B Warrants;

- each Promissory Note Payee will receive its *pro rata* share of an amount equal to $1,000;

- assumption of the HELM Settlement Agreement and the HELM License Agreement and rejection of the HELM Supply Agreement and Existing HELM License Agreement;

- general unsecured creditors will be rendered unimpaired and paid in the ordinary course of business, subject to all retained rights and defenses of the Debtors (other than with respect to HELM's claim under the HELM Supply Agreement);

- the Current Shareholders will receive zero recovery on account of their equity interests in Eagle Holding, which will be canceled; and

---

[15]   The descriptions of the treatment and transactions contemplated under the RSA and the Prepackaged Plan are for summary purposes. Where there is ambiguity between the descriptions of the proposed treatment, the Prepackaged Plan shall control.

[16]   In connection with the distribution of Class A2 Warrants and Class A3 Warrants, the RSA contemplates that Linx Capital SPV will commence an exchange process to, among other things, distribute the warrants to Linx Noteholders.

- customary Debtor and consensual third-party releases.

### 3. The Proposed DIP Notes Facility.

On March 13, 2026, the Debtors and the DIP Noteholders entered into a commitment letter in connection with the DIP Notes Facility.  As described in greater detail in the declarations in support of the DIP Notes Facility to be filed on the Petition Date, the DIP Notes Facility provides the Debtors with critical liquidity and represents the best (and only) financing alternative available to the Debtors and the only financing the Prepetition Secured Lenders will support. The DIP Notes Facility also forms an integral component of the RSA, which provides for a comprehensive and highly consensual restructuring of the Company's balance sheet. To confirm that no other party was willing to provide junior debtor-in-possession financing or debtor-in-possession financing otherwise on better terms, in the weeks preceding the Petition Date, the Company and its advisors launched a targeted "market test" process to gauge third-party interest in providing debtor-in-possession financing on the timeline and in the quantum required. In total, the Company contacted eleven (11) parties, two (2) of whom executed confidentiality agreements. Ultimately no other party expressed an interest in providing financing to the Debtors on terms acceptable to the Company and its key stakeholders. Without access to the DIP Notes Facility, the Debtors would be unable to fund operational cash needs in the immediate short term.

The DIP Notes Facility includes up to $75 million in new money superpriority secured notes, consisting of $50 million initially available following entry of the Interim DIP Order and $25 million available upon entry of the Final DIP Order. The DIP Notes Facility will bear interest at a rate of 9.00% per annum, payable in kind, and will be secured by substantially all assets and property of the Debtors. The DIP Notes Facility will also benefit from superpriority administrative expense claims against the Debtors that are senior to all other administrative expenses or other claims against the Debtors. Proceeds of the DIP Notes Facility will be used for: (a) working capital and general corporate purposes of the Debtors; (b) bankruptcy-related costs and expenses in respect of the Prepackaged Cases; (c) costs and expenses related to the DIP Notes Facility; and (d) any other purposes set forth in the budget approved by the DIP Noteholders. The DIP Notes Facility forms an integral component of the RSA and the Restructuring Transactions and will support the Company's operations during the Prepackaged Cases and ensure a smooth and timely exit from chapter 11.

The Debtors require immediate access to the additional liquidity provided through the DIP Notes Facility to continue operations and to administer the Prepackaged Cases. Based on the Debtors' forecast, the Debtors anticipate that absent the funds available from the DIP Notes Facility, the Company will suffer a liquidity shortfall within the first week of the Prepackaged Cases which would be highly disruptive to the operations of the business and result in the loss of support from its most critical customers, suppliers, and vendors on whom the Debtors' business depends and which could ultimately be highly value-destructive for the Company and its stakeholders.[17]

### C. Path Forward in Chapter 11

Through the Prepackaged Cases, the Company endeavors to partner with its key stakeholders to implement a comprehensive financial restructuring that will right-size the Company's balance sheet and position the Company for long-term operational success. Through the HELM Settlement, and the implementation of the transactions contemplated by the RSA, including the proposed DIP Notes Facility (and committed Exit Notes Facility) and the other key aspects of the Prepackaged Plan, the Company expects to obtain the liquidity necessary to fund operations during the Prepackaged Cases and facilitate a successful emergence.  The Prepackaged Plan

---

[17] Pursuant to the Intercreditor Agreement, the creditors of the Prepetition Secured Debt have irrevocably authorized Wilmington Trust (London) Limited (as the security agent under the Intercreditor Agreement in respect of the Shared Collateral and acting on the instructions of lenders holding 66.67% in value of the ssTL commitments) to support, consent to, and not oppose the incurrence of the DIP Notes Facility on behalf of all creditors of the Prepetition Secured Debt.

will provide the Company with a sustainable capital structure and financial flexibility necessary to execute on its refined business plan following emergence from chapter 11. The commitments under the HELM Settlement, the DIP Notes Facility, the Exit Notes Facility, and the other features of the RSA and the Prepackaged Plan demonstrate that the Debtors have a path to exit on "day 1" of these cases with the support of the RSA Parties. Together, these arrangements have provided the Debtors with a clear message to all stakeholders, customers, suppliers, and employees that the Debtors will continue as a global leader in fiber and technology solutions in the ordinary course. The timeline contemplated by the Milestones provides all parties with clear visibility into the proposed duration of the Prepackaged Cases.  To mitigate any business interruption and maximize the Company's ability to achieve its long-term operational and financial goals, it is critical that the Debtors move through the Prepackaged Cases as efficiently as possible while continuing to engage constructively with key stakeholders.

## VII.   MATERIAL DEVELOPMENTS OF THE PREPACKAGED CASES.

### A.   First Day Relief.

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors will file several motions (the "First Day Motions") designed to facilitate the administration of the Prepackaged Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Prepackaged Cases.

The First Day Motions, and all orders for relief entered in the Prepackaged Cases, will be available free of charge upon written or other request to the Claims and Noticing Agent by: (i) emailing the Claims and Noticing Agent at Lycrainfo@ra.kroll.com with a reference to "LYCRA Solicitation Inquiry" in the subject line; (ii) visiting the Debtors' restructuring website at https://restructuring.ra.kroll.com/lycra; or (iii) calling the Claims and Noticing Agent toll-free at (888) 498-1399  (Toll free from US / Canada) OR (347) 338-6514  (International, Toll). You may also obtain copies of any pleadings filed in the Prepackaged Cases via PACER at https://www.pacer.gov (for a fee) upon filing.

### B.   Proposed Confirmation Schedule.

Under the RSA, the Debtors agreed to certain case milestones to ensure an orderly and timely implementation of the Restructuring Transactions. It is imperative that the Debtors proceed swiftly to Confirmation of the Prepackaged Plan and emergence from the Prepackaged Cases to mitigate uncertainty among employees, customers, and vendors, minimize disruptions to the Company's business, and curtail professional fees and administrative costs. Expeditious Confirmation of the Prepackaged Plan and Consummation of the Restructuring Transactions is in the best interests of the Debtors, their Estates, and their stakeholders.

Pursuant to the agreed upon milestones, the Debtors must obtain Confirmation of the Prepackaged Plan within 45 calendar days of the Petition Date. Accordingly, the Debtors have proposed the following key case dates, subject to Court approval and availability:

| Event | Date/Timing[18] |
| --- | --- |
| Voting Record Date | March 13, 2026 |
| Solicitation Launch Date | March 16, 2026 |

---

[18]   Hearing dates subject to the Bankruptcy Court's availability.

| Event | Date/Timing[18] |
|---|---|
| • Petition Date<br><br>• Plan, Disclosure Statement, and Solicitation Materials to be filed with the Bankruptcy Court<br><br>• First Day Hearing on the following First Day Pleadings:<br><br>   o *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* ;<br><br>   o *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing on a Super-Priority Secured and Priming Basis, (II) Granting Liens and Providing Super-Priority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection to the Prepetition Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*;<br><br>   o *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief*;<br><br>   o *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief*;<br><br>   o *Debtors' Emergency Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, (II) Approving the Related Form and Manner of Notice, and (III) Granting Related Relief*;<br><br>   o *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage, Including Letters of Credit and Bank Guarantees Entered Into Prepetition, and Satisfy Prepetition Obligations Related Thereto, (B) Continue to Pay Certain Brokerage Fees, and (C) Renew, Amend, Supplement, Extend, Purchase, and Enter Into New Insurance Policies, Surety Bonds, Letters Of Credit, and Bank Guarantees, and (II) Granting Related Relief*;<br><br>   o *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees, (II) Authorizing the Debtors to Continue Group Contributions, and (III) Granting Related Relief*;<br><br>   o *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Maintain their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Continue to Perform Intercompany Transactions; (II) Granting Administrative Expense Status to Postpetition Intercompany Claims; and (III) Granting Related Relief*;<br><br>   o *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Their Existing Customer Programs and (B) Honor and Incur Obligations Under the Customer Programs and (II) Granting Related Relief*; | March 17, 2026 |

| Event | Date/Timing[18] |
|---|---|
| o *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of All Trade Claims and (II) Granting Related Relief;* <br><br> o *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (III) Approving the Solicitation Procedures, (IV) Approving the Combined Hearing Notice, (V) Waiving the Requirements for the U.S. Trustee to Convene a Meeting of Creditors, (VI) Conditionally Waiving the Requirements for the Debtors to File (A) Schedules and SOFAs and (B) Rule 2015.3 Financial Reports, and (VII) Granting Related Relief; and* <br><br> o *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix and a Consolidated List of the 30 Largest Unsecured Creditors and (B) Redact Certain Personally Identifiable Information of Natural Persons, and (C) Serve Certain Parties in Interest by Email, (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (III) Granting Related Relief.* | |
| Initial Plan Supplement Deadline | On or about April 10, 2026 |
| Voting Deadline <br><br> Objection Deadline <br><br> Opt-Out Deadline | April 17, 2026 at 4:00 p.m. Prevailing Central Time |
| Combined Hearing on Disclosure Statement Approval, Plan Confirmation | On or about April 24, 2026 |
| Effective Date | May 10, 2026 |

## VIII.   THE DEBTORS' RSA AND PREPACKAGED PLAN.

### A.   The RSA.

On March 13, 2026, after arm's-length, good faith negotiations overseen by the Debtors and the Consenting Creditors, including holders, or parties with the requisite authority to instruct or direct such holders under applicable Law, representing, in the aggregate, 100% of the SSTL Claims, 100% of the Euro Notes Claims, more than 76% of the Dollar Notes Claims and more than 90% of the Promissory Note Claims, the Consenting Creditors executed the RSA agreeing to vote to accept the Prepackaged Plan. Based on the foregoing, the Debtors further believe that once the votes are tabulated, each Class of Claims entitled to vote on the Prepackaged Plan (Classes 3, 4, 5, and 6 are the only classes entitled to vote on the Prepackaged Plan), will have received votes to accept the plan from holders of claims representing more than 66 2/3% in amount and 50% in number of claims in such Class that voted on the Prepackaged Plan. Pursuant to the RSA, the Consenting Creditors and the Debtors agreed, subject to the terms and conditions thereof, to support a recapitalization transaction that will: (i) allow the Debtors to successfully emerge from chapter 11 with a rightsized balance sheet; (ii) resolve Company liabilities in a manner that maintains the Debtors' ability to deliver their valuable products to their customer base; and (iii) provide DIP and exit financing to support the Company during the chapter 11 proceedings and as a going-concern upon emergence. Such Restructuring Transactions are embodied in the Prepackaged Plan on which the Company

will launch solicitation contemporaneously with the delivery of this Disclosure Statement to the Voting Classes. The summary of the Prepackaged Plan provided herein is qualified in its entirety by reference to the Prepackaged Plan. In the case of any inconsistency between this Disclosure Statement and the Prepackaged Plan, the Prepackaged Plan shall govern.

With a deal in hand, the Debtors commenced the Prepackaged Cases to gain access to the DIP Notes Facility and implement the terms of the RSA. The Debtors are committed to consummating the comprehensive recapitalization transaction embodied in the RSA and emerging from the Prepackaged Cases with a stronger balance sheet and the financial flexibility to continue providing their customers with top-tier service into the future. This transaction is supported by creditors throughout the Debtors' capital structure and would allow the Debtors to emerge quickly from chapter 11. It is critical that the Debtors move through their chapter 11 process as efficiently as possible to limit the administrative cost and burden on the Debtors' businesses imposed by the chapter 11 process. Upon emergence from chapter 11, the Debtors will have a stronger balance sheet and increased flexibility to conduct their operations and invest in the enterprise going forward. For detailed information on the terms of the RSA, see Article II of this Disclosure Statement.

### B. The Prepackaged Plan.

The Prepackaged Plan contemplates the following key terms, among others described herein and therein:

#### 1. General Settlement of Claims and Interests.

As discussed in detail herein and as otherwise provided in the Prepackaged Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Prepackaged Plan, upon the Effective Date, the provisions of the Prepackaged Plan will constitute a good faith compromise and settlement of all Claims, Interests, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Prepackaged Plan, including any challenge to the amount, validity, perfection, enforceability, priority, or extent of the ssTL Claims, the Euro Notes Claims, and the Dollar Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, based on any equitable theory, or otherwise. Subject to Article VI of the Prepackaged Plan, all distributions made to Holders of Allowed Claims in any Class are intended to be, and will be, final.

#### 2. Restructuring Transactions.

On or before the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, are authorized (subject to the consent of the Required Consenting Creditors and consistent with the RSA) to: (a) execute and deliver any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, formation, organization, dissolution, sale, purchase, transfers of shares of any direct or indirect wholly-owned subsidiaries of the Debtors among such subsidiaries, or liquidation containing terms that are consistent with the terms of the Prepackaged Plan, the Plan Supplement, and the RSA; and (b) consummate the Restructuring Transactions and to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Prepackaged Plan that are consistent with and pursuant to the terms and conditions of the Prepackaged Plan, including: (1) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Prepackaged Plan, the Plan Supplement, and the RSA and having other terms to which the applicable Entities may agree; (2) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state

Law, including any applicable New LYCRA Holdco Organizational Documents; (3) the issuance, allotment, and distribution of the New LYCRA Holdco Common Stock, excluding the MIP Shares; (4) the consummation of the New Debt, including the execution, delivery, and filing of all New Debt Documents; (5) the reservation of the MIP Shares and New Warrant Shares; (6) such other transactions that are required to effectuate the Restructuring Transactions; and (7) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with the Prepackaged Plan.

On or before the Effective Date, the Debtors and Reorganized Debtors (with the consent of the Required Consenting Creditors, acting reasonably) may implement the Prepackaged Plan, including effectuating the Share Transfer, through any one or more restructuring steps (including in accordance with any Agreed Transfer Process), in any order and at any time, to achieve tax and corporate efficiency, including mergers/conversions, asset and equity transfers, intercompany debt arrangements, dissolutions/formations, entity classification elections, and other step transactions. No further Court order or re solicitation is required; provided, that such steps will not (a) materially and adversely affect the recoveries, distributions, or treatment of any Holder of an Allowed Claim or Interest, (b) increase the aggregate consideration required under the Prepackaged Plan, or (c) alter the relative priorities of Allowed Claims or Interests. The Debtors and Reorganized Debtors (with the consent of the Required Consenting Creditors, acting reasonably) are authorized to make or revoke any tax elections and implement transactions intended to preserve or optimize tax attributes and minimize limitations or disallowance.

The Consenting Creditors will take commercially reasonable steps necessary and reasonably requested by the Debtors or Reorganized Debtors to consummate the Share Transfer, consistent with the terms hereof and the RSA.

The Reorganized Debtors will have the authority to effectuate the FinanceCo Dissolution from and after the Effective Date subject to local Law requirements. If a Share Transfer of Eagle Global or Eagle Intermediate is effectuated, then, following the Effective Date, each Person or Entity with requisite authority will take all actions reasonably requested by the Reorganized Debtors to effectuate the Holdco Dissolution as soon as reasonably practicable following the Effective Date, but in no event later than 60 days thereafter. For the avoidance of doubt, the Reorganized Debtors will have the authority to take any actions to cause the Holdco Dissolution. The Consenting Creditors will take all actions reasonably necessary and requested by the Reorganized Debtors to effectuate the Holdco Dissolution and the FinanceCo Dissolution, as applicable; *provided, that* such actions are not inconsistent with the terms of the Prepackaged Plan or the RSA.

The Confirmation Order will, and will be deemed to, pursuant to both sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Prepackaged Plan. The Confirmation Order will authorize the Debtors, the Reorganized Debtors, and the Consenting Creditors, as applicable, to undertake the Restructuring Transactions contemplated by the Prepackaged Plan, the RSA and the other applicable Definitive Documents.

### 3.     The Reorganized Debtors.

On the Effective Date, the New LYCRA Holdco Board will be appointed and, subject to local Law requirements, each Reorganized Debtor will adopt its New LYCRA Holdco Organizational Documents. The Reorganized Debtors will be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Prepackaged Plan as necessary to consummate the Prepackaged Plan. Cash payments to be made pursuant to the Prepackaged Plan will be made by the Debtors or the Reorganized Debtors, as applicable. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among

themselves as they determine to be necessary or appropriate to enable the Debtors or the Reorganized Debtors, as applicable, to satisfy their obligations under the Prepackaged Plan. Except as set forth in the Prepackaged Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Prepackaged Plan.

**4. Sources of Consideration for Plan Distributions.**

The Debtors and the Reorganized Debtors, as applicable, will fund distributions under the Prepackaged Plan and the Restructuring Transactions contemplated thereby with: (x) the Debtors' Cash on hand as of the Effective Date; (y) the New LYCRA Holdco Common Stock (excluding the MIP Shares) and the New Warrant Shares; and (z) the New Debt. Each distribution and issuance referred to in Article VI of the Prepackaged Plan will be governed by the terms and conditions set forth in the Prepackaged Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions will bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with the Prepackaged Plan, including the shares of New LYCRA Holdco Common Stock, the New Warrants, and the New Warrant Shares will be exempt from registration under the Securities Act, as described more fully in Article IV.M of the Prepackaged Plan.

**(a) Use of Cash.**

The Debtors or Reorganized Debtors, as applicable, will use Cash on hand to fund distributions to Holders of Allowed Claims, consistent with the terms of the Prepackaged Plan.

**(b) New LYCRA Holdco Common Stock and New Warrants.**

*(I) Issuance of the New LYCRA Holdco Common Stock*

New LYCRA Holdco will be authorized to issue the New LYCRA Holdco Common Stock and the New Warrant Shares pursuant to the New LYCRA Holdco Organizational Documents and (in relation to the New Warrant Shares) the New Warrant Agreements. Pursuant to New LYCRA Topco corporate authorizations adopted prior to the Effective Date, the issuance of the New LYCRA Holdco Common Stock, including the MIP Shares and the New Warrant Shares, will be authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors. On the Effective Date, the New LYCRA Holdco Common Stock (excluding the MIP Shares) will be issued, allotted, and distributed as provided for, and in accordance with, the Prepackaged Plan and the New LYCRA Holdco Organizational Documents.

The MIP Shares and New Warrant Shares (which are authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors) will be reserved on the Effective Date and will be issued, allotted, and distributed pursuant to the terms of the New LYCRA Holdco Organizational Documents and (in relation to the New Warrant Shares) the New Warrant Agreements.

All of the shares (or comparable units) of New LYCRA Holdco Common Stock and New Warrant Shares issued pursuant to the Prepackaged Plan will be duly authorized, validly issued, fully paid, and non-assessable. Each distribution, issuance, and allotment of New LYCRA Holdco Common Stock or New Warrant Shares will be governed by the terms and conditions set forth in the Prepackaged Plan applicable to such distribution, issuance, or allotment and by the terms and conditions of the instruments evidencing or relating to such distribution, issuance, or allotment, including the New LYCRA Holdco Organizational Documents, which terms and conditions will bind each Entity receiving such distribution, issuance, or allotment. Any Entity's acceptance of New LYCRA

Holdco Common Stock or New Warrants or New Warrant Shares will be deemed as its agreement to the New LYCRA Holdco Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. The New LYCRA Holdco Common Stock and New Warrant Shares will not be registered under the Securities Act or listed on any exchange as of the Effective Date and will not meet the eligibility requirements of DTC, Euroclear Bank SA/NV, and/or Clearstream Banking S.A. Additional information relating to the applicability of the securities law is available in Article IV.M.

*(II)*      *Issuance of the New Warrants*

The issuance of the New Warrants will be authorized without the need for any further corporate action and without any further action by the Holders of Claims other than as set forth in the Prepackaged Plan. Each distribution and issuance of the New Warrants under the Prepackaged Plan will be governed by the New Warrant Agreements. Any claimant's acceptance of the New Warrants (including any New Warrant Shares) will be deemed as its agreement to the applicable New Warrant Agreement and the New LYCRA Holdco Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

**(c)      New Debt.**

On the Effective Date, the relevant Reorganized Debtors will (i) enter into the Exit Notes Facility, pursuant to the Exit Notes Facility Documents, (ii) issue the New LYCRA Holdco Notes pursuant to the New LYCRA Holdco Notes Documents, and (iii) issue the DIP Exit Note pursuant to the DIP Note Purchase Agreement and any documents relating to, evidencing, or governing the DIP Exit Note. Confirmation of the Prepackaged Plan will constitute (x) final approval of the New Debt and the New Debt Documents; and (y) authorization for the Debtors and the Reorganized Debtors, as applicable, to take any and all actions necessary or appropriate to consummate the New Debt, including executing and delivering the New Debt Documents, in each case, without any further notice to or order of the Bankruptcy Court. On the Effective Date, the New Debt will be issued and distributed as provided for, and in accordance with the Prepackaged Plan.

As of the Effective Date, subject to local Law requirements, all of the Liens and security interests to be granted by the Debtors or Reorganized Debtors, as applicable in accordance with the New LYCRA Holdco Notes Documents and the Exit Notes Facility Documents: (a) will be deemed to be granted; (b) will be legal, valid, binding, automatically perfected, non-avoidable, first-priority and enforceable Liens on, and security interests in, the applicable collateral specified in the New LYCRA Holdco Notes Documents and the Exit Notes Facility Documents; and (c) will not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and will not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law. To the extent provided in the New LYCRA Holdco Notes Documents and the Exit Notes Facility Documents, the New Debt Agents/Trustee are authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The priorities of such Liens and security interests will be as set forth in the New LYCRA Holdco Notes Documents and the Exit Notes Facility Documents. The applicable New Debt Agents/Trustee will be authorized to make all filings and recordings necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Prepackaged Plan and the Confirmation Order (it being understood that perfection will occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents will not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties. The guarantees granted under the New Debt Documents, as applicable,

have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and will be deemed to not constitute a fraudulent conveyance or fraudulent transfer and will not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and will not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy Law.

### 5.      Corporate Existence.

Except as otherwise provided in the Prepackaged Plan, the Confirmation Order, the New LYCRA Holdco Organizational Documents, or any agreement, instrument, or other document incorporated therein, each Debtor will continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, company with limited liability, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, company with limited liability, or other form, as the case may be, pursuant to the applicable Law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Prepackaged Plan or otherwise, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to the Prepackaged Plan and require no further action or approval (other than any requisite filings, approvals, or consents required under applicable state, provincial, federal, or local Law). After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 6.      Vesting of Assets in the Reorganized Debtors.

Except as otherwise provided in the Prepackaged Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated in the Prepackaged Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Prepackaged Plan will vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Prepackaged Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated in the Prepackaged Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. For the avoidance of doubt, no Reorganized Debtor will be treated as being liable on any Claim that is discharged pursuant to the Prepackaged Plan.

### 7.      Cancellation of Existing Securities, Agreements, and Interests.

On the Effective Date and subject to local Law requirements, other than the New Debt, or to the extent otherwise provided in the Prepackaged Plan or the Confirmation Order (including to the extent any DIP Claim is refinanced and/or converted into the Exit Notes Facility), as applicable, all notes, instruments, certificates, credit agreements, note purchase agreements, indentures, and other documents evidencing Claims (including, for the avoidance of doubt, the ssTL Facility Agreement, the Euro Notes Indenture, the Dollar Notes Indenture, and the Promissory Note, and all related collateral and credit documentation) will be cancelled/waived, and any rights of

any Holder in respect thereof will be deemed cancelled and of no force or effect, and all prior, present and future obligations and liabilities, actions, suits, accounts or demands, covenants, and indemnities (both actual and contingent), of the Debtors and any non-Debtor Affiliates, or any other parties thereunder, or in any way related thereto, will be deemed satisfied in full, released, cancelled, discharged, and of no force or effect, as the amounts thereunder are considered uncollectable (*niet voor verwezenlijking vatbaar*), and the Agents/Trustees and each of the lenders and holders and their respective agents, successors and assigns, will each be automatically and fully released and discharged of and from all duties and obligations thereunder without any need for further action or approval by the Bankruptcy Court or for a Holder to take further action.

### 8.     Corporate Action.

Upon the Confirmation Date, all actions contemplated under the Prepackaged Plan (including the other documents contained in the Plan Supplement) will be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action, including, as applicable: (a) adoption or assumption, as applicable, of the employment agreements; (b) selection of the directors, officers, or managers for the Reorganized Debtors in accordance with the New LYCRA Holdco Organizational Documents; (c) the issuance and distribution of the New LYCRA Holdco Common Stock (excluding the MIP Shares); (d) implementation of the Restructuring Transactions; (e) the entry into the New Debt Documents, as applicable, and the execution, delivery, and filing of any documents pertaining thereto; (f) all other actions contemplated under the Prepackaged Plan (whether to occur before, on, or after the Effective Date); (g) adoption of the New LYCRA Holdco Organizational Documents; (h) the entry into the New Warrant Agreements, (i) the assumption or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases that have not been rejected or subject to a motion to reject as of the Confirmation Hearing; and (j) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Prepackaged Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Prepackaged Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors, as applicable, in connection with the Prepackaged Plan will be deemed to have occurred and will be in effect, without any requirement of further action by the Security Holders, members, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable. On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors and the Reorganized Debtors will be authorized and directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Prepackaged Plan (or necessary or desirable to effect the transactions contemplated under the Prepackaged Plan) in the name of and on behalf of the Reorganized Debtors, including the New LYCRA Holdco Common Stock, the New Debt Documents, the New LYCRA Holdco Organizational Documents, any other applicable Definitive Document, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV.H of the Prepackaged Plan will be effective notwithstanding any requirements under non-bankruptcy Law.

### 9.     New LYCRA Holdco Organizational Documents.

On or immediately prior to the Effective Date, except as otherwise provided in the Prepackaged Plan and subject to local Law requirements, the New LYCRA Holdco Organizational Documents will be automatically adopted or amended by the Reorganized Debtors as may be necessary to effectuate the transactions contemplated by the Prepackaged Plan. To the extent required under the Prepackaged Plan or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New LYCRA Holdco Organizational Documents with the Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate Laws of the respective state, province, or country of incorporation to the extent such

48

filing is required for each such document. The New LYCRA Holdco Organizational Documents and New LYCRA Topco corporate authorizations adopted prior to the Effective Date will, among other things (a) authorize the issuance of the New LYCRA Holdco Common Stock and (b) prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their respective New LYCRA Holdco Organizational Documents as permitted by the Laws of its jurisdiction of incorporation or formation and in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the Laws of the respective states, provinces, or countries of incorporation or formation and the New LYCRA Holdco Organizational Documents.

### 10. Directors and Officers of the Reorganized Debtors.

As of the Effective Date, subject to local Law requirements, the term of the current members of the board of directors or other Governing Body of each of the Debtors will expire, such current directors will be deemed to have resigned, and all of the directors for the initial term of the New LYCRA Holdco Board and the other Governing Bodies will be appointed in accordance with the New LYCRA Holdco Organizational Documents. The initial members of the New LYCRA Holdco Board will be identified in the Plan Supplement, to the extent known and determined at the time of filing and will be consistent with the New LYCRA Holdco Organizational Documents. Each such member and officer of the Reorganized Debtors will serve from and after the Effective Date pursuant to the terms of the New LYCRA Holdco Organizational Documents and other constituent documents of the Reorganized Debtors.

### 11. Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers, as applicable, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Prepackaged Plan and the Securities issued pursuant to the Prepackaged Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Prepackaged Plan.

### 12. Certain Securities Law Matters.

Before the Petition Date, the offering, issuance, allotment, and distribution of any shares of New LYCRA Holdco Common Stock and/or the offering, issuance, and distribution of any other debt or equity securities as contemplated herein and/or pursuant to the Prepackaged Plan (including, for the avoidance of doubt, the New Warrants (including the New Warrant Shares received with respect thereto) and the New Debt) (any such debt or equity securities, the "Other Securities") will only be made to Holders of Claims that can certify that they are (i) located inside of the United States and are (a) "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) or (b) "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act), or (ii) located outside the United States and are not "U.S. persons" (as defined in Rule 902 under the Securities Act) and will be exempt from, or not subject to, the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or in reliance on Regulation S under the Securities Act.

On and after the Petition Date, pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions

from registration, the offering, issuance, allotment, and distribution of the New LYCRA Holdco Common Stock as contemplated herein and/or the offering, issuance, allotment and distribution of the New Warrants and the New Warrant Shares, if any, will be exempt from, or not subject to, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. federal, state, or local Laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.

The New LYCRA Holdco Common Stock, the New Warrants (other than the New Class A1 Warrants), and the New Warrant Shares received with respect thereto, if any, to be issued under the Prepackaged Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof, subject to: (a) such recipients not being, and have not been within ninety (90) days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (b) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, (c) compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission or state or local securities laws, if any, applicable at the time of any future transfer of such Securities or instruments; and (d) any restrictions on the transferability of such New LYCRA Holdco Common Stock, New Warrants, and New Warrant Shares in the New LYCRA Holdco Organizational Documents or New Warrant Agreements, as applicable.

To the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, the New LYCRA Holdco Common Stock, New Warrants, and New Warrant Shares, if any, will be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from or in a transaction not subject to the registration requirements of the Securities Act and subject to any restrictions on the transferability of such New LYCRA Holdco Common Stock, New Warrants, and New Warrant Shares in the New LYCRA Holdco Organizational Documents or New Warrant Agreements, as applicable.

On and after the Petition Date, pursuant to section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, the offering, issuance, allotment and distribution of the New Debt, if any, will only be made to Holders that can certify that they are (i) located inside of the United States and are (a) "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) or (b) "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act), or (ii) located outside the United States and are not "U.S. persons" (as defined in Rule 902 under the Securities Act) and will be exempt from, or not subject to, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. federal, state, or local Laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.

The New LYCRA Holdco Notes to be issued under the Prepackaged Plan on account of Allowed Claims in accordance with, and pursuant to, the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act, will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from or in a transaction not subject to the registration requirements of the Securities Act and subject to any restrictions on the transferability of such New LYCRA Holdco Notes Documents or Exit Notes Facility Documents, as applicable.

Recipients of the New LYCRA Holdco Common Stock, New Warrants and New Warrant Shares, if any, are advised to consult with their own legal advisors as to the availability of any exemption from registration under

the Securities Act and any applicable Blue-Sky Laws for resales of New LYCRA Holdco Common Stock, New Warrants and New Warrant Shares.

On and after the Effective Date, a recipient who is eligible to receive the Other Securities:

(A)     if resident in, located in, or has a registered office in a Member State of the EEA, is not a retail investor (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU (as amended, "MiFID II"); (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a qualified investor as defined in Article 2 of the Prospectus Regulation (each, an "EEA Retail Investor"); and

(B)     if resident in, located in, or has a registered office in the United Kingdom, not a retail investor (defined as a person who is neither (x) a professional client, as defined in point (8) of Article 2(1) of regulation (EU) no 600/2014 as it forms part of domestic law by virtue of the European Union Withdrawal Act (the "EUWA"); nor (y) a qualified investor as defined in paragraph 15 of schedule 1 to The Public Offers and Admissions to Trading Regulations 2024 (the "UK POATRs") (each, a "UK Retail Investor" and, together with an EEA Retail Investor, a "Retail Investor").

The Reorganized Debtors need not provide any further evidence other than the Prepackaged Plan or the Confirmation Order to any Entity (including DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., any nominee thereof or any transfer agent for the New LYCRA Holdco Common Stock or the New Warrant Shares) with respect to the treatment of the New LYCRA Holdco Common Stock and any New Warrant Shares to be issued under the Prepackaged Plan under applicable securities laws. DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., any nominee thereof and any transfer agent for the New LYCRA Holdco Common Stock or the New Warrant Shares will be required to accept and conclusively rely upon the Prepackaged Plan and Confirmation Order in lieu of a legal opinion regarding whether the New LYCRA Holdco Common Stock or the New Warrant Shares to be issued under the Prepackaged Plan are exempt from registration and/or eligible for DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., book-entry delivery, settlement, and depository (to the extent applicable). Notwithstanding anything to the contrary in the Prepackaged Plan, no Entity (including DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., any nominee thereof and any transfer agent for the New LYCRA Holdco Common Stock or the New Warrant Shares) may require a legal opinion regarding the validity of any transaction contemplated by the Prepackaged Plan, including, for the avoidance of doubt, whether the New LYCRA Holdco Common Stock or the New Warrant Shares to be issued under the Prepackaged Plan are exempt from registration.

Notwithstanding any policies, practices, or procedures of DTC, Euroclear, or Clearstream, DTC, Euroclear, and Clearstream will cooperate with and take all actions reasonably requested by a distribution agent or an indenture trustee to facilitate distribution to Holders of Allowed Claims without requiring that such distributions be characterized as repayments of principal or interest.  No distribution agent or indenture trustee will be required to provide indemnification or other security to DTC, Euroclear, or Clearstream in connection with any distributions to Holders of Allowed Claims through the facilities of DTC, Euroclear, or Clearstream.

The Prepackaged Plan is not a prospectus within the meaning and for the purposes of the Regulation 2017/1129/EU (as amended, the "Prospectus Regulation") or the UK POATRs.

The Prepackaged Plan has been prepared on the basis that any offer or sale of securities issued in connection with the Prepackaged Plan within any Member State of the EEA will be made pursuant to an exemption under the Prospectus Regulation from the requirement to publish a prospectus for the offer of transferable securities to the public. In relation to each EEA Member State, no offer or sale of the Other Securities issued in connection with the Prepackaged Plan may be made to the public at any time other than pursuant to an exemption under the Prospectus Regulation. In any EEA Member State, the Prepackaged Plan and documents related thereto are only addressed to and directed at qualified investors in that jurisdiction within the meaning of the Prospectus Regulation.

Accordingly, the Other Securities are not being offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to a retail investor in the EEA (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of MiFID II; (y) a customer within the meaning of the Directive 2016/97/EU (as amended, the "Insurance Distribution Directive"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a qualified investor as defined in Article 2 of the Prospectus Regulation.

Further, no key information document is required to be prepared and none has been prepared in line with the requirements of the Regulation 1286/2014/EU (as amended, the "PRIIPs Regulation") in relation to any issue of the Other Securities.

The Prepackaged Plan has been prepared on the basis that any offer or sale of securities issued in connection with the Prepackaged Plan in the United Kingdom will be made pursuant to an exception from the general prohibition of offers to the public under the UK POATRs. In relation to the United Kingdom, no offer or sale of any Other Securities issued in connection with the Prepackaged Plan may be made to the public at any time other than pursuant to an exception from the general prohibition of offers to the public under the UK POATRS. In the United Kingdom, the Prepackaged Plan and documents related thereto are only addressed to and directed at qualified investors within the meaning of the UK POATRS. Accordingly, Other Securities are not being offered, sold, or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the United Kingdom (defined as a person who is neither (x) a professional client, as defined in point (8) of Article 2(1) of regulation (EU) no 600/2014 as it forms part of domestic law by virtue of the EUWA; nor (y) a qualified investor as defined in paragraph 15 of schedule 1 to the UK POATRS (each, a "UK Retail Investor")).

Further, no key information document is required to be prepared, and none has been prepared in line with the requirements of the PRIIPs Regulation as it forms part of United Kingdom domestic law by virtue of the EUWA (the "UK PRIIPs Regulation") in relation to any issue of the Other Securities.

In the United Kingdom, the information contained in the Prepackaged Plan or any documents related thereto (including, without limitation, the Prepackaged Plan) is intended only for use and may only be relied upon in relation to any investment activity by, and any investment activity to which such information relates may only be engaged in by, persons who are at the relevant time: (i) Investment Professionals within the meaning of Article 19(5) of The Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 of the United Kingdom (the "Order"); (ii) persons falling within the meaning of Articles 49(2)(a) to (d) of the Order; or (iii) persons to whom the communication may otherwise lawfully be communicated under FSMA (together, the "Permitted UK Persons"). Any person in the United Kingdom that is not a Permitted UK Person is not, for the purposes of any investment or investment decision, an intended recipient of the information contained in the Prepackaged Plan or any document related thereto and should not use such information as the basis for taking any investment activity or investment action. The Prepackaged Plan and any document related thereto should not (insofar as they relate to

any investment or investment activity) be distributed, communicated to, or directed at the general public in the United Kingdom otherwise than as described above.

### 13.    Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Prepackaged Plan or pursuant to (a) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New LYCRA Holdco Common Stock, (b) the Restructuring Transactions, (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (d) the making, assignment, or recording of any lease or sublease, (e) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the New Debt, or (f) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Prepackaged Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Prepackaged Plan, will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents will forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, will comply with the requirements of section 1146(a) of the Bankruptcy Code, will forego the collection of any such tax or governmental assessment, and will accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 14.    Employee Compensation and Benefits

#### (a)    Compensation and Benefits Programs

Except as otherwise set forth in the Prepackaged Plan, on the Effective Date, the Debtors or Reorganized Debtors, as applicable, will (i) assume all employment agreements, indemnification agreements, or other employment-related agreements entered into with current or former employees who are employees as of the Petition Date or (ii) solely with the consent of the Required Consenting Creditors, enter into new agreements with such employees on terms and conditions acceptable to the Reorganized Debtors and such employees.

A counterparty to or participant in a Compensation and Benefits Program assumed pursuant to the Prepackaged Plan will have the same rights under such Compensation and Benefits Program as such counterparty had thereunder immediately prior to such assumption (unless otherwise agreed by such counterparty and the applicable Reorganized Debtor(s)); *provided* that any assumption of Compensation and Benefits Programs pursuant to the Prepackaged Plan or any of the Restructuring Transactions will not (a) trigger or be deemed to trigger any change of control, change in control immediate vesting, termination, or similar provisions therein or (b) trigger or be deemed to trigger an event of "Good Reason" (or a term of like import) as a result of the consummation of the Restructuring Transactions or any other transactions contemplated by the Prepackaged Plan.

**(b)     Workers' Compensation Programs**

As of the Effective Date, the Debtors and the Reorganized Debtors will continue to honor their obligations under: (i) all applicable workers' compensation Laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation will be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Prepackaged Plan will limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable Law, including non-bankruptcy Law with respect to any such contracts, agreements, policies, programs, and plans; *provided, further,* that nothing in the Prepackaged Plan will be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable non-bankruptcy Law.

**15.     Director and Officer Liability Insurance.**

Notwithstanding anything in the Prepackaged Plan to the contrary, the Reorganized Debtors will be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Prepackaged Plan, Confirmation of the Prepackaged Plan will not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Prepackaged Plan as to which no Proof of Claim need be Filed.

The Reorganized Debtors will not terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies in effect or purchased as of the Petition Date (including any policy or endorsement providing for an extended claims-reporting period to the extent procured prior to the Petition Date), and all "Insureds" of the Debtors who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions on or after the Effective Date. The Debtors will procure and pay for any New D&O Policies to become effective as of the Effective Date.

**16.     Management Incentive Plan.**

Following the Effective Date, the New LYCRA Holdco Board will adopt the Management Incentive Plan, which will provide for the grants of equity and equity-based awards to employees, directors, consultants, and/or other service providers of the Reorganized Debtors, as determined at the discretion of the New LYCRA Holdco Board. The terms and conditions, including with respect to participants, allocation, timing, and the form and structure of the equity or equity-based awards, will be determined at the discretion of the New LYCRA Holdco Board after the Effective Date.

**17.     Preservation of Causes of Action.**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Prepackaged Plan, the Reorganized Debtors will retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such retained Causes of Action will be preserved notwithstanding the occurrence

54

of the Effective Date or any other provision of the Prepackaged Plan to the contrary, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Prepackaged Plan, including in Article VIII thereof.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the RSA, the Prepackaged Plan, the Plan Supplement, or this Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available retained Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity, except as otherwise expressly provided in the Prepackaged Plan**. The Reorganized Debtors may settle any such retained Cause of Action without further notice to or action, order, or approval of the Bankruptcy Court. Unless any retained Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Prepackaged Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, will apply to such retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and will retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Prepackaged Cases or pursuant to the Prepackaged Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any retained Causes of Action that a Debtor may hold against any Entity will vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in the Prepackaged Plan, including Article VIII thereof, or pursuant to a Bankruptcy Court order. The Reorganized Debtors, through their authorized agents or representatives, will retain and may exclusively enforce any and all such retained Causes of Action. The Reorganized Debtors will have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### 18.      Cashless Transactions.

Notwithstanding anything to the contrary set forth in the Prepackaged Plan, the treatment of Claims, distributions, and other transactions contemplated hereby, including, without limitation, the funding of the New Debt, if any, may, at the election of the applicable participating parties, be effectuated by netting or other form of cashless implementation.

### 19.      Helm Agreements.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to the Prepackaged Plan, the provisions of the Helm Agreements constitute a good-faith compromise and settlement of all Claims, Causes of Action, controversies, and other matters resolved pursuant to the Helm Agreements. The entry of the Confirmation Order will constitute the Bankruptcy Court's final approval and assumption of the Helm Agreements pursuant to sections 365 and 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that the Helm Agreements are in the best interests of the Debtors, their estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. As of the Effective Date, the Helm Entities are directed to comply with their obligations under the Helm Agreements. Subject to the terms of the Helm Agreements, the Debtors, with the consent of the Required

Consenting Creditors, reserve the right to modify or amend the Helm Agreements without further notice to or action, order, or approval of the Bankruptcy Court in accordance with the terms thereof.

## IX.      OTHER KEY ASPECTS OF THE PREPACKAGED PLAN.

### A.      Treatment of Executory Contracts and Unexpired Leases.

#### 1.      Assumption and Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, all Executory Contracts and Unexpired Leases that have not been rejected or subject to a motion to reject as of the Confirmation Hearing (other than the Rejected Helm Agreements, which will be deemed rejected in accordance with and subject to the Helm Settlement Agreement) will be deemed assumed by the applicable Reorganized Debtor without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease was: (a) previously assumed, amended and assumed, assumed and assigned, or rejected by the applicable Debtors; (b) previously expired or terminated pursuant to its own terms; (c) the subject of a motion to reject such executory contract or unexpired lease that is pending on the Effective Date; or (d) identified on the Rejected Executory Contract and Unexpired Lease List; *provided* that neither the Restructuring Transactions or any actions contemplated by the Prepackaged Plan will be deemed a "change of control" or other acceleration event for purposes of any Executory Contract or Unexpired Lease of the Debtors.

Entry of the Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Prepackaged Plan, the Assumed Executory Contract and Unexpired Lease List, or the Rejected Executory Contract and Unexpired Lease List, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth in the Prepackaged Plan, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Prepackaged Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Prepackaged Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date will revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Prepackaged Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date will be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors, with the reasonable consent of the Required Consenting Creditors.

Entry of the Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption of the RSA pursuant to sections 365 and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date. The RSA will be binding and enforceable against the parties to the RSA in accordance with its terms. For the avoidance of doubt, the assumption of the RSA in the Prepackaged Plan will not otherwise modify, alter, amend, or supersede any of the terms or conditions of the RSA including, without limitation, any termination events or provisions thereunder.

Except as otherwise provided in the Prepackaged Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease will include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Prepackaged Cases will not be deemed to alter the

prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Prepackaged Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision will be deemed modified such that the transactions contemplated by the Prepackaged Plan will not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Prepackaged Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contract and Unexpired Lease List and Rejected Executory Contract and Unexpired Lease List (with the reasonable consent of the Required Consenting Creditors) at any time through and including forty-five (45) days after the Effective Date.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement will be satisfied if the Debtors make an election to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

### 2. Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Prepackaged Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court no later than thirty (30) days after the effective date of such rejection.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and will not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease will be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.F of the Prepackaged Plan, notwithstanding anything in a Proof of Claim to the contrary.

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code will be treated as a General Unsecured Claim pursuant to Article III.B of the Prepackaged Plan and may be objected to in accordance with the provisions of Article VII of the Prepackaged Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

### 3. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

The Debtors or the Reorganized Debtors, as applicable, will pay the Cure amounts, if any, on the Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated by the underlying agreements and/or the ordinary course of business among the parties thereto, as applicable. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Claims and Noticing

Agent on or before thirty (30) days after the Effective Date. Any such request that is not timely Filed will be disallowed and forever barred, estopped, and enjoined from assertion, and will not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure will be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure in the Debtors' ordinary course of business; *provided* that nothing in the Prepackaged Plan will prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Prepackaged Plan must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure amount, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure amount will occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Prepackaged Plan or otherwise and full payment of any applicable Cure pursuant to Article V of the Prepackaged Plan, in the amount and at the time dictated by the Debtors' ordinary course of business, will result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Prepackaged Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Article V of the Prepackaged Plan, in the amount and at the time dictated by the Debtors' ordinary course of business, will be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

### 4.    Indemnification Obligations.

To the fullest extent permitted under applicable Law, all indemnification obligations in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, articles of association, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the benefit of current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, creditors, and other professionals of, or acting on behalf of, the Debtors (each in their capacities as such), as applicable, will be (a) reinstated and remain intact, irrevocable, and will survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date, and (b) assumed by the Reorganized Debtors.

**5.      Insurance Policies.**

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Prepackaged Plan. Unless otherwise provided in the Prepackaged Plan, on the Effective Date, (1) the Debtors will be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, and (2) such insurance policies and any agreements, documents, or instruments relating thereto will revest in the Reorganized Debtors.

**6.      Reservation of Rights.**

Nothing contained in the Prepackaged Plan or the Plan Supplement will constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, will have forty-five (45) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Prepackaged Plan.

**7.      Nonoccurrence of Effective Date.**

In the event that the Effective Date does not occur, the Bankruptcy Court will retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**8.      Contracts and Leases Entered Into After the Petition Date.**

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtor liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**B.      Provisions Governing Distributions.**

**1.      Timing and Calculation of Amounts to Be Distributed.**

Unless otherwise provided in the Prepackaged Plan, on, or as soon as reasonably practicable after, the Effective Date (or, if a Claim or Interest is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim, as applicable, will receive the full amount of the distributions that the Prepackaged Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Prepackaged Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but will be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims will be made pursuant to the provisions set forth in Article VII of the Prepackaged Plan. Except as otherwise provided in the Prepackaged Plan, Holders of Allowed Claims will not be entitled to interest, dividends, or accruals on the distributions provided for in the Prepackaged Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding the foregoing, (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Prepackaged Cases or assumed by the Debtors prior to

the Effective Date will be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Allowed Priority Tax Claims will be paid in accordance with Article II.B of the Prepackaged Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim will be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy Law or in the ordinary course of business.

### 2.    Disbursing Agent.

All distributions under the Prepackaged Plan will be made by the Disbursing Agent on the Effective Date. The Disbursing Agent will not be required to give any bond or surety or other Security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety will be borne by the Reorganized Debtors.

All Plan Distributions to any Disbursing Agent on behalf of the Holders of Claims listed on the Claims Register (or the designees of such Holders, as applicable) will be deemed completed by the Debtors when received by such Disbursing Agent. Distributions under the Prepackaged Plan will be made to any such Holders (or the designees of such Holders, as applicable) by the applicable Disbursing Agent.

### 3.    Rights and Powers of Disbursing Agent.

#### (a)    Powers of the Disbursing Agent.

The Disbursing Agent will be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Prepackaged Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Prepackaged Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Prepackaged Plan.

#### (b)    Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent (including the Agents/Trustees) on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent will be paid in Cash by the Reorganized Debtors.

### 4.    Delivery of Distributions and Undeliverable or Unclaimed Distributions.

#### (a)    Record Date for Distribution.

On the Distribution Record Date, the Claims Register will be closed and any party responsible for making distributions will instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date (or the designees of such Holders, as applicable).

For the avoidance of doubt, the Distribution Record Date will not apply to Securities held through DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., as applicable, which will receive distributions in accordance with the applicable procedures of DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., as applicable.

**(b)**      **Delivery of Distributions in General.**

Except as otherwise provided in the Prepackaged Plan or in the Plan Supplement, the Disbursing Agent will make distributions to Holders of Allowed Claims, as of the Distribution Record Date, or, if applicable, to such Holder's designee, as appropriate: (i) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date; (ii) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (iii) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; or (iv) on any counsel that has appeared in the Prepackaged Cases on the Holder's behalf; *provided* that the manner of such distributions will be determined at the discretion of the Reorganized Debtors.

For the avoidance of doubt, the Distribution Record Date will not apply to Securities held through DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., as applicable, which will receive distributions in accordance with the applicable procedures of DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., as applicable.

Notwithstanding the foregoing, (i) all distributions on account of DIP Claims will be made to the applicable DIP Agent, and the DIP Agent will be, and will act as, the distribution agent with respect to the DIP Claims in accordance with the terms and conditions of the Prepackaged Plan and the applicable debt documents; (ii) all distributions on account of ssTL Claims will be made to the ssTL Agent, and the ssTL Agent will be, and will act as, the distribution agent with respect to the ssTL Claims in accordance with the terms and conditions of the Prepackaged Plan and the applicable debt documents; (iii) all distributions on account of Euro Notes Claims will be made to the Euro Notes Trustee and the Euro Notes Trustee will be, and will act as, the distribution agent with respect to the Euro Notes Claims in accordance with the terms and conditions of the Prepackaged Plan and the applicable debt documents; and (iv) all distributions on account of Dollar Notes Claims will be made to the Dollar Notes Trustee, and the Dollar Notes Trustee will be, and will act as, the distribution agent with respect to the Dollar Notes Claims in accordance with the terms and conditions of the Prepackaged Plan and the applicable debt documents.

**(c)**      **No Fractional Distributions.**

No fractional New LYCRA Holdco Notes, fractional New Warrants or fractional shares of New LYCRA Holdco Common Stock will be distributed, and no Cash will be distributed in lieu of such fractional amounts. When any distribution pursuant to the Prepackaged Plan on account of an Allowed Claim, as applicable, would otherwise result in the issuance of a number of New LYCRA Holdco Notes, New Warrants or shares of New LYCRA Holdco Common Stock that is not a whole number, the actual distribution of New LYCRA Holdco Notes, New Warrants or shares of New LYCRA Holdco Common Stock will be rounded as follows: (i) fractions of one-half (½) or greater will be rounded to the next higher whole number and (ii) fractions of less than one-half (½) will be rounded to the next lower whole number with no further payment therefor. To the minimum extent necessary, the total number of New LYCRA Holdco Notes, New Warrants and authorized shares of New LYCRA Holdco Common Stock to be distributed under the Prepackaged Plan will be adjusted as necessary to account for the foregoing rounding.

**(d)**      **Undeliverable Distributions and Unclaimed Property.**

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder will be made unless and until the Disbursing Agent has

61

determined the then-current address of such Holder, at which time such distribution will be made to such Holder without interest; *provided* that such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date. After such date, all unclaimed property or interests in property will revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property Laws to the contrary), and the Claim of any Holder of Claims to such property or interest in property will be cancelled, released, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws, or any provisions in any document governing the distribution of such unclaimed property.

**5.      Surrender of Cancelled Instruments or Securities.**

On the Effective Date, or as soon as reasonably practicable thereafter, each Holder (and the applicable agents for such Holder, including the Agents/Trustees) of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.G of the Prepackaged Plan will be deemed to have surrendered such certificate or instrument to the Disbursing Agent. Such surrendered certificate or instrument will be cancelled solely with respect to the Debtors and any non-Debtor Affiliates, and such cancellation will not alter the obligations or rights of any non-Debtor third parties (other than the non-Debtor Affiliates) in respect of one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which will continue in effect for the purposes of allowing Holders to receive distributions under the Prepackaged Plan, charging Liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary in the Prepackaged Plan, the foregoing will not apply to certificates or instruments evidencing Claims or Interests that are Unimpaired under the Prepackaged Plan.

**6.      Manner of Payment.**

At the option of the Disbursing Agent, any Cash payment to be made under the Prepackaged Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

**7.      Compliance with Tax Requirements.**

In connection with the Prepackaged Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the Disbursing Agent, and any applicable withholding or reporting agent will comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Prepackaged Plan will be subject to such withholding and reporting requirements. Notwithstanding any provision in the Prepackaged Plan to the contrary, any applicable withholding or reporting agent will be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Prepackaged Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and the Reorganized Debtors reserve the right to allocate all distributions made under the Prepackaged Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

**8.      Allocations.**

Distributions in respect of Allowed Claims will be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

62

**9.      No Postpetition Interest on Claims.**

Unless otherwise specifically provided for in the RSA, the Prepackaged Plan, the DIP Orders, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy Law, postpetition interest will not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors will be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest will not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**10.      Foreign Currency Exchange Rate.**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than United States dollars will be automatically deemed converted to the equivalent United States dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Effective Date.

**11.      Setoffs and Recoupment.**

Except as expressly provided in the Prepackaged Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all Claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim under the Prepackaged Plan will constitute a waiver or release by a Reorganized Debtor or its successor of any and all Claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder. In no event will any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G of the Prepackaged Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**12.      Claims Paid or Payable by Third Parties.**

**(a)      Claims Paid by Third Parties.**

The Debtors or the Reorganized Debtors, as applicable, will reduce in full a Claim, and such Claim will be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder will, within five (5) Business Days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Prepackaged Plan exceeds the amount of such Claim as of the date of any such distribution under the Prepackaged Plan. The failure of such Holder to timely repay or return such distribution will result in the Holder owing the applicable

Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the five (5) Business Days grace period specified above until the amount is fully repaid.

**(b)** **Claims Payable by Third Parties.**

No distributions under the Prepackaged Plan will be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy or is found liable for satisfying in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then, immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**(c)** **Applicability of Insurance Policies.**

Except as otherwise provided in the Prepackaged Plan, distributions to Holders of Allowed Claims will be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained in the Prepackaged Plan (including Article III of the Prepackaged Plan), nothing contained in the Prepackaged Plan will constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers, under any policies of insurance, nor will anything contained in the Prepackaged Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**C.** **Procedures for Resolving Contingent, Unliquidated, and Disputed Claims.**

**1.** **Disputed Claims Process**

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Prepackaged Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims will determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Prepackaged Cases had not been commenced, except that (unless expressly waived pursuant to the Prepackaged Plan) the Allowed amount of such Claims will be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. All Proofs of Claim Filed in the Prepackaged Cases will be considered objected to and Disputed without further action by the Debtors or Reorganized Debtors. Upon the Effective Date, all Proofs of Claim Filed against the Debtors, regardless of the time of filing, and including Proofs of Claim Filed after the Effective Date, will be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in the Prepackaged Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court will in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim, as applicable, under the Prepackaged Plan. Notwithstanding the foregoing, Entities must File Cure objections as set forth in Article V.C of the Prepackaged Plan to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty. **Except as otherwise provided in the Prepackaged Plan, all Proofs of Claim Filed after the Effective Date will be disallowed and forever barred, estopped, and enjoined from assertion, and will not be**

**enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

> **2.      Allowance of Claims.**

After the Effective Date and subject to the terms of the Prepackaged Plan, each of the Reorganized Debtors will have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date. The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be Allowed under applicable non-bankruptcy Law.

> **3.      Claims Administration Responsibilities.**

Except as otherwise specifically provided in the Prepackaged Plan, after the Effective Date, the Reorganized Debtors will have the sole authority: (a) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (b) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Prepackaged Plan, from and after the Effective Date, each Reorganized Debtor will have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to the Prepackaged Plan.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors will be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable non-bankruptcy Law. If the Debtors or Reorganized Debtors, as applicable, dispute any General Unsecured Claim, such dispute will be determined, resolved, or adjudicated, as the case may be, in the manner as if the Prepackaged Cases had not been commenced and will survive the Effective Date. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all Claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Prepackaged Cases had not been commenced.

To the maximum extent required by applicable Law, any Person or Entity who the Debtors or Reorganized Debtors reasonably believe has relevant information related to any Disputed Claim will provide such assistance, cooperation or testimony as the Debtors or the Reorganized Debtors may request from time to time.

> **4.      Estimation of Claims.**

Before or after the Effective Date, the Debtors, with the reasonable consent of the Required Consenting Creditors, or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Prepackaged Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, will be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute a maximum limitation on such Claim for all purposes under the Prepackaged Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

### 5.     Adjustment to Claims Without Objection.

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged (including pursuant to the Prepackaged Plan) on the Claims Register by the Debtors or Reorganized Debtors or the Claims and Noticing Agent without the Debtors or Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 6.     Disallowance of Claims.

Except as otherwise expressly set forth in the Prepackaged Plan, and subject to the terms thereof, including Article VIII, all Claims of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code will be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

### 7.     No Distributions Pending Allowance.

Notwithstanding any other provision of the Prepackaged Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided in the Prepackaged Plan will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; *provided* that if only the Allowed amount of an otherwise valid Claim is Disputed, such Claim will be deemed Allowed in the amount not Disputed and payment or distribution will be made on account of such undisputed amount pending resolution of the dispute.

### 8.     Distributions After Allowance.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) will be made to the Holder of such Allowed Claim in accordance with the provisions of the Prepackaged Plan. On or as soon as reasonably practicable after the next Distribution Date after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent will provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Prepackaged Plan as of the Effective Date, without any interest to be paid on account of such Claim.

### D.     Conditions Precedent to Confirmation and Consummation of the Prepackaged Plan.

### 1.     Conditions Precedent to the Effective Date.

It will be a condition to the Effective Date of the Prepackaged Plan that the following conditions will have been satisfied or waived pursuant to the provisions of Article IX.B of the Prepackaged Plan:

- there will not have been instituted or be pending any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) (or there will not have been any material adverse development to any action, application, claim, counterclaim, or proceeding currently instituted, threatened, or pending) before or by any court, governmental, regulatory, or administrative agency or instrumentality, domestic or foreign, or by any other Person, domestic or foreign, in connection with the Restructuring Transactions that, in the reasonable judgment of the Debtors (or the Required Consenting Creditors), would prohibit, prevent, or restrict Consummation of the Restructuring Transactions;

- the Debtors will have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Prepackaged Plan and Restructuring Transactions, and all applicable regulatory or government-imposed waiting periods will have expired or been terminated;

- an order, statute, rule, regulation, executive order, stay, decree, judgment, or injunction will not have been enacted, entered, issued, promulgated, enforced, or deemed applicable by any court or governmental, regulatory, or administrative agency or instrumentality, domestic or foreign, that, in the reasonable judgment of the Debtors, would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

- each document or agreement constituting a Definitive Document will have been executed or otherwise effectuated as contemplated, will be in form and substance consistent with the RSA, and otherwise reasonably acceptable to the Required Consenting Creditors, and any and all conditions precedent related thereto or contained therein will have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived pursuant to the terms of the applicable Definitive Document;

- to the extent invoiced, the payment of all reasonable and documented fees and expenses of the Debtors' professionals (solely if payment of such fees and expenses has been authorized by the Bankruptcy Court, including under the DIP Orders);

- all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court will have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account;

- the Bankruptcy Court will have entered the Interim DIP Order and the Final DIP Order, each of which will not have been reversed, stayed, modified, dismissed, vacated, or reconsidered, and the Final DIP Order will have become a Final Order;

- the Bankruptcy Court will have entered the Confirmation Order, the entered Confirmation Order will be consistent with the RSA and otherwise in compliance with the consent rights contained therein, the Confirmation Order will not have been reversed, stayed, modified, dismissed, vacated, or reconsidered, and the Confirmation Order will have become a Final Order;

- the RSA will not have been terminated as to the Required Consenting Creditors and will be in full force and effect, and all conditions and terms set forth in the RSA will have been satisfied or waived in accordance with its terms;

- all of the shares of New LYCRA Holdco Common Stock required to be issued under the Prepackaged Plan have been duly issued, allotted, and delivered;

- all of the New Warrants will have been duly issued and delivered;

- the Debtors have provided evidence reasonably satisfactory to the Required Consenting Creditors that the Share Transfer has been effectuated in accordance with the Agreed Transfer Process;

- the New LYCRA Holdco Organizational Documents will have been adopted in a manner consistent in all respects with the Prepackaged Plan and the RSA and the consent rights contained therein;

- all accrued and unpaid Restructuring Expenses will have been paid in full in accordance with the RSA;

- the Debtors have procured and paid for the New D&O Policies (and the "tail" or "run-off" policy will be purchased on a prepaid, non-cancelable premium basis), and such policies will become effective as of the Effective Date; and

- all conditions precedent to the issuance or incurrence of the New Debt will have been satisfied or duly waived, and the New Debt, including all documentation related thereto, will be in form and substance satisfactory to the Debtors and in effect.

### 2. Waiver of Conditions.

The conditions to the Effective Date set forth in Article IX of the Prepackaged Plan may be waived only if waived in writing (email from counsel will suffice) by the Debtors, with the prior written consent of the Required Consenting Creditors, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Prepackaged Plan.

### 3. Effect of Failure of Conditions.

If Consummation does not occur, the Prepackaged Plan will be null and void in all respects and nothing contained in the RSA, the Prepackaged Plan, or this Disclosure Statement will: (a) constitute a waiver or release of any Claims by the Debtors or any Holder of Claims or Interests of any Claim or Interest; (b) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the RSA that survive termination thereof will remain in effect in accordance with the terms thereof.

### E. Modification, Revocation, or Withdrawal of the Prepackaged Plan.

### 1. Modification and Amendments.

Except as otherwise specifically provided in the Prepackaged Plan, the Debtors reserve the right to modify the Prepackaged Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Prepackaged Plan. Subject to those restrictions on modifications set forth in the Prepackaged Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, alter, amend, or modify the Prepackaged Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Prepackaged Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Prepackaged Plan, this Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Prepackaged Plan.  Notwithstanding anything to the contrary in the Prepackaged Plan, the Debtors will not amend or modify the Prepackaged Plan in a manner inconsistent with the RSA.

### 2. Effect of Confirmation on Modifications.

Entry of the Confirmation Order will mean that all modifications or amendments to the Prepackaged Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 3. Revocation or Withdrawal of Prepackaged Plan.

Subject to the RSA, the Debtors reserve the right to revoke or withdraw the Prepackaged Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Prepackaged Plan, or if Confirmation or Consummation does not occur, then: (a) the Prepackaged Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Prepackaged Plan (including the fixing or limiting to an amount certain, and including the Allowance or disallowance, of all or any portion of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Prepackaged Plan, and any document or agreement executed pursuant to the Prepackaged Plan, will be deemed null and void; and (c) nothing contained in the Prepackaged Plan will: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of such Debtor or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

### F.     Other Claims and Interest Classification and Treatment Features.

#### 1.     Elimination of Vacant Classes.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing will be deemed eliminated from the Prepackaged Plan for purposes of voting to accept or reject the Prepackaged Plan and for purposes of determining acceptance or rejection of the Prepackaged Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

#### 2.     Voting Classes, Presumed Acceptance by Non-Voting Classes.

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class votes to accept or reject the Prepackaged Plan, the Holders of such Claims or Interests in such Class will be presumed to have accepted the Prepackaged Plan.

#### 3.     Intercompany Interests.

To the extent Reinstated under the Prepackaged Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure, for the ultimate benefit of the Holders of shares of New LYCRA Holdco Common Stock in exchange for the Debtors' and Reorganized Debtors' agreement under the Prepackaged Plan to make certain distributions to the Holders of Allowed Claims. For the avoidance of doubt, to the extent Reinstated pursuant to the Prepackaged Plan, on and after the Effective Date, all Intercompany Interests will be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

#### 4.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Prepackaged Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Prepackaged Plan. The Debtors will seek Confirmation of the Prepackaged Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Prepackaged Plan in accordance with Article X thereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**5.      Subordinated Claims and Interests.**

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Prepackaged Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Any such contractual, legal, or equitable subordination rights will be settled, compromised, and released pursuant to the Prepackaged Plan.

**X.      RISK FACTORS.**

Holders of Claims or Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Prepackaged Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Prepackaged Plan and its implementation.

**A.      Bankruptcy Law Considerations.**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Prepackaged Plan, but will not necessarily affect the validity of the vote of the Voting Classes to accept or reject the Prepackaged Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Voting Classes.

**1.      There Is a Risk of Termination of the RSA.**

The RSA contains provisions that give the signatories thereto (collectively or individually, as applicable) the ability to terminate the RSA upon the occurrence of certain events or if certain conditions are not satisfied, including the Debtors' failure to use commercially reasonable efforts to achieve the Milestones set forth therein. To the extent that events giving rise to termination of the RSA occur, the RSA may terminate prior to the Confirmation or Consummation of the Prepackaged Plan, which could result in the loss of support for the Prepackaged Plan by important creditor constituencies and could result in the loss of use of DIP funding and/or cash collateral by the Debtors under certain circumstances. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Prepackaged Plan. In the event that the RSA is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

**2.      The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors.**

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, commencing section 363 sales of the Debtors' assets, converting to a chapter 7 plan, and any other transaction that would maximize the value of the Debtors' Estates, or proceedings in Non-U.S. jurisdictions. The terms of any such restructuring alternatives may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Prepackaged Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Prepackaged Plan, the Prepackaged Cases, or the threat of rejection of the Prepackaged Plan by the Bankruptcy Court would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationship with customers and vendors.

### 3.   Parties in Interest May Object to the Prepackaged Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Prepackaged Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Although the Debtors believe that the classification of Claims and Interests under the Prepackaged Plan complies with the requirements set forth in the Bankruptcy Code, once any Prepackaged Cases have been commenced, a Holder could challenge the classification. In such event, the cost of the Prepackaged Plan and the time needed to confirm the Prepackaged Plan may increase, and the Debtors cannot be sure that the Bankruptcy Court will agree with the Debtors' classification of Claims and Interests. If the Bankruptcy Court concludes that either or both of the classification of Claims and Interests under the Prepackaged Plan does not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Prepackaged Plan. Such modification could require a resolicitation of votes to accept or reject the Prepackaged Plan. The Prepackaged Plan may not be confirmed if the Bankruptcy Court determines that the Debtors classification of Claims and Interests is not appropriate.

### 4.   The Bankruptcy Court Might Not Approve the Debtors' Use of Cash Collateral or the DIP Facilities.

Upon commencing the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to enter into postpetition financing arrangements and use cash collateral to fund the Prepackaged Cases and to provide customary adequate protection to the prepetition secured creditors, as applicable, and in accordance with the terms of the RSA. Such access to postpetition financing and cash collateral will provide necessary liquidity during the pendency of the Prepackaged Cases. There can be no assurance that the Bankruptcy Court will approve the debtor-in-possession financing and/or such use of cash collateral on the terms requested. Moreover, if the Prepackaged Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral and postpetition financing. There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing and/or use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

**5.** **The Conditions Precedent to the Effective Date of the Prepackaged Plan May Not Occur.**

As more fully set forth in Article IX of the Prepackaged Plan, the Confirmation and Effective Date of the Prepackaged Plan are subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Confirmation and Effective Date of the Prepackaged Plan will not take place. In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new plan. If the Debtors do not secure sufficient working capital to continue their operations or if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

**6.** **The Debtors Could Fail to Satisfy Voting Threshold Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Prepackaged Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Prepackaged Plan. If sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims or Interests as those proposed in the Prepackaged Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Prepackaged Plan.

**7.** **The Debtors Might Not Be Able to Secure Confirmation of the Prepackaged Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of allowed claims or allowed interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Prepackaged Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Prepackaged Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Prepackaged Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Prepackaged Plan and the RSA, reserve the right to modify the terms and conditions of the Prepackaged Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Prepackaged Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Prepackaged Plan or no distribution whatsoever under the Prepackaged Plan.

8.     **The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.**

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Prepackaged Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Prepackaged Plan may result in, among other things, increased expenses relating to professional compensation.

9.     **Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation.**

Even if the Prepackaged Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the Debtors' products, and increasing expenses. *See* Article X.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Business." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Prepackaged Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Prepackaged Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Prepackaged Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Prepackaged Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Prepackaged Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Prepackaged Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Prepackaged Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

10.     **The Bankruptcy Court Could Find the Solicitation of Acceptances Inadequate.**

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case. Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b). Sections 1125(g) and 1126(b) and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable non-bankruptcy law;

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures. Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (a) the solicitation of such acceptance or rejection was in compliance with applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (b) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code). While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 11. The Prepackaged Cases Could Be Converted to Cases under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 12. One or More of the Prepackaged Cases May Be Dismissed.

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial Consummation of a confirmed plan, or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Prepackaged Cases. In such event, the Debtors would be unable to confirm the Prepackaged Plan with respect to the applicable Debtor or Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Prepackaged Plan.

### 13. The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Prepackaged Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Prepackaged Plan, subject to the terms of the RSA. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 14. Risk that Foreign Courts Will Not Enforce the Confirmation Order.

After the Effective Date, the Reorganized Debtors will maintain business operations in certain Non-U.S. jurisdictions, including the United Kingdom, the Netherlands, Mexico, Brazil, Hong Kong, Singapore, and Switzerland, where some of the Debtors are incorporated. Additionally, implementation of the Prepackaged Plan

and the Restructuring Transactions contemplated thereunder may require certain actions to be taken by and/or with respect to certain of the Debtors or Reorganized Debtors incorporated in certain foreign jurisdictions, including potential local implementation proceedings. There is a risk that the courts in these jurisdictions will not enforce the Confirmation Order, or that the effects of the Confirmation Order will not be recognized under the law of the relevant jurisdiction, which may affect the Reorganized Debtors ability to effectuate certain relief granted pursuant to the Confirmation Order. There is also a risk that parties in interest may seek to frustrate the Prepackaged Cases or the effects of the Confirmation Order through proceedings in these jurisdictions, notwithstanding the releases, injunctions, and exculpations set forth in Article VIII of the Prepackaged Plan.

### 15.     Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article IX of the Prepackaged Plan, the Effective Date of the Prepackaged Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or met, the Effective Date will not take place.

### 16.     Contingencies Could Affect Distributions to Holders of Allowed Claims.

The distributions available to Holders of Allowed Claims under the Prepackaged Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Prepackaged Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Prepackaged Plan or require any sort of re-vote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty, at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Prepackaged Plan.

### 17.     Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article VIII of the Prepackaged Plan provides for certain releases, injunctions, and exculpations, including a release of Liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Prepackaged Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Prepackaged Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization. The Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are important to the success of the Prepackaged Plan. The Prepackaged Plan's release and exculpation provisions are an inextricable component of the RSA and Prepackaged Plan and the significant deleveraging and financial benefits that they embody.

### 18.     The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Prepackaged Plan, and a Lengthy Bankruptcy

**Proceeding Could Disrupt the Debtors' Business, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Prepackaged Plan.**

Although the prepackaged Prepackaged Plan is designed to minimize the length of the Prepackaged Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Prepackaged Plan will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Prepackaged Plan could itself have an adverse effect on the Debtors' business. A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' business.

The disruption that the bankruptcy process would have on the Debtors' business could increase with the length of time it takes to complete the Prepackaged Cases. If the Debtors are unable to obtain Confirmation of the Prepackaged Plan on a timely basis, because of a challenge to the Prepackaged Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

19.     **The Debtors May Be Unsuccessful in Obtaining First Day Orders to Permit the Debtors to Pay Their Key Vendors and Employees, or to Continue to Perform Customer Programs, in the Ordinary Course.**

The Debtors have tried to address potential concerns of their key customers, vendors, employees, and other parties in interest that might arise from the filing of the Prepackaged Plan through a variety of provisions incorporated into or contemplated by the Prepackaged Plan. However, there can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest the Debtors may seek to treat in this manner, and, as a result, the Debtors' business might suffer.

20.     **The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Prepackaged Plan at Any Time Prior to Its Confirmation.**

The Debtors reserve the right, prior to the Confirmation or substantial Consummation thereof, subject to the provisions of Section 1127 of the Bankruptcy Code, applicable law, and the RSA, to amend the terms of the Prepackaged Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Prepackaged Plan. The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Prepackaged Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances but prior to Confirmation of the Prepackaged Plan, the Debtors seek to modify the Prepackaged Plan, the previously solicited acceptances will be valid only if (a) all Classes of adversely affected creditors and interest Holders accept the modification in writing or (b) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

21.     **The RSA Is Subject to Significant Conditions and Milestones That May Be Difficult to Satisfy.**

There are certain material conditions that must be satisfied under the RSA, including the timely satisfaction of milestones in the Prepackaged Cases. The ability to timely complete such milestones is subject to risks and uncertainties, many of which are beyond the Debtors' control.

      **B.**      **Risks Related to Recoveries Under the Prepackaged Plan.**

          **1.**      **The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results.**

The Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve the projected financial results, the value of the New LYCRA Holdco Common Stock (including any New Warrant Shares) and the New Debt may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

          **2.**      **Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary.**

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, contains estimates and assumptions that might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed. Among other things, estimates will fluctuate based on general economic and business conditions, capital market conditions, and industry-specific and Company-specific factors (including the ability of the Reorganized Debtors to achieve strategic goals, objectives, and targets over applicable periods).

          **3.**      **The New LYCRA Holdco Common Stock Are Subject to Dilution.**

The ownership percentage represented by the New LYCRA Holdco Common Stock distributed to Holders of ssTL Claims on the Effective Date under the Prepackaged Plan will be subject to dilution on account of the New Warrants and the MIP Shares.

          **4.**      **The Debtors Might Be Controlled by Significant Holders.**

Assuming that the Effective Date occurs, Holders of ssTL Claims, Euro Notes Claims and/or Dollar Notes Claims will receive distributions representing (or convertible into) a substantial percentage of the outstanding shares of the New LYCRA Holdco Common Stock. If the holders of a significant portion of the New LYCRA Holdco Common Stock were to act as a group, subject at all times to the New LYCRA Holdco Organizational Documents, such holders would be in a position to control the outcome of actions requiring shareholder approval, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors. Such Holders may have interests that differ from those of the other Holders of shares of New LYCRA Holdco Common Stock and may vote in a manner adverse to the interests of such other Holders. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of the New LYCRA Holdco Common Stock. In addition, a Holder of a significant number of shares of the New LYCRA Holdco Common Stock may, subject at all times to the New LYCRA Holdco Organizational Documents, sell all or a large portion of its shares of the New LYCRA Holdco

Common Stock within a short period of time, which sale may adversely affect the trading price of the shares of the New LYCRA Holdco Common Stock. A holder of a significant number of shares of the New LYCRA Holdco Common Stock may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' businesses, and, as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors. Such actions by Holders of a significant number of shares of the New LYCRA Holdco Common Stock may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

5.     **The Terms of the New Organizational LYCRA Holdco Organizational Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court.**

The terms of the New LYCRA Holdco Organizational Documents are subject to change based on negotiations between the Debtors and the Consenting Creditors. Holders of Claims that are not the Consenting Creditors will not participate in these negotiations and the results of such negotiations may affect the rights of equity holders in New LYCRA Holdco following the Effective Date.

6.     **The Terms of the Exit Notes Facility Documents Are Subject to Change Based On Negotiations and the Approval of the Bankruptcy Court.**

The terms of the Exit Notes Facility Documents are subject to change based on negotiations between the Debtors and the Consenting Creditors. Holders of Claims that are not the Consenting Creditors will not participate in these negotiations and the results of such negotiations may affect the rights of equity holders in New LYCRA Holdco following the Effective Date.

7.     **A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Refinance Their Debt.**

The Debtors' or the Reorganized Debtors' credit ratings, as applicable, could be lowered, suspended, or withdrawn entirely, at any time by the rating agencies if, in each rating agency's judgment, circumstances warrant such action, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Reorganized Debtors, as applicable. Downgrades in the Reorganized Debtors' long-term debt ratings may make it more difficult to refinance their debt, if any, and increase the cost of any debt that they may incur in the future.

8.     **Certain Tax Implications of the Prepackaged Plan.**

Holders of Allowed Claims should carefully review Article XIV of this Disclosure Statement, entitled "Certain united states Federal Income Tax Consequences of the Prepackaged Plan," to determine how the U.S. federal income tax implications of the Prepackaged Plan and the Prepackaged Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

C.     **Risks Related to the Debtors' and the Reorganized Debtors' Business.**

1.     **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Prepackaged Cases.**

For the duration of the Prepackaged Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Prepackaged Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed

in the Prepackaged Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Prepackaged Cases to chapter 7 proceedings; (g) ability to prevent local insolvency proceedings; and (h) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Prepackaged Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events associated with the Prepackaged Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Prepackaged Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Prepackaged Cases that may be inconsistent with the Debtors' Prepackaged Plans.

**2. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business.**

While the Debtors intend the prepackaged chapter 11 process to be short, the Debtors' future results will be dependent upon the successful Confirmation and Consummation of the Prepackaged Plan. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Prepackaged Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, the longer the proceedings related to the Prepackaged Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Prepackaged Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Prepackaged Cases. The chapter 11 proceedings also require the Debtors to seek debtor-in-possession financing to fund operations. If the Debtors are unable to obtain final approval of such financing on favorable terms or at all, or if the Debtors are unable to fully draw on the availability under the DIP Notes Facility, the chances of successfully reorganizing the Debtors' business may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 3. Financial Results May Be Volatile and May Not Reflect Historical Trends.

The Financial Projections attached hereto as **Exhibit C** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Prepackaged Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New LYCRA Holdco Common Stock (including any New Warrant Shares) and the ability of the Debtors to make necessary payments under the New Debt.

Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur. The information included in this Disclosure Statement does not necessarily conform to the information, including with respect to the Financial Projections, that would be required if the Solicitation was made pursuant to a registration statement filed with the SEC or another securities regulator.

Further, during the Prepackaged Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses and Claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Prepackaged Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting may be different from historical trends. The Financial Projections contained herein do not currently reflect the impact of "fresh start" accounting.

Lastly, the business plan was developed by the Debtors with the assistance of their advisors. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan. Any deviations from the Debtors' existing business plan would necessarily cause a deviation.

### 4. The Reorganized Debtors May Not Be Able to Implement the Business Prepackaged Plan.

While the Debtors believe that Consummation of the Prepackaged Plan will put them in a strong position to implement their go-forward business plan, various factors beyond the Reorganized Debtors' control may hinder or prevent their successful implementation of the business plan. In particular, the Reorganized Debtors' successful implementation of the business plan depends significantly on maintaining and growing their customer base. Given the nature of the Debtors' customer arrangements, there can be no assurance that the Reorganized Debtors will maintain and grow their customer base. The erosion of the Reorganized Debtors' customer base may materially and adversely affect their operating results and hinder or prevent their successful implementation of the business plan.

**5.      The Debtors' Business is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business.**

The Debtors' operations are subject to various federal, state, and local laws and regulations. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil, and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations, and cash flows of the Reorganized Debtors.

**6.      The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Prepackaged Cases.**

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Prepackaged Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

**7.      The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.**

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base. The Debtors' recent liquidity issues and the Prepackaged Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key management personnel could adversely affect the Debtors' ability to operate their business. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' business and the results of operations.

**8.      The Debtors Could Fail to Retain or Attract Customers, Which Would Adversely Affect the Debtors' Business and Financial Results.**

The Debtors' future revenue is dependent in large part upon the retention and growth of their existing customer base, in terms of customers continuing to purchase products. Existing customers may purchase fewer products or turn to alternative suppliers of such products, which could have a material adverse effect on the Debtors' business and results of operations. In such cases, there can be no assurance that the Debtors will be able to retain their current customers.

A variety of factors could affect the Debtors' ability to successfully retain and attract customers, including the level of demand for their products, the level of customer spending in the apparel and textile industries, the quality of the Debtors' customer service, the Debtors' ability to update their products and develop new products and services desired by customers, and the Debtors' ability to integrate and manage any acquired business. Further, the industry in which the Debtors operate is highly competitive and the Debtors may not be able to compete effectively. The Debtors' revenue comes from the sale of the Debtors' products. It is impossible to predict with perfect accuracy what market demand for such offerings will be. Further, the Debtors' business is highly tied to discretionary consumer spending habits, and interest rates, tariffs, employment, fuel costs, and general economic conditions may impact customers' finances and therefore willingness to spend on the Debtors' products.

9. **Deteriorations in Business Relationships May Impact the Ability to Source Materials.**

The Debtors' success depends in part on their ability to source the materials necessary to produce and sell the Debtors' products. These materials are sourced from a broad range of suppliers. As a result, the Debtors' business depends on maintaining productive business relationships with their international and dispersed network of third-party suppliers. The Debtors' operations could be disrupted if such business relationships decline, for whatever reason, or if such suppliers go out of business or are unable to provide materials to the Debtors as they have on a historical basis. There is a risk that economic conditions could lead to financial, operational, production, labor, regulatory, or quality assurance difficulties that could result in a reduction or interruption in the Debtors' raw material supply.

10. **Certain Other Contingencies May Have a Material Adverse Effect on the Debtors' Business.**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, may have a material adverse effect on the Debtors' business, financial condition or results of operations, and as a result. The risks and uncertainties described below are not the only risks that the Debtors face. Additional risks and uncertainties not currently known to the Debtors or that the Debtors currently deem to be immaterial may also have a material adverse effect on the Debtors' business, financial condition or results of operations. Such risks and contingencies include:

- volatile and uncertain costs and availability of energy and raw materials utilized for the Debtors' products;

- disruptions in the supply of raw materials and high concentration of the Debtors' supplier base;

- disruptions in global or regional macroeconomic and geopolitical conditions;

- risks related to conducting operations in many different countries;

- significant competition in the Debtors' markets;

- competition from new market entrants and from alternative forms of packaging;

- the loss of key customers for the Debtors' products, or increased customer concentration due to industry consolidation;

- impact of environmental concerns on the Debtors' sales;

- the Debtors' high fixed costs;

- changes in packaging regulations and their enforcement;

- new or existing packaging regulations in the Debtors' end-markets and their enforcement;

- current and future environmental, health and safety and other governmental requirements;

- the Debtors' failure to develop new products or improve existing products that meet the Debtors' customers' needs, as well as delays in the development of new products;

- interruptions in the operations of the Debtors' manufacturing plants;

- the Debtors' inability to fund the capital investment requirements of the Debtors' business;

- the Debtors' inability to successfully consummate acquisitions or integrate acquired businesses;

- government regulations or legislation to ban or tax the production of certain specialty fibers;

- potential liability for damages related to the contamination of soil and groundwater or other types of damages due to the presence of hazardous materials at the Debtors' facilities or in the Debtors' products;

- governmental and market responses to concerns relating to greenhouse gas emissions and climate change and potentially increased costs related thereto;

- potential liability for damages based on product liability claims;

- the Debtors' exposure to currency fluctuations in several countries;

- volatility in energy prices and the Debtors' inability to pass resulting increased costs on to the Debtors' customers;

- the Debtors' inability to successfully implement the Debtors' business strategies, including cost savings and other growth initiatives;

- any disruptions in the services of the Debtors' external transportation and warehousing providers;

- higher employment costs;

- the failure to maintain good employee relations;

- dependence on the continued service of the Debtors' senior management;

- fluctuations in the financial markets that may adversely affect the Debtors' pension plan assets and the Debtors' future cash flows;

- the failure of the Debtors' patents, trademarks, models and confidentiality agreements to protect the Debtors' intellectual property;

- the Debtors' failure to comply with the U.S. Foreign Corrupt Practices Act, trade and economic sanctions and other similar laws, and resulting penalties and damage to the Debtors' reputation;

- the Debtors' current and future involvement in legal proceedings;

- challenges by tax authorities to the Debtors' historical and future tax positions or the Debtors' allocation of taxable income among the Debtors' subsidiaries, as well as changes in the tax laws to which the Debtors are subject;

- cyber risk and the failure to maintain the integrity of the Debtors' operational or security systems or infrastructure, or those of third parties with which the Debtors do business;

- sudden fluctuations and seasonal changes in demand for the Debtors' customers' products;

- changes to the Debtors' insurance coverage;

- competition and antitrust laws;

- the quality and reliability of the facilities, machinery and equipment provided by the Debtors' technology and telecommunications providers and the Debtors' reliance on a limited number of suppliers of such technology; and

- the adequacy of the Debtors' accounting, planning or internal financial controls and related systems to prevent and discover previous or future breaches of laws and regulations and generally to manage risks.

**11.     The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service All of Their Indebtedness and May Be Forced to Take Other Actions to Satisfy their Obligations, Which May Not Be Successful.**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, including the Exit Notes Facility. These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

**D.     Risks Related to the Offer and Issuance of Securities Under the Prepackaged Plan.**

**1.     Holders of Securities Issued Under the Prepackaged Plan May Be Restricted in Their Ability to Transfer or Sell Their Securities.**

Before the Petition Date, the offering, issuance, allotment, and distribution of any New LYCRA Holdco Common Stock and/or Other Securities will only be made to Holders of Claims that can certify that they are (i) located inside of the United States and are (a) "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) or (b) "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act), or (ii) located outside the United States and are not "U.S. persons" (as defined in Rule 902 under the Securities Act) and will be exempt from, or not subject to, the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or in reliance on Regulation S under the Securities Act.

On and after the Petition Date, pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, the offering, issuance, allotment, and distribution of the New LYCRA Holdco Common Stock, the New Warrants and the New Warrant Shares, if any, will be exempt from, or not subject to, among other things,

the registration requirements of section 5 of the Securities Act and any other applicable U.S. federal, state, or local laws requiring registration prior to the offering, issuance, distribution, or sale of Securities. The New Class A1 Warrants (issued in satisfaction of the DIP Commitment Premium), the MIP Shares (issued pursuant to the Management Incentive Plan), and the New Debt will be issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

The New LYCRA Holdco Common Stock, New Warrants (other than the New Class A1 Warrants) and New Warrant Shares received with respect thereto, if any, to be issued under the Prepackaged Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code, will be freely transferable under the Securities Act by the recipients thereof, subject to:(a) such recipients not being, and have not been within ninety (90) days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (b) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, (c) compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission or state or local securities laws, if any, applicable at the time of any future transfer of such Securities or instruments; and (d) any restrictions on the transferability of such New LYCRA Holdco Common Stock, New Warrants, and New Warrant Shares in the New LYCRA Holdco Organizational Documents or New Warrant Agreements, as applicable.

The New Debt, the New Class A1 Warrants (issued in satisfaction of the DIP Commitment Premium), the MIP Shares (issued pursuant to the Management Incentive Plan), and, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, the New LYCRA Holdco Common Stock, New Warrants, and New Warrant Shares, if any, will be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from or in a transaction subject to the registration requirements of the Securities Act and subject to any restrictions on the transferability of such securities in the New LYCRA Holdco Organizational Documents, New Warrant Agreements,  New LYCRA Holdco Notes Documents or Exit Notes Facility Documents, as applicable.

Recipients of New LYCRA Holdco Common Stock, New Warrants, and New Warrant Shares, if any, are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws for resales of shares of New LYCRA Holdco Common Stock, New Warrants, and New Warrant Shares.

*See* Article XIII of this Disclosure Statement, entitled "Certain Securities Law Matters," for additional details.

**2.     There is No Established Market for the Shares of New LYCRA Holdco Common Stock, the New Warrants and the New Debt.**

The Debtors do not currently intend to list the New LYCRA Holdco Common Stock, New Warrants and New LYCRA Holdco Notes on any national securities exchange or other public market, which significantly limits the ability of holders receiving New LYCRA Holdco Common Stock, New Warrants and New LYCRA Holdco Notes to sell or otherwise liquidate their holdings. There can be no assurance that any liquidity event, such as a sale of the company, an initial public offering, or other transaction that would allow recipients to realize value from their securities, will ever occur. As a result, you may be required to bear the financial risk of your ownership

of the New LYCRA Holdco Common Stock, New Warrants and New LYCRA Holdco Notes for an indefinite period and may not be able to sell or transfer your securities at any particular time or on favorable terms.

In addition, the Reorganized Debtors do not expect to be subject to the reporting requirements of the Securities Act, and Holders of the New LYCRA Holdco Common Stock, New Warrants and New LYCRA Holdco Notes will not be entitled to any information except as expressly required by the New LYCRA Holdco Organizational Documents. As a result, the information which the Debtors are required to provide in order to issue the New LYCRA Holdco Common Stock, New Warrants and New LYCRA Holdco Notes may be less than the Debtors would be required to provide if the New LYCRA Holdco Common Stock, New Warrants and New LYCRA Holdco Notes were registered or otherwise subject to the reporting requirements of the Securities Act. Among other things, the Debtors may not be required to provide: (a) separate financial information for any subsidiary; (b) select annual audited financial data; (c) selected quarterly or other interim financial data; (d) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (e) certain information regarding the Debtors' executive compensation policies and practices and historical compensation information for their executive officers. This lack of information could materially impair your ability to evaluate your ownership and the marketability of the New LYCRA Holdco Common Stock, New Warrants and New LYCRA Holdco Notes.

## XI.    SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement is being distributed to Holders of ssTL Claims, Euro Notes Claims, Dollar Notes Claims and Promissory Note Claims in connection with the Solicitation of votes to accept or reject the Prepackaged Plan. This Disclosure Statement is accompanied by the Ballot, a ballot to be used for voting on the Prepackaged Plan.

### A.    Holders of Claims Entitled to Vote to Accept or Reject the Prepackaged Plan.

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote to accept or reject a chapter 11 plan. The table in Article III.E of this Disclosure Statement, entitled "Am I entitled to vote to accept or reject the Prepackaged Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim) under the Prepackaged Plan.

The Debtors are soliciting votes to accept or reject the Prepackaged Plan only from Holders of Claims in Class 3, Class 4, Class 5 and Class 6 (collectively, the "Voting Classes"). The Holders of Claims in the Voting Classes are Impaired under the Prepackaged Plan and may, if the Prepackaged Plan is Confirmed and Consummated, receive a distribution under the Prepackaged Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Prepackaged Plan.

The Debtors are *not* soliciting votes to accept or reject the Prepackaged Plan from Holders of Claims or Interests in Classes 1, 2, 7, 8, 9, 10, 11 and 12.

### B.    Voting Record Date.

**The Voting Record Date is March 13, 2026**. The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Prepackaged Plan, and whether such Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Prepackaged Plan as the Holder of a Claim.

    **C.**      **Voting on the Prepackaged Plan.**

Detailed instructions regarding how eligible Holders of Claims or Interest can vote to accept or reject the Prepackaged Plan are contained on the ballots distributed to a Holder of Claims that are entitled to vote to accept or reject the Prepackaged Plan (the "Ballots"). For your vote to be counted, your Ballot must be properly completed, executed, and delivered as directed, so that the Ballot containing your vote is **actually received** by the Claims and Noticing Agent **on or before the Voting Deadline,** *i.e.***, April 17, 2026 at 4:00 p.m., prevailing Central Time**.

Holders of the Debtors' securities that are entitled to vote are encouraged to coordinate with the bank, broker, or other financial institution that holds your securities on your behalf "in street name" at one of the securities depositories (your "Nominee") for the purpose of casting your vote.  Nominees will be authorized to use their customary methods of collecting votes from their beneficial holder clients, which may include (but are not limited to) via e-mail, dedicated portal, telephone, voter information form, or other acceptable methods in lieu of an actual paper Ballot.

    **D.**      **Ballots Not Counted.**

**No Ballot will be counted toward Confirmation of the Prepackaged Plan if, among other things**: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the Ballots; (3) it was cast by an entity that is not entitled to vote to accept or reject the Prepackaged Plan; (4) it was sent to any person or entity other than the Claims and Noticing Agent; (5) it is unsigned;[19] or (6) it is not clearly marked to either accept or reject the Prepackaged Plan or it is marked both to accept and reject the Prepackaged Plan. **Please refer to your Ballot for additional requirements with respect to voting to accept or reject the Prepackaged Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE THAT IS OTHERWISE IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN THIS ARTICLE XI OF THIS DISCLOSURE STATEMENT OR THE DIRECTIONS AND REQUIREMENTS SET FORTH IN YOUR BALLOT WILL NOT BE COUNTED WITH RESPECT TO VOTING ON THE PREPACKAGED PLAN WITHOUT THE CONSENT OF THE COMPANY.**

    **E.**      **Votes Required for Acceptance by a Class.**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

    **F.**      **How to Opt Out of the Releases.**

If you vote to accept the Prepackaged Plan, you cannot opt out of the Third-Party Release set forth in Article VIII.D of the Prepackaged Plan. By voting to accept the Prepackaged Plan, you are consenting to grant the Third-Party Release.

---

[19]  Electronic signatures collected through the Claims and Noticing Agent's dedicated online balloting portal ("E-Ballot") shall be deemed to be original signatures and immediately legally valid and effective..

You can opt out of providing the Third-Party Release if (1) you are a Holder of Claims or Interests (a) that is deemed to accept the Prepackaged Plan, (b) is eligible to vote to accept or reject the Prepackaged Plan and abstains from voting on the Prepackaged Plan, (c) votes to reject the Prepackaged Plan, or (d) that is deemed to reject the Prepackaged Plan, and (2) you affirmatively opt out of the releases provided by the Prepackaged Plan by checking the applicable box on the Opt-Out Form indicating that they opt not to grant the releases provided in the Prepackaged Plan.

## XII.   CONFIRMATION OF THE PREPACKAGED PLAN.

### A.   The Confirmation Hearing.

Under section 1129(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. The Debtors will request, on the Petition Date, that the Bankruptcy Court set a hearing to approve the Prepackaged Plan and Disclosure Statement. The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court, a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. Subject to section 1127 of the Bankruptcy Code and the RSA, the Prepackaged Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to File objection to Confirmation of the Prepackaged Plan. An objection to Confirmation of the Prepackaged Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to File such objections as set forth therein.

### B.   Requirements for Confirmation of the Prepackaged Plan.

Among the requirements for Confirmation of the Prepackaged Plan pursuant to section 1129 of the Bankruptcy Code are: (i) the Prepackaged Plan is accepted by all Impaired Classes of Claims or Interests, or, if rejected by an Impaired Class, the Prepackaged Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (ii) the Prepackaged Plan is feasible; and (iii) the Prepackaged Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Prepackaged Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (a) the Prepackaged Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for Confirmation; (b) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for Confirmation; and (c) the Prepackaged Plan has been proposed in good faith.

### C.   Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or interest in such impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the non- accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors and reliance upon the valuation methodologies utilized by the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Prepackaged Plan. Consequently, the Debtors and their management believe that Confirmation of the Prepackaged Plan will provide a substantially greater return to Holders of Claims or Interests than a liquidation would under chapter 7 of the Bankruptcy Code.

If the Prepackaged Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' business may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims or Interests (to the extent Holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going-concern value of their business, which is reflected in the New LYCRA Holdco Common Stock and the New Warrants to be distributed under the Prepackaged Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Prepackaged Plan.

### D.      Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Prepackaged Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Prepackaged Plan. As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows. Creditors and other interested parties should review Article X of this Disclosure Statement entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit C** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Prepackaged Cases and that the Prepackaged Plan will meet the feasibility requirements of the Bankruptcy Code.

### E.      Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[20]

---

[20] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Prepackaged Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such Class that vote to accept or reject the Prepackaged Plan actually cast their Ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Prepackaged Plan only if two-thirds in amount of the allowed interests in such Class that vote to accept or reject the Prepackaged Plan actually cast their Ballots in favor of acceptance.

Pursuant to Article III.E of the Prepackaged Plan, if a Class contains Claims or Interests that are eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Prepackaged Plan, the Holders of such Claims or Interests in such Class will be deemed to have accepted the Prepackaged Plan.

### F.      Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Prepackaged Plan, the Debtors reserve the right to seek to confirm the Prepackaged Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Prepackaged Plan or is deemed to have rejected the Prepackaged Plan, the Debtors may request Confirmation of the Prepackaged Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Prepackaged Plan or any Plan Supplement document, including the right to amend or modify the Prepackaged Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1.      No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### 2.      Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the

---

otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or interests in the class.

The Debtors submit that if the Debtors "cramdown" the Prepackaged Plan pursuant to section 1129(b) of the Bankruptcy Code, the Prepackaged Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Prepackaged Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Prepackaged Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Prepackaged Plan and the treatment of all Classes of Claims or Interests under the Prepackaged Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Prepackaged Plan.

## XIII.   CERTAIN SECURITIES LAW MATTERS.

### A.   New LYCRA Holdco Common Stock, New Warrants and New Debt.

As discussed herein, the Prepackaged Plan provides for the offer, issuance, allotment, sale, and distribution of the New LYCRA Holdco Common Stock, the New Warrants (including the New Warrant Shares received with respect thereto) and the New Debt to certain Holders of Claims against the Debtors. The Debtors believe that the New LYCRA Holdco Common Stock, the New Warrants (including the New Warrant Shares received with respect thereto) and the New Debt constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable Blue-Sky Law.

The following discussion of the issuance, allotment, and transferability of the New LYCRA Holdco Common Stock, the New Warrants (including the New Warrant Shares received with respect thereto) and the New Debt relates solely to matters arising under U.S. federal and state securities laws. The rights of Holders of the New LYCRA Holdco Common Stock, the New Warrants (including the New Warrant Shares received with respect thereto) and the New Debt, including the right to transfer the New LYCRA Holdco Common Stock, the New Warrants (including the New Warrant Shares received with respect thereto) and the New Debt, will also be subject to any restrictions in the New LYCRA Holdco Organizational Documents, New Warrant Agreements, New LYCRA Holdco Notes Documents or Exit Notes Facility Documents, as applicable. Recipients of the New LYCRA Holdco Common Stock, the New Warrants (including the New Warrant Shares received with respect thereto) and the New Debt are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act, any applicable Blue-Sky Laws, and any other applicable securities laws (including, without limitation, in the EEA and the United Kingdom).

### B.   Exemption from Registration Requirements; Issuance of Securities Under the Prepackaged Plan.

The offering, issuance, allotment, and distribution of (i) any shares of New LYCRA Holdco Common Stock and/or Other Securities prior the Petition Date and (ii) the New Debt on and after the Petition Date will be exempt from, or not subject to, the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or in reliance on Regulation S under the Securities Act.  Such securities will only be made to Holders of Allowed ssTL Claims, Euro Notes Claims and Dollar Notes Claims, as may be applicable, that can certify that they are (i) located inside of the United States and are (a) "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) or (b) "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act), or (ii) located outside the United States and are not "U.S. persons" (as defined in Rule 902 under the Securities Act).

Section 4(a)(2) of the Securities Act exempts transactions not involving a public offering, and section 506 of Regulation D of the Securities Act provides a safe harbor under section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as "accredited investors" as defined in section 501 of Reg. D (17 C.F.R. § 230.501). Regulation S under the Securities Act provides an exemption from registration under the Securities Act for the offering, issuance, and distribution of securities in certain transactions to persons outside of the United States.

On and after the Petition Date, the Debtors believe that the issuance, allotment, and distribution of the New LYCRA Holdco Common Stock, the New Warrants (other than the New Class A1 Warrants), and the New Warrant Shares received with respect thereto will be exempt from federal registration requirements under section 1145 of the Bankruptcy Code, except in certain limited circumstances as explained in more detail in this Disclosure Statement and/or the Prepackaged Plan. Section 1145 of the Bankruptcy Code, which provides that the registration requirements of Section 5 of the Securities Act (and any applicable state Blue Sky Laws) will not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property. To the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, the offering, issuance, allotment, and distribution of the New LYCRA Holdco Common Stock as contemplated herein and/or the offering, issuance, allotment and distribution of the New Warrants and the New Warrant Shares, if any, will be exempt from, or not subject to, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. federal, state, or local Laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.

In addition, the Debtors believe that any New Class A1 Warrants and MIP Shares to be issued pursuant to the Management Incentive Plan will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D and Rule 701 promulgated thereunder and/or Regulation S under the Securities Act, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Accordingly, no registration statement will be filed under the Securities Act or any Blue-Sky Laws with respect to the initial offer, issuance, and distribution of any securities under the Prepackaged Plan. Recipients of the New LYCRA Holdco Common Stock and the Other Securities are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws. As discussed below, the exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

This Disclosure Statement and any documents related thereto (including, without limitation, the Prepackaged Plan) have been prepared on the basis that any offer or sale of securities issued in connection with the Prepackaged Plan within any Member State of the EEA is made pursuant to an exemption under the Prospectus Regulation from the requirement to publish a prospectus for the offer of transferable securities to the public. In relation to each EEA Member State, no offer or sale of any securities issued in connection with the Prepackaged Plan may be made to the public at any time other than pursuant to an exemption under the Prospectus Regulation. In any EEA Member State, this Disclosure Statement and documents related thereto (including, without limitation, the Prepackaged Plan) are only addressed to and directed at qualified investors in that jurisdiction within the meaning of the Prospectus Regulation. Accordingly, any debt securities to be issued pursuant to the Prepackaged Plan are not being offered, sold or otherwise made available to and should not be offered, sold or otherwise made

available to any EEA Retail Investor. Further, no key information document is required to be prepared and none has been prepared in line with the requirements of the PRIIPs Regulation in relation to any debt securities to be issued pursuant to the Prepackaged Plan. In any EEA Member State, any debt securities to be issued pursuant to the Prepackaged Plan will only be made available to qualified investors as defined in the Prospectus Regulation.

This Disclosure Statement and any documents related thereto (including, without limitation, the Prepackaged Plan) have been prepared on the basis that any offer or sale of securities issued in connection with the Prepackaged Plan in the United Kingdom will be made pursuant to an exception from the general prohibition of offers to the public under the UK POATRs. In relation to the United Kingdom, no offer or sale of any debt securities to be issued in connection with the Prepackaged Plan may be made to the public at any time other than pursuant to an exception from the general prohibition of offers to the public under the POATRS. In the United Kingdom, this Disclosure Statement and documents related thereto (including, without limitation, the Prepackaged Plan) are only addressed to and directed at qualified investors within the meaning of the UK POATRS. Accordingly, debt securities to be issued pursuant to the Prepackaged Plan are not being offered, sold, or otherwise made available to and should not be offered, sold or otherwise made available to any UK Retail Investor. Further, no key information document is required to be prepared, and none has been prepared in line with the requirements of the UK PRIIPs Regulation in relation to debt securities to be issued pursuant to the Prepackaged Plan.

In the United Kingdom, the information contained in this Disclosure Statement or any documents related thereto (including, without limitation, the Prepackaged Plan) is intended only for use and may only be relied upon in relation to any investment activity by, and any investment activity to which such information relates may only be engaged in by, persons who are at the relevant time: (i) Investment Professionals within the meaning of Article 19(5) of the Order; (ii) persons falling within the meaning of Articles 49(2)(a) to (d) of the Order; or (iii) persons to whom the communication may otherwise lawfully be communicated under FSMA (together, the "Permitted UK Persons"). Any person in the United Kingdom that is not a Permitted UK Person is not, for the purposes of any investment or investment decision, an intended recipient of the information contained in this Disclosure Statement, or any document related thereto (including, without limitation, the Prepackaged Plan) and should not use such information as the basis for taking any investment activity or investment action. This Disclosure Statement and any document related thereto (including, without limitation, the Prepackaged Plan) should not (insofar as they relate to any investment or investment activity) be distributed, communicated to, or directed at the general public in the United Kingdom otherwise than as described above.

This document does not constitute or form part of any offer or invitation to sell or issue, or any solicitation of any offer to purchase or subscribe for, any securities.

**C.      Resales of Securities; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code.**

**1.      Resales of Securities Issued Pursuant to Section 1145.**

The New LYCRA Holdco Common Stock, the New Warrants (other than the New Class A1 Warrants), and the New Warrant Shares received with respect thereto, if any, to be issued under the Prepackaged Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and will be transferable without registration under the Securities Act by the recipients thereof, subject to: (a) such recipients not being, and have not been within ninety (90) days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (b) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, (c) compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission or state or local securities laws, if

any, applicable at the time of any future transfer of such Securities or instruments; and (d) any restrictions on the transferability of such New LYCRA Holdco Common Stock, New Warrants, and New Warrant Shares in the New LYCRA Holdco Organizational Documents or New Warrant Agreements, as applicable.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (i) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (ii) offers to sell securities offered or sold under a plan for the holders of such securities; (iii) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (x) with a view to distribution of such securities and (y) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (iv) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10 percent or more of a class of voting securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New LYCRA Holdco Common Stock and the New Warrants (including the New Warrant Shares received with respect thereto) to the Prepackaged Plan by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of such securities who are deemed to be "underwriters" may be entitled to resell their New LYCRA Holdco Common Stock and the New Warrants (including the New Warrant Shares received with respect thereto) pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of "control" securities received by such Person if the requirements for sales of such control securities under Rule 144 have been met, including that current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to such securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such securities and, in turn, whether any Person may freely trade such securities under the federal securities laws. The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, Rule 144 may not be available for resales of such securities by Persons deemed to be underwriters or otherwise.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PREPACKAGED PLAN. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF NEW LYCRA HOLDCO COMMON STOCK AND ANY OTHER SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

> **2.** **Resales of Securities Issued Pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act.**

Prior to the Petition Date, New LYCRA Holdco Common Stock and the Other Securities will be offered, issued, allotted, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and pursuant to applicable state securities laws.

After the Petition Date, the New Debt, the New Class A1 Warrants (issued in satisfaction of the DIP Commitment Premium), the MIP Shares (issued pursuant to the Management Incentive Plan), and, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, the New LYCRA Holdco Common Stock, New Warrants, and New Warrant Shares, if any, to be issued under the Prepackaged Plan on account of Allowed Claims in accordance with, and pursuant to, the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act, will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from or in a transaction not subject to the registration requirements of the Securities Act and subject to any restrictions on the transferability of such New Debt, New LYCRA Holdco Common Stock, New Warrants, and New Warrant Shares in the New LYCRA Holdco Organizational Documents, New Warrant Agreements, New LYCRA Holdco Notes Documents, or Exit Notes Facility Documents, as applicable.

Generally, Rule 144 of the Securities Act provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period. An affiliate may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such securities by affiliates of the Debtors. Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

In addition, in connection with resales of any securities offered, issued and distributed pursuant to Regulation S under the Securities Act: (a) the offer or sale, if made prior to the expiration of the one-year distribution compliance period, may not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor); and (b) the offer or sale, if made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made pursuant to the following conditions: (i) the purchaser (other than a distributor) certifies that it is not a U.S. person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person who purchased securities in a transaction that did not require registration under the Securities Act; and (ii) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

All securities issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act, will bear a restrictive legend. Each certificate or book-entry interest representing, or issued in exchange for or upon the transfer, sale or assignment of, such securities issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act, will be stamped or otherwise imprinted with a legend in substantially the following form:

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."**

The Debtors will reserve the right to require certification, legal opinions, or other evidence of compliance with Rule 144 or another applicable exemption from registration as a condition to the removal of such legend, or to any resale of any securities issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act. The Debtors will also reserve the right to stop the transfer of any such securities if such transfer (x) is not registered in compliance with Rule 144 or in compliance with another applicable exemption from registration (including section 1145 of the Bankruptcy Code) or (y) would otherwise make the Debtors subject to the periodic reporting requirements under the Exchange Act.

Notwithstanding anything to the contrary in this Disclosure Statement, no Entity will be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Prepackaged Plan or this Disclosure Statement, including, for the avoidance of doubt, whether the securities are exempt from the registration requirements of section 5 of the Securities Act.

In addition to the foregoing restrictions, such securities will also be subject to any applicable transfer restrictions contained in the New LYCRA Holdco Organizational Documents, New Warrant Agreements, New LYCRA Holdco Notes Documents or Exit Notes Facility Documents, as applicable.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PREPACKAGED PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE**

**NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF SECURITIES UNDER THE PREPACKAGED PLAN MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PREPACKAGED PLAN.**

   D.   **Financial Performance.**

   Based on preliminary drafts of internal management accounts and accounting schedules, the Company estimates that it will achieve EBITDA of approximately $43,729,786 for the 12 months ending December 31, 2026.

   *EBITDA is a supplemental measure of financial performance that is not required by, or presented in accordance with generally accepted accounting principles. The Company believes that EBITDA is a useful financial metric to assess operating performance before the impact of income taxes, interest expense and non-cash impairment charges. It also facilitates comparison between the Company and its competitors, but it should not be considered as a substitute to any financial metric prepared in accordance with generally accepted accounting principles.*

   *This financial information is based on internal management estimates and has not been audited, reviewed or verified, and no procedures have been completed by the Company's independent auditors with respect thereto. Such financial information is not intended to be a comprehensive statement of the Company's projected financial or operational results for the year ending December 31, 2026. You should therefore not place undue reliance thereon. This preliminary information is subject to confirmation in the Company's audited consolidated financial statements and audit report for the year ending December 31, 2026, if any. Consequently, upon publication of the Company's audited results for the year ending December 31, 2026, if any, the Company may report results that are materially different from the ones projected in this section. See "Risk Factors" in Section X of this Disclosure Statement for a more complete discussion of certain of the factors that could affect the Company's business, financial position and results of operation.*

**XIV. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PREPACKAGED PLAN.**

   **THE STRUCTURE OF THE RESTRUCTURING TRANSACTIONS IS SUBJECT TO ONGOING REVIEW AND MAY CHANGE IN ONE OR MORE MATERIAL RESPECTS. THE DISCUSSION BELOW PROVIDES THE CONSEQUENCES OF RECEIPT OF THE NEW LYCRA HOLDCO COMMON STOCK UNDER TWO SEPARATE SCENARIOS -- A TRANSACTION INTENDED TO BE GOVERNED BY SECTION 1001 OF THE IRC AND A TRANSACTION INTENDED TO BE GOVERNED BY SECTION 351 OF THE IRC. THE DEBTORS WILL PROVIDE SUPPLEMENTAL TAX DISCLOSURE AS PART OF THE PLAN SUPPLEMENT IF IT BECOMES APPARENT TO THE DEBTORS THAT THE FOLLOWING DISCUSSION IS NO LONGER ACCURATE IN ALL MATERIAL**

RESPECTS. HOLDERS OF CLAIMS VOTING ON THE PREPACKAGED PLAN SHOULD DO SO KNOWING THAT THE TAX CONSEQUENCES OF THE PREPACKAGED PLAN TO THE DEBTORS AND/OR HOLDERS OF CLAIMS MAY BE SUBJECT TO MATERIAL CHANGE. HOLDERS OF CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE PREPACKAGED PLAN.

A.      Introduction.

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Prepackaged Plan to the Debtors, the Reorganized Debtors, and to certain Holders of Claims. Except where specifically discussed below, the following summary does not address the U.S. federal income tax consequences to Holders (i) of Claims not entitled to vote to accept or reject the Prepackaged Plan, (ii) whose Claims are Unimpaired or otherwise entitled to payment in full under the Prepackaged Plan, or (iii) that are deemed to reject the Prepackaged Plan. To the extent that this summary addresses the consequences to Holders of DIP Claims of the consummation of the Prepackaged Plan, it only addresses Holders that acquire their DIP Claims by providing DIP financing directly to the Debtors (as opposed to Holders that acquire any DIP Claims from other Holders). This summary of certain U.S. federal income tax consequences of the consummation of the Prepackaged Plan is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those summarized herein. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the U.S. federal income tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS as to any of the U.S. federal income tax consequences of the Prepackaged Plan discussed below. The discussion below is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. This discussion assumes that New LYCRA Holdco will be an Entity incorporated in England & Wales and is treated as a non-U.S. corporation for U.S. federal income tax purposes.

This discussion of the U.S. federal income tax consequences of the consummation of the Prepackaged Plan does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors, Reorganized Debtors, or Holders in light of their individual circumstances. This discussion does not address tax issues with respect to Holders that are subject to special treatment under the U.S. federal income tax laws including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, small business investment companies, persons who are related to the Debtors within the meaning of the IRC, persons liable for alternative minimum tax, persons using a mark-to-market method of accounting, Holders that hold 10 percent or more of the equity of the Debtors or that will hold 10 percent or more of the equity of the Reorganized Debtors, Holders who are themselves in bankruptcy, real estate investment companies, regulated investment companies, and Holders holding, or who will hold, consideration received pursuant to the Prepackaged Plan as part of a hedge, straddle, conversion, or other integrated transaction.

No aspect of U.S. state, local, non-income, or (except as explicitly set forth below) non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder holds only Claims or Interests in a single Class and holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC). This summary also assumes that the various debt and other arrangements to which the Debtors and Reorganized Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary also assumes that none of the Allowed DIP Claims, the ssTL Loans, the Euro Notes, the Dollar Notes, or the Promissory Notes are "contingent payment debt instruments" within the meaning of Treasury Regulations section 1.1275-4 (a "CPDI"). This summary also does not address the consequences of any prior modifications of the DIP Claims, ssTL Loans, the Euro Notes, the Dollar Notes or the Promissory Notes.  This summary assumes that the prior sale by Eagle Super Global Holding BV of its shares in Eagle Intermediate Global Holding B.V. to Eagle Holding Co BV did not result in a "significant modification" of any of the ssTL Loans, the Euro Notes, the Dollar Notes or the Promissory Notes.  This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Prepackaged Plan to the Debtors, Reorganized Debtors, and Holders of Claims and Interests described below also may vary depending on the nature of any Restructuring Transactions that the Debtors and/or Reorganized Debtors engage in.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (a) an individual who is a citizen or resident of the United States; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner), the activities of the partner (or other beneficial owner) and the entity, and certain determinations made at the partner (or other beneficial owner) level. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Prepackaged Plan.

Except where expressly noted otherwise, this summary assumes that New LYCRA Holdco will not be a passive foreign investment company ("PFIC") for U.S. federal income tax purposes, which New LYCRA Holdco expects to be the case. However, New LYCRA Holdco has not made, and does not expect to make, any definitive determination as to its potential classification as a PFIC during any taxable year.  Additionally, this summary also assumes that New LYCRA Holdco is not a controlled foreign corporation ("CFC") for U.S. federal income tax purposes. The U.S. federal income tax consequences described below will be materially different if New LYCRA Holdco were to be a PFIC and/or, in the case of a 10% United States shareholder, a CFC in any taxable year.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR**

CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE PREPACKAGED PLAN, AS WELL AS THE CONSEQUENCES TO THEM OF THE PREPACKAGED PLAN ARISING UNDER ANY OTHER U.S. FEDERAL TAX LAWS OR THE LAWS OF ANY STATE, LOCAL, OR NON-U.S. TAXING JURISDICTION OR UNDER ANY APPLICABLE TREATY.

      B.      **Certain U.S. Federal Income Tax Consequences to U.S. Holders of DIP Claims of the Consummation of the Prepackaged Plan.**

            1.      **Consequences to U.S. Holders of Allowed DIP Claims of the Consummation of the Prepackaged Plan.**

Pursuant to the Prepackaged Plan, each Holder of an Allowed DIP Claim will receive, in full and final satisfaction of such Allowed DIP Claim, cash equal to the amount of such Allowed DIP Claim or, if a Holder of an Allowed DIP Claim is also a lender under the Exit Notes Facility, such Holder may exchange its DIP Claim into the Exit Notes Facility on a dollar-for-dollar basis. A U.S. Holder of an Allowed DIP Claim should be treated as receiving its distribution under the Prepackaged Plan in a taxable exchange under section 1001 of the IRC regardless of which option such U.S. Holder elects. Subject to the rules relating to accrued interest, original issue discount ("OID") and market discount described below, a U.S. Holder of such an Allowed DIP Claim should recognize gain or loss equal to the difference between (i) the cash consideration (or the issue price of the Exit Notes Facility) received in exchange for such Allowed DIP Claim (assuming that the receipt of New Class A1 Warrants and the DIP Exit Note is treated as an option premium, original issue discount or as a separately negotiated consideration (as opposed to in exchange for its Allowed DIP Claims), as described below) and (ii) such U.S. Holder's adjusted tax basis, if any, in such Allowed DIP Claim. The U.S. Holder's adjusted tax basis in its Allowed DIP Claim should be its issue price, increased by any OID included in income with respect to such Allowed DIP Claim. The character of any such gain or loss as capital or ordinary will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Allowed DIP Claims constitute capital assets in the hands of the U.S. Holder, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Allowed DIP Claim, and the potential application of the accrued interest and OID rules discussed below. If any such recognized gain or loss is capital in nature, it generally would be long-term capital gain or loss but only if the U.S. Holder held its Allowed DIP Claims for more than one year at the time of the exchange, or otherwise it will be short-term capital gain or loss.

Additionally, the holders of Allowed DIP Claims will receive (a) New Class A1 Warrants in full and final satisfaction of the DIP Commitment Premium and (b) a DIP Exit Note in full and final satisfaction of the DIP Exit Premium. The tax treatment of the receipt of the New Class A1 Warrants and DIP Exit Note by a U.S. Holder is subject to uncertainty. The Reorganized Debtors intend to take the position, to the extent they are required to do so, that the receipt of the New Class A1 Warrants and the DIP Exit Note is treated as an option premium, original issue discount or separately negotiated consideration (as opposed to in exchange for its Allowed DIP Claim) for U.S. federal, state, local, and non-U.S. income tax purposes. Alternative characterizations of the receipt of the New Class A1 Warrants for U.S. federal income tax purposes are possible. U.S. Holders who receive the New Class A1 Warrants are encouraged to consult their tax advisors as to the proper treatment of the receipt of the New Class A1 Warrants, including with respect to such U.S. Holder's holding period and tax basis in the New Class A1 Warrants.

**2.**     **Receipt of Amounts Attributable to Accrued Interest (and OID) on the Consummation of the Prepackaged Plan.**

To the extent that any amount received by a U.S. Holder of an Allowed DIP Claim is attributable to accrued interest or OID on such Allowed DIP Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not previously included in income by the U.S. Holder). Conversely, a U.S. Holder of an Allowed DIP Claim may be able to recognize a deductible loss to the extent that any accrued interest on the Allowed DIP Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed DIP Claim, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Under the Prepackaged Plan, the aggregate consideration to be distributed to Holders of Claims in each Class will be allocated first to the principal amount of such Claim (as determined for U.S. federal income tax purposes), with any excess allocated to the remaining portion of such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Prepackaged Plan.

U.S. Holders are urged to consult their own tax advisors regarding the allocation of consideration received under the Prepackaged Plan, as well as the deductibility of accrued but unpaid interest or OID and the character of any loss claimed with respect to accrued but unpaid interest or OID previously included in gross income for U.S. federal income tax purposes.

**3.**     **Ownership and Disposition of New Class A1 Warrants.**

**(a)**     **Characterization of the New Class A1 Warrants.**

Due to the strike price and the absence of any floor threshold beneath which the New Class A1 Warrants would not participate in proceeds in the event of an exit, the discussion below assumes that the New Class A1 Warrants will be treated as equity of New LYCRA HoldCo for U.S. federal income tax purposes. However, given that the New Class A1 Warrants are only exercisable in connection with an exit or a tag-along sale and do not carry any voting rights, there is a risk that they will be treated as a right to acquire stock resulting in different consequences to the ones described below. U.S. Holders of Allowed DIP Claims are urged to consult their own tax advisors as to the proper treatment of the New Class A1 Warrants and the consequences of holding the New Class A1 Warrants, including any actual or constructive receipt of proceeds in respect thereof, in their circumstances.

**(b)**     **Exercise, Expiration and Other Taxable Disposition of the New Class A1 Warrants.**

A U.S. Holder's initial tax basis in a New Class A1 Warrant will generally be equal to the fair market value of the New Class A1 Warrant at the time of receipt. A U.S. Holder should not recognize gain or loss upon exercise of a New Class A1 Warrant. A U.S. Holder will have a tax basis in the New Warrant Shares received upon the exercise of a New Class A1 Warrant equal to the sum of its tax basis in such New Class A1 Warrant exchanged. The holding period of the New Warrant Shares received upon the exercise of a New Class A1 Warrant should include the holding period for the New Class A1 Warrant.

Subject to the PFIC rules discussed below, upon the sale, exchange, or other taxable disposition of a New Class A1 Warrant and/or the New Warrant Shares received with respect thereto, a U.S. Holder will recognize a gain or loss equal to the difference between the amount realized on such sale, exchange, or other taxable disposition and the U.S. Holder's tax basis in such New Class A1 Warrant and/or the New Warrant Shares received with respect thereto. Gain or loss with respect to a taxable disposition of a New Class A1 Warrant and/or the New Warrant Shares received with respect thereto generally will be U.S. source capital gain or loss and will be treated as long-term capital gain or loss if the U.S. Holder's holding period in such New Class A1 Warrant and/or the New Warrant Shares received with respect thereto exceeds one year. Capital gains of certain non-corporate U.S. Holders, including individuals, derived with respect to capital assets held for over one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

In the event New LYCRA Holdco is a PFIC, a U.S. Holder generally will be taxed upon the sale, exchange or other taxable disposition of a New Class A1 Warrant and/or the New Warrant Shares received with respect thereto in the same manner that such U.S. Holder would be taxed upon the sale, exchange or other taxable disposition of shares in a PFIC (with the potentially adverse tax consequences described below).

### 4.        Ownership and Disposition of the DIP Exit Notes.

The treatment of the DIP Exit Notes is unclear. The DIP Exit Notes may be considered "Preferred Stock" for U.S. federal income tax purposes. "Preferred Stock" generally refers to stock (including instruments treated as stock for U.S. federal income tax purposes) which, in relation to other classes of stock outstanding, enjoys certain limited rights and privileges (generally associated with specified dividend and liquidation priorities) and does not participate in corporate growth to any significant extent. Alternative characterizations of the receipt of the DIP Exit Notes for U.S. federal income tax purposes are possible.

A U.S. Holder's initial tax basis in a DIP Exit Note will generally be equal to the fair market value of the DIP Exit Note at the time of receipt. A U.S. Holder generally will be taxed upon the sale, exchange or other taxable disposition of a DIP Exit Note in the same manner that such U.S. Holder would be taxed on the sale, exchange or other taxable disposition of a New Class A1 Warrant (see the discussion under " – *Exercise, Expiration and Other Taxable Disposition of the New Class A1 Warrants*" above). U.S. Holders who receive the DIP Exit Notes are encouraged to consult their tax advisors as to the proper treatment of the receipt of the DIP Exit Notes, including with respect to such U.S. Holder's holding period and tax basis in the DIP Exit Notes.

### 5.        Ownership and Disposition of Exit Notes Facility.

### (a)        Payments of Interest on the Exit Notes Facility.

Because the secured notes under the Exit Notes Facility will be issued with OID, including as a result of any interest payable in kind, U.S. Holders of the secured notes under the Exit Notes Facility will be required to include OID in income for U.S. federal income tax purposes under a constant yield accrual method regardless of their method of accounting. Thus, U.S. Holders will be required to include OID in income in advance of the receipt of cash attributable to such income. In particular, amounts of interest on the secured notes under the Exit Notes Facility that are paid by issuing additional secured notes under the Exit Notes Facility must be included in income by the U.S. Holder before any cash is received in payment of the principal of such secured notes under the Exit Notes Facility. U.S. Holders of the secured notes under the Exit Notes Facility generally will not be required to include separately in income cash payments received on such notes, even if denominated as interest, to the extent such payments constitute payments of previously accrued OID.

A secured note under the Exit Notes Facility is treated as issued with OID equal to the excess of the "stated redemption price of the secured note under the Exit Notes Facility at maturity" over its "issue price." The stated

redemption price at maturity of a secured note under the Exit Notes Facility includes all payments on such note, whether denominated as principal or interest (*provided* that, in the case of interest, such payment does not constitute "qualified stated interest" as expected to be the case). The determination of "issue price" for purposes of this analysis will depend, in part, on whether any secured note under the Exit Notes Facility or DIP Claim is traded on an established market for U.S. federal income tax purposes. The issue price of a debt instrument that is not considered traded on an established market and is not issued in exchange for debt traded on an established market would be its stated principal amount (*provided* that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS). Because the stated principal amount of the secured note under the Exit Notes Facility and the DIP Claim is not expected to exceed $100 million, they are generally not expected to be considered traded on an established market for purposes of these rules.

The amount of OID includible in income by an initial U.S. Holder of a secured note under the Exit Notes Facility is the sum of the "daily portions" of OID with respect to such note for each day during the taxable year or portion thereof in which such U.S. Holder holds such note ("accrued OID"). A daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID that accrued in such period. The "accrual period" of a note may be of any length and may vary in length over the term of the note, *provided* that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the first or last day of an accrual period. The amount of OID that accrues with respect to any accrual period is the product of the adjusted issue price of the secured note under the Exit Notes Facility at the beginning of such accrual period and its yield to maturity, determined on a basis of compounding at the close of each accrual period and properly adjusted for the length of such period. "Yield to maturity" is the interest rate at which the present value of all principal and interest payments required to be made under a debt instrument is equal to the issue price of the instrument. The "adjusted issue price" of a note at the start of any accrual period is equal to its issue price, increased by the accrued OID for each prior accrual period and reduced by any prior payments made on such note.

A payment of interest in cash that is received or accrued by U.S. Holders on the secured notes under the Exit Notes Facility that has not been previously taken into income as a result of the OID rules described above, to the extent constituting "qualified stated interest" (as defined below), may be includible in the U.S. Holder's gross income as ordinary interest income and taxable at the time that such payments are accrued or are received in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. However, the term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the secured note under the Exit Notes Facility, at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.  Because no cash interest will be payable on the secured notes under the Exit Notes Facility for more than a year, none of the interest payable on the secured notes under the Exit Notes Facility is expected to constitute "qualified stated interest." Accordingly, each payment made in cash under secured notes under the Exit Notes Facility is expected to be treated first as a payment of any accrued OID that has not been allocated to prior payments and second as a payment of principal.  A U.S. Holder is generally not required to include separately in income cash payments received on the secured notes under the Exit Notes Facility to the extent such payments constitute payments of previously accrued OID or payments or principal.

Interest on the secured notes under the Exit Notes Facility and OID accrued with respect to the secured notes under the Exit Notes Facility constitutes income from sources outside the United States.

**(b)       Sale or Other Taxable Disposition of the Exit Notes Facility.**

Upon the sale, exchange, retirement, redemption or other taxable disposition of a secured note under the Exit Notes Facility, a U.S. Holder should generally recognize gain or loss equal to the difference, if any, between

(i) the amount realized on the disposition and (ii) the U.S. Holder's adjusted tax basis in such secured note under the Exit Notes Facility. A U.S. Holder's adjusted tax basis will generally be increased by any accrued OID previously included in such U.S. Holder's gross income and decreased by any payments on the debt. A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held the debt for longer than one year. Non-corporate taxpayers are generally subject to a reduced U.S. federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

C.       **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed ssTL Claims.**

1.       **Consequences to U.S. Holders of Allowed ssTL Claims.**

Except to the extent that a Holder of an Allowed ssTL Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed ssTL Claim will receive, in full and final satisfaction of such ssTL Claim, its pro rata share of (x) the New LYCRA Holdco Notes and (y) the New LYCRA Holdco ssTL Common Stock.

If the Restructuring Transactions are structured in such a manner that Holders of Allowed ssTL Claims contribute those Allowed ssTL Claims to New LYCRA Holdco and Holders of such Allowed ssTL Claims hold more than 80 percent of the New LYCRA Holdco Common Stock (and Holders holding at least 80 percent of each class of non-voting equity of New LYCRA Holdco also contribute property to New LYCRA Holdco in exchange for non-voting equity), then it is expected that such contributions by Holders of Allowed ssTL Claims would qualify as an exchange under section 351 of the IRC with boot. However, as the New Class A Warrants are expected to be treated as non-voting equity and it is not expected that Holders of at least 80% of the New Class A Warrants will contribute property to New LYCRA HoldCo in exchange for such New Class A Warrants, the exchange of the Allowed ssTL Claims under the Restructuring Transactions is not expected to qualify as an exchange under section 351 of the IRC. As a result (or to the extent that the Restructuring Transactions otherwise are not structured in a manner that the exchange of Allowed ssTL Claims would qualify as an exchange under section 351 of the IRC), a U.S. Holder of an Allowed ssTL Claim should be treated as receiving its distribution under the Prepackaged Plan in a taxable exchange under section 1001 of the IRC. Such a U.S. Holder should recognize gain or loss on the Effective Date equal to the difference, if any, between (a) the sum of the fair market value of the New LYCRA Holdco Common Stock received and the issue price of the New LYCRA Holdco Notes received in respect of its Allowed ssTL Claim (other than any consideration received in respect of an Allowed ssTL Claim for accrued and unpaid interest and possibly accrued OID and market discount), and (b) such U.S. Holder's adjusted tax basis in its Allowed ssTL Claim. For a discussion of the determination of the "issue price" of the New LYCRA Holdco Notes, see "*Ownership and Disposition of New LYCRA Holdco Notes" - (b) Sale or Other Taxable Disposition of New LYCRA Holdco Notes*" below. The character of any such gain or loss as capital or ordinary will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Allowed ssTL Claim constitutes a capital asset in the hands of the U.S. Holder, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Allowed ssTL Claim, and the potential application of the accrued interest, OID, and market discount rules discussed below. If any such recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Allowed ssTL Claim for more than one year at the time of the exchange. The holding period for the New LYCRA Holdco Common Stock and the New LYCRA Holdco Notes should begin on the day after the Effective Date. A U.S. Holder should generally obtain a tax basis in the New LYCRA Holdco Notes equal to their issue price and a tax basis in the New LYCRA Holdco Common Stock equal to its fair market value.

To the extent that the Restructuring Transactions are structured in a manner that the exchange of Allowed ssTL Claims would qualify as an exchange under section 351 of the IRC (contrary to expectations), while section 351 of the IRC, when applicable, generally prevents recognition of both gains (other than with respect to the receipt of boot) and losses, section 367 of the IRC overrides the gain (but not the loss) deferral provisions of section 351 of the IRC where the corporation issuing stock is a non-U.S. corporation. Section 367(a)(1) of the IRC and the Treasury Regulations promulgated thereunder specifically provide for the recognition of gain (but not loss) in exchanges that would otherwise qualify for tax-deferred treatment pursuant to section 351 of the IRC, but for the transfer of property to a non-U.S. corporation. Thus, if the contribution of an Allowed ssTL Claim in exchange for New LYCRA Holdco ssTL Common Stock qualifies as an exchange under section 351 of the IRC, a U.S. Holder of such Allowed ssTL Claim should recognize gain, but not loss, for U.S. federal income tax purposes in connection with the Restructuring Transactions. The amount of such gain recognized by a U.S. Holder of a Claim should equal the excess of (i) the sum of the fair market value of the New LYCRA Holdco ssTL Common Stock and the New LYCRA Holdco Notes received and (ii) such U.S. Holder's adjusted tax basis in the Allowed ssTL Claim contributed in exchange for such New LYCRA Holdco ssTL Common Stock and New LYCRA Holdco Notes.

In certain circumstances, a U.S. Holder of an Allowed ssTL Claim may be able to avoid current recognition of gain under section 367 of the IRC pursuant to section 367(a)(2) of the IRC and the Treasury Regulations promulgated thereunder. Specifically, if a U.S. Holder of an Allowed ssTL Claim contributes "stock or securities" issued by a corporation organized outside of the United States to New LYCRA Holdco in exchange for New LYCRA Holdco Common Stock, and if such U.S. Holder either owns less than 5 percent of New LYCRA Holdco Common Stock immediately after the transfer, or, if a U.S. Holder of an Allowed ssTL Claim owns 5 percent or more of New LYCRA Holdco Common Stock immediately after the transfer and such U.S. Holder enters into a "gain recognition agreement" that meets the requirements set forth in the Treasury Regulations promulgated under section 367 of the IRC, such U.S. Holder can avoid current recognition of gain under section 367 of the IRC as long as certain other conditions are met.

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. However, due to their original and extended maturity being significantly less than 5 years, the Allowed ssTL Claims are not expected to constitute a security for U.S. federal income tax purposes, and a U.S. Holder of an Allowed ssTL Claim should not expect to be able to avoid gain recognition under section 367 of the IRC.

### 2. Accrued Interest (and OID).

To the extent that any amount received by a U.S. Holder of an Allowed ssTL Claim under the Prepackaged Plan is attributable to accrued interest or OID during its holding period of the debt instruments constituting the surrendered Allowed ssTL Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of an Allowed ssTL Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt

instruments constituting such Allowed ssTL Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Prepackaged Plan, the aggregate consideration to be distributed to Holders of Claims in each Class will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Prepackaged Plan. U.S. Holders of Allowed ssTL Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Prepackaged Plan.

### 3.    Market Discount.

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed ssTL Claim who exchanges an Allowed ssTL Claim on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of accrued "market discount" on the debt instruments constituting the exchanged Allowed ssTL Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).   U.S. Holders of Allowed ssTL Claims who acquired their Allowed ssTL Claims with market discount are urged to consult with their own tax advisors as to the appropriate treatment of any such market discount and the timing of the recognition thereof.

### 4.    Ownership and Disposition of New LYCRA Holdco Notes.

#### (a)    Payments of Interest on the New LYCRA Holdco Notes.

Because all the interest on the New LYCRA Holdco Notes will be payable in kind, the New LYCRA Holdco Notes will be treated as issued with OID and U.S. Holders of the New LYCRA Holdco Notes will be required to include OID in income for U.S. federal income tax purposes under a constant yield accrual method regardless of their method of accounting. Thus, U.S. Holders are required to include OID in income in advance of the receipt of cash attributable to such income.

The amount of OID includible in income by a U.S. Holder of a New LYCRA Holdco Note is the sum of the "daily portions" of OID with respect to such note for each day during the taxable year or portion thereof in which such U.S. Holder holds such note ("accrued OID"). A daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID that accrued in such period. The "accrual period" of a note may be of any length and may vary in length over the term of the note, *provided* that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the first or last day of an accrual period. The amount of OID that accrues with respect to any accrual period is the product of the New LYCRA Holdco Note's adjusted issue price at the beginning of such accrual period and its yield to maturity,

determined on a basis of compounding at the close of each accrual period and properly adjusted for the length of such period. The "issue price" for purposes of this analysis will depend, in part, on whether any New LYCRA Holdco Note is traded on an established market for U.S. federal income tax purposes. The issue price of a debt instrument that is traded on an established market would be the fair market value of such debt instrument on the Effective Date as determined by such trading. The issue price of a debt instrument that is not traded and is not issued for publicly traded property would be its stated principal amount (*provided* that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS). New debt instruments may be traded on an established market for these purposes even if no trades actually occur and there are merely firm or indicative quotes with respect to such new debt or Claims. Whether the New LYCRA Holdco Notes will be traded on an established market for these purposes cannot be predicted with certainty. The "adjusted issue price" of a note at the start of any accrual period is equal to its issue price, increased by the accrued OID for each prior accrual period and reduced by any prior payments made on such note. "Yield to maturity" is the interest rate at which the present value of all principal and interest payments required to be made under a debt instrument is equal to the issue price of the instrument.

Interest on the New LYCRA Holdco Notes and OID accrued with respect to the New LYCRA Holdco Notes constitutes income from sources outside the United States.

### (b)      Sale or Other Taxable Disposition of New LYCRA Holdco Notes.

Upon the sale, exchange, retirement, redemption or other taxable disposition of a New LYCRA Holdco Note, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (i) the amount realized on the disposition and (ii) the U.S. Holder's adjusted tax basis in such New LYCRA Holdco Note. A U.S. Holder's adjusted tax basis will generally be increased by any accrued OID previously included in such U.S. Holder's gross income and decreased by any payment previously made with respect to such New LYCRA Holdco Note. A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held the debt for longer than one year. Non-corporate taxpayers are generally subject to a reduced U.S. federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

### 5.      Ownership and Disposition of New LYCRA Holdco ssTL Common Stock.

### (a)      Dividends on New LYCRA Holdco ssTL Common Stock.

Subject to the discussion regarding the PFIC rules below, any distributions made on account of the New LYCRA Holdco Common Stock should constitute non-U.S. source dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the applicable Reorganized Debtors as determined under U.S. federal income tax principles. It has not yet been determined whether New LYCRA Holdco will determine its earnings and profits on the basis of U.S. federal income tax principles and, as a result, U.S. Holders may be required to treat all distributions on the New LYCRA Holdco Common Stock as dividends. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

U.S. Holders should consult their own tax advisors regarding how to account for dividends that are paid in a currency other than U.S. dollars.

Dividends paid on the New LYCRA Holdco Common Stock generally should not be eligible for the dividends received deduction generally applicable to U.S. corporations with respect to dividends received from other U.S. corporations.

Dividends paid on the New LYCRA Holdco Common Stock to non-corporate U.S. Holders may constitute "qualified dividend income" eligible for preferential rates of taxation for certain non-corporate U.S. Holders that meet certain requirements if New LYCRA Holdco is not a PFIC and New LYCRA Holdco is eligible for the benefits of a "comprehensive income tax treaty" within the meaning of Section 1(h)(11)(C)(i)(II) of the IRC. However, there can be no assurance that New LYCRA Holdco will in fact so qualify for the benefits of any such "comprehensive income tax treaty."

### (b) Sale, Exchange or Other Taxable Disposition of New LYCRA Holdco ssTL Common Stock.

Unless a non-recognition provision of the IRC applies, and subject to the market discount rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New LYCRA Holdco Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the applicable New LYCRA Holdco Common Stock for more than one year. Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations. Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on such dispositions of the New LYCRA Holdco Common Stock as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed ssTL Claim or recognized an ordinary loss on the exchange of its Allowed ssTL Claim for New LYCRA Holdco Common Stock.

### D. Certain U.S. Federal Income Tax Consequences to Linx Capital Limited, as the Holder of the Allowed Euro Notes Claims

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Prepackaged Plan (as detailed in, and subject to the caveats of, the foregoing discussion) and includes only certain U.S. federal income tax consequences of the Prepackaged Plan to Linx Capital Limited. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Linx Capital Limited are complex.

Gain, if any, recognized by Linx Capital Limited on the exchange of its Allowed Euro Notes Claims generally will not be subject to U.S. federal income taxation, *provided* that such gain is not effectively connected with the conduct by Linx Capital Limited of a trade or business in the United States, which we assume would be the case.

The Debtors generally do not anticipate that there will be material U.S. federal income tax consequences to Linx Capital Limited of owning or disposing of the New Class A2 Warrants and New Class A3 Warrants and, as a result, such topics are not further discussed.

### E. Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Dollar Notes Claims.

#### 1. Consequences to U.S. Holders of Allowed Dollar Notes Claims.

Pursuant to the Prepackaged Plan, each holder of Allowed Dollar Notes Claims will receive, in full and final satisfaction of such Allowed Dollar Notes Claims, its *pro rata* share of the New Class B Warrants. A U.S. Holder of Allowed Dollar Notes Claims should be treated as receiving its distribution under the Prepackaged Plan

in a taxable exchange under section 1001 of the IRC. Subject to the rules relating to accrued interest, OID and market discount described below, a U.S. Holder of such an Allowed Dollar Notes Claim should recognize gain or loss equal to the difference between (a) the fair market value of the New Class B Warrants received in exchange for the Allowed Dollar Notes Claim and (b) such U.S. Holder's adjusted basis, if any, in such a Allowed Dollar Notes Claim. The U.S. Holder's adjusted tax basis in its Allowed Dollar Notes Claim should be its issue price, increased by any OID included in income with respect to such Allowed Dollar Notes Claim. The character of any such gain or loss as capital or ordinary will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Allowed Dollar Notes Claim constitutes a capital asset in the hands of the U.S. Holder, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Allowed Doller Notes Claim, and the potential application of the accrued interest (and OID) and market discount rules discussed below. If any such recognized gain or loss is capital in nature, it generally would be long-term capital gain or loss if the U.S. Holder held its Allowed Dollar Notes Claim for more than one year at the time of the exchange. The holding period for the New Class B Warrants should begin the day after the Effective Date. A U.S. Holder should obtain a tax basis in the New Class B Warrants equal to its fair market value.

### 2. Accrued Interest (and OID).

A portion of the consideration received by U.S. Holders of Allowed Dollar Notes Claims may be attributable to accrued but untaxed interest (or OID, if any) on such Allowed Dollar Notes Claims. If any amount is attributable to such accrued interest (or OID), then such amount should be taxable to that U.S. Holder as interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Allowed Dollar Notes Claims should be able to recognize a deductible loss to the extent any accrued interest on the Allowed Dollar Notes Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Dollar Notes Claim, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Under the Prepackaged Plan, the aggregate consideration to be distributed to Holders of Claims in each Class will be allocated first to the principal amount of such Claim (as determined for U.S. federal income tax purposes), with any excess allocated to the remaining portion of such Claim, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Prepackaged Plan.

U.S. Holders are urged to consult their own tax advisors regarding the allocation of consideration received under the Prepackaged Plan, as well as the deductibility of accrued but unpaid interest and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for U.S. federal income tax purposes.

### 3. Market Discount.

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed Dollar Notes Claim who exchanges an Allowed Dollar Notes Claim on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of accrued "market discount" on the debt instruments constituting the exchanged Allowed Dollar Notes Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the

holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (a) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). U.S. Holders of Allowed Dollar Notes Claims who acquired the notes underlying their Allowed Dollar Notes Claims with market discount are urged to consult with their own tax advisors as to the appropriate treatment of any such market discount and the timing of the recognition thereof.

4. **Ownership and Disposition of New Class B Warrants.**

(a) **Exercise, Expiration and Other Taxable Disposition of the New Class B Warrants.**

As discussed above, a U.S. Holder's initial tax basis in a New Class B Warrant generally will be equal to the fair market value of the Class B Warrant at the time of the exchange. A U.S. Holder should not recognize gain or loss upon exercise of a New Class B Warrant. A U.S. Holder will have a tax basis in the New LYCRA Holdco Common Stock received upon the exercise of a New Class B Warrant equal to its tax basis in the New Class B Warrant exchanged. The holding period of the New LYCRA Holdco Common Stock received upon the exercise of a New Class B Warrant should commence on the day after the New Class B Warrant is exercised.

Subject to the PFIC rules discussed below, upon the sale, exchange, or other taxable disposition of a New Class B Warrant and/or the New Warrant Shares received with respect thereto, a U.S. Holder will recognize gain or loss equal to the difference between the amount realized on such sale, exchange, or other taxable disposition and the U.S. Holder's tax basis in such New Class B Warrant and/or the New Warrant Shares received with respect thereto. Gain or loss with respect to a taxable disposition of a New Class B Warrant and/or New Warrant Shares received with respect thereto generally will be U.S. source capital gain or loss and will be treated as long-term capital gain or loss if the U.S. Holder's holding period in the New Class B Warrant exceeds one year. Capital gains of certain non-corporate U.S. Holders, including individuals, derived with respect to capital assets held for over one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

In the event New LYCRA Holdco is a PFIC, a U.S. Holder generally will be taxed upon the sale, exchange or other taxable disposition of a Class B Warrant and/or the New Warrant Shares received with respect thereto in the same manner that such U.S. Holder would be taxed upon the sale, exchange or other taxable disposition of shares in a PFIC (with the potentially adverse tax consequences described below), except that it is unclear whether a U.S. Holder of the New Class B Warrants will be eligible to make a "QEF Election" and/or a "mark-to-market" election (see the discussion under " – PFIC Status" below).

F. **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Promissory Notes Claims.**

Pursuant to the Prepackaged Plan, the holders of Allowed Promissory Note Claims will receive, in full and final satisfaction of such Allowed Promissory Note Claims, its *pro rata* share of USD 1,000. A U.S. Holder of Allowed Promissory Note Claims should be treated as receiving its distribution under the Prepackaged Plan in a taxable exchange under section 1001 of the IRC. A U.S. Holder of such an Allowed Promissory Note Claim should generally recognize gain or loss equal to the difference between (i) the fair market value of the consideration received (i.e., its *pro rata* share of USD 1,000) in exchange for the Allowed Promissory Note Claim and (ii) such U.S. Holder's adjusted basis, if any, in such Allowed Promissory Note Claim. U.S. Holders of Allowed Promissory Note Claims are urged to consult their own tax advisors regarding the treatment of distribution under the Prepackaged Plan in their particular circumstances.

110

### G.     PFIC Status of New LYCRA Holdco

A special set of U.S. federal income tax rules apply to ownership interests (or options to acquire ownership interests) in a PFIC. New LYCRA Holdco would be classified as a PFIC for any taxable year if, after the application of certain look-through rules, either: (1) 75% or more of its gross income for such year is "passive income" as defined in the relevant provisions of the IRC; or (2) 50% or more of the value of its assets, determined on the basis of a quarterly average, during such year is attributable to assets that produce or are held for the production of passive income. In determining whether New LYCRA Holdco is a PFIC, it will be treated as owning its proportionate share of the assets, and earning its proportionate share of the income (reduced in each case by certain intercompany transactions pursuant to Treasury Regulations section 1.1297-2(c)), of any other corporation in which it owns, directly or indirectly, 25% or more (by value) of the stock.

New LYCRA Holdco's status as a PFIC in any taxable year requires a factual determination that depends on, among other things, the composition of its income, assets, and activities in each year, and can only be made annually after the close of each taxable year. Therefore, there can be no assurance that New LYCRA Holdco (or any Reorganized Debtor that is a non-U.S. corporation) will not be classified as a PFIC for the taxable year in which the Restructuring Transactions occur, or for any future taxable year after the Restructuring Transactions. The Debtors do not currently know whether New LYCRA Holdco or the other Reorganized Debtors which are non-U.S. corporations will be classified or PFICs for U.S. federal income tax purposes.

If New LYCRA Holdco is treated as a PFIC for any taxable year during which a U.S. Holder owns the New LYCRA Holdco Common Stock, the U.S. Holder would be subject to additional U.S. information return filing requirements. Additionally, if New LYCRA Holdco is treated as a PFIC for any taxable year during which a U.S. Holder owns the New LYCRA Holdco Common Stock, such U.S. Holder may be subject to adverse tax consequences upon a sale, exchange, or other disposition of such New LYCRA Holdco Common Stock, or upon the receipt of distributions in respect of the New LYCRA Holdco Common Stock. Under the "default PFIC regime," in general, an "excess distribution" is any distribution to a U.S. Holder that is greater than 125 percent of the average annual distributions received by the U.S. Holder (including return of capital distributions) during the three preceding taxable years or, if shorter, a U.S. Holder's holding period. If the New LYCRA Holdco is classified as a PFIC for any taxable year during which a U.S. Holder owns the New LYCRA Holdco Common Stock, gains from the sale or other disposition of, and "excess distributions" with respect to, the New LYCRA Holdco Common Stock should be allocated ratably over a U.S. Holder's entire holding period and taxed at the highest ordinary income tax rate in effect for each such taxable year (subject to certain exceptions). Moreover, interest should be charged retroactively at the rate applicable to underpayments of tax (with respect to each such tax year's ratable allocation) through the date of gains from the sale or other disposition of, and "excess distributions" with respect to, the New LYCRA Holdco Common Stock.

The Debtors cannot provide any assurances that they will assist investors in determining whether New LYCRA Holdco is a PFIC for any taxable year. Additionally, the tax consequences that would apply if New LYCRA Holdco were classified as a PFIC would also be different from those described above if a U.S. Holder that holds New LYCRA Holdco Common Stock were able to make a valid election to treat New LYCRA Holdco as a "qualified electing fund" (such election a "QEF Election"). At this time, it is unclear whether the Debtors will be able to provide U.S. Holders with the information necessary to make and maintain a valid QEF Election. U.S. Holders should consult their tax advisors about the potential application of the PFIC rules to their ownership of New LYCRA Holdco Common Stock. A U.S. Holder can also avoid certain of the adverse rules described above where a mark-to-market election is available with respect to its New LYCRA Holdco Common Stock. The mark-to-market election is only available where the New LYCRA Holdco Common Stock are "marketable." The New LYCRA Holdco Common Stock will be marketable if they are "regularly traded" on a "qualified exchange" or

other market within the meaning of applicable Treasury Regulations. It is unclear whether the New LYCRA Holdco Common Stock will be "regularly traded" on a "qualified exchange" for this purpose and therefore, it is unclear whether the mark-to-market election would be available to a U.S. Holder of the New LYCRA Holdco Common Stock if New LYCRA Holdco becomes a PFIC.

**H.      Characterization of the Restructuring Transactions With Respect to the Debtors**

The following discussion describes certain U.S. federal income tax consequences to the Reorganized Debtors. It would generally be relevant to non-U.S. Reorganized Debtors (that are not U.S. taxpayers) only to the extent that they need to calculate their income and/or earnings and profits for U.S. federal income tax purposes.

**1.      Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes.**

The Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

Under sections 382 and 383 of the IRC, if the Debtors undergo an "ownership change" as defined under section 382 of the IRC, the amount of any remaining NOL carryforwards, tax credit carryforwards, deductions under section 163(j) of the IRC, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then, generally, built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the IRC are complicated, but an ownership change of the Debtors is expected to occur as a result of the Restructuring Transactions. If such an ownership change occurs, the ability of the Reorganized Debtors to use the Pre-Change Losses for U.S. federal income tax purposes (to the extent relevant) will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

**(a)      General Section 382 Annual Limitation.**

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in which the ownership change occurs, currently 3.65% percent for November 2025). Under certain circumstances, the annual limitation may be increased to the extent that the corporation (or parent of the consolidated group) has an overall built-in gain in its assets at the time of the ownership change. If the corporation or consolidated group has such "net unrealized built-in gain" at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss, and deduction), any built-in gains recognized (or, according to the currently effective IRS Notice 2003-65, treated as recognized) during the following five-year period (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year of such recognition, such that the loss corporation or consolidated group

would be permitted to use its Pre-Change Losses against such built-in gain income in addition to its otherwise applicable annual limitation. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. If the corporation or consolidated group does not continue its historic business (or if the historic business consists of multiple lines of business, at least one of the significant lines of business) or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to recognized built-in gains). As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (b)        Special Bankruptcy Exceptions.

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation under the jurisdiction of a bankruptcy court (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (i) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (ii) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application.

## XV.    RECOMMENDATION.

In the opinion of the Debtors, the Prepackaged Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.

Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Prepackaged Plan vote to accept the Prepackaged Plan and support Confirmation of the Prepackaged Plan.

Dated: March 17, 2026                                THE LYCRA COMPANY LLC
                                                     on behalf of itself and all other Debtors

                                            By:     */s/ Dean Williams*
                                                     _____

                                                     Name: Dean Williams
                                                     Title: Chief Financial Officer

115

**Exhibit A**

**Prepackaged Plan of Reorganization**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| THE LYCRA COMPANY LLC, *et al.*,[1] | ) | Case No. 26-90399 (CML) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**JOINT PREPACKAGED PLAN OF REORGANIZATION OF
THE LYCRA COMPANY LLC AND ITS DEBTOR AFFILIATES
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

> **THIS PREPACKAGED CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

**HAYNES AND BOONE, LLP**

Charles A. Beckham, Jr. (TX Bar No. 02016600)
Kenric D. Kattner (TX Bar No. 11108400)
Arsalan Muhammad (TX Bar No. 24074771)
Kourtney Lyda (TX Bar No. 24013330)
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile:  (713) 547-2600
Email:  charles.beckham@haynesboone.com
        kenric.kattner@haynesboone.com
        arsalan.muhammad@haynesboone.com
        kourtney.lyda@haynesboone.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**LINKLATERS LLP**

Michael H. Torkin (*pro hac vice* pending)
Daniel J. Guyder (*pro hac vice* pending)
Christopher J. Hunker (*pro hac vice* pending)
Clark L. Xue (*pro hac vice* pending)
Ramsey Scofield (*pro hac vice* pending)
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 903-9000
Facsimile:  (212) 903-9100
Email:  michael.torkin@linklaters.com
        daniel.guyder@linklaters.com
        christopher.hunker@linklaters.com
        clark.xue@linklaters.com
        ramsey.scofield@linklaters.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/lycra. The location of Debtor The LYCRA Company LLC's corporate headquarters and the Debtors' service address in these chapter 11 cases is 2711 Centerville Road, Suite 300, Wilmington, Delaware 19808.

**TABLE OF CONTENTS**

**Contents**                                                                             **Page**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ...............................................................................................................**1**

    A.    Defined Terms. .......................................................................................................1

    B.    Rules of Interpretation.........................................................................................16

    C.    Computation of Time. ..........................................................................................17

    D.    Governing Law.....................................................................................................17

    E.    Reference to the Debtors or the Reorganized Debtors. ......................................18

    F.    Nonconsolidated Plan..........................................................................................18

    G.    Controlling Document..........................................................................................18

    H.    Consultation, Notice, Information, and Consent Rights.......................................18

**ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, DIP CLAIMS, PROFESSIONAL FEE CLAIMS, AND RESTRUCTURING EXPENSES** .........................**18**

    A.    Administrative Claims. ........................................................................................19

    B.    Priority Tax Claims. .............................................................................................19

    C.    DIP Claims, DIP Commitment Premium, and DIP Exit Premium. ....................19

    D.    Professional Fee Claims. ......................................................................................20

    E.    Payment of Restructuring Expenses.....................................................................21

    F.    Non-U.S. Facility. ...............................................................................................21

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** .........................**21**

    A.    Classification of Claims and Interests. ................................................................21

    B.    Treatment of Claims and Interests.......................................................................22

    C.    Special Provision Governing Unimpaired Claims. ..............................................26

    D.    Elimination of Vacant Classes.............................................................................26

    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes..........................27

    F.    Intercompany Interests. .......................................................................................27

    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.................27

    H.    Controversy Concerning Impairment....................................................................27

    I.    Subordinated Claims and Interests.......................................................................27

**ARTICLE IV. MEANS FOR IMPLEMENTATION** .........................................................................**27**

    A.    General Settlement of Claims and Interests. ........................................................27

    B.    Restructuring Transactions...................................................................................28

    C.    The Reorganized Debtors.....................................................................................29

    D.    Sources of Consideration for Plan Distributions. ................................................29

    E.    Corporate Existence. ............................................................................................31

    F.    Vesting of Assets in the Reorganized Debtors.....................................................31

    G.    Cancellation of Existing Securities, Agreements, and Interests. .........................32

    H.    Corporate Action. ................................................................................................32

    I.    New LYCRA Holdco Organizational Documents.................................................32

    J.    Directors and Officers of the Reorganized Debtors. ...........................................33

    K.    Effectuating Documents; Further Transactions....................................................33

    L.    Certain Securities Law Matters. ..........................................................................33

    M.    Section 1146 Exemption. ....................................................................................36

N.  Employee Compensation and Benefits....................................................................37
O.  Director and Officer Liability Insurance. ..............................................................38
P.  Management Incentive Plan. .................................................................................38
Q.  Preservation of Causes of Action. ........................................................................38
R.  Cashless Transactions...........................................................................................39
S.  Helm Agreements.................................................................................................39

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..................39**
A.  Assumption and Rejection of Executory Contracts and Unexpired Leases. ................39
B.  Claims Based on Rejection of Executory Contracts or Unexpired Leases...................40
C.  Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ...............41
D.  Indemnification Obligations..................................................................................42
E.  Insurance Policies.................................................................................................42
F.  Reservation of Rights. ..........................................................................................42
G.  Nonoccurrence of Effective Date. .........................................................................42
H.  Contracts and Leases Entered Into After the Petition Date. .......................................42

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS...................................................43**
A.  Timing and Calculation of Amounts to Be Distributed. ...........................................43
B.  Disbursing Agent..................................................................................................43
C.  Rights and Powers of Disbursing Agent.................................................................43
D.  Delivery of Distributions and Undeliverable or Unclaimed Distributions. .................44
E.  Surrender of Cancelled Instruments or Securities. ...................................................45
F.  Manner of Payment. .............................................................................................45
G.  Compliance with Tax Requirements. .....................................................................45
H.  Allocations. .........................................................................................................46
I.  No Postpetition Interest on Claims.........................................................................46
J.  Foreign Currency Exchange Rate...........................................................................46
K.  Setoffs and Recoupment.......................................................................................46
L.  Claims Paid or Payable by Third Parties.................................................................46

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS ......................................................................................47**
A.  Disputed Claims Process.......................................................................................47
B.  Allowance of Claims.............................................................................................48
C.  Claims Administration Responsibilities. ................................................................48
D.  Estimation of Claims. ...........................................................................................48
E.  Adjustment to Claims Without Objection. ..............................................................49
F.  Disallowance of Claims. .......................................................................................49
G.  No Distributions Pending Allowance. ....................................................................49
H.  Distributions After Allowance...............................................................................49

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...............49**
A.  Discharge of Claims and Termination of Interests. ..................................................49
B.  Release of Liens. ..................................................................................................50
C.  Releases by the Debtors. .......................................................................................50
D.  Releases by the Releasing Parties. .........................................................................52
E.  Exculpation. ........................................................................................................53

| | | |
|---|---|---|
| F. | Injunction. | 54 |
| G. | Protections Against Discriminatory Treatment. | 55 |
| H. | Document Retention. | 55 |
| I. | Reimbursement or Contribution. | 55 |

**ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN ... 55**

| | | |
|---|---|---|
| A. | Conditions Precedent to the Effective Date. | 55 |
| B. | Waiver of Conditions. | 57 |
| C. | Effect of Failure of Conditions. | 57 |

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN ... 57**

| | | |
|---|---|---|
| A. | Modification and Amendments. | 57 |
| B. | Effect of Confirmation on Modifications. | 57 |
| C. | Revocation or Withdrawal of Plan. | 57 |

**ARTICLE XI. RETENTION OF JURISDICTION ... 58**

**ARTICLE XII. MISCELLANEOUS PROVISIONS ... 60**

| | | |
|---|---|---|
| A. | Immediate Binding Effect. | 60 |
| B. | Additional Documents. | 60 |
| C. | Payment of Statutory Fees. | 60 |
| D. | Statutory Committee and Cessation of Fee and Expense Payment. | 60 |
| E. | Reservation of Rights. | 60 |
| F. | Successors and Assigns. | 61 |
| G. | Notices. | 61 |
| H. | Term of Injunctions or Stays. | 63 |
| I. | Entire Agreement. | 63 |
| J. | Exhibits. | 63 |
| K. | Nonseverability of Plan Provisions. | 63 |
| L. | Votes Solicited in Good Faith. | 64 |
| M. | Closing of Prepackaged Cases. | 64 |
| N. | Waiver or Estoppel. | 64 |

**INTRODUCTION**

The LYCRA Company LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") propose this joint prepackaged chapter 11 plan of reorganization (as amended, supplemented, or otherwise modified from time to time, this "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Article I.A of this Plan. This Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, and projections of future operations, as well as a summary and description of this Plan, the Restructuring Transactions, and certain related matters. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS PLAN (INCLUDING UNDER ARTICLE IV.M HEREOF) IN FULL.**

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*Ad Hoc Group*" means that certain ad hoc group of creditors represented by the Ad Hoc Group Advisors.

2.      "*Ad Hoc Group Advisors*" means (a) Gibson, Dunn & Crutcher LLP, as legal counsel to the Ad Hoc Group, (b) Porter Hedges, LLP, as Texas counsel to the Ad Hoc Group, (c) PJT Partners, Inc., as investment banker to the Ad Hoc Group, (d) Niederer Kraft Frey Ltd, as Swiss legal counsel to the Ad Hoc Group, (e) Stibbe London B.V., as Dutch legal counsel to the Ad Hoc Group, (f) A&L Goodbody Northern Ireland LLP, as Northern Irish legal counsel to the Ad Hoc Group, (g) Shin & Kim LLC, as Korean legal counsel to the Ad Hoc Group, (h) Holland & Knight LLP, as Virginian legal counsel to the Ad Hoc Group; (i) Appleby (Jersey) LLP, as Jersey legal counsel to the Ad Hoc Group, (j) Pinheiro Neto Advogados, as Brazilian legal counsel to the Ad Hoc Group, (k) Cuatrecasas, as Mexican legal counsel to the Ad Hoc Group, and (l) any other professionals or advisors retained by the Ad Hoc Group, in each case for this clause (l), with the consent of the Debtors, not to be unreasonably withheld.

3.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Prepackaged Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred by the Debtors on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) the Restructuring Expenses; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

4.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity was a debtor in a case under the Bankruptcy Code.

5.      "*Agents/Trustees*" means, collectively, the DIP Agent, the ssTL Agent, the Euro Notes Trustee, the Dollar Notes Trustee, and the Security Agent.

6.      "*Agreed Transfer Process*" means the legal process necessary to implement the Share Transfer in accordance with applicable Law, as reasonably determined by the Debtors and the Required Consenting Creditor, which the Debtors may (but shall not be required to) summarize in the form of steps plan to be filed as a Plan Supplement.

7.      "*Allowed*" means, as to a Claim or an Interest, a Claim or an Interest expressly allowed under this Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under this Plan, and (b) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy Law; *provided* that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to this Plan.

8.      "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common Law, including fraudulent transfer Laws.

9.      "*Ballot*" means the ballot included in the Solicitation Materials transmitted by the Claims and Noticing Agent to a Holder of an Impaired Claim entitled to vote on the Plan, by which such Holder may cast a vote to accept or reject the Plan and, if applicable, make the elections and opt-out elections set forth therein.

10.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

11.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or another United States Bankruptcy Court with jurisdiction over the Prepackaged Cases.

12.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

13.     "*Business Day*" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, (a) the states of New York or Texas, (b) London, England, (c) Amsterdam, The Netherlands or (c) St Helier, Jersey.

14.     "*Cash,*" "*$,*" or "*€*" means cash and cash equivalents, including bank deposits, checks, and other similar items in the applicable currency.

15.     "*Cash Collateral*" has the meaning ascribed to it under section 363(a) of the Bankruptcy Code.

16.     "*Causes of Action*" means any and all actions, Claims, interests, remedies, causes of action, controversies, demands, proceedings, agreements, rights, Liens, indemnities, contributions, guaranties, suits, obligations, liabilities, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in Law

2

or in equity, or pursuant to any other theory of Law. Causes of Action also include: (a) any and all rights of setoff, counterclaim, or recoupment, and Claims for breach of contract or for breach of duties imposed by Law or in equity; (b) any and all rights to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate, or disallow Claims against or Interests in the Debtors; (c) any and all Claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any and all Claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any and all state or foreign Law fraudulent transfer or similar Claims.

17. "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

18. "*Claims and Noticing Agent*" means Kroll Restructuring Administration LLC in its capacity as claims, noticing, and solicitation agent for the Debtors.

19. "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the clerk of the Bankruptcy Court or the Claims and Noticing Agent.

20. "*Class*" means a class of Claims or Interests as set forth in Article III hereof pursuant to sections 1122(a) and 1123 of the Bankruptcy Code.

21. "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

22. "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, wages, compensation, and benefit plans and policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs, and payments, life and accidental death and dismemberment insurance plans and programs, for all employees who are current employees of the Debtors as of the Petition Date, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and managers, in each case existing with the Debtors as of immediately prior to the Effective Date.

23. "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Prepackaged Cases.

24. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Prepackaged Cases within the meaning of Bankruptcy Rules 5003 and 9021.

25. "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code to consider Confirmation of this Plan and approval of the Disclosure Statement, as such hearing(s) may be adjourned or continued from time to time.

26. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the adequacy of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code, which shall be in form and substance acceptable to the Required Consenting Creditors.

27. "*Consenting Creditors*" means, collectively, the holders (or beneficial holders), or nominees, investment advisors, sub-advisors, or managers of certain funds or discretionary accounts of holders, that are party to the RSA.

28. "*Consummation*" means the occurrence of the Effective Date.

29. "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of

3

the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

30.     "*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

31.     "*Debtor Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

32.     "*Debtor Release*" means the release set forth in Article VIII.C of this Plan.

33.     "*Debtors*" means, collectively, The LYCRA Company LLC, a Delaware limited liability company and its debtor affiliates.

34.     "*Definitive Documents*" means all material documents in respect of the Restructuring Transactions including: (a) this Plan; (b) the Confirmation Order; (c) the Disclosure Statement (and the motion seeking approval thereof); (d) the Solicitation Materials; (e) the DIP Documents; (f) the Plan Supplement; (g) the New LYCRA Holdco Organizational Documents; (h) the New Warrant Agreements; (i) the New Debt Documents; (j) any employee retention or incentive plans; (k) all material pleadings and motions Filed by the Debtors in connection with the Prepackaged Cases (and related orders), including the First Day Pleadings, any "second day" pleadings, and all orders sought pursuant thereto; (l) any other agreements, instruments, or documentation as may be agreed in writing to document and consummate the Restructuring Transactions; and (m) any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents, motions, pleadings, and/or agreements relating to any of the foregoing, which shall be in form and substance acceptable to the Debtors and the Reorganized Debtors and acceptable to the Required Consenting Creditors.

35.     "*DIP Agent*" means GLAS USA LLC, in its capacity as administrative agent, and GLAS Trust Corporation Limited, in its capacity as collateral agent, under the DIP Note Purchase Agreement, and any successors and permitted assigns, in such capacity.

36.     "*DIP Claim*" means any Claim on account of indebtedness under the DIP Notes Facility and/or DIP Note Purchase Agreement, other than the DIP Commitment Premium and DIP Exit Premium. DIP Claims include Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Documents, which, for the avoidance of doubt, shall include all "DIP Obligations" as such term is defined in the DIP Orders, but shall not include the DIP Commitment Premium or DIP Exit Premium.

37.     "*DIP Commitment Premium*" means the commitment premium under the DIP Notes Facility and/or DIP Note Purchase Agreement.

38.     "*DIP Documents*" means, collectively, the documentation governing the DIP Notes Facility, including the DIP Note Purchase Agreement and any other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, budgets, and other security documents, the DIP Orders, the DIP Motion, and any amendments, modifications and supplements to any of the foregoing, which shall be in form and substance acceptable to the Required Consenting Creditors.

39.     "*DIP Exit Premium*" means the exit premium under the DIP Notes Facility and/or DIP Note Purchase Agreement.

40.     "*DIP Exit Note*" means the $10,000,000 junior unsecured promissory note to be issued by New LYCRA Holdco to the DIP Noteholders, with allocations to be determined and agreed among the DIP Noteholders

4

(and communicated in writing to the Debtors prior to the Effective Date), in full and final satisfaction of the DIP Exit Premium, which promissory note shall contain the other terms and conditions set forth in the DIP Note Purchase Agreement, and shall otherwise be in form and substance satisfactory to the Debtors and the DIP Noteholders entitled to receive such promissory note. A substantially final form of the DIP Exit Note shall be filed as a Plan Supplement.

41.     "*DIP Motion*" means any motion filed with the Bankruptcy Court seeking approval of the DIP Notes Facility, which shall be in form and substance acceptable to the Required Consenting Creditors.

42.     "*DIP Noteholders*" shall mean the Purchasers under the DIP Note Purchase Agreement.

43.     "*DIP Note Purchase Agreement*" means that certain superpriority debtor-in-possession note purchase agreement, filed as an attachment to the DIP Orders (as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time), by and among Eagle Intermediate, as issuer, each of the Debtors as guarantors, GLAS USA LLC, as administrative agent, GLAS Trust Corporation Limited, as collateral agent, and the purchasers party thereto setting forth the terms and conditions of the DIP Notes Facility, which shall be in form and substance acceptable to the Required Consenting Creditors.

44.     "*DIP Notes Facility*" means the new superpriority senior secured debtor-in-possession notes facility to be issued in accordance with the DIP Note Purchase Agreement.

45.     "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

46.     "*Disbursing Agent*" means the Debtors or the Reorganized Debtors, as applicable, or the Entity or Entities selected by the Debtors or the Reorganized Debtors (with the reasonable consent of the Required Consenting Creditors) to make or facilitate distributions contemplated under this Plan.

47.     "*Disclosure Statement*" means the disclosure statement with respect to this Plan, including all exhibits, schedules, supplements, modifications, and amendments thereto, to be approved by the Confirmation Order, which shall be in form and substance acceptable to the Required Consenting Creditors.

48.     "*Disputed*" means, as to a Claim or an Interest, a Claim or an Interest: (a) that is not Allowed; (b) that is not disallowed under this Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

49.     "*Distribution Date*" means, except as otherwise set forth in this Plan, the date or dates determined by the Debtors or the Reorganized Debtors, as applicable, in consultation with the Required Consenting Creditors, on or after the Effective Date upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under this Plan.

50.     "*Distribution Record Date*" means the record date for purposes of making distributions under this Plan on account of Allowed Claims, which date shall be a date in advance of the Effective Date that is selected by the Debtors in consultation with the Required Consenting Creditors. For the avoidance of doubt, the Distribution Record Date shall not apply to Securities held through DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., as applicable, which shall receive distributions in accordance with the applicable procedures of DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., as applicable.

51.     "*Dollar Notes*" means the senior secured notes issued pursuant to the Dollar Notes Indenture.

52.     "*Dollar Notes Advisors*" means Milbank LLP and Moelis & Company, as advisors to certain holders of Dollar Notes.

53.      "*Dollar Notes Advisor Cap*" means (a) all accrued and unpaid fees, costs, and expenses of (i) Milbank LLP in the amount of $3,106,967.04 to be paid from the proceeds of the DIP Notes Facility and (ii) Moelis & Company in the amount of $3,600,000 to be paid on the Effective Date, in each case for the period up to the "Effective Date" (as defined in the RSA), plus (b) up to $250,000 for fees and expenses incurred by Milbank LLP after the "Effective Date" (as defined in the RSA).

54.      "*Dollar Notes Claims*" means any Claims on account of indebtedness under the Dollar Notes.

55.      "*Dollar Notes Indenture*" means that certain senior secured notes indenture, dated May 4, 2018, by and among Eagle Intermediate and Eagle Finance Co. B.V. as co-issuers, certain of the Debtors as guarantors, and Wilmington Trust, National Association as trustee, paying agent, registrar, and transfer agent.

56.      "Dollar Notes Trustee" means Wilmington Trust, National Association, in its capacity as the trustee, paying agent, registrar, and transfer agent in respect of the Dollar Notes.

57.      "*DPI*" means the distributable proceeds paid from New LYCRA Holdco to holders of New LYCRA Holdco Common Stock and New Warrant Shares and proceeds from a sale of New LYCRA Holdco Common Stock and New Warrant Shares in which the holders of New Warrants (or a class thereof) participate (in each case on account of such shares) less distributable proceeds paid from New LYCRA Holdco to MIP Shares on account of such MIP Shares.

58.      "*DTC*" means the Depository Trust Company.

59.      "*Eagle Finance BV*" means Eagle Finance Co B.V.

60.      "*Eagle Finance Entities*" means Eagle Finance BV and Eagle Finance UK.

61.      "*Eagle Finance UK*" means Eagle UK Finance Limited.

62.      "*Eagle Global*" means Eagle Global Holding B.V.

63.      "*Eagle Holding*" means Eagle Holding Co B.V.

64.      "*Eagle Holding Companies*" means Eagle Holding, Eagle Intermediate or Eagle Global.

65.      "*Eagle Intermediate*" means Eagle Intermediate Global Holding B.V.

66.      "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of this Plan have been satisfied or waived in accordance with Article IX.B of this Plan; and (c) this Plan is declared effective by the Debtors. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

67.      "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

68.      "*Estate*" means, as to each Debtor, the estate created for such Debtor pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

69.      "*Euro/Dollar Claims*" means the Euro Notes Non-Priority Tranche Claims and the Dollar Notes Claims.

70.      "*Euro Notes*" means the senior secured notes issued pursuant to the Euro Notes Indenture.

71.      "*Euro Notes Claims*" means the Euro Notes Priority Tranche Claims and the Euro Notes Non-Priority Tranche Claims.

6

72.     "*Euro Notes Indenture*" means that certain senior secured notes indenture, dated April 25, 2023, by and among Eagle UK Finance Limited as issuer, certain of the Debtors as guarantors, and Kroll Trustee Services Limited as trustee.

73.     "*Euro Notes Non-Priority Tranche*" means Euro Notes equal to the difference between (a) the aggregate amount of Euro Notes less (b) the Euro Notes comprising the Euro Notes Priority Tranche.

74.     "*Euro Notes Non-Priority Tranche Claims*" means any Claims on account of indebtedness under the Euro Notes Non-Priority Tranche.

75.     "*Euro Notes Priority Tranche*" means the $120,000,000 of Euro Notes that rank senior in recovery of any proceeds of enforcement to the Euro/Dollar Claims.

76.     "*Euro Notes Priority Tranche Claims*" means any Claims on account of indebtedness under the Euro Notes Priority Tranche.

77.     "*Euro Notes Trustee*" means, collectively, Kroll Trustee Services Limited as trustee, U.S. Bank Europe DAC, UK Branch as paying agent, and U.S. Bank Europe DAC as registrar and transfer agent in respect of the Euro Notes.

78.     "*Exculpated Partie*s" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; and (b) the independent directors or managers of any Debtor.

79.     "*Executory Contract*" means a contract to which one or more of the Debtors are a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

80.     "*Exit Notes Facility*" means the secured exit notes facility, in an amount not less than $75,000,000 (which, for the avoidance of doubt, shall be sufficient to satisfy in full all requisite payments under this Plan, including all Professional Fees, DIP Claims, and Administrative Claims) to be entered into by certain of the Reorganized Debtors on or around the Effective Date, which exit notes facility (or other credit agreement) shall contain the other terms and conditions as set forth on Schedule 1 to the RSA, and/or shall otherwise be in form and substance satisfactory to the Debtors and the Required Consenting Lenders. A substantially final form of the Exit Notes Facility shall be filed as a Plan Supplement.

81.     "*Exit Notes Facility Documents*" means any documents governing the Exit Notes Facility, including the credit agreement and/or indenture governing the Exit Notes Facility, and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

82.     "*Federal Judgment Rate*" means the federal judgment rate specified by 28 U.S.C. § 1961 in effect as of the Petition Date.

83.     "*File*," "*Filed*," "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Prepackaged Cases.

84.     "*Final DIP Order*" means any order entered by the Bankruptcy Court on a final basis approving the DIP Motion, which shall be in form and substance acceptable to the Required Consenting Creditors.

85.     "*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has

been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, re-argument, leave to appeal or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable rule under the Bankruptcy Rules, the Local Bankruptcy Rules, or applicable non-bankruptcy Law may be filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

86.     "*FinanceCo Dissolution*" means the dissolution of each of the Eagle Finance Entities under applicable Law.

87.     "*First Day Pleadings*" means the motions and related pleadings that the Debtors shall have filed upon the commencement of the Prepackaged Cases, which shall be in form and substance acceptable to the Required Consenting Creditors.

88.     "*General Unsecured Claim*" means any Claim that is not (a) an Other Secured Claim, (b) an Administrative Claim; (c) an Other Priority Claim, (d) a Priority Tax Claim, (e) a DIP Claim (or a Claim for the DIP Commitment Premium or DIP Exit Premium), (f) an ssTL Claim, (g) a Euro Notes Claim, (h) a Dollar Notes Claim, (i) a Promissory Note Claim, (j) an Intercompany Claim, (k) a Section 510(b) Claim, or (l) otherwise secured by collateral or entitled to priority under the Bankruptcy Code or an order of the Bankruptcy Court.

89.     "*Governing Body*" means, in each case in its capacity as such, a board of directors, board of managers, manager, managing member, general partner, special committee, or any other similar governing body of any of the Debtors.

90.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

91.     "*Helm Agreements*" means, collectively (i) the Helm License Agreement (ii) the Helm Settlement Agreement.

92.     "*Helm Entities*" means, collectively (i) Helm US Corporation and (ii) Qore LLC.

93.     "*Helm License Agreement*" means that certain Non-Exclusive Patent License Agreement, dated as of March 10, 2026, by and between (i) The LYCRA Company LLC and The LYCRA Company UK Limited and (ii) the Helm Entities.

94.     "*Helm Settlement Agreement*" means that certain Settlement and Release Agreement, dated as of March 10, 2026, by and between The LYCRA Company LLC and the Helm Entities.

95.     "*Holdco Dissolution*" means the dissolution of each of the Holdco Entities under applicable Law.

96.     "*Holdco Entities*" means (i) in the event a Share Transfer of Eagle Global is effectuated, Eagle Intermediate and Eagle Holding or (ii) in the event a Share Transfer of Eagle Intermediate is effectuated, Eagle Holding.

97.     "*Holdco Interests*" means any Interest in any Holdco Entity or Eagle Finance Entity.

98.     "*Holder*" means a Person or Entity that is the record owner of a Claim against, or an Interest in, any Debtor, as applicable.

99.     "*Impaired*" means, with respect to a Claim or Interest, or a Class of Claims against or Interests in the Debtors, a Class of Claims against or Interests in the Debtors that is impaired within the meaning of section 1124 of the Bankruptcy Code.

100. "*Intercompany Claim*" means any Debtor Intercompany Claim and any Non-Debtor Intercompany Claim.

101. "*Intercompany Interest*" means any Interest in a Debtor held by another Debtor.

102. "*Intercreditor Agreement*" means that certain that certain Intercreditor Agreement, originally dated as of May 4, 2018, by and among, Eagle Holding Co B.V., Eagle Intermediate, Wilmington Trust (London) Limited (as security agent), and any other creditors that may from time to time accede thereto (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

103. "*Interest*" means the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor (or any Holdco Entity, as applicable), and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (or any Holdco Entity, as applicable) (in each case whether or not arising under or in connection with any employment agreement).

104. "*Interim DIP Order*" means any order entered by the Bankruptcy Court on an interim basis approving the DIP Motion, which shall be in form and substance acceptable to the Required Consenting Creditors.

105. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time, and as applicable to the Prepackaged Cases.

106. "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

107. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

108. "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules for the Southern District of Texas.

109. "*Management Incentive Plan*" has the meaning set forth in Article IV.P of this Plan.

110. "*MIP Shares*" means shares of New LYCRA Holdco Common Stock, representing up to 10% of the aggregate number of shares of New LYCRA Holdco Common Stock issued on the Effective Date calculated on a fully diluted basis, after taking into account the issuance of all New Warrant Shares, which such shares shall be of a separate class of New LYCRA Holdco Common Stock reserved for issuance under the Management Incentive Plan, as determined by the New LYCRA Holdco Board.

111. "*New Class A Warrant DPI Pool*" means the aggregate DPI up to the New Class A Warrant Equity Cap, to be distributed to holders of (a) New LYCRA Holdco Common Stock, excluding the MIP Shares, (b) New Class A Warrant Shares, and (c) after DPI representing the New Class B Warrant Participation Threshold is reached, New Class B Warrant Shares, as set forth in the New Warrants and New Warrants Agreements.

112. "*New Class A Warrant Equity Cap*" means $480,000,000.

113. "*New Class A Warrant Shares*" means the shares of a separate class of New LYCRA Holdco Common Stock issued upon exercise of the New Class A Warrants.

114. "*New Class A Warrant Strike Price*" means $0.01.

115. "*New Class A Warrants*" means the New Class A1 Warrants, New Class A2 Warrants and New Class A3 Warrants.

9

116.     "*New Class A Warrant DPI Pool Participating Shares*" means the following shares entitled to participate in the Class A Warrant DPI Pool, all of the then issued and outstanding shares of (a) New LYCRA Holdco Common Stock, excluding the MIP Shares, plus (b) New Class A Warrant Shares plus (c) after DPI representing the New Class B Warrant Participation Threshold is reached, the New Class B Warrant Shares.

117.     "*New Class A1 Warrants*" means warrants convertible into New Class A Warrant Shares (subject to dilution on account of the MIP Shares), at the New Class A Warrant Strike Price, and in the form attached to the applicable New Warrant Agreement, which shall be consistent with the RSA. The New Class A Warrant Shares issued upon exercise of the New Class A1 Warrants shall be treated as fully paid-up and ranking *pari passu* in all respects with the New LYCRA Holdco Common Stock, subject to the following: the New Class A Warrant Shares issued upon exercise of the New Class A1 Warrants shall: (a) not be entitled to voting rights, (b) only be entitled to participate in the Class A Warrant DPI Pool, (c) represent 9% of the total Class A Warrant DPI Pool Participating Shares at the time of issuance of the New Class A Warrants (subject to any antidilution adjustments set forth in the New Warrant Agreement, but subject to dilution by any issued and outstanding MIP Shares), and (d) following receipt of their distributions in full from the Class A Warrant DPI Pool, such New Class A Warrant shares shall have no further economic rights. For the avoidance of doubt, all Class A Warrants shall be structured to be fungible with each other.

118.     "*New Class A2 Warrants*" means warrants convertible into New Class A Warrant Shares (subject to dilution on account of the MIP Shares), at the New Class A Warrant Strike Price, and in the form attached to the applicable New Warrant Agreement, which shall be consistent with the RSA. The New Class A Warrant Shares issued upon exercise of the New Class A2 Warrants shall be treated as fully paid-up and ranking *pari passu* in all respects with the New LYCRA Holdco Common Stock, subject to the following: the New Class A Warrant Shares issued upon exercise of the New Class A2 Warrants shall: (a) not be entitled to voting rights, (b) only be entitled to participate in the Class A Warrant DPI Pool, (c) represent 20% of the total Class A Warrant DPI Pool Participating Shares at the time of issuance of the New Class A Warrants (subject to any antidilution adjustments set forth in the New Warrant Agreement, but subject to dilution by any issued and outstanding MIP Shares), and (d) following receipt of their distributions in full from the Class A Warrant DPI Pool, such New Class A Warrant shares shall have no further economic rights. For the avoidance of doubt, all Class A Warrants shall be structured to be fungible with each other.

119.     "*New Class A3 Warrants*" means warrants convertible into New Class A Warrant Shares (subject to dilution on account of the MIP Shares), at the New Class A Warrant Strike Price, and in the form attached to the applicable New Warrant Agreement, which shall be consistent with the RSA. The New Class A Warrant Shares issued upon exercise of the New Class A3 Warrants shall be treated as fully paid-up and ranking *pari passu* in all respects with the New LYCRA Holdco Common Stock, subject to the following: the New Class A Warrant Shares issued upon exercise of the New Class A3 Warrants shall: (a) not be entitled to voting rights, (b) only be entitled to participate in the Class A Warrant DPI Pool, (c) represent 1% of the total Class A Warrant DPI Pool Participating Shares at the time of issuance of the New Class A Warrants (subject to any antidilution adjustments set forth in the New Warrant Agreement, but subject to dilution by any issued and outstanding MIP Shares), and (d) following receipt of their distributions in full from the Class A Warrant DPI Pool, such New Class A Warrant shares shall have no further economic rights. For the avoidance of doubt, all Class A Warrants shall be structured to be fungible with each other.

120.     "*New Class B Warrant DPI Pool*" means the aggregate DPI exceeding the New Class A Warrant Equity Cap, to be distributed to holders of (a) New LYCRA Holdco Common Stock, excluding the MIP Shares and (b) New Class B Warrant Shares, as set forth in the New Class B Warrants and New Warrant Agreements applicable thereto.

121.     "*New Class B Warrant DPI Pool Participating Shares*" means the following shares entitled to participate in the Class B Warrant DPI Pool, all of the then issued and outstanding shares of (a) New LYCRA Holdco Common Stock, excluding the MIP Shares, plus (b) the New Class B Warrant Shares.

10

122.     "*New Class B Warrant Participation Threshold*" means $120,000,000.

123.     "*New Class B Warrant Shares*" means the shares of a separate class of New LYCRA Holdco Common Stock issued upon exercise of the New Class B Warrants.

124.     "*New Class B Warrant Strike Price*" means $0.01.

125.     "*New Class B Warrants*" means warrants convertible into New Class B Warrant Shares (subject to dilution on account of the MIP Shares), at the New Class B Warrant Strike Price, and in the form attached to the applicable New Warrant Agreement, which shall be consistent with the RSA. The New Class B Warrant Shares issued upon exercise of the New Class B Warrants shall be treated as fully paid-up and ranking *pari passu* in all respects with the New LYCRA Holdco Common Stock, subject to the following: the New Class B Warrant Shares issued upon exercise of the New Class B Warrants shall: (a) not be entitled to voting rights, (b) only be entitled to participate in the New Class A Warrant DPI Pool after DPI representing the New Class B Warrant Participation Threshold is reached, (c) entitled to participate in the New Class B Warrant DPI Pool, (d) represent 6% of the total Class A Warrant DPI Pool Participating Shares (once the New Class B Warrant Participation Threshold is reached) and 6% of the total Class B DPI Pool Participating Shares (in each case at the time of issuance of the New Class B Warrants and subject to any antidilution adjustments set forth in the New Warrant Agreement, but subject to dilution by any issued and outstanding MIP Shares), and (d) until the New Class B Warrant Participation Threshold is met, such New Class B Warrant shares shall have no economic rights. For the avoidance of doubt, all Class B Warrants shall be structured to be fungible with each other.

126.     "*New D&O Policies*" means (a) an extended reporting period policy or endorsement (or replacement "run-off" policy) to the Debtors' existing directors' and officers' liability insurance policies, providing coverage, on terms no less favorable in the aggregate than those in effect immediately prior to the Effective Date (including with respect to limits, scope, and priority of payments), for Claims made after the Effective Date that relate to any act, omission, event, or occurrence taking place on or prior to the Effective Date, with a reporting period of not less than six (6) years and (b) a new go-forward new director's and officer's liability insurance policy, providing for coverage substantially similar to the coverage under the policies in effect prior to the Petition Date.

127.     "*New Debt*" means, collectively, the Exit Notes Facility, the New LYCRA Holdco Notes, and the DIP Exit Note.

128.     "*New Debt Agents/Trustee*" means, collectively, any agent, collateral agent, trustee, or similar Entity under the New Debt, including any successors thereto.

129.     "*New Debt Documents*" means, collectively, the Exit Notes Facility Documents, the New LYCRA Holdco Notes Documents, and any documents relating to, evidencing, or governing the DIP Exit Note, which shall be in form and substance acceptable to the Debtors or Reorganized Debtors, as applicable, and the Required Consenting Creditors.

130.     "*New LYCRA Holdco*" means an Entity to incorporated in England & Wales, or such other jurisdiction as determined by the Debtors which shall be acceptable to the Required Consenting Creditors, that will be the recipient of the Share Transfer.

131.     "*New LYCRA Holdco Board*" means the new board of directors of New LYCRA Holdco, which shall be selected in accordance with the New LYCRA Holdco Organizational Documents. The members of the New LYCRA Holdco Board shall be filed as a Plan Supplement to the extent known.

132.     "*New LYCRA Holdco Common Stock*" means the common equity in New LYCRA Holdco, but excluding the New Warrant Shares.

133.     "*New LYCRA Holdco Investor Agreement*" means the investment agreement of New LYCRA Holdco containing the terms and conditions set forth in Schedule 4 to the RSA, in form and substance acceptable to the Debtors and the Required Consenting Creditors. A substantially final form of the New LYCRA Holdco Investor Agreement shall be filed as a Plan Supplement.

134.     "*New LYCRA Holdco Notes*" means the new secured notes in an amount equal to 95% of the Allowed amount of ssTL Claims (i.e., $214,051,828), to be issued by New LYCRA Holdco on the Effective Date pursuant to the New LYCRA Holdco Notes Purchase Agreement, which note shall contain the other terms and conditions set forth on Schedule 6 to the RSA and shall otherwise be in form and substance satisfactory to the Debtors and the Required Consenting Creditors. A substantially final form of the New LYCRA Holdco Notes shall be filed as a Plan Supplement.

135.     "*New LYCRA Holdco Notes Documents*" means collectively, the New LYCRA Holdco Notes Purchase Agreement and any other documents governing the New LYCRA Holdco Notes and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, consistent with the terms and conditions set forth in the RSA, which documents shall be in form and substance acceptable to the Required Consenting Creditors and contain the other terms and conditions set forth on Schedule 6 to the RSA.

136.     "*New LYCRA Holdco Notes Purchase Agreement*" means that certain note purchase agreement or indenture memorializing the New LYCRA Holdco Notes (including any amendments, restatements, supplements, or modifications thereof) to be entered into on the Effective Date, consistent with the terms and conditions set forth in the RSA, and otherwise in form and substance acceptable to the Debtors and the Required Consenting Creditors.

137.     "*New LYCRA Holdco Organizational Documents*" means the documents providing for corporate governance of New LYCRA Holdco, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements (including the New LYCRA Holdco Investor Agreement), as applicable, which shall be consistent with this Plan and section 1123(a)(6) of the Bankruptcy Code (as applicable), and shall be included in the Plan Supplement, which shall be in form and substance acceptable to the Debtors and the Required Consenting Creditors.

138.     "*New LYCRA Holdco ssTL Common Stock*" means that number of shares of New LYCRA Holdco Common Stock as determined by the Debtors and the Required Consenting Creditors prior to the Effective Date.

139.     "*New Warrants*" means the New Class A1 Warrants, the New Class A2 Warrants, the New Class A3 Warrants, and the New Class B Warrants.

140.     "*New Warrant Agreements*" means the warrant agreements for the issuance of the New Warrants, the form of which shall be included in the Plan Supplement and the terms of which shall be consistent with the RSA, and otherwise in form and substance acceptable to the Required Consenting Creditors.

141.     "*New Warrant Shares*" means those shares of specific class or series of New LYCRA Holdco Common Stock issued upon the exercise of the New Warrants, which have limitations on economic and voting rights as set forth in the applicable New Warrants and New Warrants Agreements.

142.     "*Non-Debtor*" means all direct and indirect subsidiaries of any Debtor that are not Debtors in these Prepackaged Cases.

143.     "*Non-Debtor Intercompany Claim*" means any Claim against a Debtor held by a Non-Debtor.

144.     "*Non-U.S. Facility*" means that certain short-term borrowing facility between Debtor The LYCRA Company Industria E Comercio Textil Ltda, as borrower, and Itaú Unibanco S.A. Nassau Branch (Bahamas), as lender.

12

145. "*Non-U.S. Facility Claims*" means any Claims on account of the Non-U.S. Facility.

146. "*Opt-Out Form*" means the notice of non-voting status and opt-out form included in the Solicitation Materials transmitted by the Claims and Noticing Agent to Holders of Claims or Interests that are not entitled to vote on the Plan, by which such Holders may elect to opt out of the Third-Party Release.

147. "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right to payment under section 507(a) of the Bankruptcy Code.

148. "*Other Secured Claim*" means any other secured Claim against the Debtors that is not a DIP Claim, an ssTL Claim, a Euro Notes Claim, or a Dollar Notes Claim.

149. "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

150. "*Petition Date*" means the date on which each of the Debtors commence the Prepackaged Cases.

151. "*Plan*" means this joint chapter 11 plan, including all exhibits, supplements (including the Plan Supplement), appendices, annexes, schedules, and attachments hereto, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and the RSA, and otherwise in form and substance reasonably acceptable to the Required Consenting Creditors.

152. "*Plan Distribution*" means a payment or distribution to holders of Allowed Claims, Allowed Interests, or other eligible Entities under and in accordance with this Plan.

153. "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and the RSA) that will be filed by the Debtors with the Bankruptcy Court, which shall be in form and substance acceptable to the Required Consenting Creditors.

154. "*Prepackaged Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, any procedurally consolidated and jointly administered cases Filed for the Debtors under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

155. "*Priority Tax Claim*" means a Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

156. "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

157. "*Professional*" means an Entity (other than an ordinary course professional): (a) employed, or proposed to be employed prior to the Confirmation Date, in the Prepackaged Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

158. "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.D of this Plan.

159. "*Professional Fee Claim*" means any Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred on or after the Petition Date by such Professional through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

160. "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors on the Effective Date with the Professional Fee Amount.

161. "*Promissory Note*" means that certain unsecured $19,446,000 promissory note entered into between, among others, Eagle Intermediate and Eagle Finance Co. B.V. and certain payees that are holders of the Dollar Notes.

162. "*Promissory Note Claims*" means any Claim on account of indebtedness under the Promissory Note.

163. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Prepackaged Cases.

164. "*Regulation S*" means Regulations S under the Securities Act.

165. "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to a Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

166. "*Rejected Executory Contracts and Unexpired Leases List*" means the schedule of Executory Contracts and Unexpired Leases, if any, to be rejected by the Debtors pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time; *provided*, however, the Rejected Helm Agreements shall be deemed rejected in accordance with and subject to the terms of the Helm Settlement Agreement.

167. "*Rejected Helm Agreements*" means that (i) certain supply contract, dated July 10, 2023, by and between Debtor The LYCRA Company LLC and Helm US Corporation, as may have been amended, modified or restated from time to time  and (ii) that certain trademark license agreement, dated July 10, 2023, by and between Debtor The LYCRA Company LLC and Qore LLC, as may have been amended, modified or restated from time to time.

168. "*Related Party*" means, each of, and in each case solely in its capacity as such, current and former directors, managers, officers, committee members, members of any Governing Body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors.

169. "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Noteholders; (d) the Agents/Trustees (including the DIP Agent); (e) each Consenting Creditor; (f) Holders of Claims or Interests who vote to accept this Plan and do not affirmatively opt out of the releases set forth herein; (g) Holders of Claims or Interests who are presumed to accept this Plan, have been served with an Opt-Out Form, and do not affirmatively opt out of the releases set forth herein; (h) Holders of Claims or Interests who are entitled to vote but abstain from voting on this Plan, and do not affirmatively opt out of the releases set forth herein; (i) Holders of Claims or Interests who vote to reject this Plan or are deemed to reject this Plan, and have been served with an Opt-Out Form or a Ballot, but do not affirmatively opt out of the releases set forth herein; (j) the Helm Entities; (k) Linx Capital Limited (*provided* that Linx Capital Limited shall not be a Released Party in its

capacity as SPV Notes Issuer with respect to the 1L SPV Note Documents and 2L SPV Note Documents (each as defined in the RSA)); (l) each current and former Affiliate of each Entity in clause (a) through the following clause (m); and (m) each Related Party of each Entity in clause (a) through clause (l); *provided* that, in each case, an Entity shall not be a Released Party if it: (i) affirmatively opts out of the releases in this Plan; or (ii) timely objects to the releases in this Plan, and such objection is not withdrawn before the Confirmation Hearing.

170.     "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Noteholders; (d) the Agents/Trustees (including the DIP Agent); (e) each Consenting Creditor; (f) Holders of Claims or Interests who vote to accept this Plan and do not affirmatively opt out of the releases set forth herein; (g) Holders of Claims or Interests who are presumed to accept this Plan, have been served with an Opt-Out Form, and do not affirmatively opt out of the releases set forth herein; (h) Holders of Claims or Interests who are entitled to vote but abstain from voting on this Plan, and do not affirmatively opt out of the releases set forth herein; (i) Holders of Claims or Interests who vote to reject this Plan or are deemed to reject this Plan, and have been served with an Opt-Out Form or a Ballot, but do not affirmatively opt out of the releases set forth herein; (j) the Helm Entities; (k) Linx Capital Limited (*provided* that Linx Capital Limited shall not be a Releasing Party in its capacity as SPV Notes Issuer with respect to the 1L SPV Note Documents and 2L SPV Note Documents (each as defined in the RSA)); (l) each current and former Affiliate of each Entity in clause (a) through the following clause (m); and (m) each Related Party of each Entity in clause (a) through clause (l); *provided* that, in each case, an Entity shall not be a Releasing Party if it: (i) affirmatively opts out of the releases in this Plan; or (ii) timely objects to the releases in this Plan, and such objection is not withdrawn before the Confirmation Hearing.

171.     "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under this Plan, on and after the Effective Date, or any successors or assigns thereto including by transfer, merger, consolidation, or otherwise, and including any new Entity established in connection with the implementation of the Restructuring Transactions.

172.     "*Required Consenting Creditors*" means the Majority Euro Consenting Creditors as defined in the RSA.

173.     "*Restructuring Expense Parties*" means, collectively: (a) the Ad Hoc Group Advisors, (b) the DIP Noteholders, (c) the DIP Agent, (d) the ssTL Agent, (e) the Euro Notes Trustee, (f) the Dollar Notes Trustee, (g) the Security Agent, (h) the advisors to each of the foregoing set forth in clauses (a) through (g), and (i) the Dollar Notes Advisors (subject to the Dollar Notes Advisor Cap).

174.     "*Restructuring Expenses*" means the reasonable, documented, and due and owing fees and out-of-pocket expenses of the Restructuring Expense Parties (subject to the Dollar Notes Advisor Cap with respect to the Dollar Notes Advisors), in each case incurred prior to the Effective Date in accordance with their respective engagement letters or fee letters with the Debtors, the RSA, and/or any applicable order of the Bankruptcy Court, including the DIP Orders. For the avoidance of doubt, any Restructuring Expenses incurred by the Restructuring Expense Parties after the Effective Date shall be paid by the Reorganized Debtors in the ordinary course of business (subject to the Dollar Notes Advisor Cap with respect to the Dollar Notes Advisors).

175.     "*Restructuring Transactions*" means the transactions described in <u>Article IV.B</u> of this Plan.

176.     "*RSA*" means that certain Short-Form Lock-Up Deed, dated as of March 13, 2026, by and among the Debtors and the Consenting Creditors, including all exhibits thereto, as may be amended, modified, or supplemented from time to time, in accordance with its terms.

177.     "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to this Plan and which shall be filed with the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

178.    "*Section 510(b) Claim*" means any Claim on account of, arising from or related to any Security issued by, or offered and/or sold by any Debtor, which Claim is subject to subordination under section 510(b) of the Bankruptcy Code.

179.    "*Secured Claim*" means a Claim: (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code to the extent of the amount subject to setoff.

180.    "*Securities Act*" means the Securities Act of 1933, as amended.

181.    "*Security*" or "*Securities*" has the meaning set forth in section 2(a)(1) of the Securities Act.

182.    "*Security Agent*" means Wilmington Trust (London) Limited, as security agent under the Intercreditor Agreement, the ssTL Facilities Agreement, the Euro Notes Indenture, and the Dollar Notes Indenture.

183.    "*Share Transfer*" means the Transfer or issuance of 100% of the outstanding capital stock of one of the Eagle Holding Companies to New LYCRA Holdco, free and clear of all Liens, Claims and other encumbrances, other than Liens, Claims and other encumbrances created under the terms of this Plan or the Exit Notes Facility.

184.    "*Solicitation Materials*" means, as applicable, any documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on this Plan.

185.    "*ssTL*" means the loans issued under the ssTL Facilities Agreement.

186.    "*ssTL Agent*" means Kroll Agency Services Limited, in its capacity as agent under the ssTL Facilities Agreement.

187.    "*ssTL Claims*" means any Claim against any Debtor derived from, based upon, or arising under the ssTL Facilities Agreement and the other Finance Documents (as defined therein).

188.    "*ssTL Facilities Agreement*" means that certain super senior term loan facility between Eagle Intermediate, as borrower, certain of the other Debtors as guarantors, Kroll Agency Services Limited as agent, and Wilmington Truste (London) Limited, as security agent under the Intercreditor Agreement.

189.    "*Third-Party Release*" means the release set forth in Article VIII.D of this Plan.

190.    "*Transfer*" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions); *provided* that any pledge in favor of a bank or broker dealer at which a Consenting Creditor maintains an account, where such bank or broker dealer holds a security interest or other encumbrance over property in the account generally shall not be deemed a "Transfer" for any purposes hereunder. When used as a noun, "Transfer" shall have a correlative meaning.

191.    "*Unexpired Lease*" means a lease of non-residential, real property to which one or more of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

192.    "*Unimpaired*" means, with respect to a Claim against or an Interest in a Debtor, not impaired within the meaning of section 1124 of the Bankruptcy Code.

B.    *Rules of Interpretation.*

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall

include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan or the Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan (including the exhibits and Plan Supplement) in its entirety rather than to a particular portion of this Plan; (8) subject to the provisions of any contract, charter, bylaws, limited liability company agreements, operating agreements, certificates of incorporation, or other organizational documents or shareholders' agreements, as applicable, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable Law, including the Bankruptcy Code and the Bankruptcy Rules; (9) any immaterial effectuating provisions may be interpreted by the Debtors or Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval, of the Bankruptcy Court or any other Entity; (10) unless otherwise specified, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (11) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (12) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (13) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (14) all references to docket numbers of documents Filed in the Prepackaged Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (15) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Prepackaged Cases, unless otherwise stated; (16) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (17) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; (18) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective Person or Entity that have such consent, acceptance, or approval rights, including by electronic mail; and (19) except as otherwise provided in this Plan, any reference to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Except as set forth herein or in any DIP Order, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Except to the extent a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code or the Bankruptcy Rules) and subject to the provisions of any contract, lease, instrument, release, indenture, or other

agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed, implemented, and enforced in accordance with, the Laws of the State of New York, without giving effect to the principles of conflict of Laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law); *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the Laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

F.      *Nonconsolidated Plan.*

Although for purposes of administrative convenience and efficiency, this Plan has been proposed as a joint plan for each of the Debtors and presents Classes of Claims against and Interests in the Debtors, this Plan does not provide for the substantive consolidation of any of the Debtors. The classification of Claims against and Interest in any Debtor shall not affect such Debtor's status as a separate legal Entity, change the organizational structure of such Debtors' business enterprise, constitute a change of control of such Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under this Plan, each Reorganized Debtor shall continue to exist as separate legal Entity from and after the Effective Date.

G.      *Controlling Document.*

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects. In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and this Plan or the Disclosure Statement, the Confirmation Order shall control.

H.      *Consultation, Notice, Information, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all respective consultation, information, notice, and consent rights set forth in the RSA (including the exhibits thereto), including with respect to the form and substance of this Plan, all exhibits to this Plan, the Plan Supplement, and all other applicable Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I hereof) and fully enforceable as if stated in full herein until such time as the RSA is terminated in accordance with its terms.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, DIP CLAIMS, PROFESSIONAL FEE CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, DIP Claims (and the DIP Commitment Premium and DIP Exit Premium) and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.       *Administrative Claims.*

Except with respect to the Professional Fee Claims, Restructuring Expenses, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtors against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtors on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.       *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive Cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

C.       *DIP Claims, DIP Commitment Premium, and DIP Exit Premium.*

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (a) the principal amount outstanding under the DIP Notes Facility on such date, (b) all interest accrued and unpaid thereon to the date of payment, and (c) all accrued and unpaid fees, premiums, expenses, and non-contingent indemnification obligations payable under the DIP Documents and the DIP Orders. On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, each Allowed DIP Claim shall be, in full and final satisfaction of such Allowed DIP Claim, paid in full in Cash from proceeds in connection with the Exit Notes Facility, *provided* that, if a Holder of an Allowed DIP Claim is also a lender under the Exit Notes Facility, such Holder may elect to exchange its Allowed DIP Claim into the Exit Notes Facility on a dollar-for-dollar basis.

The Reorganized Debtors are authorized and directed, upon the Effective Date, to (x) issue the New Class A1 Warrants in full and final satisfaction of the DIP Commitment Premium and (y) issue the DIP Exit Note in full and final satisfaction of the DIP Exit Premium, in each case, with allocation to be determined and agreed as among the DIP Noteholders.

Upon the satisfaction of the Allowed DIP Claims in accordance with the terms of this Plan, or other such treatment as contemplated by this Article II.C of this Plan, all guarantees provided and all Liens and security interests granted, in each case, to secure such obligations shall be automatically released, terminated, and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. The DIP Agent and the DIP Noteholders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

19

*D.      Professional Fee Claims.*

      1.      <u>Final Fee Applications and Payment of Professional Fee Claims</u>.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with <u>Article II.A</u> of this Plan.

      2.      <u>Professional Fee Escrow Account</u>.

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

      3.      <u>Professional Fee Amount</u>.

Professionals shall reasonably estimate in good faith their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than three (3) Business Days before the Effective Date; *provided* that such estimates shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or the Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

      4.      <u>Post-Confirmation Fees and Expenses</u>.

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors or the Reorganized Debtors as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of this Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ and pay any Professional without any further notice to or action, order, or approval of the Bankruptcy Court.

*E.      Payment of Restructuring Expenses.*

Any time that a Restructuring Expense Party seeks payment of Restructuring Expenses from the Debtors or the Reorganized Debtors, such Restructuring Expense Party shall deliver to the Debtors or the Reorganized Debtors (as applicable) and their counsel an invoice for such Restructuring Expenses in summary form, which shall be reasonably acceptable to the Debtors or Reorganized Debtors, as applicable. The Debtors reserve the right to request additional detail regarding the services rendered and expenses incurred by such Restructuring Expense Party.

To the extent not otherwise paid, and subject to the preceding paragraph, the Debtors or the Reorganized Debtors, as applicable, shall promptly pay in Cash in full outstanding and invoiced Restructuring Expenses as follows: (i) on the Effective Date, Restructuring Expenses incurred, or estimated to be incurred, during the period prior to the Effective Date to the extent invoiced to the Debtors at least three (3) Business Days in advance of the Effective Date following the Debtors' delivery of prior written notice of the date on which they anticipate the Effective Date will occur, and (ii) after the Effective Date, any unpaid Restructuring Expenses within ten (10) Business Days of receiving an invoice; *provided* that, such Restructuring Expenses shall be paid in accordance with the terms of any applicable engagement letters or other contractual arrangements without the requirement for the filing of retention applications, fee applications, or any other applications in the Prepackaged Cases, and without any requirement for further notice or Bankruptcy Court review or approval; *provided further* that, to the extent timely invoiced, Restructuring Expenses that are not paid by the Debtors or the Reorganized Debtors, as applicable, within the timeframes set forth in this Article II.D of this Plan, such Restructuring Expenses shall not be deemed waived and shall be included in a subsequent invoice. After the Effective Date, the Debtors and Reorganized Debtors (as applicable) shall continue to pay when due and payable in the ordinary course of their business any unpaid Restructuring Expenses that were incurred on, before or after the Effective Date.

*F.      Non-U.S. Facility.*

All Non-U.S. Facility Claims shall be Allowed Claims. On the Effective Date, the Allowed Non-U.S. Facility Claims shall be Reinstated and the New Debt Documents shall provide for and allow the continuation of the Non-U.S. Facility.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*A.      Classification of Claims and Interests.*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims against and Interests in the Debtors pursuant to this Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

21

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | ssTL Claims | Impaired | Entitled to Vote |
| Class 4 | Euro Notes Claims | Impaired | Entitled to Vote |
| Class 5 | Dollar Notes Claims | Impaired | Entitled to Vote |
| Class 6 | Promissory Note Claims | Impaired | Entitled to Vote |
| Class 7 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Debtor Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| Class 10 | Non-Debtor Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| Class 11 | Intercompany Interests | Unimpaired/ Impaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| Class 12 | Holdco Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with such Claim's terms in the ordinary course of business) or as soon as reasonably practicable thereafter.

1.      Class 1 – Other Secured Claims.

(a)     *Classification*: Class 1 consists of all Allowed Other Secured Claims against any Debtor.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Other Secured Claim, at the option of the applicable Debtor or the Reorganized Debtor with the reasonable consent of the Required Consenting Creditors, either:

(i)      payment in full in Cash of its Allowed Other Secured Claim;

(ii)     the collateral securing its Allowed Other Secured Claim;

(iii)    Reinstatement of its Allowed Other Secured Claim; or

(iv)     such other treatment rendering its Allowed Other Secured Claim Unimpaired.

(c)    *Voting*: Class 1 is Unimpaired under this Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

2.    <u>Class 2 – Other Priority Claims</u>.

(a)    *Classification*: Class 2 consists of all Allowed Other Priority Claims against any Debtor.

(b)    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Other Priority Claim, Cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c)    *Voting*: Class 2 is Unimpaired under this Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

3.    <u>Class 3 – ssTL Claims</u>.

(a)    *Classification*: Class 3 consists of all Allowed ssTL Claims against any Debtor.

(b)    *Allowance*: On the Effective Date, all ssTL Claims shall be deemed Allowed and not subject to any counterclaim, defense, offset, or reduction of any kind, in the aggregate amount of $214,051,828.

(c)    *Treatment*: Except to the extent that a Holder of an Allowed ssTL Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed ssTL Claim shall receive, in full and final satisfaction of such ssTL Claim, its Pro Rata share of (x) the New LYCRA Holdco Notes and (y) the New LYCRA Holdco ssTL Common Stock; *provided* that, distribution of any New LYCRA Holdco ssTL Common Stock to the Holders of the ssTL Claims shall be conditioned upon execution of the New LYCRA Holdco Investor Agreement by such Holders of ssTL Claims.

(d)    *Voting*: Class 3 is Impaired under this Plan. Holders of Allowed ssTL Claims are entitled to vote to accept or reject this Plan.

4.    <u>Class 4 – Euro Notes Claims</u>.

(a)    *Classification*: Class 4 consists of all Allowed Euro Notes Claims against any Debtor.

(b)    *Allowance*: On the Effective Date, all Euro Notes Claims shall be deemed Allowed and not subject to any counterclaim, defense, offset, or reduction of any kind, in the aggregate amount of €448,615,157.

(c)    *Treatment*: Except to the extent that Linx Capital Limited, as the Holder of the Allowed Euro Notes Claims, agrees to less favorable treatment, on the Effective Date Linx Capital Limited shall receive (i) 95% of the New Class A2 Warrants in respect of the Allowed Euro Notes Priority Tranche Claims and (ii)(a) 5% of the New Class A2 Warrants and (b) 100% of the New Class A3 Warrants in respect of the Allowed Euro Non-Priority Tranche Claims.

23

(d)     *Voting*: Class 4 is Impaired under this Plan. Holders of Allowed Euro Notes Claims are entitled to vote to accept or reject this Plan.

5.     Class 5 – Dollar Notes Claims.

(a)     *Classification*: Class 5 consists of all Allowed Dollar Notes Claims against any Debtor.

(b)     *Allowance*: On the Effective Date, all Dollar Notes Claims shall be deemed Allowed and not subject to any counterclaim, defense, offset, or reduction of any kind, in the aggregate amount of $779,907,149.

(c)     *Treatment*: Except to the extent that a Holder of an Allowed Dollar Notes Claim agrees to less favorable treatment, on the Effective Date, each Holder of an Allowed Dollar Notes Claim shall receive its Pro Rata share of the New Class B Warrants.

(d)     *Voting*: Class 5 is Impaired under this Plan. Holders of Allowed Dollar Notes Claims are entitled to vote to accept or reject this Plan.

6.     Class 6 – Promissory Note Claims.

(a)     *Classification*: Class 6 consists of all Allowed Promissory Note Claims against any Debtor.

(b)     *Allowance*: On the Effective Date, all Promissory Note Claims shall be deemed Allowed and not subject to any counterclaim, defense, offset, or reduction of any kind, in the aggregate amount of $19,446,000.

(c)     *Treatment*: Except to the extent that a Holder of an Allowed Promissory Note Claim agrees to less favorable treatment, each Holder of an Allowed Promissory Note Claim shall receive, in full and final satisfaction of such Promissory Note Claim, its Pro Rata share of $1,000.

(d)     *Voting* Class 6 is Impaired under this Plan. Holders of Allowed Promissory Note Claims are entitled to vote to accept or reject this Plan.

7.     Class 7 – General Unsecured Claims.

(a)     *Classification*: Class 7 consists of all Allowed General Unsecured Claims against any Debtor.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment of its Allowed Claim, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such General Unsecured Claim, Reinstatement of its Allowed General Unsecured Claim or such other treatment rendering such Allowed General Unsecured Claim unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)     *Voting*: Class 7 is Unimpaired under this Plan. Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

8.     Class 8 – Section 510(b) Claims.

(a)     *Classification*: Class 8 consists of all Section 510(b) Claims.

24

(b) *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

(c) *Treatment*: On the Effective Date, all Section 510(b) Claims will be cancelled, released, discharged, extinguished, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims.

(d) *Voting*: Class 8 is Impaired under this Plan. Holders of Allowed Section 510(b) Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

9. <u>Class 9 – Debtor Intercompany Claims</u>.

(a) *Classification*: Class 9 consists of all Debtor Intercompany Claims.

(b) *Treatment*: Each Allowed Debtor Intercompany Claim shall be, at the option of the applicable Debtor or the Reorganized Debtor with the reasonable consent of the Required Consenting Creditors, either:

(i) Reinstated;

(ii) adjusted, converted to equity, set off, settled, distributed, or contributed;

(iii) discharged, cancelled, and released without any distribution on account of such Allowed Debtor Intercompany Claims; or

(iv) otherwise addressed at the Debtors' election.

(c) *Voting*: Class 9 is Unimpaired if the Allowed Debtor Intercompany Claims are Reinstated or Impaired if the Allowed Debtor Intercompany Claims in Class 9 are cancelled. Holders of Allowed Debtor Intercompany Claims in Class 9 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

10. <u>Class 10 – Non-Debtor Intercompany Claims</u>.

(a) *Classification*: Class 10 consists of all Non-Debtor Intercompany Claims.

(b) *Treatment*: Each Allowed Non-Debtor Intercompany Claim shall be, at the option of the applicable Debtor or the Reorganized Debtor, with the reasonable consent of the Required Consenting Creditors, either:

(i) Reinstated;

(ii) adjusted, converted to equity, set off, settled, distributed, or contributed;

(iii) discharged, cancelled, and released without any distribution on account of such Allowed Non-Debtor Intercompany Claims; or

(iv) otherwise addressed at the Debtors' election.

(c) *Voting*: Class 10 is Unimpaired if the Allowed Non-Debtor Intercompany Claims are Reinstated or Impaired if the Allowed Non-Debtor Intercompany Claims are cancelled. Holders of Allowed Non-Debtor Intercompany Claims are conclusively presumed to have

accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

11.   Class 11 – Intercompany Interests.

(a)   *Classification*: Class 11 consists of all Intercompany Interests.

(b)   *Treatment*: Each Allowed Intercompany Interest shall be, at the option of the applicable Debtor or the Reorganized Debtor, with the reasonable consent of the Required Consenting Creditors, either:

(i)   Reinstated;

(ii)   adjusted, converted to equity, set off, settled, distributed, or contributed;

(iii)   discharged, cancelled, and released without any distribution on account of such Intercompany Interests; or

(iv)   otherwise addressed at the Debtors' election.

(c)   *Voting*: Class 11 is Unimpaired if the Allowed Intercompany Interests are Reinstated or Impaired if the Allowed Intercompany Interests are cancelled. Holders of Allowed Intercompany Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

12.   Class 12 – Holdco Interests.

(a)   *Classification*: Class 12 consists of all Holdco Interests.

(b)   *Treatment*: Each Allowed Holdco Interest shall be discharged, cancelled, and released without any distribution on account of such Holdco Interests.

(c)   *Voting*: Class 12 is Impaired under this Plan. Holders of Allowed Holdco Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

C.   *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan or the Plan Supplement shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.   *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.       *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class votes to accept or reject this Plan, the Holders of such Claims or Interests in such Class shall be presumed to have accepted this Plan.

F.       *Intercompany Interests.*

To the extent Reinstated under this Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure, for the ultimate benefit of the Holders of shares of New LYCRA Holdco Common Stock and the New Warrant Shares in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims. For the avoidance of doubt, to the extent Reinstated pursuant to this Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

G.       *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to Article III.B of this Plan. The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify this Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.       *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date or such other date as fixed by the Bankruptcy Court.

I.       *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to this Plan.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION

A.       *General Settlement of Claims and Interests.*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to this Plan, including any challenge to the amount, validity, perfection,

enforceability, priority, or extent of the ssTL Claims, the Euro Notes Claims, and the Dollar Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, based on any equitable theory, or otherwise. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be, and shall be, final.

B.      *Restructuring Transactions.*

On or before the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, are authorized (subject to the consent of the Required Consenting Creditors and consistent with the RSA) to: (a) execute and deliver any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, formation, organization, dissolution, sale, purchase, transfers of shares of any direct or indirect wholly-owned subsidiaries of the Debtors' among such subsidiaries, or liquidation containing terms that are consistent with the terms of this Plan, the Plan Supplement, and the RSA; and (b) consummate the Restructuring Transactions and to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan that are consistent with and pursuant to the terms and conditions of this Plan, including: (1) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan, the Plan Supplement, and the RSA and having other terms to which the applicable Entities may agree; (2) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state Law, including any applicable New LYCRA Holdco Organizational Documents; (3) the issuance, allotment, and distribution of the New LYCRA Holdco Common Stock, excluding the MIP Shares; (4) the consummation of the New Debt, including the execution, delivery, and filing of all New Debt Documents; (5) the reservation of the MIP Shares and New Warrant Shares; (6) such other transactions that are required to effectuate the Restructuring Transactions; and (7) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with this Plan.

On or before the Effective Date, the Debtors and Reorganized Debtors (with the consent of the Required Consenting Creditors, acting reasonably) may implement this Plan, including effectuating the Share Transfer, through any one or more restructuring steps (including in accordance with any Agreed Transfer Process), in any order and at any time, to achieve tax and corporate efficiency, including mergers/conversions, asset and equity transfers, intercompany debt arrangements, dissolutions/formations, entity classification elections, and other step transactions. No further Court order or re-solicitation is required; *provided*, that such steps shall not (a) materially and adversely affect the recoveries, distributions, or treatment of any Holder of an Allowed Claim or Interest, (b) increase the aggregate consideration required under this Plan, or (c) alter the relative priorities of Allowed Claims or Interests. The Debtors and Reorganized Debtors (with the consent of the Required Consenting Creditors, acting reasonably) are authorized to make or revoke any tax elections and implement transactions intended to preserve or optimize tax attributes and minimize limitations or disallowance.

The Consenting Creditors shall take commercially reasonable steps necessary and reasonably requested by the Debtors or Reorganized Debtors to consummate the Share Transfer, consistent with the terms hereof and the RSA.

The Reorganized Debtors shall have the authority to effectuate the FinanceCo Dissolution from and after the Effective Date subject to local Law requirements. If a Share Transfer of Eagle Global or Eagle Intermediate is effectuated, then, following the Effective Date, each Person or Entity with requisite authority shall take all actions reasonably requested by the Reorganized Debtors to effectuate the Holdco Dissolution as soon as reasonably practicable following the Effective Date, but in no event later than 60 days thereafter. For the avoidance of doubt, the Reorganized Debtors shall have the authority to take any actions to cause the Holdco Dissolution. The Consenting

Creditors shall take all actions reasonably necessary and requested by the Reorganized Debtors to effectuate the Holdco Dissolution and the FinanceCo Dissolution, as applicable; *provided, that* such actions are not inconsistent with the terms of this Plan or the RSA.

The Confirmation Order shall, and shall be deemed to, pursuant to both sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan. The Confirmation Order shall authorize the Debtors, the Reorganized Debtors, and the Consenting Creditors, as applicable, to undertake the Restructuring Transactions contemplated by this Plan, the RSA and the other applicable Definitive Documents.

C.      *The Reorganized Debtors.*

On the Effective Date, the New LYCRA Holdco Board shall be appointed and, subject to local Law requirements, each Reorganized Debtor shall adopt its New LYCRA Holdco Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under this Plan as necessary to consummate this Plan. Cash payments to be made pursuant to this Plan will be made by the Debtors or the Reorganized Debtors, as applicable. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or the Reorganized Debtors, as applicable, to satisfy their obligations under this Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of this Plan.

D.      *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under this Plan and the Restructuring Transactions contemplated thereby with: (1) the Debtors' Cash on hand as of the Effective Date; (2) the New LYCRA Holdco Common Stock (excluding the MIP Shares) and the New Warrant Shares; and (3) the New Debt. Each distribution and issuance referred to in Article VI shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain Securities in connection with this Plan, including the shares of New LYCRA Holdco Common Stock, the New Warrants, and the New Warrant Shares will be exempt from registration under the Securities Act, as described more fully in Article IV.M hereof.

1.      Use of Cash.

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand to fund distributions to Holders of Allowed Claims, consistent with the terms of this Plan.

2.      New LYCRA Holdco Common Stock and New Warrants.

(a)      *Issuance of the New LYCRA Holdco Common Stock*

New LYCRA Holdco shall be authorized to issue the New LYCRA Holdco Common Stock and the New Warrant Shares pursuant to the New LYCRA Holdco Organizational Documents and (in relation to the New Warrant Shares) the New Warrant Agreements. Pursuant to New LYCRA Topco corporate authorizations adopted prior to the Effective Date, the issuance of the New LYCRA Holdco Common Stock, including the MIP Shares, and the New Warrant Shares, shall be authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors. On the Effective Date, the New LYCRA Holdco Common Stock (excluding the

29

MIP Shares) shall be issued, allotted, and distributed as provided for, and in accordance with, this Plan and the New LYCRA Holdco Organizational Documents.

The MIP Shares and New Warrant Shares (which are authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors) will be reserved on the Effective Date and shall be issued, allotted, and distributed pursuant to the terms of the New LYCRA Holdco Organizational Documents and (in relation to the New Warrant Shares) the New Warrant Agreements.

All of the shares (or comparable units) of New LYCRA Holdco Common Stock and New Warrant Shares issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution, issuance, and allotment of New LYCRA Holdco Common Stock or New Warrant Shares shall be governed by the terms and conditions set forth in this Plan applicable to such distribution, issuance, or allotment and by the terms and conditions of the instruments evidencing or relating to such distribution, issuance, or allotment, including the New LYCRA Holdco Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution, issuance, or allotment. Any Entity's acceptance of New LYCRA Holdco Common Stock or New Warrants or New Warrant Shares shall be deemed as its agreement to the New LYCRA Holdco Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. The New LYCRA Holdco Common Stock and New Warrant Shares will not be registered under the Securities Act or listed on any exchange as of the Effective Date and will not meet the eligibility requirements of DTC, Euroclear Bank SA/NV, and/or Clearstream Banking S.A. Additional information relating to the applicability of the securities law is available in Article IV.M.

(b)     *Issuance of the New Warrants*

The issuance of the New Warrants shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims other than as set forth herein. Each distribution and issuance of the New Warrants under this Plan shall be governed by the New Warrant Agreements. Any claimant's acceptance of the New Warrants (including any New Warrant Shares) shall be deemed as its agreement to the applicable New Warrant Agreement and the New LYCRA Holdco Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with its terms.

3.      New Debt.

On the Effective Date, the relevant Reorganized Debtors shall (a) enter into the Exit Notes Facility, pursuant to the Exit Notes Facility Documents, (b) issue the New LYCRA Holdco Notes pursuant to the New LYCRA Holdco Notes Documents, and (c) issue the DIP Exit Note pursuant to the DIP Note Purchase Agreement and any documents relating to, evidencing, or governing the DIP Exit Note. Confirmation of this Plan shall constitute (x) final approval of the New Debt and the New Debt Documents; and (y) authorization for the Debtors and the Reorganized Debtors, as applicable, to take any and all actions necessary or appropriate to consummate the New Debt, including executing and delivering the New Debt Documents, in each case, without any further notice to or order of the Bankruptcy Court. On the Effective Date, the New Debt shall be issued and distributed as provided for, and in accordance with, this Plan.

As of the Effective Date, subject to local Law requirements, all of the Liens and security interests to be granted by the Debtors or Reorganized Debtors, as applicable in accordance with the New LYCRA Holdco Notes Documents and the Exit Notes Facility Documents: (a) shall be deemed to be granted; (b) shall be legal, valid, binding, automatically perfected, non-avoidable, first-priority and enforceable Liens on, and security interests in, the applicable collateral specified in the New LYCRA Holdco Notes Documents and the Exit Notes Facility Documents; and (c) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law. To the extent provided in the New LYCRA Holdco Notes Documents and the Exit

Notes Facility Documents, the New Debt Agents/Trustee are authorized to file with the appropriate authorities mortgages, financing statements and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests. The priorities of such Liens and security interests shall be as set forth in the New LYCRA Holdco Notes Documents and the Exit Notes Facility Documents. The applicable New Debt Agents/Trustee shall be authorized to make all filings and recordings necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties. The guarantees granted under the New Debt Documents, as applicable, have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed to not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy Law.

E.      *Corporate Existence.*

Except as otherwise provided in this Plan, the Confirmation Order, the New LYCRA Holdco Organizational Documents, or any agreement, instrument, or other document incorporated therein, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, company with limited liability, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, company with limited liability, or other form, as the case may be, pursuant to the applicable Law in the jurisdiction in which such Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under this Plan or otherwise, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings, approvals, or consents required under applicable state, provincial, federal, or local Law). After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, Causes of Action, or other encumbrances. On and after the Effective Date, except as otherwise provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. For the avoidance of doubt, no Reorganized Debtor shall be treated as being liable on any Claim that is discharged pursuant to this Plan.

G.      *Cancellation of Existing Securities, Agreements, and Interests.*

On the Effective Date and subject to local Law requirements, other than the New Debt, or to the extent otherwise provided in this Plan or the Confirmation Order (including to the extent any DIP Claim is refinanced and/or converted into the Exit Notes Facility), as applicable, all notes, instruments, certificates, credit agreements, note purchase agreements, indentures, and other documents evidencing Claims (including, for the avoidance of doubt, the ssTL Facility Agreement, the Euro Notes Indenture, the Dollar Notes Indenture, and the Promissory Note, and all related collateral and credit documentation) shall hereby be cancelled/waived, and any rights of any Holder in respect thereof shall be deemed cancelled and of no force or effect, and all prior, present and future obligations and liabilities, actions, suits, accounts or demands, covenants, and indemnities (both actual and contingent), of the Debtors and any non-Debtor Affiliates, or any other parties thereunder, or in any way related thereto, shall be deemed satisfied in full, released, cancelled, discharged, and of no force or effect, as the amounts thereunder are considered uncollectable (*niet voor verwezenlijking vatbaar*), and the Agents/Trustees and each of the lenders and holders and their respective agents, successors and assigns, shall each be automatically and fully released and discharged of and from all duties and obligations thereunder without any need for further action or approval by the Bankruptcy Court or for a Holder to take further action.

H.      *Corporate Action.*

Upon the Confirmation Date, all actions contemplated under this Plan (including the other documents contained in the Plan Supplement) shall be deemed authorized and approved by the Bankruptcy Court in all respects without any further corporate or equity holder action, including, as applicable: (1) adoption or assumption, as applicable, of the employment agreements; (2) selection of the directors, officers, or managers for the Reorganized Debtors in accordance with the New LYCRA Holdco Organizational Documents; (3) the issuance and distribution of the New LYCRA Holdco Common Stock (excluding the MIP Shares); (4) implementation of the Restructuring Transactions; (5) the entry into the New Debt Documents, as applicable, and the execution, delivery, and filing of any documents pertaining thereto; (6) all other actions contemplated under this Plan (whether to occur before, on, or after the Effective Date); (7) adoption of the New LYCRA Holdco Organizational Documents; (8) the entry into the New Warrant Agreements, (9) the assumption or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases that have not been rejected or subject to a motion to reject as of the Confirmation Hearing; and (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by this Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors, as applicable, in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security Holders, members, directors, officers, or managers of the Debtors or the Reorganized Debtors, as applicable. On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors and the Reorganized Debtors shall be authorized and directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Reorganized Debtors, including the New LYCRA Holdco Common Stock, the New Debt Documents, the New LYCRA Holdco Organizational Documents, any other applicable Definitive Document, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy Law.

I.      *New LYCRA Holdco Organizational Documents.*

On or immediately prior to the Effective Date, except as otherwise provided in this Plan and subject to local Law requirements, the New LYCRA Holdco Organizational Documents shall be automatically adopted or amended

32

by the Reorganized Debtors as may be necessary to effectuate the transactions contemplated by this Plan. To the extent required under this Plan or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New LYCRA Holdco Organizational Documents with the Secretaries of State and/or other applicable authorities in its respective state, province, or country of incorporation in accordance with the corporate Laws of the respective state, province, or country of incorporation to the extent such filing is required for each such document. The New LYCRA Holdco Organizational Documents and New LYCRA Topco corporate authorizations adopted prior to the Effective Date will, among other things (a) authorize the issuance of the New LYCRA Holdco Common Stock and (b) prohibit the issuance of non-voting Equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their respective New LYCRA Holdco Organizational Documents as permitted by the Laws of its jurisdiction of incorporation or formation and in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the Laws of the respective states, provinces, or countries of incorporation or formation and the New LYCRA Holdco Organizational Documents.

*J.      Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, subject to local Law requirements, the term of the current members of the board of directors or other Governing Body of each of the Debtors shall expire, such current directors shall be deemed to have resigned, and all of the directors for the initial term of the New LYCRA Holdco Board and the other Governing Bodies shall be appointed in accordance with the New LYCRA Holdco Organizational Documents. The initial members of the New LYCRA Holdco Board will be identified in the Plan Supplement, to the extent known and determined at the time of filing and shall be consistent with the New LYCRA Holdco Organizational Documents. Each such member and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the New LYCRA Holdco Organizational Documents and other constituent documents of the Reorganized Debtors.

*K.      Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers, as applicable, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan and the Securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

*L.      Certain Securities Law Matters.*

Before the Petition Date, the offering, issuance, allotment, and distribution of any shares of New LYCRA Holdco Common Stock and/or the offering, issuance, and distribution of any other debt or equity securities as contemplated herein and/or pursuant to this Plan (including, for the avoidance of doubt, the New Warrants (including the New Warrant Shares received with respect thereto) and the New Debt) (any such debt or equity securities, the "Other Securities") shall only be made to Holders of Claims that can certify that they are (i) located inside of the United States and are (a) "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) or (b) "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act), or (ii) located outside the United States and are not "U.S. persons" (as defined in Rule 902 under the Securities Act) and shall be exempt from, or not subject to, the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or in reliance on Regulation S under the Securities Act.

On and after the Petition Date, pursuant to section 1145 of the Bankruptcy Code, or, to the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration,

33

the offering, issuance, allotment, and distribution of the New LYCRA Holdco Common Stock as contemplated herein and/or the offering, issuance, allotment, and distribution of the New Warrants and the New Warrant Shares, if any, shall be exempt from, or not subject to, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. federal, state, or local Laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.

The New LYCRA Holdco Common Stock, the New Warrants (other than the New Class A1 Warrants), and the New Warrant Shares received with respect thereto, if any, to be issued under this Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof, subject to: (a) such recipients not being, and have not been within ninety (90) days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (b) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, (c) compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission or state or local securities laws, if any, applicable at the time of any future transfer of such Securities or instruments; and (d) any restrictions on the transferability of such New LYCRA Holdco Common Stock, New Warrants, and New Warrant Shares in the New LYCRA Holdco Organizational Documents or New Warrant Agreements, as applicable.

To the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, the New LYCRA Holdco Common Stock, New Warrants, and New Warrant Shares, if any, will be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from or in a transaction not subject to the registration requirements of the Securities Act and subject to any restrictions on the transferability of such New LYCRA Holdco Common Stock, New Warrants, and New Warrant Shares in the New LYCRA Holdco Organizational Documents or New Warrant Agreements, as applicable.

On and after the Petition Date, pursuant to section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, the offering, issuance, allotment and distribution of the New Debt, the New Class A1 Warrants (issued in satisfaction of the DIP Commitment Premium), and the MIP Shares (issued pursuant to the Management Incentive Plan), if any, shall only be made to Holders that can certify that they are (i) located inside of the United States and are (a) "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) or (b) "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act), or (ii) located outside the United States and are not "U.S. persons" (as defined in Rule 902 under the Securities Act) and will be exempt from, or not subject to, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. federal, state, or local Laws requiring registration prior to the offering, issuance, distribution, or sale of Securities.

The New Debt, the New Class A1 Warrants (issued in satisfaction of the DIP Commitment Premium), and the MIP Shares to be issued under this Plan on account of Allowed Claims in accordance with, and pursuant to, the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act, will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from or in a transaction not subject to the registration requirements of the Securities Act and subject to any restrictions on the transferability of such New LYCRA Holdco Organizational Documents, New Warrant Agreements, New LYCRA Holdco Notes Documents or Exit Notes Facility Documents, as applicable.

Recipients of the New LYCRA Holdco Common Stock, New Warrants and New Warrant Shares, if any, are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws for resales of New LYCRA Holdco Common Stock, New Warrants and New Warrant Shares.

On and after the Effective Date, a recipient who is eligible to receive the Other Securities:

i.      if resident in, located in, or has a registered office in a Member State of the EEA, is not a retail investor (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU (as amended, "MiFID II"); (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a qualified investor as defined in Article 2 of the Prospectus Regulation (each, an "**EEA Retail Investor**")); and

ii.     if resident in, located in, or has a registered office in the United Kingdom, not a retail investor (defined as a person who is neither (x) a professional client, as defined in point (8) of Article 2(1) of regulation (EU) no 600/2014 as it forms part of domestic law by virtue of the European Union Withdrawal Act (the "EUWA"); nor (y) a qualified investor as defined in paragraph 15 of schedule 1 to The Public Offers and Admissions to Trading Regulations 2024 (the "UK POATRs") (each, a "**UK Retail Investor**" and, together with an EEA Retail Investor, a "**Retail Investor**").

The Reorganized Debtors need not provide any further evidence other than this Plan or the Confirmation Order to any Entity (including DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., any nominee thereof or any transfer agent for the New LYCRA Holdco Common Stock or the New Warrant Shares) with respect to the treatment of the New LYCRA Holdco Common Stock and any New Warrant Shares to be issued under this Plan under applicable securities laws. DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., any nominee thereof and any transfer agent for the New LYCRA Holdco Common Stock or the New Warrant Shares shall be required to accept and conclusively rely upon this Plan and Confirmation Order in lieu of a legal opinion regarding whether the New LYCRA Holdco Common Stock or the New Warrant Shares to be issued under this Plan are exempt from registration and/or eligible for DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., book-entry delivery, settlement, and depository (to the extent applicable). Notwithstanding anything to the contrary in this Plan, no Entity (including DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., any nominee thereof and any transfer agent for the New LYCRA Holdco Common Stock or the New Warrant Shares) may require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether the New LYCRA Holdco Common Stock or the New Warrant Shares to be issued under this Plan are exempt from registration.

Notwithstanding any policies, practices, or procedures of DTC, Euroclear, or Clearstream, DTC, Euroclear, and Clearstream shall cooperate with and take all actions reasonably requested by a distribution agent or an indenture trustee to facilitate distribution to Holders of Allowed Claims without requiring that such distributions be characterized as repayments of principal or interest.  No distribution agent or indenture trustee shall be required to provide indemnification or other security to DTC, Euroclear, or Clearstream in connection with any distributions to Holders of Allowed Claims through the facilities of DTC, Euroclear, or Clearstream.

This Plan is not a prospectus within the meaning and for the purposes of the Regulation 2017/1129/EU (as amended, the "Prospectus Regulation") or the UK POATRs.

This Plan has been prepared on the basis that any offer or sale of securities issued in connection with this Plan within any Member State of the EEA will be made pursuant to an exemption under the Prospectus Regulation from the requirement to publish a prospectus for the offer of transferable securities to the public. In relation to each EEA Member State, no offer or sale of the Other Securities issued in connection with this Plan may be made to the public

35

at any time other than pursuant to an exemption under the Prospectus Regulation. In any EEA Member State, this Plan and documents related thereto are only addressed to and directed at qualified investors in that jurisdiction within the meaning of the Prospectus Regulation.

Accordingly, the Other Securities are not being offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to a retail investor in the EEA (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of MiFID II; (y) a customer within the meaning of the Directive 2016/97/EU (as amended, the "Insurance Distribution Directive"), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a qualified investor as defined in Article 2 of the Prospectus Regulation.

Further, no key information document is required to be prepared and none has been prepared in line with the requirements of the Regulation 1286/2014/EU (as amended, the "PRIIPs Regulation") in relation to any issue of the Other Securities.

This Plan has been prepared on the basis that any offer or sale of securities issued in connection with this Plan in the United Kingdom will be made pursuant to an exception from the general prohibition of offers to the public under the UK POATRs. In relation to the United Kingdom, no offer or sale of any Other Securities issued in connection with this Plan may be made to the public at any time other than pursuant to an exception from the general prohibition of offers to the public under the UK POATRS. In the United Kingdom, this Plan and documents related thereto are only addressed to and directed at qualified investors within the meaning of the UK POATRS. Accordingly, Other Securities are not being offered, sold, or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the United Kingdom (defined as a person who is neither (x) a professional client, as defined in point (8) of Article 2(1) of regulation (EU) no 600/2014 as it forms part of domestic law by virtue of the EUWA; nor (y) a qualified investor as defined in paragraph 15 of schedule 1 to the UK POATRS (each, a "UK Retail Investor")).

Further, no key information document is required to be prepared, and none has been prepared in line with the requirements of the PRIIPs Regulation as it forms part of United Kingdom domestic law by virtue of the EUWA (the "UK PRIIPs Regulation") in relation to any issue of the Other Securities.

In the United Kingdom, the information contained in this Plan or any documents related thereto (including, without limitation, this Plan) is intended only for use and may only be relied upon in relation to any investment activity by, and any investment activity to which such information relates may only be engaged in by, persons who are at the relevant time: (i) Investment Professionals within the meaning of Article 19(5) of The Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 of the United Kingdom (the "Order"); (ii) persons falling within the meaning of Articles 49(2)(a) to (d) of the Order; or (iii) persons to whom the communication may otherwise lawfully be communicated under FSMA (together, the "Permitted UK Persons"). Any person in the United Kingdom that is not a Permitted UK Person is not, for the purposes of any investment or investment decision, an intended recipient of the information contained in this Plan or any document related thereto and should not use such information as the basis for taking any investment activity or investment action. This Plan and any document related thereto should not (insofar as they relate to any investment or investment activity) be distributed, communicated to, or directed at the general public in the United Kingdom otherwise than as described above.

*M.     Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under this Plan or pursuant to (1) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New LYCRA Holdco Common Stock, (2) the Restructuring Transactions, (3) the

creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (4) the making, assignment, or recording of any lease or sublease, (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the New Debt, or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

N.      *Employee Compensation and Benefits.*

1.      Compensation and Benefits Programs.

Except as otherwise set forth herein, on the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall (a) assume all employment agreements, indemnification agreements, or other employment-related agreements entered into with current or former employees who are employees as of the Petition Date or (b) solely with the consent of the Required Consenting Creditors, enter into new agreements with such employees on terms and conditions acceptable to the Reorganized Debtors and such employees.

A counterparty to or participant in a Compensation and Benefits Program assumed pursuant to this Plan shall have the same rights under such Compensation and Benefits Program as such counterparty had thereunder immediately prior to such assumption (unless otherwise agreed by such counterparty and the applicable Reorganized Debtor(s)); *provided* that any assumption of Compensation and Benefits Programs pursuant to this Plan or any of the Restructuring Transactions shall not (a) trigger or be deemed to trigger any change of control, change in control immediate vesting, termination, or similar provisions therein or (b) trigger or be deemed to trigger an event of "Good Reason" (or a term of like import) as a result of the consummation of the Restructuring Transactions or any other transactions contemplated by this Plan.

2.      Workers' Compensation Programs.

As of the Effective Date, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation Laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in this Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable Law, including non-bankruptcy Law with respect to any such contracts, agreements, policies, programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable non-bankruptcy Law.

O.      *Director and Officer Liability Insurance.*

Notwithstanding anything in this Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in this Plan, Confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under this Plan as to which no Proof of Claim need be Filed.

The Reorganized Debtors shall not terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies in effect or purchased as of the Petition Date (including any policy or endorsement providing for an extended claims-reporting period to the extent procured prior to the Petition Date), and all "Insureds" of the Debtors who served in such capacity at any time prior to the Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions on or after the Effective Date. The Debtors shall procure and pay for any New D&O Policies to become effective as of the Effective Date.

P.      *Management Incentive Plan.*

Following the Effective Date, the New LYCRA Holdco Board shall adopt the Management Incentive Plan, which will provide for the grants of equity and equity-based awards to employees, directors, consultants, and/or other service providers of the Reorganized Debtors, as determined at the discretion of the New LYCRA Holdco Board. The terms and conditions, including with respect to participants, allocation, timing, and the form and structure of the equity or equity-based awards, shall be determined at the discretion of the New LYCRA Holdco Board after the Effective Date.

Q.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of this Plan to the contrary, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in this Plan, including in Article VIII hereof.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the RSA, this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available retained Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity, except as otherwise expressly provided in this Plan.** The Reorganized Debtors may settle any such retained Cause of Action without further notice to or action, order, or approval of the Bankruptcy Court. Unless any retained Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial,

38

equitable, or otherwise), or laches, shall apply to such retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Prepackaged Cases or pursuant to this Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any retained Causes of Action that a Debtor may hold against any Entity shall vest in the corresponding Reorganized Debtor, except as otherwise expressly provided in this Plan, including Article VIII hereof, or pursuant to a Bankruptcy Court order. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such retained Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

R.      *Cashless Transactions.*

Notwithstanding anything to the contrary set forth herein, the treatment of Claims, distributions, and other transactions contemplated hereby, including, without limitation, the funding of the New Debt, if any, may, at the election of the applicable participating parties, be effectuated by netting or other form of cashless implementation.

S.      *Helm Agreements.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to this Plan, the provisions of the Helm Agreements constitute a good-faith compromise and settlement of all Claims, Causes of Action, controversies, and other matters resolved pursuant to the Helm Agreements. The entry of the Confirmation Order shall constitute the Bankruptcy Court's final approval and assumption of the Helm Agreements pursuant to sections 365 and 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that the Helm Agreements are in the best interests of the Debtors, their estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. As of the Effective Date, the Helm Entities are directed to comply with their obligations under the Helm Agreements. Subject to the terms of the Helm Agreements, the Debtors, with the consent of the Required Consenting Creditors, reserve the right to modify or amend the Helm Agreements without further notice to or action, order, or approval of the Bankruptcy Court in accordance with the terms thereof.

## ARTICLE V.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, all Executory Contracts and Unexpired Leases that have not been rejected or subject to a motion to reject as of the Confirmation Hearing (other than the Rejected Helm Agreements, which shall be deemed rejected in accordance with and subject to the Helm Settlement Agreement) shall be deemed assumed by the applicable Reorganized Debtor without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease was: (a) previously assumed, amended and assumed, assumed and assigned, or rejected by the applicable Debtors; (b) previously expired or terminated pursuant to its own terms; (c) the subject of a motion to reject such executory contract or unexpired lease that is pending on the Effective Date; or (d) is identified on the Rejected Executory Contract and Unexpired Lease List; *provided* that neither the Restructuring Transactions or any actions contemplated by this Plan shall be deemed a "change of control" or other acceleration event for purposes of any Executory Contract or Unexpired Lease of the Debtors.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in this Plan, the Assumed Executory Contract and Unexpired Lease List, or the Rejected Executory Contract and Unexpired Lease List, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to this Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors, with the reasonable consent of the Required Consenting Creditors.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption of the RSA pursuant to sections 365 and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date. The RSA shall be binding and enforceable against the parties to the RSA in accordance with its terms. For the avoidance of doubt, the assumption of the RSA herein shall not otherwise modify, alter, amend, or supersede any of the terms or conditions of the RSA including, without limitation, any termination events or provisions thereunder.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Prepackaged Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in this Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contract and Unexpired Lease List and Rejected Executory Contract and Unexpired Lease List (with the reasonable consent of the Required Consenting Creditors) at any time through and including forty-five (45) days after the Effective Date.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the

Confirmation Order, if any, must be Filed with the Bankruptcy Court no later than thirty (30) days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.F of this Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to Article III.B of this Plan and may be objected to in accordance with the provisions of Article VII of this Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

*C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

The Debtors or the Reorganized Debtors, as applicable, shall pay the Cure amounts, if any, on the Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated by the underlying agreements and/or the ordinary course of business among the parties thereto, as applicable. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the ordinary course amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Claims and Noticing Agent on or before thirty (30) days after the Effective Date. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure in the Debtors' ordinary course of business; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under this Plan must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure amount, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure amount shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise and full payment of any applicable Cure pursuant to this Article V, in the amount and at the time dictated by the Debtors' ordinary course of business, shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest

41

composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Prepackaged Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this <u>Article V</u>, in the amount and at the time dictated by the Debtors' ordinary course of business, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.      *Indemnification Obligations.*

To the fullest extent permitted under applicable Law, all indemnification obligations in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, limited partnership agreements, articles of association, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the benefit of current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, creditors, and other professionals of, or acting on behalf of, the Debtors (each in their capacities as such), as applicable, shall be (a) reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of, or acting on behalf of, the Debtors than the indemnification provisions in place prior to the Effective Date, and (b)  assumed by the Reorganized Debtors.

E.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under this Plan. Unless otherwise provided in this Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

F.      *Reservation of Rights.*

Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Reorganized Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under this Plan.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtor liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in this Plan, on, or as soon as reasonably practicable after, the Effective Date (or, if a Claim or Interest is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim, as applicable, shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided in this Plan, Holders of Allowed Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding the foregoing, (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Prepackaged Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Allowed Priority Tax Claims shall be paid in accordance with Article II.B of this Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy Law or in the ordinary course of business.

B.      *Disbursing Agent.*

All distributions under this Plan shall be made by the Disbursing Agent on the Effective Date. The Disbursing Agent shall not be required to give any bond or surety or other Security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

All Plan Distributions to any Disbursing Agent on behalf of the Holders of Claims listed on the Claims Register (or the designees of such Holders, as applicable) shall be deemed completed by the Debtors when received by such Disbursing Agent. Distributions under this Plan shall be made to any such Holders (or the designees of such Holders, as applicable) by the applicable Disbursing Agent.

C.      *Rights and Powers of Disbursing Agent.*

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent (including the Agents/Trustees) on or after the Effective Date (including taxes), and

any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date (or the designees of such Holders, as applicable).

For the avoidance of doubt, the Distribution Record Date shall not apply to Securities held through DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., as applicable, which shall receive distributions in accordance with the applicable procedures of DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., as applicable.

2.      Delivery of Distributions in General.

Except as otherwise provided herein or in the Plan Supplement, the Disbursing Agent shall make distributions to Holders of Allowed Claims, as of the Distribution Record Date, or, if applicable, to such Holder's designee, as appropriate: (a) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date; (b) to the signatory set forth on any Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have not been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Disbursing Agent, as appropriate, after the date of any related Proof of Claim; or (d) on any counsel that has appeared in the Prepackaged Cases on the Holder's behalf; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

For the avoidance of doubt, the Distribution Record Date shall not apply to Securities held through DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., as applicable, which shall receive distributions in accordance with the applicable procedures of DTC, Euroclear Bank SA/NV and/or Clearstream Banking S.A., as applicable.

Notwithstanding the foregoing, (a) all distributions on account of DIP Claims will be made to the applicable DIP Agent, and the DIP Agent will be, and will act as, the distribution agent with respect to the DIP Claims in accordance with the terms and conditions of this Plan and the applicable debt documents; (b) all distributions on account of ssTL Claims will be made to the ssTL Agent, and the ssTL Agent will be, and will act as, the distribution agent with respect to the ssTL Claims in accordance with the terms and conditions of this Plan and the applicable debt documents; (c) all distributions on account of Euro Notes Claims will be made to the Euro Notes Trustee and the Euro Notes Trustee will be, and will act as, the distribution agent with respect to the Euro Notes Claims in accordance with the terms and conditions of this Plan and the applicable debt documents; and (d) all distributions on account of Dollar Notes Claims will be made to the Dollar Notes Trustee, and the Dollar Notes Trustee will be, and will act as, the distribution agent with respect to the Dollar Notes Claims in accordance with the terms and conditions of this Plan and the applicable debt documents.

3.      No Fractional Distributions.

No fractional New LYCRA Holdco Notes, fractional New Warrants or fractional shares of New LYCRA Holdco Common Stock shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to this Plan on account of an Allowed Claim, as applicable, would otherwise result in the issuance of a number of New LYCRA Holdco Notes, New Warrants or shares of New LYCRA Holdco Common Stock

44

that is not a whole number, the actual distribution of New LYCRA Holdco Notes, New Warrants or shares of New LYCRA Holdco Common Stock shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor. To the minimum extent necessary, the total number of New LYCRA Holdco Notes, New Warrants and authorized shares of New LYCRA Holdco Common Stock to be distributed under this Plan shall be adjusted as necessary to account for the foregoing rounding.

4.      Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims or Allowed Interests (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property Laws to the contrary), and the Claim of any Holder of Claims to such property or interest in property shall be cancelled, released, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws, or any provisions in any document governing the distribution of such unclaimed property.

E.      *Surrender of Cancelled Instruments or Securities.*

On the Effective Date, or as soon as reasonably practicable thereafter, each Holder (and the applicable agents for such Holder, including the Agents/Trustees) of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.G hereof, shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors and any non-Debtor Affiliates, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties (other than the non-Debtor Affiliates) in respect of one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for the purposes of allowing Holders to receive distributions under this Plan, charging Liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary in this Plan, the foregoing shall not apply to certificates or instruments evidencing Claims or Interests that are Unimpaired under this Plan.

F.      *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

G.      *Compliance with Tax Requirements.*

In connection with this Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the Disbursing Agent, and any applicable withholding or reporting agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, any applicable withholding or reporting agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are

reasonable and appropriate. The Debtors and the Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

H.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the RSA, this Plan, the DIP Orders, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy Law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

J.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than United States dollars shall be automatically deemed converted to the equivalent United States dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Effective Date.

K.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all Claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all Claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.G hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

L.      *Claims Paid or Payable by Third Parties.*

        1.      Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a

Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within five (5) Business Days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the five (5) Business Days grace period specified above until the amount is fully repaid.

2.      Claims Payable by Third Parties.

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy or is found liable for satisfying in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then, immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article III of this Plan), nothing contained in this Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers, under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Disputed Claims Process.*

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under this Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Prepackaged Cases had not been commenced, except that (unless expressly waived pursuant to this Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. All Proofs of Claim Filed in these Prepackaged Cases shall be considered objected to and Disputed without further action by the Debtors or Reorganized Debtors. Upon the Effective Date, all Proofs of Claim Filed against the Debtors, regardless of the time of filing, and including Proofs of Claim Filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim, as applicable, under this Plan. Notwithstanding the foregoing, Entities must File Cure objections as set forth in Article V.C of this Plan to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty. **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred,**

**estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.      *Allowance of Claims.*

After the Effective Date and subject to the terms of this Plan, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date. The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be Allowed under applicable non-bankruptcy Law.

C.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in this Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to this Plan.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable non-bankruptcy Law. If the Debtors or Reorganized Debtors, as applicable, dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Prepackaged Cases had not been commenced and shall survive the Effective Date. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all Claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Prepackaged Cases had not been commenced.

To the maximum extent required by applicable Law, any Person or Entity who the Debtors or Reorganized Debtors reasonably believe has relevant information related to any Disputed Claim shall provide such assistance, cooperation or testimony as the Debtors or the Reorganized Debtors may request from time to time.

D.      *Estimation of Claims.*

Before or after the Effective Date, the Debtors, with the reasonable consent of the Required Consenting Creditors, or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in this Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under this Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

*E.        Adjustment to Claims Without Objection.*

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged (including pursuant to this Plan) on the Claims Register by the Debtors or Reorganized Debtors or the Claims and Noticing Agent without the Debtors or Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

*F.        Disallowance of Claims.*

Except as otherwise expressly set forth herein, and subject to the terms hereof, including Article VIII, all Claims of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (1) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

*G.        No Distributions Pending Allowance.*

Notwithstanding any other provision of this Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; *provided* that if only the Allowed amount of an otherwise valid Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount pending resolution of the dispute.

*H.        Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan. On or as soon as reasonably practicable after the next Distribution Date after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

*A.        Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided herein, or in any contract, instrument, or other agreement or document created pursuant to this Plan, the distributions, rights, and treatment that are provided herein shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims that the Debtors resolve or compromise after the Effective Date), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services that employees of the Debtors have performed prior to the Effective Date,

and that arise from a termination of employment, any contingent or noncontingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted this Plan. Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the filing of the Prepackaged Cases shall be deemed cured (and no longer continuing) as of the Effective Date. Without prejudice to the distributions, rights, and treatment that are provided by this Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date, and, upon the Effective Date, all Holders of such Claims and Interests shall be forever precluded and enjoined, pursuant to Section 524 of the Bankruptcy Code, from prosecuting or asserting any such Claim or Interest against the Debtors, Reorganized Debtors, or any of their assets or property.

B.      *Release of Liens.*

**Except as otherwise provided in the New Debt Documents, this Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, benefit, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder, including the Agents/Trustees) and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors or the Reorganized Debtors, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

C.      *Releases by the Debtors.*

**Except as otherwise provided in this Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, including the obligations of the Debtors under this Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by this Plan, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, their Estates, the Reorganized Debtors, and any Person seeking to exercise the rights of the Debtors or their Estates, including**

any successors to the Debtors or any Estates or any Estate representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever, including any Avoidance Actions and any derivative Claims, asserted or assertable on behalf of any of the Debtors, Reorganized Debtors, and their Estates, whether liquidated or unliquidated, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, contingent or noncontingent, in Law, equity, contract, tort or otherwise, that the Debtors, their Estates, or the Reorganized Debtors, including any successors to the Debtors or any Estate representatives appointed or selected, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Reorganized Debtors, their Estates, or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, any related adversary proceedings, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the decision to file the Prepackaged Cases, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into or filing of the RSA, the DIP Notes Facility, the DIP Documents, the New LYCRA Holdco Common Stock, the New Warrants, the New Debt, the New Debt Documents, the Disclosure Statement, this Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Prepackaged Cases, any other Definitive Document or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by this Plan or the reliance by any Released Party on this Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the DIP Notes Facility, the DIP Documents, the New LYCRA Holdco Common Stock, the New Warrants, the New Debt, the New Debt Documents, the Disclosure Statement, this Plan, the Plan Supplement, any other Definitive Document, or any Restructuring Transactions before or during the Prepackaged Cases, the filing of the Prepackaged Cases, the Disclosure Statement or this Plan, the solicitation of votes with respect to this Plan, the pursuit of Confirmation, the pursuit of Consummation of the Restructuring Transactions, the administration and implementation of this Plan and the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any Causes of Action identified in the Schedule of Retained Causes of Action, *provided* that, for the avoidance of doubt, no Causes of Action against any Consenting Creditor shall be included on such Schedule of Retained Causes of Action, (ii) any post-Effective Date obligations of any party or Entity under this Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including any Definitive Document, the Helm Agreements, the New Debt Documents, the New LYCRA Holdco

51

Organizational Documents, and other documents set forth in the Plan Supplement) executed to implement this Plan or any Claim or obligation arising under this Plan, (iii) any Released Party from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, or (iv) any of the Debtors', Reorganized Debtors' and wholly-owned non-Debtor affiliates (as applicable) claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing this Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.      *Releases by the Releasing Parties.*

Except as otherwise provided in this Plan or the Confirmation Order to the contrary, on and after the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under this Plan and the contributions and services of the Released Parties in facilitating the implementation of the restructuring contemplated by this Plan, the adequacy of which is hereby confirmed, pursuant to section 1123(b) of the Bankruptcy Code, in each case except for Claims arising under, or preserved by, this Plan, to the fullest extent permitted under applicable Law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged by each and every Releasing Party, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever, including any Avoidance Actions and any derivative claims asserted, whether liquidated or unliquidated, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, contingent or noncontingent, in Law, equity, contract, tort, or otherwise, including any derivative Claims asserted or assertable on behalf of any of the Debtors, that such Entities would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Reorganized Debtors, or their Estates or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, and their Estates (including the capital structure, management, ownership, or operation thereof), the Prepackaged Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, any related adversary proceedings, intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or an Affiliate of a Debtor, the decision to file the Prepackaged Cases, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or Filing of the RSA, the DIP Notes Facility, the DIP Documents, the New LYCRA Holdco Common

Stock, the New Warrants, the New Debt, the New Debt Documents, the Disclosure Statement, this Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Prepackaged Cases, any other Definitive Document or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by this Plan or the reliance by any Released Party on this Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the DIP Notes Facility, the DIP Documents, the New LYCRA Holdco Common Stock, the New Warrants, the New Debt, the New Debt Documents, the Disclosure Statement, this Plan, the Plan Supplement, any other Definitive Document, or any Restructuring Transactions before or during the Prepackaged Cases, the filing of the Prepackaged Cases, the Disclosure Statement, or this Plan, the solicitation of votes with respect to this Plan, the pursuit of Confirmation, the pursuit of Consummation of the Restructuring Transactions, the administration and implementation of this Plan and the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) to the extent that any Causes of Action against any releasing Party are not released or discharged pursuant to this Plan, any rights of such Releasing Party to assert any and all counterclaims, crossclaims, claims for contribution, defenses, and similar claims in response to such Causes of Action (provided that no such third-party claims or claims for contribution or similar claims may be asserted against the Debtors or the Reorganized Debtors to the extent such claims have been released or discharged pursuant to this Plan), (b) any post-Effective Date obligations of any party or Entity under this Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including any Definitive Document, the Helm Agreements, the New Debt Documents, the New LYCRA Holdco Organizational Documents, and other documents set forth in the Plan Supplement) executed to implement this Plan or any Claim or obligation arising under this Plan, or (c) any Released Party from any claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of this Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing this Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

E.    *Exculpation.*

Notwithstanding anything contained in this Plan to the contrary, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or Third-Party Release, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any Claim arising from the Petition Date

53

**through the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Prepackaged Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the Definitive Documents, the New LYCRA Holdco Common Stock, the New Warrants, the New Debt, the New Debt Documents, the Disclosure Statement, this Plan, the Plan Supplement, the Restructuring Transactions, the DIP Notes Facility, the DIP Documents, or any wind down transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by this Plan or the reliance by any Released Party on this Plan or the Confirmation Order in lieu of such legal opinion) in connection with the RSA and related prepetition transactions, the Definitive Documents, the New LYCRA Holdco Common Stock, the New Warrants, the New Debt, the New Debt Documents, the Disclosure Statement, this Plan, the Plan Supplement, the Restructuring Transactions, the DIP Notes Facility, the DIP Documents, any preference, fraudulent transfer, or other avoidance Claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable Law, the filing of the Prepackaged Cases, the pursuit of Confirmation, the pursuit of consummation of the Restructuring Transactions, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.**

*F.      Injunction.*

**Except as otherwise expressly provided in this Plan or in the Confirmation Order, or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been extinguished, released, discharged, or are subject to exculpation, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, and the Released Parties: (1) commencing, conducting, or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (2) enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has timely filed a motion with the Bankruptcy Court expressly requesting the right to perform such setoff, subrogation or recoupment on or before the Effective Date, and notwithstanding an indication of a Claim, Interest, or Cause of Action or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to this Plan.**

**No Person or Entity may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising**

**out of a Claim or Cause of Action, as applicable, subject to Article VIII.C, Article VIII.D, and Article VIII.E hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim not released or subject to exculpation under this Plan, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party. The injunction in this Plan shall extend to any successors and assigns of the Debtors and the Reorganized Debtors and their respective property and interests in property.**

**The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.**

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Prepackaged Cases (or during the Prepackaged Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Prepackaged Cases.

H.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN**

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.      there shall not have been instituted or be pending any action, proceeding, application, claim, counterclaim, or investigation (whether formal or informal) (or there shall not have been any material adverse development to any action, application, claim, counterclaim, or proceeding currently instituted, threatened, or pending) before or by any court, governmental, regulatory, or administrative agency or instrumentality, domestic or foreign, or by any other Person, domestic or foreign, in connection with the Restructuring Transactions that, in the

reasonable judgment of the Debtors (or the Required Consenting Creditors), would prohibit, prevent, or restrict Consummation of the Restructuring Transactions;

2.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate this Plan and Restructuring Transactions, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

3.      an order, statute, rule, regulation, executive order, stay, decree, judgment, or injunction shall not have been enacted, entered, issued, promulgated, enforced, or deemed applicable by any court or governmental, regulatory, or administrative agency or instrumentality, domestic or foreign, that, in the reasonable judgment of the Debtors, would prohibit, prevent, or restrict consummation of the Restructuring Transactions;

4.      each document or agreement constituting a Definitive Document shall have been executed or otherwise effectuated as contemplated, shall be in form and substance consistent with the RSA, and otherwise reasonably acceptable to the Required Consenting Creditors, and any and all conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived pursuant to the terms of the applicable Definitive Document;

5.      to the extent invoiced, the payment of all reasonable and documented fees and expenses of the Debtors' professionals (solely if payment of such fees and expenses has been authorized by the Bankruptcy Court, including under the DIP Orders);

6.      all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account;

7.      the Bankruptcy Court shall have entered the Interim DIP Order and the Final DIP Order, each of which shall not have been reversed, stayed, modified, dismissed, vacated, or reconsidered, and the Final DIP Order shall have become a Final Order;

8.      the Bankruptcy Court shall have entered the Confirmation Order, the entered Confirmation Order shall be consistent with the RSA and otherwise in compliance with the consent rights contained therein, the Confirmation Order shall not have been reversed, stayed, modified, dismissed, vacated, or reconsidered, and the Confirmation Order shall have become a Final Order;

9.      the RSA shall not have been terminated as to the Required Consenting Creditors and shall be in full force and effect, and all conditions and terms set forth in the RSA shall have been satisfied or waived in accordance with its terms;

10.     all of the shares of New LYCRA Holdco Common Stock required to be issued hereunder, have been duly issued, allotted, and delivered;

11.     all of the New Warrants shall have been duly issued and delivered;

12.     the Debtors have provided evidence reasonably satisfactory to the Required Consenting Creditors that the Share Transfer has been effectuated in accordance with the Agreed Transfer Process;

13.     the New LYCRA Holdco Organizational Documents shall have been adopted in a manner consistent in all respects with this Plan and the RSA and the consent rights contained herein and therein;

14.     all accrued and unpaid Restructuring Expenses shall have been paid in full in accordance with the RSA;

56

15.     the Debtors have procured and paid for the New D&O Policies (and the "tail" or "run-off" policy shall be purchased on a prepaid, non-cancelable premium basis), and such policies will become effective as of the Effective Date; and

16.     all conditions precedent to the issuance or incurrence of the New Debt shall have been satisfied or duly waived, and the New Debt, including all documentation related thereto, shall be in form and substance satisfactory to the Debtors and in effect.

B.     *Waiver of Conditions.*

The conditions to the Effective Date set forth in this Article IX may be waived only if waived in writing (email from counsel shall suffice) by the Debtors, with the prior written consent of the Required Consenting Creditors, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.

C.     *Effect of Failure of Conditions.*

If Consummation does not occur, this Plan shall be null and void in all respects and nothing contained in the RSA, this Plan, or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors or any Holder of Claims or Interests of any Claim or Interest; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the RSA that survive termination thereof shall remain in effect in accordance with the terms thereof.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

A.     *Modification and Amendments.*

Except as otherwise specifically provided in this Plan, the Debtors reserve the right to modify this Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in this Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, alter, amend, or modify this Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan, or remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan.  Notwithstanding anything to the contrary herein, the Debtors shall not amend or modify this Plan in a manner inconsistent with the RSA.

B.     *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.     *Revocation or Withdrawal of Plan.*

Subject to the RSA, the Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or

compromise embodied in this Plan (including the fixing or limiting to an amount certain, and including the Allowance or disallowance, of all or any portion of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Prepackaged Cases, the Confirmation Order, and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.   allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.   decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan;

3.   resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.   ensure that distributions to Holders of Allowed Claims are accomplished (as applicable) pursuant to the provisions of this Plan;

5.   adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.   adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.   enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with this Plan, the Confirmation Order, or the Disclosure Statement;

8.   enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.  resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan or otherwise in connection with the Prepackaged Cases;

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan or the Confirmation Order;

11. adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, releases, injunctions, discharges, exculpations, and other provisions contained in this Plan, including under Article VIII hereof, whether arising prior to or after the Effective Date, and enter such orders as may be necessary or appropriate to implement and enforce such releases, injunctions, exculpations, and other provisions;

12. adjudicate, decide, or resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.L hereof;

13. enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14. determine any other matters that may arise in connection with or relate to this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan, the Plan Supplement, or the Disclosure Statement; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning any Definitive Document contained in the Plan Supplement that has a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court or arbitration forum;

15. enter an order concluding or closing the Prepackaged Cases;

16. adjudicate any and all disputes arising from or relating to distributions under this Plan or any transactions contemplated herein;

17. consider any modifications of this Plan, to Cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18. determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

20. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

22. enforce all orders previously entered by the Bankruptcy Court in connection with the Prepackaged Cases; and

59

23. hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article IX to the contrary, the New LYCRA Holdco Organizational Documents shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A. *Immediate Binding Effect.*

Subject to Article IX.A hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims or Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim or Interest has voted on this Plan.

B. *Additional Documents.*

On or before the Effective Date, and consistent in all respects with the terms of the RSA, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

C. *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the Prepackaged Cases are converted, dismissed, or closed, whichever occurs first.

D. *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Prepackaged Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Prepackaged Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

E. *Reservation of Rights.*

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

*F.      Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, Related Party, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

*G.      Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.      <u>If to the Debtors, to</u>:

**The LYCRA Company LLC**
2711 Centerville Road, Suite 300
Wilmington, Delaware 19808
Attention:   Catherine Spicer (catherine.spicer@lycra.com)
              Dean Williams (dean.williams@lycra.com)

with copies to:

**Linklaters LLP**
1290 Avenue of the Americas
New York, New York, 10104
Attention:   Michael H. Torkin (michael.torkin@linklaters.com)
              Daniel J. Guyder (daniel.guyder@linklaters.com)
              Christopher J. Hunker (christopher.hunkder@linklaters.com)

– and –

**Linklaters LLP**
20 Ropemaker Street
London, EC2Y 9AR
United Kingdom
Attention:   James Warboys (james.warboys@linklaters.com)
              Liam Robinson (liam.robinson@linklaters.com)

– and –

**Haynes and Boone LLP**
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Attention:   Charles A. Beckham, Jr. (charles.beckham@haynesboone.com)
              Kenric Kattner (kenric.kattner@haynesboone.com)
              Arsalan Muhammad (arsalan.muhammad@haynesboone.com)

2.      If to a member of the Ad Hoc Group or a DIP Noteholder, to:

    **Gibson, Dunn & Crutcher UK LLP**
Telephone House
2-4 Temple Avenue
Temple, London EC4Y 0HB
United Kingdom
Attention:   Matthew Squire (msquire@gibsondunn.com)
                 Christopher J. Howard (choward@gibsondunn.com)

– and –

**Gibson, Dunn & Crutcher LLP**
200 Park Avenue
New York, NY 10166
Attention:   Keith R. Martorana (kmartorana@gibsondunn.com)

– and –

**Gibson, Dunn & Crutcher LLP**
333 South Grand Avenue
Los Angeles, CA 90071
Attention:   Michael G. Farag (mfarag@gibsondunn.com)

– and –

**Gibson, Dunn & Crutcher LLP**
3161 Michelson Drive
Suite 1200
Irvine, CA 92612
Attention:   Suzanne Span (sspan@gibsondunn.com)

3.      If to the DIP Agent, to:

    **GLAS USA LLC**
3 Second Street
Suite 203
Jersey City, New Jersey 07311
United States
Attention:   tmg@glas.agency

– and –

**GLAS Trust Corporation Limited**
2nd Floor,
10 Old Bailey
London, EC4M 7NG
United Kingdom

Attention:   tmg@glas.agency

with copies to:

**Hogan Lovells US LLP**
390 Madison Avenue
New York, New York, 10017
Attention:   Robert Ripin (robert.ripin@hoganlovells.com)

4.      <u>If to a Consenting Creditor, to the notice parties listed on its signature page to the RSA.</u>

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

*H.      Term of Injunctions or Stays.*

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Prepackaged Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect from and after the Effective Date in accordance with their terms.

*I.      Entire Agreement.*

Except as otherwise indicated, this Plan (including the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

*J.      Exhibits.*

All exhibits and documents included in the Plan Supplement are an integral part of this Plan and are incorporated into and are a part of this Plan as if set forth in full in this Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://restructuring.ra.kroll.com/lycra or the Bankruptcy Court's website at https://www.txs.uscourts.gov/page/bankruptcy-court. To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the Plan Supplement exhibit or document shall control.

*K.      Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions

of this Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Exculpated Parties, the directors and officers of any of the Debtors, each of the Debtors and Reorganized Debtors, the DIP Agents and DIP Noteholders, and with respect to the foregoing, the Related Parties thereto will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under this Plan and any previous plan, and, therefore, no such parties nor individuals or the Reorganized Debtors will have any liability for the violation of any applicable Law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and any previous plan.

M.      *Closing of Prepackaged Cases.*

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Prepackaged Cases except for one of the Prepackaged Cases, as determined by the Reorganized Debtors, and all contested matters (if any) relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case. The Reorganized Debtors shall, promptly after the full administration of the Prepackaged Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Prepackaged Cases.

N.      *Waiver or Estoppel.*

On the Effective Date, each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

[*Remainder of page intentionally left blank.*]

65

Dated: March 17, 2026

**THE LYCRA COMPANY LLC**

on behalf of itself and all other Debtors

By:   */s/ Dean Williams*

Name: Dean Williams
Title: Chief Financial Officer

**Exhibit B**

**RSA**

EXECUTION VERSION

**SHORT-FORM LOCK-UP DEED**

**DATED 13 March 2026**

**BETWEEN CERTAIN ENTITIES AS ORIGINAL CONSENTING CREDITORS**

**THE COMPANY PARTIES**

**AND**

**CERTAIN ENTITIES AS ORIGINAL CONSENTING SHAREHOLDERS**

**CONTENTS**

| Clause | | Page |
|---|---|---|
| 1. | Interpretation | 2 |
| 2. | Effectiveness | 13 |
| 3. | Support for the Restructuring | 13 |
| 4. | Milestones | 21 |
| 5. | Accession | 22 |
| 6. | Transfers | 23 |
| 7. | Termination | 25 |
| 8. | Survival | 29 |
| 9. | Notices | 30 |
| 10. | Representations and Warranties | 30 |
| 11. | Amendments, Waivers and Further Assurance | 33 |
| 12. | Limitation of Liability | 34 |
| 13. | Confidentiality | 35 |
| 14. | Third Party Rights; Relationship Among Consenting Creditors | 36 |
| 15. | Specific Performance | 37 |
| 16. | Fiduciary Duties | 37 |
| 17. | Reservation of Rights | 38 |
| 18. | Severability | 38 |
| 19. | Dates Other Than a Business Day | 38 |
| 20. | Parties' Rights and Obligations | 38 |
| 21. | Counterparts | 39 |
| 22. | Governing Law | 39 |
| 23. | Enforcement and Submission to Jurisdiction | 39 |
| 24. | Acknowledgement | 39 |
| 25. | Service of Process | 39 |

26.   Company Parties' Agent ........................................................................................... 40

Schedule 1 Term Sheet ................................................................................................... 42

Schedule 2 Form of Creditor Accession Deed ................................................................ 43

Schedule 3 Form of Transfer Certificate ......................................................................... 45

Schedule 4 Equity Term Sheet ....................................................................................... 47

Schedule 5 Baskets and Covenants Table ....................................................................... 48

Schedule 6 Holdco Term Sheet ...................................................................................... 49

*THIS DEED IS NOT (NOR SHALL IT BE CONSTRUED AS) AN OFFER TO SELL OR BUY, OR THE SOLICITATION OF AN OFFER TO SELL OR BUY, ANY SECURITIES OR AN ACCEPTANCE OR SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS DEED SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.*

*THIS DEED DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT IN ALL RESPECTS TO THE COMPLETION OF DEFINITIVE DOCUMENTS REFLECTING THE TERMS AND CONDITIONS SET FORTH IN THIS DEED. THE CLOSING OF ANY SUCH TRANSACTIONS SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE CONSENT RIGHTS OF THE PARTIES SET FORTH HEREIN AND THEREIN.*

*THIS DEED IS CONFIDENTIAL AND IS SUBJECT IN ALL RESPECTS TO THE CONFIDENTIALITY AGREEMENTS ENTERED INTO AND BY THE RECIPIENTS OF THIS DEED AND THE COMPANY ENTITIES (INCLUDING BUT NOT LIMITED TO ANY OBLIGATION TO INCLUDE THIS DEED IN THE CLEANSING MATERIALS), AND MAY NOT BE SHARED WITH ANY THIRD PARTY OTHER THAN AS SET FORTH IN THE CONFIDENTIALITY AGREEMENTS.*

**THIS DEED** is dated 13 March 2026 **AMONG** the Consenting Creditors whose names appear on the execution pages hereto as original consenting creditors (each such person, an "**Original Consenting Creditor**"), the Company Parties, and each Shareholder whose name appears on the execution pages hereto as original consenting shareholders (each such person, an "**Original Consenting Shareholder**")

**WHEREAS**:

(A)     The Parties wish to execute a Restructuring of the Debt of the Group in accordance with the Term Sheet at Schedule 1 (*Term Sheet*);

(B)     The Parties have entered into this deed (including all annexes and schedules attached hereto, the "**Deed**") to facilitate the implementation and consummation of the Restructuring;

(C)     Certain Parties to this Deed are party to the Existing Lock-Up Deed together with the USD Notes Ad Hoc Committee (as defined therein) and the Shareholders (the "**Existing Lock-Up Deed Parties**" and, individually, an "**Existing Lock-Up Deed Party**").

(D)     On 5 September 2025, a change of control occurred whereby the shares of the Dutch Co-Issuer were transferred to a newly incorporated entity, Eagle Holding Co B.V., and are held on trust pursuant to the Trust Deed (defined below). Further maturity extensions were granted in respect of the SS Term Loans, the USD Notes and the Euro Notes to 31 March 2026 to enable further negotiations on the terms of the Restructuring (as defined in the Existing Lock-Up Deed) to take place, or otherwise for an Alternative Restructuring Notice (as defined in the Existing Lock-Up Deed) to be delivered.

(E)     The Euro Notes Ad Hoc Committee provided an Alternative Restructuring Notice to each other Existing Lock-Up Deed Party on 9 January 2026 and, subsequently, have proposed the terms of an Alternative Restructuring as set out in the Term Sheet at Schedule 1 (*Term Sheet*) hereto. The Euro Notes Ad Hoc Committee wish for the Existing Lock-Up Deed Parties to accede to this Deed to implement the terms of the Alternative Restructuring (as defined in the Existing Lock-Up Deed) in accordance with this Deed and the Term Sheet.

(F)    It is intended that this document takes effect as a deed notwithstanding the fact that a Party may only execute this document under hand.

**THIS DEED WITNESSETH** as follows:

1.    **INTERPRETATION**

1.1    **Definitions**

In this Deed:

"**1L SPV Note Documents**" means the Note Documents, as that term is defined in the 1L SPV Notes Indenture.

"**1L SPV Noteholders**" means a person who is the beneficial owner of, and/or holder of the ultimate economic interest in, the 1L SPV Notes and whose interests in the 1L SPV Notes are held through records maintained in book entry form by a Clearing System.

"**1L SPV Notes**" means the first lien notes issued by the SPV Notes Issuer under and in accordance with the 1L SPV Notes Indenture due 31 March 2026 (Rule 144A Notes: ISIN XS2616745480; Regulation S Notes: ISIN XS2616745134).

"**1L SPV Notes Debt**" means all Liabilities owed to the 1L SPV Noteholder under or in connection with the 1L SPV Note Documents together with any related Additional Debt under or in connection with the 1L SPV Notes.

"**1L SPV Notes Indenture**" means the first lien notes indenture made between, among others, the SPV Notes Issuer and the 1L SPV Notes Trustee and originally dated 25 April 2023 (as amended and/or supplemented from time to time).

"**1L SPV Notes Trustee**" means Kroll Trustee Services Limited acting in its capacity as trustee under and in connection with the 1L SPV Notes.

"**2L SPV Note Documents**" means the Note Documents, as that term is defined in the 2L SPV Notes Indenture.

"**2L SPV Noteholders**" means a person who is the beneficial owner of, and/or holder of the ultimate economic interest in, the 2L SPV Notes and whose interests in the 2L SPV Notes are held through records maintained in book entry form by a Clearing System.

"**2L SPV Notes**" means the second lien notes issued by the SPV Notes Issuer under and in accordance with the 2L SPV Notes Indenture due 31 March 2026.

"**2L SPV Notes Debt**" means all Liabilities owed to the 2L SPV Noteholder under or in connection with the 2L SPV Note Documents together with any related Additional Debt under or in connection with the 2L SPV Notes.

"**2L SPV Notes Indenture**" means the second lien notes indenture made between, among others, the SPV Notes Issuer and the 2L SPV Notes Trustee and originally dated 25 April 2023 (as amended and/or supplemented from time to time).

"**2L SPV Notes Trustee**" means Kroll Trustee Services Limited acting in its capacity as trustee under and in connection with the 2L SPV Notes.

"**Additional Company Party**" means any member of the Group which has become a Company Party in accordance with Clause 5.1 (*Accession*).

"**Additional Consenting Creditor**" means any person which has become a Consenting Creditor in accordance with Clause 5.2 (*Additional Consenting Creditors*) or Clause 6 (*Transfers*);

"**Additional Consenting Shareholder**" means any person which has become a Consenting Shareholder in accordance with Clause 5.3 (*Joinder by Shareholders*);

"**Additional Debt**" means, in relation to any Debt, any Liabilities under or in connection with:

(a)     any refinancing, deferral or extension of that Debt;

(b)     any further advance which may be made under any document, agreement or instrument supplemental to any relevant document together with any related interest, fees and costs;

(c)     any claim for damages or restitution;

(d)     any claim against any member of the Group or the SPV Notes Issuer flowing from any recovery by a member of the Group or the SPV Notes Issuer or any liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer of a payment or discharge in respect of that Debt on the grounds of preference or otherwise; and

(e)     any amount (such as post-insolvency interest) which would be included in any of the above but for any discharge, non-provability, unenforceability or non-allowance of the same in any insolvency or other proceedings.

"**Affiliates**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

"**Additional Holdings**" has the meaning given to that term in Clause 6.2 (*Additional Holdings*).

"**Agreed Implementation Route**" means the method of implementing the Restructuring agreed by the Majority Euro Consenting Creditors and the Company Parties, which is the Chapter 11 Case or as otherwise agreed between the Majority Euro Consenting Creditors and the Company Parties.

"**Alternative Restructuring**" means any reorganization, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale of all or any material portion of assets, financing (debt or equity), plan proposal, repayment, recapitalisation, restructuring, or liquidation of the Group, or any other transaction of similar effect, in each case, which is not consistent with this Deed or the Term Sheet.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

"**Business Day**" means each day that is not a Saturday, Sunday or other day on which banking institutions in London, or New York are authorised by law to close.

"**Chapter 11 Case**" means the voluntary cases under Chapter 11 of Bankruptcy Code in the Bankruptcy Court commenced by the Company Parties to implement and consummate the Restructuring.

"**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Company Parties that have commenced a Chapter 11 Case.

"**Company's Advisors**" means the Company's Counsel and the Company's Financial Advisor.

"**Company's Counsel**" means Linklaters LLP or any successor legal counsel to the Company Parties.

"**Company's Financial Advisor**" means Houlihan Lokey or any successor financial advisor to the Company.

"**Company Parties**" means Eagle Holding Co B.V., Eagle Finance Co B.V., the Dutch Co-Issuer, the USD Notes Co- Issuers, Eagle UK Finance Limited, and each obligor under the Debt Documents, in each case, upon its accession hereto pursuant to Clause 5 (*Accession*).

"**Company Parties' Agent**" means The LYCRA Company LLC (or any other Company Party notified in writing to the Company's Counsel and the Euro Notes Ad Hoc Committee's Counsel for this purpose from time to time by the then existing Company Parties' Agent and such Company Party) in the capacity in which it has been appointed to act on behalf of each Company Party in relation to this Deed pursuant to Clause 26 (*Company Parties' Agent*).

"**Conditional Approval Order**" has the meaning given to it under paragraph (c) of Clause 4.2.

"**Confidential Annexure**" means, in relation to a Consenting Creditor, the confidential annexure to its signature page to this Deed and/or any Creditor Accession Deed (as applicable).

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan.

"**Consenting Creditor**" means:

(a)      any Original Consenting Creditor; and

(b)      any Additional Consenting Creditor,

which in each case has not ceased to be a Consenting Creditor in accordance with the terms of this Deed.

"**Consenting Shareholder**" means:

(a)      any Original Consenting Shareholder; and

(b)      any Additional Consenting Shareholder,

which in each case has not ceased to be a Consenting Shareholder in accordance with the terms of this Deed.

"**Creditor Accession Deed**" means a document substantially in the form set out in Schedule 2 (*Form of Creditor Accession Deed*).

"**Debt**" means any SS Term Loan Debt, Promissory Note Debt, Euro Notes Debt, 1L SPV Notes Debt, 2L SPV Notes Debt, USD Notes Debt or DIP Debt.

"**Debt Documents**" means the RG Intercreditor Agreement, the Orphan Intercreditor Agreement, the SS Term Loan Agreement, the Promissory Note, the Euro Note Documents, the 1L SPV Note Documents, the 2L SPV Note Documents and the USD Note Documents.

"**DIP Commitment**" means, in relation to each DIP Noteholder, its commitment as set out in the DIP Commitment Letter.

"**DIP Commitment Letter**" means the commitment letter dated on or around the time of this Deed between the Company and the DIP Noteholders in connection with the DIP Financing (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time).

"**DIP Documents**" means the DIP Term Sheet, DIP Commitment Letter, Interim DIP Order, Final DIP Order, and any other documents, agreements and instruments necessary or desirable to document the DIP Financing.

"**DIP Financing**" means the superpriority senior secured debtor-in-possession financing provided by the DIP Noteholders on the terms, and subject to the conditions, set out in the DIP Term Sheet and the DIP Commitment Letter.

"**DIP Debt**" means all Liabilities owed to the DIP Noteholders under or in connection with the DIP Financing together with any related Additional Debt under or in connection with the DIP Financing.

"**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

"**DIP Noteholders**" has the meaning given to it in the DIP Term Sheet.

"**DIP Term Sheet**" means the term sheet appended to the DIP Commitment Letter containing the summary of terms and conditions of the DIP Financing (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time).

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan.

"**Dutch Co-Issuer**" means Eagle Intermediate Global Holding B.V., a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands with corporate seat in Amsterdam and registered with the Dutch chamber of commerce under number 71303006.

"**Effective Date**" has the meaning given to that term in Clause 2 (*Effectiveness*).

"**Enforcement Action**" means:

(a)     the acceleration of any Debt or the making of any declaration that any Debt is prematurely due and payable;

(b)     the making of any declaration that any Debt is payable on demand;

(c)     the making of a demand in relation to any Debt;

(d)     the making of any demand in relation to any guarantees, indemnities or other assurance against loss provided in respect of any of the Debt;

(e)     the exercise of any remedies or right of set-off, account combination or payment netting in respect of any Debt;

(f)     the taking of any action of any kind to recover or demand cash cover in respect of all or any part of the Debt;

(g)     the suing for, commencing or joining of any legal process against any member of the Group to recover any Debt;

(h)     the taking of any step to obtain recognition or enforcement of a judgment against any member of the Group in any jurisdiction in respect of any Debt;

(i)      the taking of any steps to obtain recognition or enforce or require the enforcement of any security interest (excluding any registrations or other steps in relation to the perfection of security interests that do not relate to any such enforcement); or

(j)      the petitioning (or taking any formal corporate action to petition for), applying or voting for, or the taking of any steps (including the appointment of any liquidator, receiver, administrator or similar officer in any jurisdiction) in relation to, the winding up, dissolution, administration or reorganisation of any member of the Group which owes any Debt, or has given any security, guarantee, indemnity or other assurance against loss in respect of any of the Debt, or any of such member of the Group's assets or any suspension of payments or moratorium of any indebtedness of any such member of the Group, or any analogous procedure or step in any jurisdiction.

provided that, (i) the filing of any proof of claim or other documentation necessary to preserve the validity, existence or priority of claims in respect of the Debt or any security interest in connection with the Debt and (ii) exercising or directing or instructing the Security Agent to exercise rights under the Transaction Security or the RG Intercreditor Agreement with a view to implementing the Restructuring, including the putting in place of the DIP Financing, shall not constitute an Enforcement Action.

"**Euro Notes Ad Hoc Committee**" means the ad hoc committee of SS Term Loan Lenders, 1L SPV Noteholders and DIP Noteholders as advised by the Euro Notes Ad Hoc Committees' Advisors (as such group is constituted from time to time).

"**Euro Notes Ad Hoc Committee's Advisors**" means the Euro Notes Ad Hoc Committee's Counsel and the Euro Notes Ad Hoc Committee's Financial Advisors.

"**Euro Notes Ad Hoc Committee's Counsel**" means Gibson Dunn & Crutcher LLP or any successor legal counsel to the Euro Notes Ad Hoc Committee.

"**Euro Notes Ad Hoc Committee's Financial Advisors**" means PJT Partners (UK) Limited or any successor financial advisor to the Euro Notes Ad Hoc Committee.

"**Euro Notes Issuer**" means Eagle UK Finance Limited.

"**Euro Note Documents**" means the Note Documents, as that term is defined in the Euro Notes Indenture.

"**Euro Noteholder**" means a person who is the beneficial owner of and/or the owner of the ultimate economic interest in the Euro Notes and whose interests in the Euro Notes are held through records maintained in book entry form by a Clearing System.

"**Euro Notes**" means the 16.00% senior secured notes issued by the Euro Notes Issuer due 31 March 2026  issued pursuant to the Euro Notes Indenture (Rule 144A ISIN: XS2616649419; Regulation S ISIN: XS2616647041).

"**Euro Notes Debt**" means all Liabilities owed to the Euro Noteholders under or in connection with the Euro Note Documents, together with any related Additional Debt under or in connection with the Euro Notes.

"**Euro Notes Indenture**" means the indenture with respect to the Euro Notes made between, among others, the Euro Notes Issuer, certain other members of the Group as original guarantors and the Euro Notes Trustee dated 25 April 2023 (as amended and supplemented from time to time).

"**Euro Notes Trustee**" means Kroll Trustee Services Limited in their capacity as trustee under the Euro Notes Indenture.

"**Existing Governance Structure**" means the constitutional documents, the number of members of the board and the share capital of the relevant member of the Group as at 28 March 2025.

"**Existing Lock-Up Deed**" means the lock-up deed originally dated 24 October 2024 as amended and restated from time to time including most recently on 30 December 2025 between, among others, the Original Consenting Creditors, certain other creditors listed therein, the Company Parties and the Original Consenting Shareholders.

"**Existing Lock-Up Deed Parties**" has the meaning given to that term in Recital (C).

"**Exit Commitment**" means, in relation to each party to the Exit Financing, its commitment as agreed with the Group separately.

"**Exit Financing**" means the exit financing as described under Part D (*Exit Financing – Exit Secured Notes*) in the Term Sheet.

"**Final DIP Order**" means the order entered by the Bankruptcy Court approving the DIP Financing on a final basis.

"**Governmental Body**" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether federal, state, local or foreign, or any agency of such body.

"**Group**" means the Parent and its Subsidiaries from time to time.

"**Holding Company**" means, in relation to a company or corporation, any other company or corporation in respect of which it is a Subsidiary.

"**Interim DIP Order**" means the order entered by the Bankruptcy Court approving the DIP Financing on an interim basis.

"**Liabilities**" means all present and future moneys, debts, claims, liabilities and obligations due, owing or incurred from time to time by any member of the Group and the SPV Notes Issuer, in each case whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently and whether as principal, surety or otherwise.

"**Limitation Acts**" means the applicable limitation law (including the Limitation Act 1980 and the Foreign Limitation Periods Act 1984).

"**Lock-Up Period**" means the period commencing from and including the Effective Date and ending on the Termination Date.

"**Locked-Up Debt**" means:

(a)      in relation to an Original Consenting Creditor, the amount of its (a) DIP Commitment; and (b) Debt at any time (including accrued but unpaid interest and the amount of any Debt transferred to it or to which it becomes entitled after the date of this Deed), the

aggregate principal amount of which at the date of this Deed is shown or referred to in its Confidential Annexure, delivered by it to the Euro Notes Ad Hoc Committee's Advisors upon execution of this Deed and any other Debt transferred to it after such Confidential Annexure was delivered; and

(b)      in relation to an Additional Consenting Creditor, the amount of its Debt at any time (including accrued but unpaid interest and the amount of any Debt transferred to it or to which it becomes entitled after the date of its accession), the aggregate principal amount of which at the date on which it accedes to this Deed is shown opposite its name as "Locked-Up Debt" in any Creditor Accession Deed, and as confirmed in its Confidential Annexure, delivered by it to the Euro Notes Ad Hoc Committee's Advisors in accordance with this Deed and any other Debt transferred to it after such Confidential Annexure was delivered,

to the extent not reduced or transferred by it under this Deed and in each case, excluding any Debt (i) held by a Consenting Creditor in its capacity as a Qualified Market Maker or (ii) held in custody for a third party.

"**Locked-Up Shares**" means in relation to a Consenting Shareholder, the number of Shares it holds at any time, as reflected on the share register of Eagle Investments Holdco.

"**Majority Consenting Shareholders**" means Consenting Shareholders holding at least 90% of the Shares which are held by Consenting Shareholders.

"**Majority Euro Consenting Creditors**" means members of the Euro Notes Ad Hoc Committee holding at least 80% of the aggregate principal amount of the 1L SPV Notes Debt, SS Term Loan Debt and USD Notes Debt which constitutes Locked-Up Debt, held by all members of the Euro Notes Ad Hoc Committee.

"**Majority USD Consenting Creditors**" means Consenting Creditors who are USD Noteholders holding at least 80% of the aggregate principal amount of the Locked-Up Debt held by all such Consenting Creditors.

"**Material Adverse Effect**" means, by reference to the position as at the date of this Deed, a material adverse effect on or material adverse change in:

(a)      the ability of any Company Party or the Group taken as a whole to implement or consummate the Restructuring; or

(b)      the consolidated financial condition, assets or business of the Group taken as a whole.

"**Milestones**" means those certain milestones described under Clause 4 (*Milestones*).

"**Parent**" means Eagle Holding Co B.V., a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands with its corporate seat in Amsterdam and registered with the Dutch chamber of commerce under number 98202200.

"**Orphan Intercreditor Agreement**" means the intercreditor agreement originally dated 25 April 2023 between, amongst others, the SPV Notes Issuer, The Linx Capital Trust, and Kroll Trustee Services Limited (as amended and restated on 25 August 2023).

"**Party**" means a party to this Deed.

"**Petition Date**" means the first date any of the Company Parties commence a Chapter 11 Case.

"**Plan**" means the plan filed by the Company under chapter 11 of the Bankruptcy Code that embodies the Restructuring.

"**Plan Effective Date**" means the date on which the transactions contemplated by the Plan are consummated in accordance with the terms thereof.

"**Priority Portion**" means USD 120,000,000.

"**Promissory Note**" means the $19,446,000 promissory note dated 28 June 2022 (as amended, restated and/or supplemented from time to time) and made between the Dutch Co-Issuer and the Note Payees (as defined therein).

"**Promissory Note Debt**" means all Liabilities owed to the Promissory Noteholders under or in connection with the Promissory Note together with any related Additional Debt under or in connection with the Promissory Note.

"**Promissory Noteholders**" means a Note Payee under and as defined in the Promissory Note.

"**Qualified Market-maker**" means an entity that:

(a)     holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers, and sell to customers, Debt (or enter with customers into long and short positions in respect of the Debt, in its capacity as a dealer or market-maker in the Debt); and

(b)     is, in fact, regularly in the business of making a two-way market in the Debt.

"**Related Funds**" means, in relation to a fund (the "**First Fund**"), a fund which is (i) managed or advised by the same investment manager or investment adviser as the First Fund or, (ii) if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the First Fund.

"**Reservations**" means:

(a)     the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors;

(b)     the time barring of claims under the Limitation Acts and defences of set-off or counterclaim; and

(c)     similar principles, rights and defences under the laws of any relevant jurisdiction.

"**Restructuring**" means the DIP Financing and the debt and equity restructuring on the terms set out in the Term Sheet.

"**Restructuring Documents**" means all documents, agreements and instruments reasonably necessary or desirable to document the Parties' detailed agreement in relation to the terms of the Restructuring, including but not limited to the Plan, the Disclosure Statement, any Solicitation Materials, any plan supplement, any documents governing the Exit Financing, any documents related to the issuance of Preferred Stock, Common Stock and the Warrants, and any such other documents, agreements and instruments reasonably necessary to implement the Restructuring pursuant to the Agreed Implementation Route, in each case, in form and

substance satisfactory to the Majority Euro Consenting Creditors and, in the case of the Warrants, the Majority USD Consenting Creditors.

"**Restructuring Effective Date**" means the date on which the Restructuring is consummated.

"**RG Intercreditor Agreement**" means the intercreditor agreement originally dated 4 May 2018 between, amongst others, the USD Notes Co-Issuers, Wilmington Trust (London) Limited, Eagle UK Finance Limited and certain other entities (as amended and restated on 25 August 2023 and as further amended from time to time).

"**Security Agent**" means Wilmington Trust (London) Limited.

"**Shareholder**" means each holder of Shares.

"**Shares**" means the Class A shares issued by Eagle Investments Holdco.

"**Solicitation Materials**" means, as applicable, any documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on the Plan.

"**SPV Notes Issuer**" means Linx Capital Limited, a private limited company incorporated under the laws of Jersey, Channel Islands, with registered number 148332 and registered office at 2nd Floor, Sir Water Raleigh House, 48-50 Esplanade, St Helier, Jersey JE2 3QB.

"**SS Term Loan**" means the super senior term loan facility made available pursuant to the SS Term Loan Agreement.

"**SS Term Loan Agreement**" means the super senior facility agreement dated 1 March 2023 (as amended and/or restated from time to time) and made between, among others, the Parent (as parent), the Dutch Co-Issuer (as borrower) and the Kroll Agency Services Limited (as facility agent).

"**SS Term Loan Debt**" means all Liabilities owed to the SS Term Loan Lenders under or in connection with the SS Term Loan together with any related Additional Debt under or in connection with the SS Term Loan.

"**SS Term Loan Lender**" means a Lender under and as defined in the SS Term Loan Agreement.

"**Subsidiary**" means, in relation to any company, corporation or other legal entity (a "holding company"), a company, corporation or other legal entity:

(a)     which is controlled, directly or indirectly, by the holding company;

(b)     more than half the issued share capital of which is beneficially owned, directly or indirectly, by the holding company; or

(c)     which is a subsidiary of another Subsidiary of the holding company,

and, for this purpose, a company or corporation shall be treated as being controlled by another if that other company or corporation is able to determine the composition of the majority of its board of directors or equivalent body.

"**Surviving Provisions**" has the meaning given to that term in Clause 8 (*Survival*).

"**Termination Date**" means the date of termination of this Deed in accordance with Clause 7 (*Termination*).

"**Term Sheet**" means the term sheet in the form set out in Schedule 1 (*Term Sheet*).

"**Trade Settlement Condition**" means those certain Disclosed Transfers that are required by their terms to settle on or before the Effective Date shall have settled in accordance with their terms.

"**Transaction Security**" means the Transaction Security as defined in the RG Intercreditor Agreement.

"**Transfer**" means the assignment, novation, sub participation, encumbering, creating a trust over or otherwise disposing of in any manner whatsoever of any interest in any Debt or Shares.

"**Transfer Certificate**" means written confirmation in the form of a certificate issued by two Consenting Creditors to the Euro Notes Ad Hoc Committee's Advisors of the principal amount of Locked-Up Debt transferred by one Consenting Creditor to the other Consenting Creditor at the time of the confirmation, in the form of Schedule 3 (*Form of Transfer Certificate*).

"**Trust Deed**" means the trust deed dated 5 September 2025 between the Dutch Co-Issuer (as Company), Eagle Holding Co B.V. (as holdco) and GLAS Trustees Limited (as Trustee) (as amended, amended and restated, modified and/or supplemented from time to time).

"**USD Notes Co-Issuers**" means Eagle Finance Co B.V. and the Dutch Co-Issuer.

"**USD Note Documents**" means the Note Documents, as that term is defined in the USD Notes Indenture.

"**USD Noteholder**" means a person who is the beneficial owner of and/or the owner of the ultimate economic interest in the USD Notes and whose interests in the USD Notes are held through records maintained in book entry form by a Clearing System.

"**USD Noteholders' Advisors**" has the meaning given to it in Clause 3.2(k).

"**USD Noteholders' Advisors Fees**" has the meaning given to that term in the Term Sheet.

"**USD Notes**" means the 7.50% senior secured notes issued by the USD Notes Co-Issuers due 31 March 2026 issued pursuant to the USD Notes Indenture (Rule 144A Notes: ISIN US26963PAA21, ISIN USN28268AB11; Regulation S Notes: ISIN USN28268AA38, ISIN US26963PAC86).

"**USD Notes Debt**" means all Liabilities owed to the USD Noteholders under or in connection with the USD Note Documents, together with any related Additional Debt under or in connection with the USD Notes.

"**USD Notes Indenture**" means the indenture with respect to the USD Notes made between, among others, the USD Notes Co-Issuers, certain other members of the Group as original guarantors and the USD Notes Trustee dated 4 May 2018 (as amended and supplemented from time to time).

"**USD Notes Trustee**" means Wilmington Trust, National Association in their capacity as trustee under the USD Notes Indenture.

"**Warrants**" means the Class A Warrants and the Class B Warrants described under Part B (*Other Restructuring Terms*) in the Term Sheet.

1.2    **Interpretation**

- 11 -

(a)     Capitalised terms used in this Deed shall, unless defined herein or in Schedule 1 (*Term Sheet*), have the meanings given to them in the Existing Lock-Up Deed.

(b)     Unless a contrary indication appears any reference in this Deed to:

(i)     "this Deed" shall include the Schedules to this Deed;

(ii)    the "Euro Notes Ad Hoc Committee" includes, where the context requires, each member thereof;

(iii)   references to "Party" or "Parties" shall be construed so as to include Party or Parties from time to time party to this Deed;

(iv)    any person shall be construed so as to include its successors in title, permitted assigns and permitted transferees;

(v)     an agreement, deed, instrument or other document is a reference to the agreement, deed, instrument or other document as amended and an amendment includes a supplement, novation, extension (whether of maturity or otherwise), restatement, re-enactment or replacement (however fundamental and whether or not more onerous) and as amended will be construed accordingly;

(vi)    "indebtedness" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(vii)   a "person" includes any person, firm, company, corporation, government, state or agency of a state or any joint venture, association, trust or partnership (whether or not having separate legal personality);

(viii)  a "process" includes any litigation/arbitration proceeding commenced, brought, conducted or heard by or before, or otherwise involving any Governmental Body, court or any arbitrator or arbitration panel or other process of law;

(ix)    a provision of law is a reference to that provision as amended or re-enacted;

(x)     "**£**" is to the lawful currency of the United Kingdom, "**€**" and "**EUR**" is to the lawful currency of the European Economic and Monetary Union and as adopted by the countries in the Eurozone and "**$**" and "**US$**" is to the lawful currency of the United States of America;

(xi)    a time of day is a reference to London time;

(xii)   "includes", "included" or "including" shall be construed without limitation;

(xiii)  words importing the singular shall include the plural equivalent and vice versa;

(xiv)   the recitals to this Deed constitute integral and binding provisions hereunder; and

(xv)    Clause and Schedule headings are for ease of reference only (and, in each case, to Clauses and Schedules in this Deed).

(c)     If there is any conflict between the terms of this Deed and the terms of the Term Sheet or any Restructuring Document, the terms of the Term Sheet or relevant Restructuring Document (as applicable) shall prevail.

(d)     Where this Deed provides for a notice or other communication or confirmation to be given "in writing", it is sufficient for that notice or other communication to be given by email.

(e)     Unless specified to the contrary, in this Deed, any reference to a determination, certification, specification or similar act to be made or done by any person shall, in the absence of manifest error, be deemed to be conclusive and shall be construed and take effect as that person making or doing that determination, certification, specification or similar act, acting in its sole discretion.

(f)     A breach of this Deed shall only occur when a Party (the "**Breaching Party**") does not comply with any material provision of this Deed applicable to it or if any representation or statement made or deemed to be made by the Breaching Party is or proves to have been incorrect or misleading in any material respect, unless the failure to comply (or the circumstances leading to the misrepresentation) is capable of remedy, in which case a breach will only occur under this Deed if not remedied within 5 Business Days of notice given to the Breaching Party.

2.     **EFFECTIVENESS**

2.1     This Deed will become effective and legally binding on the later of:

(a)     the date when it is executed and delivered by each of the Company Parties and the Original Consenting Creditors; and

(b)     the date on which the Trade Settlement Condition is satisfied,

such date, the "Effective Date".

2.2     This Deed shall become binding on each Additional Company Party which accedes to, or becomes a party to, this Deed, on and from such time that such person becomes a Party in accordance with Clause 5.1 (*Additional Company Parties*).

2.3     This Deed shall become binding on each Additional Consenting Creditor which accedes to, or becomes a party to, this Deed, on and from such time that such person becomes a Party in accordance with Clause 5.2 (*Additional Consenting Creditors*).

2.4     This Deed shall become binding on each Additional Consenting Shareholder which accedes to, or becomes party to, this Deed, on and from such time that such person becomes a Party in accordance with Clause 5.3 (*Joinder by Shareholders*).

3.     **SUPPORT FOR THE RESTRUCTURING**

3.1     Subject to Clause 12 (*Limitation of Liability*), each Party shall:

(a)     promptly take all actions (within its power), or shall cooperate to take all actions, (including submitting any vote, filing any motion, pleading or other document with any court or initiating (or having initiated on its behalf) any litigation or proceeding of any kind with respect to this Deed, the Term Sheet or the Restructuring), which are reasonably necessary or desirable to support, facilitate, implement, consummate, or otherwise give effect to, all or any part of the Term Sheet and the Restructuring as soon

as reasonably practicable and in a manner that minimises adverse tax, structuring, or regulatory consequences;

(b)      use reasonable endeavours to obtain all corporate and regulatory approvals necessary to implement the Restructuring in the manner envisaged by, and substantially on terms consistent with, the Term Sheet;

(c)      notify the Euro Notes Ad Hoc Committee's Advisors and the Company's Advisors as promptly as practicable (1) of any material communication received from any member of the Group, any Shareholders, and any other third parties, with respect to the Group (or any member thereof), including with respect to the Restructuring or an Alternative Restructuring, including any communication indicating the imminent commencement of an insolvency proceeding of any member of the Group, and (2) as soon as any such Party becomes aware of any member of the Group or the Shareholders taking or having taken concrete steps to prepare to initiate any voluntary or involuntary process under insolvency, bankruptcy, or any analogous law with respect to any member of the Group;

(d)      identify the regulatory approvals that such Party determines in good faith, following consultation with counsel, will be required in connection with the Restructuring (the "**Required Regulatory Approvals**"), and promptly notify the Euro Notes Ad Hoc Committee's Advisors and the Company's Advisors of such regulatory approvals and the regulatory bodies from which such approvals are required to be obtained;

(e)      use reasonable endeavours, including procuring its Affiliates to use reasonable endeavours, to co-operate fully with each other in relation to the Required Regulatory Approvals;

(f)      provide reasonable updates from time to time to the Euro Notes Ad Hoc Committee's Advisors and the Company's Advisors of the progress of the Required Regulatory Approvals;

(g)      use all reasonable endeavours to (x) promptly agree the documentation required to effect the DIP Financing; (y) finalise, agree, and execute the Restructuring Documents, in a form consistent with this Deed and the Term Sheet; and (z) promptly agree the documentation required to effect the Exit Financing, in each case, as soon as reasonably practicable;

(h)      promptly take all actions required in order to effect any amendments, consents, instructions or waivers required under the Trust Deed to give effect to the Restructuring, including such actions, consents, instructions or waivers necessary or desirable to facilitate the transfer of the shares of the Parent from the trust to the issuer of the Replacement Equity (as defined in the Trust Deed) or such other transfer or issuance of share capital of the Dutch Co-Issuer and/or Eagle Global Holding B.V. as the Parent and the Majority Euro Consenting Creditors may agree is reasonably necessary or desirable to implement the Restructuring;

(i)      comply with all Milestones set forth in this Deed; and

(j)      work together in good faith and will use commercially reasonable efforts to structure and implement the Restructuring transactions in a tax efficient and cost effective manner for the Group as determined by the Parties.

3.2      Each Company Party shall (and the Parent and the Dutch Co-Issuer shall each use reasonable endeavours to ensure that their respective Subsidiaries from time to time will) co-operate with,

actively assist, and deliver information reasonably requested by, the other Parties to support, facilitate, implement or consummate or otherwise give effect to all or any part of the Restructuring by:

(a)     promptly complying with all reasonable written requests from the Euro Notes Ad Hoc Committee's Advisors for information within its knowledge and which could reasonably be expected to pertain to the financial position or prospects of the Group in so far as it pertains (or may pertain) to the implementation or consummation of the Restructuring, including quarterly financial statements of the Group and reports on any material corporate developments;

(b)     keeping the Euro Notes Ad Hoc Committee or the Euro Notes Ad Hoc Committee's Advisors regularly informed in relation to the status and progress of the Restructuring, including (1) progress in relation to obtaining any necessary or desirable an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration; and (2) any consents from the SS Term Loan Lenders, Promissory Noteholders, the USD Noteholders, the Euro Noteholder, the 1L SPV Noteholders, the 2L SPV Noteholders, the Shareholders, or any relevant regulator;

(c)     making such senior management and other representatives of each Company Party and the Parent as the Euro Notes Ad Hoc Committee may reasonably request (in writing, upon reasonable notice), available to assist with matters which could reasonably be expected to pertain to the implementation or consummation of the Restructuring,

(d)     complying as soon as reasonably practicable with all written requests for information within its knowledge and which could reasonably be expected to pertain to implementation or consummation of the Restructuring;

(e)     using its reasonable endeavours to minimise, to the extent reasonably practicable, any material negative impact of the Restructuring on the business of the Group, including with respect to any material contracts, licences, authorisation, consent, approval, resolution, licence, exemption, filing, notarisation, registration, or financing documents which could be terminated or breached as a result of the transactions contemplated by the Term Sheet;

(f)     notifying the Euro Notes Ad Hoc Committee or the Euro Notes Ad Hoc Committee's Advisors as soon as reasonably practicable on receipt of any notice from a counterparty to a material contract, licence, authorisation, consent, approval, resolution, exemption, filing, notarisation or registration or financing document that it intends to terminate, or has terminated, such material contract, licence, authorisation, consent, approval, resolution, exemption, filing, notarisation or registration, or financing document, other than in the ordinary course of business;

(g)     implementing the Restructuring in a manner consistent with this Deed, the Term Sheet and the Agreed Implementation Route, including:

(i)     convening all meetings of its creditors which are required to consider any resolutions and/or decisions relating to the Restructuring;

(ii)     convening all meetings of directors and shareholders which are required to consider any resolutions and/or decisions in relation to the Restructuring; and

(iii)     making all securities and other filings and announcements and publishing all documents and making all submissions required in connection with the matters

contemplated by this Deed as and when necessary to effect the Restructuring and/or comply with all applicable laws;

(h)   promptly notifying the Consenting Creditors of the occurrence of any event(s) or circumstance(s) which, in its reasonable opinion, would result in a Material Adverse Effect;

(i)   promptly providing to the Euro Notes Ad Hoc Committee's Advisors following receipt, copies of all documents relating to any insolvency event or Enforcement Action that has been taken, save to the extent that such insolvency event or Enforcement Action has taken place with the consent of the Company Parties and the Majority Euro Consenting Creditors or otherwise in accordance with the Agreed Implementation Route;

(j)   paying the fees, costs and expenses of the Euro Notes Ad Hoc Committee's Advisors (and any other advisors engaged by the Euro Notes Ad Hoc Committee with the Parent's or the Dutch Co-Issuer's consent) in accordance with the "Fee and expense coverage – Euro Notes Ad Hoc Committee Advisors" provision under Part B (*Other Restructuring Terms*) of the Term Sheet;

(k)   paying the fees, costs and expenses of Milbank LLP and Moelis & Company (and any other advisors engaged by the USD Noteholders with the Parent's or the Dutch Co-Issuer's consent) (the "**USD Noteholders' Advisors**") in accordance with the "Fee and expense coverage – USD Noteholders' Advisors" provision under Part B (*Other Restructuring Terms*) of the Term Sheet;

(l)   promptly upon request by the Euro Notes Ad Hoc Committee's Advisors at the Company Parties' expense, taking all such action (including giving notice, order or direction and the making of any filings or registrations) for the purpose of the perfection, protection or maintenance of any Transaction Security as defined in and to the extent such steps are required pursuant to the Debt Documents and the DIP Financing;

(m)   take all reasonable steps to oppose and/or contest any Enforcement Action taken by any creditor not party to this Deed against the Company Parties or any member of the Group;

(n)   using its reasonable endeavours to obtain, or assist the SS Term Loan Lenders, the Promissory Noteholders, the USD Noteholders, the Euro Noteholders, the 1L SPV Noteholders and the 2L SPV Noteholders to obtain, any necessary or desirable Authorisations, to implement or consummate the Restructuring, including any necessary or desirable authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration including any consents, from the SS Term Loan Lenders, the Promissory Noteholders, the USD Noteholders, the Euro Noteholder, the 1L SPV Noteholders, the 2L SPV Noteholders, the Shareholders or any relevant regulator; and

(o)   promptly notify the Euro Notes Ad Hoc Committee's Counsel of any decision by the board of directors or other governing body of any Company Party to exercise the Company Parties' rights under Clause 7.4(c) with respect to an Alternative Restructuring within twenty-four (24) hours of such decision.

3.3   Subject to Clause 12 (*Limitation of Liability*), each Consenting Creditor or Consenting Shareholder, as applicable, shall:

(a)     timely vote any and all of its Claims (in all cases, in accordance with the Solicitation Materials) in favor of the Plan, and not change or withdraw such vote;

(b)     timely opt in to, or not opt out of, as applicable, any releases under the Plan;

(c)     use commercially reasonable efforts to negotiate and agree to a method of implementation of the Restructuring in jurisdictions outside the United States, which is, in the reasonable opinion of the directors of any non-U.S. Company Party having taken legal advice, compliant with all local laws, including with respect to fiduciary duties, applicable to that non-U.S. Company Party or its directors and officers, in their respective capacities as such in such jurisdiction;

(d)     support and not object to (x) the DIP Orders, and (y) any order approving the Disclosure Statement, the Confirmation Order, and any order approving the Exit Financing, in each case, solely to the extent that such order is consistent with the terms of this Deed;

(e)     use commercially reasonable efforts to execute, perform its obligations under, and consummate the transactions contemplated by, the Restructuring Documents to which it is or will be a party or for which its approval or consent is required or take other actions necessary to implement the Restructuring;

(f)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate with the Company Parties in good faith appropriate additional or alternative provisions to address any such impediment; and

(g)     upon request by the Company Parties or the Company's Advisors, promptly provide to the Company's Advisors the aggregate principal amount of each Consenting Creditor's claims, by debt instrument, as of the date of such request (which may be provided indirectly through counsel).

3.4     Subject to Clause 12 (*Limitation of Liability*), no Party shall:

(a)     take, encourage, assist or support (or procure that any other person takes, encourages, assists or supports) directly or indirectly any action (including filing any motion, pleading or other document with any court or initiating (or having initiated on its behalf) any litigation or proceeding of any kind with respect to this Deed, the Term Sheet, the DIP Financing or the Restructuring  that would, or could reasonably be expected to, breach or be inconsistent with this Deed, the Term Sheet, DIP Financing or the Restructuring;

(b)     encourage, assist, support, vote for or commit (or procure that any other person encourages, assists, supports, votes for or commits) to any Alternative Restructuring, disposition, merger, financing or other transaction in relation to the Group or the Debt that is inconsistent with this Deed, the Term Sheet, the DIP Financing or the Restructuring, *provided that* this covenant shall not impede the Company Parties' rights under Clause 7.4(c) with respect to an Alternative Restructuring; or

(c)     support, negotiate, or prepare, or take any other steps (or procure that any other person supports, negotiates, prepares  or takes any other steps) to pursue , directly or indirectly, any Alternative Restructuring, refinancing, recapitalisation, arrangement, composition, or other procedure, in respect of the Group or the Debt, in each case, that is inconsistent with this Deed or the Term Sheet,

in each case, unless (i) expressly contemplated by this Deed or the Restructuring, or (ii) otherwise agreed to by the Majority Euro Consenting Creditors.

3.5 No Company Party shall (and the Parent and the Dutch Co-Issuer shall each use reasonable endeavours to ensure that none of their respective Subsidiaries from time to time will):

(a) assign any of its rights or transfer any of its rights or obligations under this Deed;

(b) except in the ordinary course of business or in connection with the DIP Financing, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any debt contingently or otherwise;

(c) except in the ordinary course of business or in connection with the DIP Financing, create, incur, assume or otherwise cause or suffer to exist or become effective any lien securing indebtedness on any of its property or assets or give any guarantee or indemnity or like commitments, in any such case of whatever nature;

(d) declare, make or pay any dividend, charge, fee (including any monitoring or advisory fee), or other distribution (or interest on any unpaid dividend, charge, fee, or other distribution) or purchase, redeem or otherwise acquire any equity interests in the Company Parties or repay or make any payment in respect of any direct or indirect debt held (howsoever described) directly or indirectly by any Shareholders or its Affiliates or Related Funds;

(e) (i) make any investment or otherwise purchase or acquire (including pursuant to any merger or consolidation) any interest in any other person or business; (ii) to the extent legally permissible and practicable permit any changes to the holdings of its shares or voting rights or grant to any person any conditional or unconditional option, warrant or other right to call for the issue or allotment of, subscribe for, purchase or otherwise acquire any shares of any Company Party (including any right of pre-emption, conversion or exchange), or alter any right attaching to any share capital of any Company Party; (iii) incorporate or establish any subsidiary; (iv) designate any subsidiary as an "Unrestricted Subsidiary" pursuant to the USD Notes Documents or Euro Notes Documents; or (v) enter into amalgamation, merger, corporate reorganisation, consolidation, liquidation or winding up or corporate reconstruction;

(f) acquire any legal or beneficial interest in the USD Notes Debt, Euro Notes Debt, 1L SPV Notes Debt, or 2L SPV Notes Debt prior to the termination of this Deed;

(g) except in the ordinary course of business, enter into, amend, vary, novate, supplement, supersede, waive or terminate any terms of any constitutional document, any material contract, lease, licence or financing document (other than the DIP Financing pursuant to the terms of the definitive documentation in connection therewith);

(h) make any payment, repayment or prepayment of any principal, interest or other amount on or in respect of, or any redemption, purchase or defeasance of, or participate in any risk in respect or any Debt in cash or in kind, in each case, other than the DIP Financing; or

(i) except as provided under the terms of this Deed or consented to by the Majority Euro Consenting Creditors, take or consent to the taking of any material corporate action, including:

(i) changing the capital structure of any member of the Group, increasing the authorised share capital of any member of the Group, issuing any share to any

person, granting to any person any conditional or unconditional option, warrant or other right to call for the issue or allotment of, subscribe for, purchase or otherwise acquire any share of any member of the Group (including any right of pre-emption, conversion or exchange), or altering any right attaching to any share capital of any member of the Group; and

(ii) setting or amending the compensation, terms and conditions of employment, any employment agreement, any consulting agreement, any incentive plan of, or voting in favour of any resolution relating to employment or compensation matters with respect to, any member of the executive management team of any member of the Group.

3.6 Subject to Clause 12 (*Limitation of Liability*), no Consenting Creditor shall:

(a) (1) vote any of its Claims to reject the Plan; (2) opt out of, or fail to opt in to, any third party release contemplated by the Plan; or (3) change or withdraw (or cause to be changed or withdrawn) any such foregoing vote or release;

(b) authorize, encourage, or direct any agents or trustees under the Debt Documents with respect to which the Consenting Creditors hold Debt to exercise rights or remedies under such Debt Documents, as applicable, that the Consenting Creditors (either by this Deed or any other agreement) have expressly agreed to forbear from exercising; or

(c) directly or indirectly object to the allowance and payment by the Company Parties of the reasonable and documented fees and expenses of the Company Parties' professionals in the Chapter 11 Cases.

3.7 No Consenting Shareholder shall:

(a) acquire (or shall permit any of its Affiliates or Related Funds to acquire) any legal or beneficial interest in the USD Notes Debt, Euro Notes Debt, 1L SPV Debt, or 2L SPV Debt prior to the termination of this Deed;

(b) directly or indirectly, interfere, delay, frustrate, or impede the Restructuring or the DIP Financing (or cause, direct, facilitate or encourage any of the foregoing); and

(c) assign any of its rights or transfer any of its rights or obligations under this Deed;

(d) take, encourage, assist or support (or procure that any other person takes, encourages, assists or supports) directly or indirectly any action that would, or could reasonably be expected to, adversely affect the Group, economically or operationally, or adversely affect the Group's operations in China.

3.8 Paragraphs 3.5 and 3.6 above do not apply to any action which:

(a) has the prior written consent of the Majority Euro Consenting Creditors which shall, for the avoidance of doubt, be treated as modification and must comply with the requirements under Clause 11 (*Amendments, Waivers and Further Assurance*);

(b) is expressly contemplated by the Term Sheet;

(c) is required to be taken in order to comply with applicable law or regulation; or

(d)        constitutes a Transfer to an Affiliate of the transferring Party, provided that the transferee Affiliate accedes to this Deed as a Party in accordance with Clause 5 (*Accession*).

3.9      Subject to Clause 12 (*Limitation of Liability*) and paragraphs 17(b) and 17(c) of Clause 17 (*Reservation of Rights*) (but not, for the avoidance of doubt, paragraph (a) thereof), each Consenting Creditor agrees during the Lock-Up Period not to:

(a)        take any Enforcement Action;

(b)        direct, encourage, assist or support (or procure that any other person directs, encourages, assists or supports) any other person to take any Enforcement Action; or

(c)        vote (or instruct its proxy or other relevant person to vote) in favour of any Enforcement Action,

in each case, in relation to any default under the Debt instrument that arises as a result of implementing the Restructuring in accordance with the terms of this Deed, unless expressly permitted by (x) the Restructuring Documents or (y) otherwise agreed to by the Majority Euro Consenting Creditors.

3.10    Each Consenting Shareholder shall co-operate with and actively assist the other Parties to support, facilitate, implement or consummate or otherwise give effect to all or any part of the Restructuring or the DIP Financing, by:

(a)        making such Consenting Shareholder as the Euro Notes Ad Hoc Committee may reasonably request (in writing, upon reasonable notice), available to assist with matters which could reasonably be expected to pertain to the implementation or consummation of the Restructuring or DIP Financing;

(b)        promptly complying with all written requests for information within its knowledge and which could reasonably be expected to pertain to implementation or consummation of the Restructuring or DIP Financing; and

(c)        using its reasonable endeavours to obtain, or assist the SS Term Loan Lenders, the Promissory Noteholders, the USD Noteholders, the Euro Noteholder, the 1L SPV Noteholders and the 2L SPV Noteholders (as applicable) to obtain, any necessary or desirable Authorisations, to implement or consummate the Restructuring or the DIP Financing, including any necessary or desirable authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration including any consents, from the SS Term Loan Lenders, the Promissory Noteholders, the USD Noteholders, the Euro Noteholder, the 1L SPV Noteholders, the 2L SPV Noteholders, the Consenting Shareholders or any relevant regulator.

3.11    Each Party agrees that the obligations under this Clause 3 shall extend to support by each Party (as applicable) to the terms of the DIP Financing as described in the DIP Commitment Letter and the Exit Financing and the Exit Commitments as described under Part D (*Exit Financing – Exit Secured Notes*) in the Term Sheet.

3.12    Each Party (including any Consenting Creditor, Company Party, Consenting Shareholder and the Parent) shall cooperate together in good faith to defend against any restructuring plan, bankruptcy proceeding, scheme of arrangement or other restructuring or insolvency process that was filed or initiated by any Company Party, or by any Shareholder, third party, or other person against any Company Party, which is not consented to by the Majority Euro Consenting Creditors in accordance with this Deed.

4.    **MILESTONES**

4.1    The following milestones shall apply to this Deed unless extended or waived in writing (email being sufficient) by the Majority Euro Consenting Creditors, *provided that*, the following shall also require the consent of the Majority USD Consenting Creditors:

(a)    any extension of a Milestone beyond ten (10) Business Days of the initial Milestone date (as at the Effective Date); or

(b)    in the case of the Milestone date in Clause 4.2(h), any extension of that Milestone date beyond ten (10) Business Days of such Milestone date (as at the Effective Date) or, if such Milestone date is extended by the Company in accordance with that clause, beyond ten (10) Business Days of such Milestone date as so extended.

**Toggle Option 1 – prepackaged chapter 11**

4.2    If the Company Parties and the Majority Euro Consenting Creditors elect to pursue a prepackaged Chapter 11 Case, the following Milestones shall apply:

(a)    No later than 20 March, 2026, the Company Parties shall have commenced solicitation of votes on the Plan;

(b)    No later than 23 March, 2026, the Petition Date shall have occurred;

(c)    No later than the date that is one (1) Business Day after the Petition Date, the Company Parties shall have filed with the Bankruptcy Court the Plan, Disclosure Statement, and a motion seeking approval of solicitation procedures and conditional approval of the Disclosure Statement (the "**Conditional Approval Order**");

(d)    No later than the date that is three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(e)    No later than the date that is three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Conditional Approval Order;

(f)    No later than the date that is the earlier of (a) thirty-five (35) calendar days after the Petition Date and (b) entry of the Confirmation Order, the Bankruptcy Court shall have entered the Final DIP Order;

(g)    No later than the date that is sixty (60) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

(h)    No later than the date that is seventy-five (75) calendar days after the Petition Date, the Plan Effective Date shall have occurred, *provided that,* if the Company determines (acting reasonably) that additional time is required to accommodate any delays obtaining the Required Regulatory Approvals, the Company may extend such date on one occasion only by up to a further fifteen (15) calendar days, by notifying each other Party in writing at least five (5) Business Days prior to the initial seventy-five (75) day expiry.

**Toggle Option 2 – pre-negotiated chapter 11**

4.3    If the Company Parties and the Majority Euro Consenting Creditors elect to pursue a pre-negotiated Chapter 11 Case, the following Milestones shall apply:

(a)     the Petition Date shall occur no later than 23 March, 2026;

(b)     no later than the date that is three (3) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(c)     no later than the date that is forty (40) calendar days after the Petition Date, the Company Parties shall file the Disclosure Statement and the Plan;

(d)     no later than the date that is twenty-five (25) calendar days after the Disclosure Statement and the Plan are filed, the Bankruptcy Court shall have entered the Conditional Approval Order;

(e)     no later than the date that is five (5) calendar days after the Conditional Approval Order is entered, the Company Parties shall have launched solicitation of votes with respect to the Plan;

(f)     no later than the date that is thirty-five (35) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(g)     no later than the date that is ninety (90) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

(h)     no later than the date that is one hundred and twenty (120) calendar days after the Petition Date, the Plan Effective Date shall have occurred.

## 5.     ACCESSION

### 5.1     Additional Company Parties

Subject to compliance with Clause 9 (*Notices*), any Additional Company Party may accede to this Deed by executing and delivering a joinder to this Deed to the Euro Notes Ad Hoc Committee's Advisors and the Company's Advisors, in form and substance satisfactory to the Majority Euro Consenting Creditors, which shall become effective immediately upon receipt of the joinder.

### 5.2     Additional Consenting Creditors

A holder of the Debt may accede to this Deed as a "Party" and an "Additional Consenting Creditor" by executing and delivering the Creditor Accession Deed to the Euro Notes Ad Hoc Committee's Advisors and the Company's Advisors, whereupon such creditor shall become a Party and be bound by, and receive the benefit of, the provisions of this Deed from the date of its Creditor Accession Deed as if originally named herein as a Consenting Creditor. For the avoidance of doubt, the membership of the Euro Notes Ad Hoc Committee is a matter reserved solely for the Euro Notes Ad Hoc Committee and the Euro Notes Ad Hoc Committee's Advisors, and an accession to this Deed is not intended to result in membership of the Euro Notes Ad Hoc Committee. The Euro Notes Ad Hoc Committee's Advisors do not owe any obligations or duties to any Additional Consenting Creditor, unless otherwise agreed between that Additional Consenting Creditor and the Euro Notes Ad Hoc Committee's Advisors in an engagement letter with the Euro Notes Ad Hoc Committee's Advisors.

### 5.3     Joinder by Shareholders

Any Additional Consenting Shareholder may accede to this Deed by executing and delivering a joinder to this Deed to the Euro Notes Ad Hoc Committee's Advisors and the Company's

Advisors, in form and substance satisfactory to the Majority Euro Consenting Creditors, which shall become effective immediately upon receipt of the joinder.

5.4    **Alternative Restructuring Agreement**

(a)    Upon this Deed meeting the conditions for it to be an Alternative Restructuring Agreement under the Trust Deed (the "**Accession Condition**"), this Deed shall take effect as an Alternative Restructuring Agreement (as defined in the Trust Deed).

(b)    Upon satisfaction of the Accession Condition, the "Instructing Beneficiaries" for the purposes of the Trust Deed shall mean, subject to Clause 8.2 (*Voting as part of the Instructing Beneficiaries*) of the Trust Deed, a member or members of the Euro Notes Ad Hoc Committee holding more than 50 per cent. (or, if the Euro Notes Ad Hoc Committee's Counsel confirms to the Trustee (as defined in the Trust Deed) that the members of the Euro Notes Ad Hoc Committee have received all of the antitrust regulatory consents and approvals they require as a result of such increase in the voting threshold, at least 66 2/3 per cent.) of the aggregate principal amount of the 1L SPV Notes Debt, SS Term Loan Debt and USD Notes Debt which constitutes Locked-Up Debt, held by all members of the Euro Notes Ad Hoc Committee at that time.

6.    **TRANSFERS**

6.1    **Consenting Creditors**

(a)    During the Lock-Up Period, no Consenting Creditors may enter into a Transfer in connection with its Locked-Up Debt or this Deed in favour of any person unless:

(i)    the transferor has confirmed that the transferee is an Original Consenting Creditor as of the date of the Transfer or the transferee is an Affiliate of that Consenting Creditor and the Debt subject to the Transfer will remain Locked-Up Debt; or

(ii)    the transferor has (subject to Clause 6.7 below) (i) with respect to transfers of 1L SPV Notes Debt, 2L SPV Notes Debt, SS Term Loan Debt and DIP Debt, obtained the consent of the Majority Euro Consenting Creditors (which shall not be unreasonably withheld) and (ii) the transferee has delivered an executed Creditor Accession Deed to the Euro Notes Ad Hoc Committee's Advisors, which shall become effective immediately upon receipt by it of the transferred Debt, such that it will then immediately become a Consenting Creditor, and

in each case, each of the transferor and the transferee has delivered a duly completed and signed Transfer Certificate to the Euro Notes Ad Hoc Committee's Advisors confirming the total principal amount of Locked-Up Debt held by it as at the date of and reflecting such Transfer.

(b)    Except for (i) the Disclosed Transfers (as defined in Clause 6.7 below), or (ii) a Transfer of Locked-Up Debt that complies with the foregoing or Clause 6.4 below, a Consenting Creditor may not enter into any agreement or arrangement which has the effect of transferring, delegating, fettering, or otherwise disposing of in any manner whatsoever any or all of that Consenting Creditor's rights, powers or discretions (including its authority, entitlement and ability to control the exercise and casting of votes) arising under or in connection with all or any part of its Locked-Up Debt or this Deed.

(c)    Notwithstanding the foregoing, each Consenting Creditor may pledge its right, or interest in or to any Debt in connection with such Consenting Creditor's regular course

debt financing arrangements, provided that, in each case, such pledge does not have the effect described in the previous sentence.

6.2     **Additional Holdings**

(a)     A Consenting Creditor may acquire Debt, pursuant to Transfers, in addition to their Locked-Up Debt at any time ("**Additional Holdings**"). Any Additional Holdings shall automatically become Locked-Up Debt.

(b)     A Consenting Creditor who has acquired Additional Holdings shall, as soon as reasonably practicable after the date of the Transfer, deliver a duly completed and signed Transfer Certificate, including an updated Confidential Annexure, to the Euro Notes Ad Hoc Committee's Advisors.

6.3     **Consenting Creditors to be a Party**

(a)     Subject to paragraph (b) below, following the Transfer of all of its Locked-Up Debt to another person in a manner permitted by this Deed, a Consenting Creditor shall cease to be a Consenting Creditor.

(b)     Clause 6.3(a) above shall be (i) without prejudice to the accrued rights of the Consenting Creditor against any other Party or the accrued rights of any other Party against the Consenting Creditor with respect to any breaches of any of the terms of this Deed prior to the Transfer; and (ii) without limitation to the obligations of any Party against the remaining Parties under the terms of the Deed.

6.4     **Qualified Market-makers**

A Consenting Creditor may Transfer Locked-Up Debt to a Qualified Market-maker that is not a Consenting Creditor (a "**QMM Transfer**") and such Qualified Market-maker shall not be required to accede to this Deed or otherwise agree to be bound by the terms and conditions of this Deed, provided that:

(a)     such Qualified Market-maker, (subject to Clause 6.7 below) within ten Business Days of the QMM Transfer transfers the relevant Locked-up Debt that is the subject of the QMM Transfer to a person (a "**Back-to-Back Transfer**"):

(i)     that is an Original Consenting Creditor as of the date of the Transfer; or

(ii)    for whom the transferor has (other than in respect of a Transfer of any USD Notes Debt, and subject to Clause 6.7 below) obtained the consent of the Majority Euro Consenting Creditors (which shall not be unreasonably withheld) and the transferee has delivered an executed Creditor Accession Deed to the Euro Notes Ad Hoc Committee's Advisors, which shall become effective immediately upon receipt by it of the transferred Debt such, that it will then immediately become a Consenting Creditor; and

(b)     in each case, each of the selling Consenting Creditor and the ultimate purchaser of the relevant Locked-up Debt that are the subject of the QMM Transfer has delivered a duly completed and signed Creditor Accession Deed in the event of a Back-to-Back Transfer pursuant to Clause 6.4(a)(ii), to the Euro Notes Ad Hoc Committee's Advisors or confirming the total principal amount of Locked-Up Debt held by it as at the date of and reflecting such Transfer.

6.5     **Consenting Shareholders**

No Consenting Shareholder may Transfer all or any portion of its Shares or Debt, without the prior written consent of the Majority Euro Consenting Creditors, save for any Transfer to an Affiliate of the transferring Consenting Shareholder provided that the transferee Affiliate accedes to this Deed as a Party in accordance with Clause 6 (*Transfers*).

6.6     **Non-compliant Transfers**

Any purported Transfer that does not comply with this Clause 6 shall be *void ab initio*.

6.7     **SS Term Loan Transfers**

(a)     In this Clause 6.7, "**Disclosed Transfer**" means any transaction entered into by any of the Original Consenting Creditors (the "**Disclosing Creditor**") prior to the date of this Deed, which involved the sale or transfer by such Disclosing Creditor of any of its Debt, *provided that* the terms of such transaction have been disclosed to the Euro Notes Ad Hoc Committee.

(b)     It shall be a condition to the Restructuring Effective Date that the relevant "know your customer" or other similar checks required to be carried out under applicable laws in relation to any Disclosed Transfer have been completed to the satisfaction of the counterparties to such Disclosed Transfer.

(c)     No Majority Euro Consenting Creditor consent is required by such Disclosing Creditor in relation to the Disclosed Transfers.

(d)     No Consenting Creditor may transfer their SS Term Loan Debt without the consent of the Majority Euro Consenting Creditors.

7.      **TERMINATION**

7.1     **Automatic Termination**

This Deed shall automatically terminate on the earliest to occur of:

(a)     the Plan Effective Date; and

(b)     the Restructuring Effective Date.

7.2     **Termination by agreement**

This Deed may be terminated with the mutual written consent of the Majority Euro Consenting Creditors, the Majority USD Consenting Creditors, the Majority Consenting Shareholders and the Company Parties.

7.3     **Termination by the Majority Euro Consenting Creditors**

(a)     The Majority Euro Consenting Creditors may terminate this Deed by written notice to the other Parties if a Company Party does not comply with any material provision of this Deed or if any representation or statement made or deemed to be made by such Party is or proves to have been incorrect or misleading in any material respect, in each case unless failure to comply (or the circumstances leading to the misrepresentation) is capable of remedy and is remedied within 5 Business Days of the Majority Euro Consenting Creditors giving notice to the relevant Party.

(b)     The Majority Euro Consenting Creditors may terminate this Deed by written notice to the other Parties if a Consenting Creditor that is USD Noteholder does not comply with

any material provision of this Deed or if any representation or statement made or deemed to be made by such Party is or proves to have been incorrect or misleading in any material respect, in each case, unless failure to comply (or the circumstances leading to the misrepresentation) is capable of remedy and is remedied within 5 Business Days of the Majority EUR Consenting Creditors having given notice to the relevant Party. A termination as a result of this Clause 7.3(b) shall have the effect of terminating this Deed with respect to the relevant Party only. This Deed shall continue in full force and effect and remain valid, binding, and enforceable with regards to each other Party.

(c)     The Majority Euro Consenting Creditors may terminate this Deed by written notice to the other Parties if they, acting reasonably and in good faith, determine that a Material Adverse Effect exists or has occurred at any time following the date of this Deed.

(d)     The Majority Euro Consenting Creditors may terminate this Deed by written notice to the other Parties if a Milestone is not satisfied.

(e)     The Majority Euro Consenting Creditors may terminate this Deed by written notice to the other Parties upon the entry of an order by the Bankruptcy Court, or the filing of a motion or application by the Company Parties seeking an order (without the prior written consent of the Majority Euro Consenting Creditors), (i) dismissing the Chapter 11 Case, (ii) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (iii) appointing, in the Chapter 11 Case, a trustee or examiner with expanded powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code; (iv) terminating the Company's exclusivity under Bankruptcy Code Section 1121; (v) rejecting this Deed, or (vi) terminating the Company Parties' right to use cash collateral.

(f)     The Majority Euro Consenting Creditors may terminate this Deed by written notice to the other Parties if the Bankruptcy Court enters an order denying, reversing, staying, dismissing, vacating, reconsidering or modifying the DIP Orders, any order approving the Disclosure Statement, or the Confirmation Order, or disallowing any material provision thereof (without the consent of the Majority Euro Consenting Creditors), and such order remains in effect for five (5) Business Days after entry of such order.

(g)     The Majority Euro Consenting Creditors may terminate this Deed by written notice to the other Parties if the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in Section 362 of the Bankruptcy Code) with regard to any material asset of the Company and such order materially and adversely affects the Company's ability to operate its business in the ordinary course or to consummate the Restructuring.

(h)     The Majority Euro Consenting Creditors may terminate this Deed by written notice to the other Parties upon (a) a filing by the Company Parties of any motion, objection, application or adversary proceeding challenging the validity, enforceability, perfection or priority of, or seeking avoidance, subordination or characterization of the Debt, and/or the liens securing any such Debt or asserting any other claim or cause of action against and/or with respect to any such Debt, liens, or any agent or indenture trustee under any of the relevant debt documents (or if the Company Parties support any such motion, application or adversary proceeding commenced by any third party) or (b) the entry of an order by the Bankruptcy Court providing relief adverse to the interests of any Consenting Creditor or any agent or indenture trustee with respect to any of the foregoing claims, causes of action or proceedings, including an order granting standing to any other party to prosecute such claims, causes of action or proceedings.

(i)     The Majority Euro Consenting Creditors may terminate this Deed if any Governmental Body, including any regulatory authority or court of competent jurisdiction, issues any ruling, judgment, or order enjoining the consummation of, or rendering illegal, a material portion of the Restructuring (including consummation of the Plan), which ruling, judgment, or order has not been not stayed, reversed, or vacated within fifteen (15) Business Days after such issuance.

(j)     The Majority Euro Consenting Creditors may terminate this Deed by written notice to the other Parties if the Company Parties withdraw the Plan or file any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Deed and such withdrawal, motion, or pleading has not been revoked or withdrawn within three (3) Business Days of receipt by the Company Parties of written notice from the Majority Euro Consenting Creditors that such withdrawal, motion or pleading is inconsistent with this Deed.

(k)     The Majority Euro Consenting Creditors may terminate this Deed if any Company Party (1) executes a binding definitive written agreement with respect to, or consummates, an Alternative Restructuring, or (2) provides notice under Section 16 (*Fiduciary Duties*) hereof.

7.4     **Termination by the Company**

(a)     The Company Parties may terminate this Deed upon the breach, in any material respect, by one or more of the Consenting Creditors of any of the undertakings or covenants of the Consenting Creditors set forth herein which, if capable of being cured, remains uncured for a period of seven (7) Business Days after the receipt of written notice from the Company Parties to the Majority Euro Consenting Creditors detailing such breach pursuant to this Clause 7.4 and, as a result, as of the date that is five (5) Business Days after the Consenting Creditors' receipt of the aforementioned written notice from the Company Parties, the non-breaching Consenting Creditors hold less than two-thirds of the aggregate principal amount of any of the SS Term Loan Debt, Euro Notes Debt, USD Notes Debt, or Promissory Note Debt then outstanding; *provided that* the Company Parties may, at their option, terminate this Deed solely as to any Consenting Creditor that breaches, in any material respect, any of the undertakings or covenants set forth herein (to the extent such breach remains uncured for a period of five (5) Business Days after the receipt of written notice of such breach pursuant to this Clause 7.4, whether or not such breach would entitle the Company Parties to terminate this Deed with respect to all Consenting Creditors.

(b)     The Company Parties may terminate this Deed if any representation or warranty in this Deed made by any Consenting Creditors shall have been untrue in any material respect when made, and such breach remains uncured (to the extent curable) for a period of seven (7) Business Days after the receipt of written notice from the Company Parties to the Majority Euro Consenting Creditors detailing such breach pursuant to this Clause 7.4 and, as a result, as of the date that is five (5) Business Days after receipt of the aforementioned written notice from the Company Parties, the non-breaching Consenting Creditors hold less than two-thirds of the aggregate principal amount of any of the SS Term Loan Debt, Euro Notes Debt, USD Notes Debt, or Promissory Note Debt then outstanding; provided that the Company Parties may, at their option, terminate this Deed solely as to any Consenting Creditor that breaches, in any material respect, any of the representations or warranties set forth herein (to the extent breach remains uncured for a period of five (5) Business Days after the receipt of written notice of such breach pursuant to this Clause 7.4), whether or not such breach would entitle the Company Parties to terminate this Deed with respect to all Consenting Creditors.

(c)     The Company Parties may terminate this Deed if the board of directors or other governing body of any Company Party determines in good faith after consultation with counsel (i) that continued performance under this Deed or the Restructuring Documents (including taking any action or refraining from taking any action) would be inconsistent with the exercise of its fiduciary duties under applicable law; or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring, provided, however, that the Company Parties shall provide notice within forty-eight (48) hours following such determination to counsel to the Majority Euro Consenting Creditors.

(d)     The Company Parties may terminate this Deed if the DIP Orders, any order approving the Disclosure Statement, or the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is modified or amended after entry in a manner that is not acceptable to the Company Parties and such order remains in effect for five (5) Business Days after entry of such order.

(e)     The Company Parties may terminate this Deed if any Governmental Body, including any regulatory authority or court of competent jurisdiction, issues any ruling, judgment, or order enjoining the consummation of, or rendering illegal, a material portion of the Restructuring (including consummation of the Plan), which ruling, judgment, or order has not been not stayed, reversed, or vacated within fifteen (15) Business Days after such issuance.

(f)     The Company Parties may terminate this Deed by written notice to the other Parties at 11:59 p.m. on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction either: (A) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (B) involuntarily dismissing any of the Chapter 11 Cases, (C) appointing of a trustee, liquidator or analogous officeholder or examiner with expanded powers (as such term is used in the Bankruptcy Code) in one or more of the Chapter 11 Cases, (D) enforcing any right to (1) appoint one or more receivers and/or receivers and managers over any of the shares and/or assets of any Company Party or (2) enforce security over any of the shares or assets of any Company Party, or (E) any other order that is analogous to any of the foregoing under the laws of any jurisdiction, the effect of which would render the Restructuring incapable of consummation on the material terms set forth in this Deed; provided that no right to terminate will arise if such order is entered or any of steps (A) through (E) (subject to Bankruptcy Court approval) is taken for the purpose of completing the Restructuring; and provided further that if such termination is the result of any act or omission on the part of a Party or any representative thereof in violation of its obligations under this Deed, then this termination event shall not be available to such Party as a basis for termination of this Deed.

**7.5**    **Termination as to Additional Consenting Creditor**

(a)     The Majority Euro Consenting Creditors may terminate this Deed as it pertains to an Additional Consenting Creditor by written notice to the relevant Additional Consenting Creditor if such Additional Consenting Creditor does not comply with any material provisions of this Deed or if any representation or statement made or deemed to be made by such Additional Consenting Creditor is or proves to have been incorrect or misleading in any material respect, in each case unless failure to comply (or the circumstances leading to the misrepresentation) is capable of remedy and is remedied within 5 Business Days of the requisite Consenting Creditors given notice to the relevant Additional Consenting Creditor.

(b)     For the avoidance of doubt, a termination as a result of this Clause 7.4 shall have the effect of terminating this Deed with respect to the relevant Additional Consenting

Creditor only. This Deed shall continue in full force and effect and remain valid, binding, and enforceable with regards to each other Party.

7.6    **Termination as to Consenting Shareholders**

(a)    The Majority Euro Consenting Creditors may terminate this Deed as it pertains to a Consenting Shareholder only by written notice to the relevant Consenting Shareholder if such Consenting Shareholder does not comply with any material provisions of this Deed (which shall include without limitation Clause 3.3, Clause 3.7, Clause 3.10 and Clause 3.12) or if any representation or statement made or deemed to be made by such Consenting Shareholder is or proves to have been incorrect or misleading in any material respect, in each case unless failure to comply (or the circumstances leading to the misrepresentation) is capable of remedy and is remedied within 5 Business Days of the requisite Consenting Creditors given notice to the relevant Consenting Shareholder.

(b)    For the avoidance of doubt, a termination as a result of this Clause 7.6 shall have the effect of terminating this Deed with respect to the relevant Consenting Shareholder only. This Deed shall continue in full force and effect and remain valid, binding, and enforceable with regards to each other Party.

7.7    **Termination by the Majority USD Consenting Creditors**

(a)    The Majority USD Consenting Creditors may terminate this Deed by written notice to the other Parties if a Company Party does not comply with any material provision of this Deed or if any representation or statement made or deemed to be made by such Party is or proves to have been incorrect or misleading in any material respect, in each case unless failure to comply (or the circumstances leading to the misrepresentation) is capable of remedy and is remedied within 5 Business Days of the Majority USD Consenting Creditors giving notice to the relevant Party.

(b)    The Majority USD Consenting Creditors may terminate this Deed by written notice to the other Parties if a Consenting Creditor that is a member of the Euro Notes Ad Hoc Committee does not comply with any material provision of this Deed or if any representation or statement made or deemed to be made by such Party is or proves to have been incorrect or misleading in any material respect, in each case, unless failure to comply (or the circumstances leading to the misrepresentation) is capable of remedy and is remedied within 5 Business Days of the Majority USD Consenting Creditors having given notice to the relevant Party.

(c)    The Majority USD Consenting creditors may terminate this Deed by written notice to the other Parties if a Milestone is not satisfied within ten (10) Business Days of the relevant Milestone date. For the avoidance of doubt, if any Milestone has been extended (i) in accordance with Clause 4.1 with the consent of the Majority USD Consenting Creditors, or (ii) in accordance with Clause 4.2(h) by the Company, the ten (10) Business Day period to which this paragraph (c) applies will commence from the date to which such Milestone has been extended.

8.    **SURVIVAL**

The rights and obligations of the Parties under Clause 1.2 (*Interpretation*), this Clause 8 (*Survival*), Clause 9 (*Notices*), Clause 12 (*Limitation of Liability*), Clause 13 (*Confidentiality*), Clause 14 (*Third Party Rights; Relationship among Consenting Creditors*), Clause 15 (*Specific Performance*), Clause 17 (*Reservation of Rights*), Clause 20 (*Parties' Rights and Obligations*), Clause 21 (*Counterparts*), Clause 22 (*Governing Law*), Clause 23 (*Enforcement and Submission to Jurisdiction*) and Clause 25 (*Service of Process*) (the "**Surviving Provisions**")

and the rights and obligations of the Parties in respect of breaches of this Deed which have accrued prior to the Termination Date shall, in each case, continue notwithstanding the occurrence of the Termination Date.

9.    **NOTICES**

(a)    Any communication made or received or any notice or confirmation to be provided under or in connection with this Deed may be made or received by a Party's advisor on behalf of that Party, and, if so made or received, shall be deemed to be made or received by such Party.

(b)    Any notice or other written communication to be given under or in relation to this Deed must be given in the English language by email to the email address as set out below (or in the case of any communication or notice given to an advisor on behalf of a Party in accordance with paragraph (a) above, the relevant advisor Email Address).

(c)    The addresses for notices are as follows:

(i)    to the Euro Notes Ad Hoc Committee, to the Euro Notes Ad Hoc Committee's Advisors:

Address: Gibson Dunn & Crutcher UK LLP, Telephone House, 2-4 Temple Avenue, Temple, London EC4Y 0HB, United Kingdom

Email: CHoward@gibsondunn.com; MSquire@gibsondunn.com

Attention: Christopher J. Howard, Matthew Squire

Address: Gibson Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193

Email: KMartorana@gibsondunn.com; MJWilliams@gibsondunn.com

Attention: Keith Martorana, Matthew J Williams

(ii)    to the Company Parties:

Address: Linklaters LLP, 1 Silk Street,  London EC2Y 8HQ

Email: dllycralinklaters@linklaters.com

Attention: James Warboys, Liam Robinson

(d)    Any notice or other written communication to be given under this Deed shall be deemed to have been served at the time of transmission if sent by email provided, in each case, such notice or other written communication is in legible form.

(e)    The accidental omission to send any notice, written communication or other document in accordance with paragraphs (a) to (c) above shall not affect the provisions of this Deed.

10.    **REPRESENTATIONS AND WARRANTIES**

10.1    **All Party representations**

Each Party makes the representations and warranties set out in this Clause 10.1 to each other Party on the date on which it becomes a Party by reference to the facts and circumstances then existing on that date:

(a)      it is duly incorporated (if a corporate person) or duly established (in any other case) and validly existing under the law of its jurisdiction of incorporation or formation;

(b)      it has the power to own its assets and carry on its business as it is being, and is proposed to be, conducted;

(c)      the obligations expressed to be assumed by it in this Deed are legal, valid, binding and enforceable, subject to any applicable Reservations;

(d)      the entry into and performance by it of, and the transactions contemplated by, this Deed do not and will not conflict with any law or regulation applicable to it or its constitutional documents or any agreement or instrument binding on it or any of its assets, subject to any applicable Reservations;

(e)      it has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of this Deed and (subject to the fulfilment of the conditions to the implementation and consummation of the Restructuring specified in the Term Sheet) the transactions contemplated by this Deed, subject to any applicable Reservations; and

(f)      all corporate and regulatory authorisations required for the performance by it of this Deed and the transactions contemplated by this Deed and to make this Deed admissible in evidence in its jurisdiction of incorporation and any jurisdiction where it conducts its business have been obtained or effected and are in full force and effect.

10.2     **Consenting Creditors and Consenting Shareholders representations**

In addition to the representations and warranties given in Clause 10.1 (*All Party representations*), each Consenting Creditor and each Consenting Shareholder represents and warrants to each of the other Parties as to itself as at the date on which it becomes a Party by reference to the facts and circumstances then existing on that date:

(a)      it is authorised, legally entitled and able to control the exercise and casting of votes, and consenting to amendments to the Debt Documents and any documents required under the DIP Financing in relation to its Locked-Up Debt and its Locked-Up Shares, as applicable, to the extent necessary to comply with the terms of this Deed and promote all relevant approvals for the implementation of the Restructuring, including the DIP Financing;

(b)      other than pursuant to this Deed, its Locked-Up Debt and its Locked-Up Shares, as applicable, is free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would prevent in any way such Consenting Creditor's performance of the obligations contained in this Deed at the time such obligations are required to be performed;

(c)      it has the power to vote, deal with, approve changes to, dispose of and transfer all of its Locked-Up Debt and its Locked-Up Shares, as applicable, as contemplated by this Deed;

(d)     (i) it is either (A) a "qualified institutional buyer" as defined in Rule 144A of the Securities Act, (B) a non-U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rule 501(a)(1), (2), (3), or (7) of the Securities Act), and (ii) any securities acquired by the Consenting Creditor or Consenting Shareholder in connection with the Restructuring will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

(e)     it has made its own independent appraisal of, and investigation into, all risks arising in respect of the business of the Company Parties and the Group or under or in connection with the Restructuring, this Deed, the Restructuring Documents and any associated documentation that it considers sufficient and reasonable for purposes of entering into the Restructuring, this Deed, the Restructuring Documents and any associated documentation, and has independently concluded that its entry into the Restructuring, this Deed, and any associated documentation is in its own best interests and (if applicable) the interests of any person it acts for or represents; and

(f)     (except for any Locked-Up Debt held by it in its capacity as Qualified Market- maker) the aggregate principal amount of its Locked-Up Debt as set it in any Confidential Annexure or Transfer Certificate delivered by it to the Euro Notes Ad Hoc Committee's Advisors constitutes all the Debt legally and beneficially owned by it at the relevant date of delivery.

## 10.3    Repetition

Delivery of an Accession Deed or Transfer Notice constitutes confirmation by the relevant person that the representations and warranties sets out in Clause 10.1 (*All Party representations*) and Clause 10.2 (*Consenting Creditors and Consenting Shareholders representations*) are true and correct in relation to it as at the date of delivery as if made by reference to the facts and circumstances then existing.

## 10.4    Company Party representations

To the best of its knowledge having made all reasonable enquiries, each Company Party represents and warrants to each other Party that by reference to the facts and circumstances as at the date of this Deed:

(a)     no member of the Group is the legal or beneficial owner of any Debt nor a sub-participant of any Debt; and

(b)     it does not engage in:

(i)     the design, fabrication, development, testing, production or manufacture of one or more "critical technologies" within the meaning of Section 721 of the U.S. Defense Production Act of 1950, as amended, including all implementing regulations thereof (the "**DPA**");

(ii)    the ownership, operation, maintenance, supply, or servicing of "covered investment critical infrastructure" within the meaning of the DPA (where such activities are covered by column 2 of Appendix A to 31 C.F.R. Part 800); or

(iii)   the maintenance or collection, directly or indirectly, of "sensitive personal data" of U.S. citizens within the meaning of the DPA,

nor does it have any current intention of engaging in any such activities in the future.

11.  **AMENDMENTS, WAIVERS AND FURTHER ASSURANCE**

11.1  Subject to Clause 11.2 (*Exceptions*) below, the terms of this Deed may be modified, amended, or supplemented only with the written consent of the Majority Euro Consenting Creditors and the Company Parties' Agent. The Company Parties' Agent may effect, as agent of each Company Party, any waiver, modification, amendment, or supplement permitted by this Clause 11. This includes any waiver, modification, amendment, or supplement which would, but for this Clause 11, require the consent of all or any of the Company Parties.

11.2  **Exceptions**

In addition to satisfying the requirements of Clause 11.1 hereof:

(a)  Any waiver, modification, amendment, or supplement that materially, disproportionately, and adversely affects a Consenting Creditor individually shall require the prior written consent of such Consenting Creditor.

(b)  If it is possible to implement the Restructuring out-of-court and the Majority Euro Consenting Creditors agree with the Company Parties to implement the Restructuring out-of-court, an amendment or modification of the terms of the Term Sheet to the extent necessary to facilitate successful implementation of the Restructuring on an out-of-court basis (based on the advice of external counsel) shall require the consent of the Majority Euro Consenting Creditors, the Company Parties' Agent and, if the amendment or modification concerns a decrease in the allocation of Warrants to the holders of USD Notes, the Majority USD Consenting Creditors.

(c)  Any waiver, modification, amendment, or supplement that adversely affects the Consenting Shareholders in a material respect shall require the prior written consent of each Consenting Shareholder.

(d)  Any amendment or modification of the terms of this Deed or the Term Sheet if the amendment or modification concerns (i) a decrease in the allocation of, or modification of the terms of the Warrants issued to the holders of USD Notes, or (ii) payment of fees, costs and expenses of the USD Noteholders' Advisors, shall require the prior written consent of the Majority USD Consenting Creditors.

(e)  Any amendment or modification of the definition of "Majority Euro Consenting Creditors" shall require the consent of each member of the Euro Notes Ad Hoc Committee.

(f)  Any amendment or modification of the definition of "Majority USD Consenting Creditors" shall require the consent of each Consenting Creditor that is a USD Noteholder.

(g)  Any amendment or modification of this Clause 11 (*Amendments, Waivers and Further Assurance*) shall require the consent of each Original Consenting Creditor.

(h)  Any waiver, modification, amendment or supplement of, or in relation to, any term of this Deed or the Term Sheet that has the effect of changing or which relates to (i) any Majority USD Consenting Creditor consent or approval right specified in this Deed or the Term Sheet, (ii) Clause 6 (*Transfers*) in so far as it relates to any Transfer or any USD Notes Debt, or (iii) Clause 7.7 (*Termination by the Majority USD Consenting Creditors*), shall require, and shall not be effective without, the consent of the Majority USD Consenting Creditors.

11.3 The consent of any Party to any amendments, modifications, waivers or supplements made pursuant to this Clause 11 may be provided via email by (i) such Party or (ii) in the case of:

(a) a Company Party or the Company Parties' Agent, by the Company's Counsel; and

(b) a member of the Euro Notes Ad Hoc Committee, by the Euro Notes Ad Hoc Committee's Counsel.

## 12. LIMITATION OF LIABILITY

(a) Nothing in this Deed shall:

(i) be construed to prohibit any Party from asserting or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Deed or prevent any Party from enforcing this Deed;

(ii) require any Party to take any action that would breach any legal or regulatory requirement beyond the control of that Party or any order or direction of any relevant court, regulator, or Governmental Body, in each case provided that such breach cannot be avoided or removed by taking reasonable steps which would not otherwise cause material disadvantage to such Party;

(iii) require any Party or any officer or director of any Party to take or procure the taking of or refrain from taking any action if doing so is reasonably likely to result in:

(A) any representative incurring personal liability or sanction due to a breach of any law, regulation or legal or fiduciary duty; or

(B) a breach of law, regulation or legal duty applicable to that Party, provided that such breach cannot be avoided or removed by taking reasonable steps which would not otherwise cause material disadvantage to such Party;

(iv) require any Consenting Creditors to make any additional equity or debt financing available to any member of the Group or the Group, except as contemplated by this Deed, the Term Sheet or any Restructuring Document; or

(v) require any Consenting Creditor to incur any material out of pocket costs or expenses (including entry into any agreement providing for indemnification by such Consenting Creditors of any person) unless expressly agreed by that Consenting Creditor.

(b) If a Party anticipates that it will, or is reasonably likely to, fail to take or refrain from taking action which would otherwise have been required were it not for this Clause 12 (*Limitation of Liability*), it shall so notify the Euro Notes Ad Hoc Committee's Advisors and the Company Parties promptly upon becoming so aware.

(c) If a Party fails to take or refrains from taking action which would otherwise have been required were it not for this Clause 12 (*Limitation of Liability*), it shall so notify the Euro Notes Ad Hoc Committee's Advisors and the Company Parties promptly upon becoming so aware, and the Euro Notes Ad Hoc Committee's Advisors and the Company Parties shall be entitled to require the relevant Party to provide reasonably satisfactory evidence (without any obligation on such Party whatsoever to breach any relevant privilege) as to why taking or refraining from taking the action would have

given rise to the breach of the applicable law, regulation, statute or legal or fiduciary duty referred to in this Clause 12 (*Limitation of Liability*).

(d)     Nothing in this Deed constitutes any Party or an advisor as a trustee, agent or fiduciary of any other person.

(e)     No advisor shall be liable to any person for any action taken or not taken by it under or in connection with this Deed, including any losses, damages, claims, liabilities, costs (including but not limited to legal costs and disbursements) and expenses of any kind, unless directly caused by its fraud or wilful misconduct. The advisors may assume that (and shall not be under any obligation to any person to verify or arrange, coordinate or facilitate the verification of) any representation, notice or document delivered to them is genuine, correct and appropriately authorised and any statement made by any director, authorised signatory or employee of any person regarding any matters which may reasonably be assumed to be within that person's knowledge or within that person's power to verify.

13.     **CONFIDENTIALITY**

13.1    The Parties agree that: (i) the proportion of the Locked-Up Debt held by a Consenting Creditor is strictly confidential; and (ii) it will not make any disclosure to any person, which would identify such Consenting Creditor's individual holdings of Locked-Up Debt without the prior consent of that Consenting Creditor.

13.2    Subject to Clause 13.1, each Consenting Creditor hereby irrevocably authorises the Euro Notes Ad Hoc Committee's Advisors to inform the Parties of the aggregate amount of Locked-Up Debt held by each of the Euro Notes Ad Hoc Committee and Consenting Creditors that are USD Noteholders.

13.3    Subject to Clause 13.1, the Parties agree that, promptly upon a reasonable request from the Euro Notes Ad Hoc Committee's Counsel or Company's Counsel, to provide a list of the Consenting Creditors that are USD Noteholders or Euro Notes Ad Hoc Committee to the Euro Notes Ad Hoc Committee's Counsel or the Company's Counsel, as applicable.

13.4    Subject to Clause 13.1, each Party agrees not to disclose the identity of any other Party, or this Deed (including the existence of or any terms of this Deed), other than that:

(a)     a Party may disclose this Deed (and as a result the identities of all other Parties):

(i)     to any of its respective Affiliates, officers, directors, members, employees, representatives and/or advisors and auditors, or, other than with respect to the identity of the other Consenting Creditors, to its managed funds (each, a "**Representative**") who have a bona fide need to know the existence or any terms of this Deed or the identities of any other Consenting Creditor and who are informed of the obligations under this Clause 13 (*Confidentiality*) and, unless the person is bound by a professional confidentiality obligation or is one of its employees or directors, has confirmed in writing to the Consenting Creditor that it will not disclose this Deed or its existence to any other person unless such Consenting Creditor would be so permitted;

(ii)    subject to Clause 13.1, to any governmental, banking, taxation or other regulatory authority or similar body or any stock exchange if required pursuant to any applicable law or regulation; or

- 35 -

(iii)    subject to Clause 13.1, to a court of competent jurisdiction in connection with any litigation or arbitration relating to the rights under or in connection with this Deed.

(b)    a Party or a Qualified Market-maker may disclose a redacted version of this Deed that does not include or disclose the identities of any Consenting Creditor, to a proposed new Additional Consenting Creditor, provided that the proposed new Additional Consenting Creditor first delivers to the disclosing Party, disclosing Qualified Market-maker or the Euro Notes Ad Hoc Committee's Advisors a confirmation in writing (including by email) that they agree to (1) keep this Deed confidential and not share outside of their institution and (2) keep the existence and terms of this Deed confidential for such period until such information may become public; or

(c)    a Party may disclose a redacted version of this Deed that does not include or disclose the identities of any Consenting Creditor, to a Qualified Market-maker to the extent necessary to facilitate trading in the Debt, provided that the Qualified Market-maker first delivers to the Euro Notes Ad Hoc Committee's Advisors a confirmation in writing (including by email) that, subject to their ability to disclose the Deed to a proposed new Additional Consenting Creditor pursuant to Clause 13.4(b), they agree to (1) keep the Deed confidential and not share outside of their institution and (2) keep the existence and terms of the Deed confidential for such period until such information may become public.

13.5    If and to the extent (a) self-cleansing is permitted at that time under any confidentiality agreement signed by a Consenting Creditor with or for the benefit of any Company Party; and (b) required by law, including applicable securities trading laws, to prevent a Consenting Creditor from being restricted from trading the Locked-Up Debt by virtue of the existence of this Deed, that Consenting Creditor may make a public disclosure as required by law and in accordance with the terms of the relevant confidentiality agreement applicable to such Consenting Creditor to set aside such restriction.

13.6    The Consenting Creditors agree that the following information may be disclosed to any trustee or security agent under any of the Debt Documents, the Company Parties and their respective advisers, and each Consenting Creditor hereby irrevocably authorises the Euro Notes Ad Hoc Committee's Advisors to make such disclosure:

(a)    the existence of this Deed;

(b)    the number of institutions who have signed this Deed; and

(c)    the aggregate amount of Locked-Up Debt held by the Consenting Creditors, but not the identity of any of the Consenting Creditors without the consent of the relevant Consenting Creditor(s).

13.7    Subject to Clause 12 (*Limitation of Liability*), until the Termination Date, no public announcement including the identity of any Consenting Creditor will be made by or on behalf of any Party without the prior consent of that Consenting Creditor.

14.    **THIRD PARTY RIGHTS; RELATIONSHIP AMONG CONSENTING CREDITORS**

(a)    Unless expressly provided to the contrary in this Deed, a person who is not a Party may not enforce any of its terms under the Contracts (Rights of Third Parties) Act 1999, other than the Euro Notes Ad Hoc Committee's Advisors in respect of Clause 5.2, Clause 12(e) (*Limitation of Liability*), Clause 13.2 and Clause 13.5 and, notwithstanding any

- 36 -

term of this Deed, no consent of any third party is required for any amendment (including any release or compromise of any liability) or termination of this Deed.

(b)   No Consenting Creditor shall have any responsibility for any trading by any other entity by virtue of this Deed. No prior history, pattern, or practice among or between the Consenting Creditor shall in any way affect or negate this Deed. The Consenting Creditors have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Group, and do not constitute a "group" within the meaning of Rule 13d-5 under the Exchange Act. No Consenting Creditor shall have, by reason of this Deed, a fiduciary relationship in respect of any other Consenting Creditor, and nothing in this Deed, expressed or implied, is intended to or shall be so construed as to impose upon any Consenting Creditor any obligations in respect of this Deed, except as expressly set forth herein.

15.   **SPECIFIC PERFORMANCE**

The Parties agree that monetary damages would not be a sufficient remedy for the breach by any Party of any term of this Deed. Any non-breaching Party may seek specific performance and injunctive or other equitable relief as a remedy for any such breach. Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies which any Party may have under this Deed or otherwise.

16.   **FIDUCIARY DUTIES**

(a)   Notwithstanding anything to the contrary herein, nothing herein shall require the Company Parties or their subsidiaries or affiliates or any of their respective directors, managers, officers or members, as applicable (each in such person's capacity as a director, manager, officer or member), after consulting with counsel, to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with, or cause such party to breach, such party's fiduciary obligations under applicable law, provided that the Company Parties shall promptly notify the Majority Euro Consenting Creditors of any such determination within forty-eight (48) hours of any such determination. Notwithstanding anything to the contrary herein, except as required under applicable law, nothing in this Deed shall create any additional fiduciary obligations on the part of the Parties, or any members, partners, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the same or their respective affiliated entities, in such person's capacity as a member, partner, manager, managing member, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of such Party or its affiliated entities, that such entities did not have prior to the execution of this Deed. Nothing in this Deed shall (i) impair or waive the rights of the Parties to assert or raise any objection permitted under this Deed in connection with the Restructuring or (ii) prevent the Parties from enforcing this Deed or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Deed.

(b)   Notwithstanding anything to the contrary in this Deed (but subject to Clause 16(a) hereof), if the Company Parties receive an unsolicited proposal for an Alternative Restructuring, the Company Parties and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (i) consider, respond to, and facilitate such Alternative Restructuring; (ii) subject to the terms and conditions of this Deed, provide access to non-public information concerning the Company Parties to any entity or enter

- 37 -

into confidentiality agreements or nondisclosure agreements with any entity; (iii) maintain or continue discussions or negotiations with respect to such Alternative Restructuring; (iv) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of such Alternative Restructuring; and (v) enter into or continue discussions or negotiations with holders of claims against or equity interests in a Company Party, any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other entity regarding such Alternative Restructuring, *provided that* if any Company Party receives an Alternative Restructuring proposal, the Company Party shall provide a summary of the material terms of any such Alternative Restructuring proposal to the Euro Notes Ad Hoc Committee's Advisors no later than two (2) Business Days following receipt thereof by any of the Company Parties.

17. **RESERVATION OF RIGHTS**

(a)     Unless expressly provided to the contrary, this Deed does not amend or waive any Party's rights under the Debt Documents or any other documents and agreements, or any Party's rights as creditors of any member of the Group.

(b)     The Parties fully reserve any and all of their rights until such time as the Restructuring is implemented.

(c)     If this Deed is terminated by any Party for any reason, the rights of that Party against the other Parties to this Deed, and those other Parties' rights against the terminating Party, shall be fully reserved.

18. **SEVERABILITY**

If a term of this Deed is or becomes illegal, invalid or unenforceable in any jurisdiction, that will not affect:

(a)     the legality, validity or enforceability of any other term of this Deed; or

(b)     the legality, validity or enforceability in other jurisdictions of that term or any other term of this Deed.

19. **DATES OTHER THAN A BUSINESS DAY**

If any obligation is to be performed under the terms of this Deed on a date other than a Business Day and is not capable of being performed on such date, the relevant obligation shall be performed on the next Business Day.

20. **PARTIES' RIGHTS AND OBLIGATIONS**

(a)     The obligations of each Party under this Deed are several. Failure by a Party to perform its obligations under this Deed does not affect the obligations of the other Parties under this Deed.

(b)     The rights of each Party under or in connection with this Deed are separate and independent rights. A Party may separately enforce its rights under this Deed.

(c)     For the avoidance of doubt, the Consenting Creditors shall comply with the covenants set forth in Clause 3 (*Support for the Restructuring*) of this Deed in all of their respective capacities, including as Lenders under (and as defined in) the Debt Documents and holders of Debt, as applicable.

21.   **COUNTERPARTS**

(a)   This Deed may be signed by the Parties in any number of counterparts. This has the same effect as if the signatures on the counterparts were on a single copy of this Deed.

(b)   Unless otherwise provided for in the execution pages, it is acknowledged that a Party signing in one capacity in the execution pages to this Deed will not be deemed to have signed this Deed in any other capacity.

22.   **GOVERNING LAW**

This Deed (including any non-contractual obligations arising out of or in connection with this Deed) shall be governed by English law.

23.   **ENFORCEMENT AND SUBMISSION TO JURISDICTION**

(a)   Each Party agrees that the courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Deed or any non-contractual obligations arising out of or in connection with it.

(b)   Each Party agrees that the courts of England are the most appropriate and convenient courts to settle any such disputes and accordingly no Party will argue to the contrary.

(c)   References in this Clause 23 (*Enforcement*) to a dispute in connection with this Deed include any dispute as to the existence, validity or termination of this Deed.

(d)   By executing or acceding to, as applicable, this Deed and notwithstanding any term to the contrary in any Debt Document, each Consenting Creditor acknowledges and submits to the jurisdiction of the English court in respect of any English Court Process or restructuring plan used or to be used to support, facilitate, implement or consummate or otherwise give effect to all or any part of the Restructuring and agrees that it shall enter an appearance formally in connection with an English Court Process or restructuring plan (if required by the English court or, if any creditor that is not a Consenting Creditor formally objects to an English Court Process or restructuring plan required to implement the Restructuring) or be willing to be joined formally to such an English Court Process or restructuring plan (if required by the English court).

(e)   Notwithstanding any of the foregoing or any term to the contrary in any Debt Document, if any Chapter 11 Case is commenced, nothing in this Clause 23 shall limit the authority of the Bankruptcy Court to hear any matter related to or arising out of this Deed.

24.   **ACKNOWLEDGEMENT**

Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and other applicable Law.

25.   **SERVICE OF PROCESS**

(a)   Without prejudice to any other mode of service allowed under any relevant law:

(i)     each Company Party (other than a Company Party incorporated in England and Wales) appoints The Lycra Company UK Limited as its agent for service of process in relation to any proceedings before the English courts in connection with this Deed;

(ii)    each Party (other than a Party incorporated in England and Wales and the Company Parties referred to in subparagraph (a) above) will, at its own cost and expense, within 10 days of becoming a Party appoint an agent for service of process in relation to any process before the English courts in connection with this Deed, and shall notify the other Parties of the name and address details of such agent for service of process; and

(iii)   each Party agrees that failure by an agent for service of process to notify any relevant Party of the process will not invalidate the process concerned.

(b)   Any Party may, by written notice in accordance with Clause 9 (*Notices*), replace and appoint a successor agent for service of process in relation to any proceedings before the English courts in connection with this Deed.

(c)   If any person appointed as an agent for service of process by a Party, or in the case of the Company parties, as a condition to its becoming a Party, as applicable, is unable for any reason to act as agent for service of process, the relevant Party must immediately appoint another agent and notify the Parties of the name and address details of such agent for service of process.

## 26.   COMPANY PARTIES' AGENT

26.1   Each Company Party (other than The LYCRA Company LLC) by its execution of this Deed or a joinder to this Deed in accordance with Clause 5.1 (*Additional Company Parties*), appoints and authorises the Company Parties' Agent:

(a)   to give and receive all notices and instructions, and make such agreements expressed to be capable of being given or made by the Company Parties' Agent on behalf of the Company Parties or any of them under or in connection with this Deed; and

(b)   to enter into any agreement capable of being entered into by any Company Party (whether in its capacity as a Company Party or otherwise) notwithstanding that such agreement may affect (adversely or otherwise) such Company Party (in any such capacity) (including the terms of any consent or waiver given or required under this Deed and any amendment, variation, supplement, restatement or novation of this Deed, however fundamental it may be and notwithstanding any increase or other change in the obligations of such Company Party), without further reference to, or consent of, such Company Party and such Company Party shall be bound thereby as though such Company Party itself had given such notices and instructions or entered into such agreements provided that in the event of any conflict between any notice or other communication of a Company Party (other than the Company Parties' Agent) and the Company Parties' Agent, that of the Company Parties' Agent shall prevail.

26.2   In all matters relating to this Deed, each Company Party acknowledges and confirms that it is acting as principal and for its own account and not as agent or trustee or in any other capacity whatsoever on behalf of any third party save as expressly provided in Clause 26.1 above.

26.3   Each Company Party agrees that it will provide to the Company Parties' Agent such information as it may reasonably require in order to give effect to its obligations under this Deed.

26.4    Unless otherwise agreed by the relevant Company Party, the Company Parties' Agent will keep confidential information received by it under Clause 26.3 above provided that such information may be disclosed by the Company Parties' Agent for the purposes of discharging its obligations under this Deed.

26.5    Each of the Company Parties hereby releases the Company Parties' Agent from any restrictions on representing several persons and self-dealing under any applicable law to make use of any authorisation granted under this Deed and to perform its duties and obligations as Company Parties' Agent hereunder.

**THIS DEED** has been executed and delivered on the date stated at the beginning of this Deed.

**Schedule 1**
**Term Sheet**

- 42 -

EXECUTION VERSION

**Project Stretch**

**Term Sheet**

This term sheet ("**Term Sheet**") sets out the indicative terms of certain proposed transactions relating to the Group as negotiated and agreed by the Consenting Creditors.

The Term Sheet forms part of the lock-up deed to which it is scheduled (the "**Lock-Up Deed**"). Capitalised terms used in this Term Sheet shall have the meanings given to them in the Lock-Up Deed (as defined above). This Term Sheet remains subject to further tax and legal structuring and definitive documentation signed by the parties.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER TO SELL OR BUY, OR THE SOLICITATION OF AN OFFER TO SELL OR BUY, ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE.   NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE PLAN EFFECTIVE DATE OF THE RESTRUCTURING SUPPORT AGREEMENT ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

| A.  Overview of the Restructuring |
|---|

| **Equity and Debt Restructuring:** | • DIP Notes:<br><br>  o At the option of each holder of DIP Notes, paid in cash in full or cashless exchange on a dollar-for-dollar basis into the Exit Secured Notes.<br><br>• SS Term Loan:<br><br>  o Each SS Term Loan Lender's portion of the SS Term Loan Debt (including accrued and uncapitalised interest) shall be exchanged , on a cashless basis, into its *pro rata* share (based on its portion of the aggregate amount of SS Term Loan Debt as at the Restructuring Effective Date) of the Holdco Notes at an exchange price of 95%.<br><br>  o The holders of the Holdco Notes shall receive Common Equity *pro rata* to their Holdco Notes holdings.<br><br>• Euro Notes:<br><br>  o The Priority Portion of the Euro Notes shall be released and discharged in full in exchange for receiving 95% of the Class A2 Warrants.<br><br>  o The non-Priority Portion of the Euro Notes shall be released and discharged in full in exchange for receiving 5% of the Class A2 Warrants and Class A3 Warrants.<br><br>• USD Notes: |

|  | o Each holder's portion of the USD Notes shall be exchanged into its *pro rata* share of the Class B Warrants. <br><br> • Promissory Note: <br><br>      o Released and discharged in full for each note payee's *pro rata* share of USD 1,000. <br><br> • 1L SPV Notes: <br><br>      o Each 1L SPV Noteholder's portion of the 1L SPV Notes shall be released and discharged in full in exchange for its *pro rata* share of the Class A2 Warrants and cash as set out in Section C (*SPV Notes Issuer Exchange Offer*) below. <br><br> • 2L SPV Notes <br><br>      o Each 2L SPV Noteholder's portion of the 2L SPV Notes shall be released and discharged in full in exchange for its share of the Class A3 Warrants as set out in Section C (*SPV Notes Issuer Exchange Offer*) below. <br><br> • General Unsecured Creditors <br><br>      o Treatment of General Unsecured Creditors to be agreed between Company Parties and Majority Euro Consenting Creditors, other than with respect to Helm, whose claim will be treated pursuant to a settlement, the terms of which have been disclosed to the Majority Euro Consenting Creditors prior to the entry into this Deed. <br><br> • Shareholders <br><br>      o Released and discharged in full for no consideration. |
| **Implementation:** | • To be implemented via a proceeding under Chapter 11 of the U.S. Bankruptcy Code, or as otherwise agreed with the consent of the Company Parties and the Majority Euro Consenting Creditors including, without limitation, the satisfaction of the conditions below. <br><br> • As a condition to any consensual implementation (including the provision of bridge financing): <br><br>      o consents shall be received by 100% of the SS Term Loan Lenders under the SS Term Loan in respect of the incurrence of any bridge financing; <br><br>      o consents shall be received from 50.01% of the USD Noteholders to make the requisite amendments to the USD Notes Indenture; <br><br>      o consents shall be received from 66⅔% of the 1L SPV Noteholders to make the requisite amendments to the Euro Notes Indenture; <br><br>      o consents shall have been received from the Majority Consenting Creditors (as defined in the Existing Lock-Up Deed) to the |

incurrence of any bridge financing; and

- o   consents shall be received by, among others, 66⅔% of the Super Senior Creditors in value, 66⅔% of the  USD Noteholders in value, and 66⅔% of the Euro Noteholders in value to amend the RG Intercreditor Agreement to include an amendment to the turnover provision in the RG Intercreditor Agreement that shall provide that all amounts received by any Primary Creditor (as defined therein) in relation to any Debt Document (as defined therein) (including amounts that are not Enforcement Proceeds (as defined therein)) shall be turned over to the Security Agent for distribution in accordance with Clause 17 (*Application of Proceeds*) of the RG Intercreditor Agreement.

- o   the terms and documentation of any bridge financing to be in form and substance satisfactory to the Company Parties and the Majority Euro Consenting Creditors, save that the economic terms of any bridge financing shall be substantially similar to the economic terms set out in the DIP Term Sheet.

- Equity restructuring to be undertaken, subject to receipt of necessary consents under the Trust Deed, through consensual release of the shares of Eagle Holding Co B.V. from the trust established under the Trust Deed or as otherwise agreed between the Company Parties and the Majority Euro Consenting Creditors.

- If implemented as part of a Chapter 11 Case, the Plan shall contain customary Debtor and third-party release and exculpation provisions consistent with the draft of the Plan provided for review.

| B. Other Restructuring Terms | |
|---|---|
| **Governance Rights:** | • The holders of the Class A Warrants and Class B Warrants (each as described below and together, the "**Warrants**") shall have no voting rights.<br><br>• See Schedule 4 (*Equity Term Sheet*) of the Lock-Up Deed (the "**Equity Term Sheet**"). |
| **MIP:** | The post-restructuring board shall implement a management incentive plan representing up to 10% of the fully diluted Common Equity (including any shares issued in respect of Warrants), with terms to be agreed between the board and management following the Restructuring Effective Date. |
| **Allocation of Warrants:** | The Warrants shall be issued by TopCo on the Restructuring Effective Date.<br><br>**Class A Warrants**<br><br>The following parties shall receive warrants convertible into Common Equity (of a class that is separate and distinct from: (i) the Common Equity held by existing shareholders; (ii) any Common Equity issued in connection with the exercise of the Class B Warrants; and (iii) any Common Equity issued in connection with the exercise of the MIP) (treated as fully paid-up and ranking *pari passu* in all respects with the Common Equity then in issue, save as to voting and the economic entitlements described below), *provided* that such warrants shall only be entitled to participate in distributable proceeds paid from TopCo to the holders of Common Equity and proceeds from a sale of Common Equity in which the holders of the Warrants (or a class thereof) participate (in each case on account of such shares) less distributable proceeds paid from TopCo to holders of shares issued in respect of the MIP on account of such shares ("**DPI**") until Common Equity (including any shares issued in connection with the Class A Warrants and Class B Warrants, but excluding any shares issued in connection with the MIP) have received USD 480,000,000 in aggregate of distributions and/or proceeds from a sale in which the holders of the Warrants participate (the "**Class A Participation Cap**") and shall have no entitlement to any Common Equity value in excess thereof:<br><br>(A) the DIP Noteholders shall receive Class A1 Warrants as a commitment premium convertible into 9% of the fully diluted (other than with respect to the MIP) Common Equity at the time of issuance (including any shares issued in connection with Class A Warrants and Class B Warrants, but excluding any shares issued in connection with the MIP), with allocations to be determined and agreed amongst the DIP Noteholders;<br><br>(B) the SPV Notes Issuer shall receive Class A2 Warrants convertible into 20% of the fully diluted (other than with respect to the MIP) Common Equity at the time of issuance (including any shares issued in connection with Class A Warrants and Class B Warrants, but excluding any shares issued in connection with the MIP); and<br><br>(C) the SPV Notes Issuer shall receive Class A3 Warrants convertible into 1% of the fully diluted (other than with respect to the MIP) Common Equity at the time of issuance (including any shares issued in connection with Class A Warrants and Class B Warrants, but |

excluding any shares issued in connection with the MIP).

All Class A Warrants shall be structured to be fungible with each other.

**Class B Warrants**

The USD Noteholders shall receive Class B Warrants convertible into 6% of the fully diluted (other than with respect to the MIP) Common Equity (of a class that is separate and distinct from: (i) the Common Equity held by existing shareholders; (ii) any Common Equity issued in connection with the exercise of the Class A Warrants; and (iii) any Common Equity issued in connection with the exercise of the MIP) (treated as fully paid-up and ranking *pari passu* in all respects with the Common Equity then in issue, save as to voting and the economic entitlements described below) at the time of issuance (including any shares issued in connection with the Class A Warrants and Class B Warrants, but excluding any shares issued in connection with the MIP) to be allocated *pro rata* to their USD Notes holdings.

The Class B Warrants shall be entitled to participate in DPI only after the Common Equity (including any shares issued in connection with the Class A Warrants, but excluding any shares issued in connection with the MIP) have received USD 120,000,000 of distributions and/or proceeds from a sale in which the holders of the Warrants participate in aggregate (the "**Class B Participation Threshold**").

**Exercise and pricing of Class A Warrants and Class B Warrants**

The Class A Warrants and Class B Warrants shall: (i) only be exercisable in the event of an Exit or in connection with a Tag-Along Sale (each as defined in the Equity Term Sheet) with sufficient advance notice of an Exit or a Tag-Along Sale to be provided to the Warrant holders, and (ii) have an exercise price of USD 0.01 per Warrant (the "**Strike Price**").

**Pre-emption rights**

Subject to customary exclusions, on a new issuance of shares or debt instruments, the Class A Warrants and Class B Warrants will benefit from pro rata pre-emption rights (on an as-if-converted basis) as set out in the Equity Term Sheet. If a holder of warrants does not elect to participate, it shall be diluted by the new share issuance to the extent that TopCo obtains a third-party fair value opinion confirming that the new shares are being issued at fair market value. If any such opinion provides a lower fair market value than the price of the new shares, the holders of the Class A Warrants and Class B Warrants shall be issued additional warrants to place them in the position they would have been in, had the new shares been issued at the fair market value set out in the third-party fair value opinion (the "**Warrantholder Pre-Emption Right**").

**Class B Warrants – Documentation**

The Class B Warrants shall be in a form and substance satisfactory to the Majority USD Consenting Creditors.

**Illustrative example of Exit waterfall**

| Instrument | DPI | | | | |
|---|---|---|---|---|---|
| | First $120m | $m | Next $360m | $m | Over $480m |

| | | | | | |
|---|---|---|---|---|---|
| Common Equity (excl. MIP) | 70% | 84.0 | 64% | 230.4 | 94% |
| Class A1 Warrants | 9% | 10.8 | 9% | 32.4 | 0% |
| Class A2 Warrants | 20% | 24.0 | 20% | 72.0 | 0% |
| Class A3 Warrants | 1% | 1.2 | 1% | 3.6 | 0% |
| Class B Warrants | 0% | 0.0 | 6% | 21.6 | 6% |
| | 100% | 120 | 100% | 360 | 100% |

**Class A Warrants and Class B Warrants – Amendments, waivers and modifications**

Any non-clerical amendments, waivers or modifications to (or under) the terms of the Class A Warrants or Class B Warrants shall not be made without the approval of the holders of warrants who together hold more than 67% of the Class A Warrants and Class B Warrants respectively, provided that, notwithstanding the foregoing, any non-clerical amendment, waiver or modification that (i) results in a reduction of any Economic Term or imposition of any additional obligations on the Warrant holders (including in their capacity as the holders of Common Equity upon exercise or conversion of the Warrants), shall require the prior written consent from each holder of the Class A Warrants or Class B Warrants adversely affected thereby; and (ii) materially adversely and disproportionately affects one Warrant holder as compared to the holders of a simple majority of the Warrants of the same class, shall require the  prior written consent from the Warrant holder so adversely affected.

**"Economic Term"** means: (a) the Strike Price; (b) the percentage of Common Equity that the Class A Warrants or Class B Warrants shall convert into; (c) the Class A Participation Cap; (d) Class B Participation Threshold; (e) the Warrantholder Pre-Emption Right; and (f) the "Priority of Distributions" section of the Equity Term Sheet.

| | |
|---|---|
| **Other Warrant terms** | TopCo shall ensure that, at all times, it has and retains the required authority to issue Common Equity upon exercise of the Warrants free from encumbrances, pre-emption rights or other restrictions. |

The instruments constituting the Warrants shall contain a customary "cashless exercise" and "cash cancellation" mechanic, which can be invoked at the election of a Warrant holder.

The Warrants shall be freely transferable, subject to restrictions equivalent to those applicable to the Common Equity and set out in the "Transfer Restrictions" section of the Equity Term Sheet.

On distributions and returns of capital on the Common Equity, the relevant Warrant holders are entitled to participate in such distributions / returns of capital on an as-if converted basis in accordance with the waterfall. Any distributions or returns of capital that are not in accordance with the waterfall and adversely impact any Economic Term of the Warrants shall require the prior written consent of 90% of the adversely impacted Warrant holders.

The Warrants shall have the benefit of customary protections in respect of share capital reorganisations (e.g. consolidation, subdivision of Common Equity, Etc.), any other corporate reorganisation, conversion, merger with another company or demerger, to prevent any artificial dilution of the Warrants as a result of any such transaction.

Any purchase or redemption of share capital, including buy-back, and share

| | |
|---|---|
| | capital reduction, other than: (a) in relation to a MIP; or (b) pursuant to an offer made in accordance with the waterfall (whether or not such offer is accepted), that adversely impact any Economic Term of the Warrants shall require the prior written consent of 90% of the adversely impacted Warrant holders. |
| | If a Solvent Reorganisation (as defined in the Equity Term Sheet) disproportionately and adversely impacts the holders of the Warrants as compared to the holders of Common Equity, the prior written consent of 90% of the adversely impacted Warrantholders shall be required. |
| | If any agreement, commitment or understanding is entered into (or amended) between: (a) the Topco or any of its subsidiary undertakings (the "Group"); and (b) any shareholder (or its affiliates) or any Investor Director (as defined in the Equity Term Sheet), which is not entered into in the ordinary course of the Group's business or on arm's length terms (as reasonably determined by the board of Topco, excluding any conflicted Investor Director), and which adversely impacts any Economic Term of the Warrants shall require the prior written consent of 90% of the adversely impacted Warrant holders. |
| | The Warrant holders shall have the benefit of tag-along rights as set out in the "Tag-Along Sale" section of the Equity Term Sheet. |
| | The Warrants shall be subject to drag-along rights as set out in the "Drag-Along Sale" section of the Equity Term Sheet. |
| **Pricing Methodology Adjustment Protections:** | Black-Scholes valuation or similar option pricing methodology adjustment protections shall not apply to the Class A Warrants and Class B Warrants. |
| **Fee and expense coverage – Euro Notes Ad Hoc Committee Advisors:** | The Company Parties shall be responsible for the payment of all fees, costs and expenses of the Euro Notes Ad Hoc Committee Advisors (and any other advisors engaged by the Euro Notes Ad Hoc Committee and/or the Euro Notes Ad Hoc Committee Advisors with the consent of Eagle Holding Co B.V.) in full. |
| **Fee and expense coverage – USD Noteholders' Advisors:** | The Company Parties shall be responsible for the payment of the following fees, costs and expenses of the USD Noteholders' Advisors (the "**USD Noteholders' Advisors Fees**") on the earlier of (i) the date falling 10 Business Days after the date of the relevant invoice and (ii) the Restructuring Effective Date provided the relevant invoice is issued at least two Business Days before the expected Restructuring Effective Date: <br><br> (A) all accrued and unpaid fees, costs and expenses of the USD Noteholders' Advisors up to the Effective Date, in the amount agreed between each USD Noteholders' Advisor and the Majority USD Consenting Creditors; and <br><br> (B) fees, costs and expenses of the USD Noteholders' Advisors incurred after the Effective Date, in the amount capped at USD 250,000.00. <br><br> The conditions precedent to the occurrence of the Restructuring Effective Date shall include evidence satisfactory to the Majority USD Consenting Creditors that the USD Noteholders' Advisors Fees have been or will be paid on the Restructuring Effective Date (provided that invoices for the USD Noteholders' Advisors Fees are provided at least two Business Days before the expected Restructuring Effective Date). |

| **Trades:** | Certain parties to the Lock-Up Deed have entered into trades prior to, and/or substantially concurrently with, entry into the Lock-Up Deed, the terms of which have been disclosed to the Euro Ad Hoc Committee and deemed consented to under the Lock-Up Deed (the "**Disclosed Trades**"). |
|---|---|
| | Any amendments to such prior Disclosed Trades shall require the consents of the Majority Euro Consenting Creditors. |
| | The Restructuring Effective Date shall be conditional upon the settlement of the Disclosed Trades. |
| **Bloomberg Reporting:** | The Issuer of the DIP Financing shall use commercially reasonable efforts to procure that Bloomberg reports such DIP Financing instrument on the Bloomberg terminal as soon as reasonably practicable following the issuance of the DIP Notes. |
| **Tax Matters:** | The Parties will work together in good faith and will use commercially reasonable efforts to structure and implement the restructuring transactions contemplated in this Term Sheet in a tax efficient and cost-effective manner for the Company Parties as determined by the Company Parties and the Majority Euro Consenting Creditors. |

| **C. SPV Notes Issuer – Exchange Offer** | |
|---|---|
| **Exchange Offer:** | <ul><li>Each Party to this Lock-Up Deed that is a 1L SPV Noteholder shall vote in favour of, and otherwise support, an exchange offer and/or consent solicitation to be launched by the SPV Notes Issuer pursuant to which such Party will elect to exchange its 1L SPV Notes in exchange for its *pro rata* share of the Class A2 Warrants and an amount of cash standing to the credit of bank accounts held by the SPV Notes Issuer to be agreed by the SPV Notes Issuer and the Majority Euro Consenting Creditors.</li><li>Each Party to this Lock-Up Deed that is a 2L SPV Noteholder shall vote in favour of, and otherwise support, an exchange offer and/or consent solicitation to be launched by the SPV Notes Issuer pursuant to which such Party will elect to exchange its 2L SPV Notes for its *pro rata* share of the Class A3 Warrants.</li><li>In the event that consents from at least 90% of the 1L SPV Noteholders and 2L SPV Noteholders are received in respect of the exchange offer and/or consent solicitation described above, any stub of the 1L SPV Notes and 2L SPV Notes remaining outstanding following completion of such exchange offer and/or consent solicitation shall be written down and released and stub 1L SPV Noteholders' *pro rata* share of the Class A2 Warrants and cash and 2L SPV Noteholders' Class A3 Warrants shall be transferred to a holding period trust.</li><li>In the event that consents from at least 90% of the 1L SPV Noteholders and 2L SPV Noteholders are not received, the Parties to this Lock-Up Deed that are 1L SPV Noteholders and 2L SPV Noteholders shall agree to take all steps necessary, including the delivery of any Enforcement Instructions if required, to ensure that SPV Notes Issuer can be wound down in an orderly manner. Any remaining assets of the SPV Notes Issuer will be liquidated and distributed to creditors in such a wind down scenario in accordance with the legal waterfall in Jersey.</li></ul> |

| | D. Exit Financing – Exit Secured Notes |
|---|---|
| **Principal Amount:** | The Principal Amount shall comprise:<br><br>• USD 75,000,000 committed facility;<br><br>• such amount required to repay the interest accrued and unpaid on the DIP Financing; and<br><br>• USD 25,000,000 uncommitted incremental facility. |
| **Currency:** | USD. |
| **Issuer:** | Eagle Intermediate Global Holding B.V. |
| **Commitment Parties:** | The following parties to this Lock-Up Deed hereby unconditionally and irrevocably commit to purchase, severally and not jointly, the Exit Secured Notes:<br><br>• ██████████████████████<br><br>██████████████████████<br>████████████<br><br>██████████████████████<br>████████████████<br><br>██████████████████████<br>████████<br><br>The allocations between the Commitment Parties shall be determined and agreed amongst such Commitment Parties and the Issuer on or about the date of the Lock-Up Deed. |
| **Issue Date:** | The Restructuring Effective Date. |
| **Original Issue Discount (OID):** | ██████████████████████████████████████████ |
| **Interest:** | Interest shall accrue on the Exit Secured Notes from the Issue Date in accordance with the rates set forth in the table below.<br><br>██████████████████████████████ |
| **Commitment Premium:** | ██████████████████████████████████████████ |

| | |
|---|---|
| | ██████████████████████████████████████ ██████████████ |
| **Use of Proceeds:** | Proceeds from the Exit Secured Notes shall be applied in repayment in full of the DIP Financing. |
| **Coupon Payment Dates:** | ████████████████████████████ |
| **Maturity Date:** | Restructuring Effective Date plus 5 years.<br><br>On the Maturity Date, the outstanding principal amount of the Exit Secured Notes, plus any accrued and unpaid interest, will become due and payable in full in cash. |
| **Additional Notes Basket:** | If utilized, the Additional Notes Basket of USD 25,000,000 shall be utilized by way of a tap issuance and shall rank *pari passu* with the USD 75,000,000 committed facility. To be subject to no existing or pro forma default or event of default requirement. |
| **Call protection:** | ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ |
| **Restricted Group:** | Eagle Holding Co B.V. and its Subsidiaries. |
| **Security:** | Comprehensive all asset security to be granted subject to agreed security principles which shall be negotiated in good faith as part of long form documentation. |
| **Change of Control:** | ████████████████████████████████████████████████████████████████████████████████████ |

| | ███████████████████████████ ███████████████████████████ |
|---|---|
| **Transfer:** | The Exit Secured Notes will be freely transferable, subject to restrictions pursuant to federal and state securities laws (including that such Exit Secured Notes shall only be transferable to "qualified institutional buyers" within the meaning of Rule 144A promulgated under the Securities Act or in a transaction not subject to the registration requirements of the Securities Act pursuant to Regulation S). |
| **Covenants, baskets and events of default:** | Covenants, baskets and events of default shall be substantially consistent with the Euro Notes Indenture save (i) as set out in Schedule 5 (*Baskets and Covenants Table*), and (ii) for any consequential amendments necessary to conform to the transaction structure contemplated by the Lock-Up Deed and this Term Sheet. |
| **Additional Guarantors/Guarant or coverage:** | All subsidiaries of the Issuer, subject to exceptions acceptable to the Commitment Parties (acting reasonably). |
| **Voting and consent thresholds:** | ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ |
| **Documentation:** | The definitive terms of the Exit Secured Notes will be set out in an indenture and global note which will each be in form and substance satisfactory to the Company Parties and the Majority Euro Consenting Creditors, in accordance with the Lock-Up Deed. |
| **Governing law and jurisdiction:** | Laws of the State of New York, with disputes to be resolved by any U.S. federal or state court located in the State and City of New York. |
| **Intercreditor Agreement:** | U.S. style Intercreditor Agreement with European distressed disposal annexure. |
| **Trustee:** | Such Trustee as may be selected by the Issuer and the Majority Euro Consenting Creditors. |
| **Security Agent:** | Such Security Agent as may be selected by the Issuer and the Majority Euro Consenting Creditors. |

| | |
|---|---|
| **Paying Agent, Registrar and Transfer Agent:** | Such Paying Agent, Registrar and Transfer Agent as may be selected by the Issuer and the Majority Euro Consenting Creditors. |
| **Listing:** | The International Stock Exchange (or another exchange which may or may not be a 'regulated market' for purposes of the Market Abuse Regulation (596/2014/EU)). |
| **U.S. Securities Laws:** | The Exit Secured Notes shall be issued in the United States under section 4(a)(2) of the Securities Act of 1933, as amended, and/or Regulation D promulgated thereunder to "qualified institutional buyers" as defined under Rule 144A, and/or outside the United States pursuant to Regulation S under the Securities Act of 1933, as amended. |
| **Settlement:** | The Depository Trust Company. |
| **Rating:** | Exit Secured Notes to be rated by two of S&P, Fitch and/or Moody's as soon as practically possible and in any event no later than 12 months after the Issue Date. |
| **Governance Rights:** | The Issuer shall appoint a board observer as directed from time to time by the Trustee (on the instructions of those holders holding at least 50% of the principal amount of the Exit Secured Notes). |

| E.   Common Equity | |
|---|---|
| **Issuer:** | A company to be incorporated in England and Wales by those SS Term Loan Lenders (or by a corporate services provider instructed by those SS Term Loan Lenders) whose SS Term Loan Debt shall be exchanged, on a cashless basis, into its *pro rata* share of the Common Equity in accordance with this Term Sheet ("**TopCo**"). |
| **Common Equity:** | Ordinary shares of TopCo with nominal value of USD 0.01 each. |
| **Allocation of Common Equity:** | On the Restructuring Effective Date, 100% of the Common Equity shall be issued to the holders of the Holdco Notes *pro rata* to their Holdco Notes holdings. |
| **Management Incentive Plan Dilution:** | Subject to economic dilution from MIP. |
| **Shareholders Agreement:** | A shareholders agreement for the Common Equity to be agreed by Common Equity holders reflecting the terms of the Equity Term Sheet. |

**Schedule 2**
**Form of Creditor Accession Deed**

To:     [●]

Email:  [●]

From:   [Additional Consenting Creditor] (the "**Acceding Party**")

Email:  [Additional Consenting Creditor's email address]

Dated:  Dear Sir/Madam

**Short-form lock-up agreement dated [●] 2026 between, among others, [●] (the "Lock-Up")**

1.  This is a Creditor Accession Deed for the purposes of the Lock-Up and terms defined in the Lock-Up but not in this Creditor Accession Deed have the same meaning in this Creditor Accession Deed.

2.  We agree to be bound by the terms of the Lock-Up as a Party and as a Consenting Creditor.

3.  Our Locked-Up Debt is set out in the Confidential Annexure to this Creditor Accession Deed.

4.  Our notice details for the purposes of Clause 8 (*Notices*) of the Lock-Up are as follows:

    Address: [●]

    Attn: [●]

    Email address: [●]

5.  Our agent for service of process for the purposes of Clause 23 (*Service of Process*) of the  Lock-Up is as follows:

    Address: [●]

    Attn: [●]

    Email address: [●]

    Telephone number: [●][1]

6.  This Creditor Accession Deed is governed and construed in accordance with English law.

This Creditor Accession Deed has been executed and delivered as a letter on the date stated above.


Executed as a letter by [Additional Consenting Creditor], acting by:

_____, a director and
_____, a director

---

[1] Please use this paragraph if you are not incorporated in England and Wales. A telephone number is required for the purposes of service of notices by courier.

..............................
Director

..............................
Director

**CONFIDENTIAL ANNEXURE TO THE NOTEHOLDER ACCESSION LETTER**
Our Locked-Up Debt is as follows:

| Debt | ISIN | Principal Amount | Euroclear / Clearstream Account Number | Name of custodian, trustee, prime broker or similar |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

**Schedule 3**
**Form of Transfer Certificate**

To:  [●]

Email: [●]

Dated: _____

Dear Sir/Madam

**Short-form lock-up agreement dated [●] 2026 between, among others, [●] (the "Lock-Up")**

1.   We refer to the Lock-Up. Terms defined in the Lock-Up have the same meaning in this letter. This is a Transfer Certificate.

2.   [The transferor] (the "**Transferor**") and [the transferee] (the "**Transferee**") are both Consenting Creditors as at the date hereof.

3.   We write to inform you that the principal amounts of Locked-Up Debt set out in the table below, plus any accrued unpaid interest thereon, have been transferred by the Transferor to the Transferee on [date][2]:

| Debt | ISIN | Principal Amount | Euroclear / Clearstream Account Number | Name of custodian, trustee, prime broker or similar |
|---|---|---|---|---|
|  |  |  |  |  |

4.   We write to inform you that the principal amounts of Debt (which has not previously been Locked-Up Debt) set out in the table below, plus any accrued unpaid interest thereon, have been transferred to the Transferee on [date][3]:

| Debt | ISIN | Principal Amount | Euroclear / Clearstream Account Number | Name of custodian, trustee, prime broker or similar |
|---|---|---|---|---|
|  |  |  |  |  |

5.   This Transfer Certificate is governed by and construed in accordance with English law.

---

[2] Please use this paragraph and delete paragraph 4 if you are a Consenting Creditor informing of a decrease in your Locked-Up Debt.

[3] Please use this paragraph and delete paragraphs 2 and 3 if you are a Consenting Creditor informing of an increase in your Locked-Up Debt.

- 45 -

Executed as a certificate by the Transferor [**TRANSFEROR**], acting by

_____, a  director and

_____, a director

..............................
Director

..............................
Director

Executed as a certificate by the Transferee [**TRANSFEREE**], acting by

_____ , a director and

_____ , a director

..............................
Director

..............................
Director

**Schedule 4**
**Equity Term Sheet**

**Schedule 4**
**Equity Term Sheet**

EXECUTION VERSION

**Project Stretch**

**Equity Term Sheet**

**THIS EQUITY TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER TO SELL OR BUY, OR THE SOLICITATION OF AN OFFER TO SELL OR BUY, ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE.   NOTHING CONTAINED IN THIS EQUITY TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE PLAN EFFECTIVE DATE OF THE RESTRUCTURING TERM SHEET ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING TERM SHEET, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

This equity term sheet (the "**Equity Term Sheet**") sets out a summary of the key equity and governance terms of the proposed investment agreement (the "**Investment Agreement**") in relation to TopCo (as defined in the Restructuring Term Sheet (as defined below)), which will become the direct holder of 100% of the shares in the capital of Eagle Holding Co. B.V., in accordance with the restructuring (the "**Restructuring**"), as described in the term sheet (the "**Restructuring Term Sheet**") to the lock-up deed to which this Equity Term Sheet is scheduled. Terms used but not otherwise defined herein have the meaning given to them in the Restructuring Term Sheet.

The exact structuring, details and terms of this Equity Term Sheet remain subject to further regulatory, tax structuring and legal diligence and advice and the execution of documentation satisfactory to the Majority EUR Consenting Creditors.

| Summary | |
|---|---|
| **Summary** | This Equity Term Sheet sets out the governance arrangements in relation to TopCo (and, together its subsidiaries from time to time, the "**Group**" and each of them a "**Group Company**"), and primarily addresses the relationship amongst the Shareholders of TopCo (in their capacity as such) with regard to their holding of shares in the capital of TopCo. |
| **Equity Capital Structure** | |
| **TopCo** | TopCo is a private limited company to be incorporated in England & Wales. |
| | TopCo will issue ordinary shares with nominal value of USD 0.01 each of multiple classes (the "**Ordinary Shares**"). In addition, TopCo will issue warrants of multiple classes, including Class A1 Warrants, Class A2 Warrants, Class A3 Warrants (together, the "**Class A Warrants**") and Class B Warrants (and together with |

| | the Class A Warrants, the "**Warrants**"), each convertible into Ordinary Shares in accordance with the terms set out below. |
|---|---|
| **Pre-emption Rights on Qualified Pre-emption Issuances** | Subject to the Reserved Matters (if applicable) and the Accelerated Issuance procedure described below, if there is a proposal by any Group Company to issue any shares or any securities or other instruments convertible into shares of any Group Company, to any Person, or any subordinated debt instruments, subordinated shareholder loans or subordinated loan notes of any Group Company, to any Shareholder or any of its Affiliates, other than (in each case) any issuance:<br><br>(a)  in relation to any MIP;<br><br>(b)  in relation to the exercise of the Warrants;<br><br>(c)  as a result of any conversion of Qualified Pre-emption Instruments (as defined below) previously issued in accordance with the Pre-Emption Rights;<br><br>(d)  of Qualified Pre-emption Instruments as consideration for an acquisition by TopCo or any other Group Company of any shares or assets of any Person on arm's length terms;<br><br>(e)  on an IPO; or<br><br>(f)  of shares (subordinated debt instruments, subordinated shareholder loans or subordinated loan notes of the Group or other instruments convertible into shares) to another Group Company,<br><br>("**Qualified Pre-emption Instruments**" and any issuance of Qualified Pre-emption Instruments being a "**Qualified Pre-emption Issuance**"), each shareholder (other than a holder of MIP Shares with respect to such MIP Shares, unless otherwise approved by the Shareholder Simple Majority) and Warrantholder shall be given an opportunity to subscribe, at the same time and on the same terms, for such percentage of the Qualified Pre-emption Instruments proposed to be issued in a Qualified Pre-emption Issuance as equates to its *pro rata* entitlement based on its holding of such shares and Warrants at the time (on an as-if-converted basis) with customary over-subscription rights (the "**Pre-Emption Rights**"). The issuance and/or allocation of any Qualified Pre-emption Instruments which have not been taken up pursuant to the exercise of the Pre-Emption Rights shall be determined by the Board acting reasonably.<br><br>Subject to the Reserved Matters (if applicable) and the Accelerated Issuance procedure described below, if there is: (a) a proposal by any Group Company to issue any senior debt (the proposed debt being issued, the "**Senior Debt**"), being debt that is secured (whether secured by fixed or floating security) or unsecured, in each case that ranks pari passu with or senior or junior to any other outstanding senior debt of the Group; and (b) the existing shareholders and their Affiliates (excluding |

| | licensed/regulated banking institutions) constitute more than 50 per cent of such Senior Debt (upon incurrence), each shareholder (other than a holder of MIP Shares with respect to such MIP Shares, unless otherwise approved by the Shareholder Simple Majority) and Warrantholder shall be given an opportunity to subscribe, at the same time and on the same terms, for such percentage of the Senior Debt proposed to be issued as equates to its *pro rata* entitlement based on its holding of such shares and Warrants at the time (on an as-if-converted basis) with customary over-subscription rights (the "**Senior Debt Pre-Emption Rights**"). The issuance and/or allocation of any Senior Debt which has not been taken up pursuant to the exercise of the Senior Debt Pre-Emption Rights shall be determined by the Board. The holders of Shares will also benefit from the Anti-Dilution Protection (see below). |
|---|---|
| **Accelerated Issuance** | If the Board (as defined below) at any time determines (acting in good faith) that additional funding is required by the Group on an urgent basis, the Board may conduct an issuance of shares, and any securities or instruments convertible into shares, subordinated debt instruments, subordinated shareholder loans or subordinated loan notes of the Group, other than in compliance with the above Pre-Emption Rights (the "**Accelerated Issuance**"); provided that (a) each shareholder and Warrantholder who would otherwise be entitled to a Pre-Emption Right shall be given an opportunity to participate in the Accelerated Issuance, and (b) promptly following such Accelerated Issuance, the non-participating shareholders and Warrantholders who would otherwise be entitled to Pre-Emption Rights shall be entitled to customary catch-up rights ("**Catch-Up Rights**") for a period of 15 business days after the Accelerated Issuance (the "**Catch-Up Period**"). |
| | If the Board at any time determines (acting in good faith) that additional funding is required by the Group on an urgent basis, the Board may (subject to the Reserved Matters (if applicable)) incur additional Senior Debt, other than in compliance with the above Senior Debt Pre-Emption Rights (the "**Senior Debt Accelerated Issuance**"); provided that (a) each shareholder who would otherwise be entitled to a Senior Debt Pre-Emption Right shall be given an opportunity to participate in the Senior Debt Accelerated Issuance, either upon issuance or on a catch-up basis, and (b) promptly following such Senior Debt Accelerated Issuance, the non-participating shareholders who would otherwise be entitled to Senior Debt Pre-Emption Rights shall be entitled to customary catch-up rights ("**Senior Debt Catch-Up Rights**") for a period of 90 calendar days after the Accelerated Issuance (the "**Senior Debt Catch-Up Period**"). |
| | Shares issued pursuant to an Accelerated Issuance shall not be entitled to vote and shall not count towards relevant thresholds for voting until the end of the Catch-Up Period (or, if earlier, the full |

| | |
|---|---|
| | take up or waiver of the Catch-Up Rights). To that end, the holders of shares issued pursuant to an Accelerated Issuance will (each time they subscribe for shares as part of an Accelerated Issuance) waive their voting rights in respect of such shares until the end of the Catch-Up Period.<br><br>It is acknowledged that no shareholder or Warrantholder shall be under any obligation to provide further funding to the Group (beyond the amounts committed by it, if any). |
| **Anti-Dilution Protection** | In order to protect those shareholders who are entitled to but do not elect to exercise their Pre-Emption Rights (or Catch-Up Rights) from unfair economic dilution, any issuance constituting a Qualified Pre-emption Issuance or Accelerated Issuance which, in each case, comprises shares or other equity instruments shall be at the fair market value, as determined by the Board. The Board may, at its sole discretion, or shall, to the extent required by the terms of the Warrants, refer the fair market value determination to an independent expert (at the Group's cost). |
| **"Group basis"** | The Pre-Emption Rights and the Catch-Up Rights will operate on a "group basis" such that they may be subscribed for by different Affiliates of a shareholder; provided that such Person is not a Prohibited Transferee (as defined below) and subject to customary re-transfer provisions. |
| **Management Incentive Plan** | The shareholders intend that the Group will establish a management incentivisation plan (a "**MIP**"), representing up to 10% of the fully diluted Ordinary Shares (including Warrant Shares). The structure (including as to the use of any pooling vehicles), nature (e.g. bonus or equity, including a recovery scheme, retention scheme and/or underpin scheme), size and dilutive impact of which (which must be proportionate across all shareholders) is to be agreed by the Board or any committee established by the Board for such purpose (i.e. a remuneration committee).<br><br>The Board will consider in good faith the reasonable requirements of participants to achieve a tax efficient structure.<br><br>Any shares or other equity securities of TopCo which may, from time to time, be issued to the officers, directors and/or management of the Group by way of incentivisation arrangements are referred to in this Equity Term Sheet as "**MIP Shares**".<br><br>For the avoidance of doubt, the issuance of MIP Shares shall dilute all other equity interests on an as-converted basis, including the Ordinary Shares and any Warrant Shares. |
| **Warrant Structure** | |
| **Class A Warrants** | TopCo shall issue Class A Warrants to the DIP Noteholders and the SPV Note Holders: (a) convertible into 30% of the fully |

| | |
|---|---|
| | diluted (other than with respect to the MIP) Ordinary Shares at the time of issuance (including any Warrant Shares, but excluding MIP Shares) treated as fully paid-up and ranking *pari passu* in all respects with the Ordinary Shares then in issue save as to voting and the economic entitlements described below; and (b) convertible into a class of Ordinary Shares that is separate and distinct from: (i) the Ordinary Shares held by existing shareholders; (ii) the Ordinary Shares issued in connection with the exercise of the Class B Warrants; and (iii) any Ordinary Shares issued in connection with the exercise of the MIP. |
| | The Class A Warrants shall only be entitled to participate in distributable proceeds paid from Topco to holders of the Ordinary Shares and proceeds from a sale of Ordinary Shares in which the Warrantholders (or a class thereof) participate (in each case on account of such Ordinary Shares) less distributable proceeds paid from TopCo to holders of the MIP Shares on account of such MIP Shares ("**DPI**") until the Ordinary Shares (including Warrant Shares, but excluding MIP Shares) have received USD 480,000,000 in aggregate of distributions and/or proceeds from a sale in which the holders of the Warrants participate (the "**Class A Participation Cap**") and shall have no entitlement to any Ordinary Shares value in excess thereof. All Class A Warrants shall be structured to be fungible with each other. |
| **Class B Warrants** | TopCo shall issue Class B Warrants to the USD Noteholders, to be allocated *pro rata* to their USD Notes holdings. The Class B Warrants shall: (a) in aggregate, represent no more than 6% of the fully diluted (other than with respect to the MIP) Ordinary Shares at the time of issuance (including any Warrant Shares, but excluding MIP Shares) treated as fully paid-up and ranking pari passu in all respects with the Ordinary Shares then in issue save as to voting and the economic entitlements described below; and (b) be convertible into a class of Ordinary Shares that is separate and distinct from: (i) the Ordinary Shares held by existing shareholders; (ii) any Ordinary Shares issued in connection with the exercise of the Class A Warrants; and (iii) any Ordinary Shares issued in connection with the exercise of the MIP. |
| | The Class B Warrants shall be entitled to participate in DPI only after the Ordinary Shares (including any Warrant Shares issued in connection with the Class A Warrants, but excluding MIP Shares) have received USD 120,000,000 of distributions and/or proceeds from a sale  in which the holders of the Warrants participate in aggregate (the "**Class B Participation Threshold**"). All Class B Warrants shall be structured to be fungible with each other. |
| **Calculation** | The calculation formulas for the Class A Warrants and Class B Warrants (or an illustrative example of an Exit waterfall) shall be as set out in the Restructuring Term Sheet or supporting commitments schedules. |

| Voting Rights | The holders of Class A Warrants and Class B Warrants shall have no voting rights. |
|---|---|
| Exercise and Pricing | The Class A Warrants and Class B Warrants shall: (a) only be exercisable in the event of an Exit or in connection with a Tag-Along sale (each as defined herein) with sufficient advance notice of an Exit or Tag-Along Sale to be provided to the Warrantholders; and (b) have an exercise price of USD 0.01 per Class A Warrant or Class B Warrant (the "**Strike Price**").<br><br>On exercise of the Class A Warrants and Class B Warrants, the holder of the warrants will receive Ordinary Shares per the terms hereof (such Ordinary Shares, the "**Warrant Shares**"). |
| Amendments | Any non-clerical amendments or modifications to the terms of the Warrants shall not be made without the approval of the Warrantholders who together hold more than 67%[1] of the Class A Warrants and Class B Warrants, respectively, provided that, notwithstanding the foregoing, any non-clerical amendment, waiver or modification that: (i) results in a reduction of any Economic Term or imposition of any additional obligations on the Warrantholders (including in their capacity as the holders of Ordinary Shares upon exercise or conversion of the Warrants), shall require the prior written consent from each Warrantholder adversely affected thereby; and (ii) materially adversely and disproportionately affects one Warrantholder as compared to the holders of a simple majority of the Warrants of the same class, shall require the prior written consent from the Warrantholder so adversely affected. |
| Pre-emption Rights for Warrantholders | Subject to customary exclusions, on a new issuance of shares (in line with the Pre-Emption Rights as further described above) or debt instruments (in line with the Senior Debt Pre-Emption Rights as further described above) the Class A Warrants and Class B Warrants will benefit from pre-emption rights (on an as-if converted basis). If a Warrantholder does not elect to participate, it shall be diluted by the new share issuance to the extent that TopCo obtains a third-party fair value opinion confirming that the new shares are being issued at fair market value. If any such opinion provides a lower fair market value than the price of the new shares, the holders of the Class A Warrants and Class B Warrants shall be issued additional warrants to place them in the position they would have been in, had the new shares been issued at the fair market value set out in the third-party fair value opinion (the "**Warrantholder Pre-Emption Right**"). |

---

[1] All percentage thresholds for Warrantholder consent shall be calculated by reference to respective Warrant holdings (on an as-if converted basis), not by number of Warrantholders.

| **Distributions / Waterfall** | |
|---|---|
| **Priority of Distributions** | All distributions (whether on an Exit, dividend, return of capital or otherwise) to the holders of Shares shall be made to all holders of Shares and Warrants *pari passu* and *pro rata* to the number of Shares and Warrants (on an as-converted basis according to their respective entitlements to Ordinary Shares), subject at all times to the Class A Participation Cap and the Class B Participation Threshold. |
| **Corporate Governance** | |
| **TopCo Board Composition** | The board of directors of TopCo (the "**Board**") shall be the main board of the Group and shall be responsible for the overall direction, supervision and management of the operations of the Group and strategic-level decisions, subject to the Reserved Matters. <br><br> *Board Composition* <br><br> See Schedule 1 below. <br><br> *Independence Requirements* <br><br> To qualify as "independent" a proposed director must not be directly employed or engaged or otherwise remunerated or incentivised by any of the shareholders or their Affiliates. For the avoidance of doubt, the fact that a proposed director (a) is entitled to receive or has been issued equity incentives pursuant to a remuneration scheme approved by the Board, (b) has a separate consultancy arrangement with a shareholder or its Affiliate which is unconnected with the Restructuring or the Group, or (c) had a consultancy arrangement which was related to the Restructuring or the Group but which was terminated prior to their appointment as director, shall not, in and of itself, mean that such director is not independent (the "**Independence Requirements**"). <br><br> A written confirmation of independence by the nominating shareholder(s), acting reasonably and in good faith, or by the director him/herself, shall be determinative of the issue. <br><br> *Other* <br><br> The appointment of any director is subject to completion of customary and reasonably appropriate compliance and sanctions screening to be undertaken promptly by the Board upon the nomination of any such proposed director, provided that if the Board fails to initiate, progress and/or complete the screening process promptly (other than due to any failure by such director or his or her nominating shareholder(s) to provide any reasonably requested information promptly) within 5 business days, then the failure to complete such screening shall not prevent the appointment of the relevant director. |

Directors and their nominating shareholders may consult with each other subject to applicable law.

Customary confidentiality and information sharing provisions and restrictions shall apply.

*Observer*

The Board may invite any person it considers relevant to attend any meeting of the Board as an observer (an "**Observer**"). Observers shall be entitled to receive Board materials and attend Board meetings but shall not be entitled to vote. Customary confidentiality and information sharing provisions and restrictions shall apply to Observers.

*Removal of Observers and Directors*

The Board may, by resolution passed by a majority of the directors, require any Observer to leave a Board meeting or revoke any Observer's invitation to attend future Board meetings, where the Board considers that such Observer's conduct is disruptive to the proper functioning of the Board or detrimental to the interests of the Company.

Where the Board reasonably believes that the Minority Director's conduct is disruptive to the proper functioning of the Board or detrimental to the interests of the Company, the Board may, by resolution passed by a majority of the directors (excluding the director in question) give notice to the Qualifying Minority Shareholder(s) that the Minority Director will be removed within four (4) business days of receipt of such notice. If the Qualifying Minority Shareholder(s) fail to appoint a replacement within such period, the Minority Director shall be removed and the position shall remain vacant until the Qualifying Minority Shareholder(s) appoint a replacement. Without prejudice to the foregoing paragraph, any director appointed by a Shareholder maybe be removed at any time by notice from that Shareholder.

| | |
|---|---|
| **Reserved Matters** | The Board of TopCo shall be the main governance forum and decision-making body for the strategic and supervisory control of the Group (subject to the Reserved Matters). |

Save as otherwise expressly provided for in this Equity Term Sheet, all decisions of the Board will be made by the Board acting by a simple majority (with each director having one vote), subject to, for so long as and to the extent they apply, the Reserved Matters referenced below and the terms of the Warrants.

TopCo will (insofar as permitted by law by exercising its shareholder rights and subject always to the customary fiduciary duties of directors carve outs) procure that:

(a)  none of the matters set out in Schedule 2 (*Shareholder Simple Majority Reserved Matters*) of this Equity Term Sheet shall be undertaken by the Group without obtaining the prior

<table>
<tr>
<td></td>
<td>

approval of the Shareholder Simple Majority (the "**Shareholder Simple Majority Matters**");

(b) none of the matters set out in Schedule 3 (*Shareholder Super Majority Reserved Matters*) of this Equity Term Sheet shall be undertaken without obtaining the prior approval of the Shareholder Super Majority (the "**Shareholder Super Majority Matters**"); and

(c) none of the matters set out in Schedule 4 (*95% Reserved Matters*) of this Equity Term Sheet shall be undertaken without obtaining the prior approval of shareholders who together hold more than 95% of the Ordinary Shares (other than the MIP Shares and Warrant Shares) (the "**95% Reserved Matters**", and together with the Shareholder Simple Majority Matters and the Shareholder Super Majority Matters, the "**Reserved Matters**").

Save to the extent otherwise required under applicable law, consent of the relevant shareholders to the Reserved Matters may be provided in writing and no shareholders' meeting shall be needed.

If TopCo intends to undertake an act or matter constituting a Reserved Matter, it shall first notify all shareholders of such matter and request such shareholders' consent as would be sufficient for the valid passing of the relevant resolution in relation to the relevant matter (a "**Reserved Matter Notice**"). Upon receipt of such notice, the relevant shareholder(s) must, within five business days, respond in writing to: (a) grant its consent; (b) refuse its consent; or (c) request further information from TopCo and/or request up to an additional five business days to respond to TopCo (a "**Time Extension**"), in each case if reasonably required in order to assess the matter and subject to such shareholder(s) acting in good faith. If TopCo receives a request for further information from such shareholder, it shall provide such information (to the extent it is legally and practically able to do so) as soon as reasonably practicable and in any event within three business days. If a shareholder: (a) fails to grant or deny its consent, or to request a Time Extension, within five business days from receipt of the Reserved Matter Notice; or (b) following the request of a Time Extension, fails to grant or deny its consent within ten business days from receipt of the Reserved Matter Notice, that shareholder's approval shall be deemed to have been given in respect of that Reserved Matter.

</td>
</tr>
<tr>
<td>**Information Rights**</td>
<td>

Without prejudice to information rights under applicable law (in particular with respect to annual accounts) and except as otherwise expressly provided below:

*Annual Audited Accounts*

Each holder of Ordinary Shares shall be entitled to receive, within a reasonable period of time (but in any event no later than it is

</td>
</tr>
</table>

provided to the Group's financial creditors) after the end of each financial year, annual audited consolidated accounts of the Group for that financial year (the "**Annual Accounts**").

*Other Information Rights*

Each holder of Ordinary Shares (other than MIP Shares and Warrant Shares) holding (together with its Affiliates) 4% or more of the Ordinary Shares (other than MIP Shares and Warrant Shares) (each, a "**Qualifying Information Holder**") shall be entitled to receive the following information from TopCo provided that, prior to receiving any such information, the Qualifying Information Holder has entered into a restriction agreement with the Company in a form reasonably satisfactory to the Board (such restriction agreement shall include, among other things, information barriers and other customary restrictions on the sharing of any such information):

(a) within a reasonable period of time (and in any event within 15 business days from the date of request), such other information which is readily available to the Group that such Qualifying Information Holder may reasonably request in order for such Qualifying Information Holder (and/or its Affiliates) to comply with applicable tax, law or regulation (including any investigations) or bona fide internal reporting requirements, provided that such Qualifying Information Holder shall be permitted to receive copies (at such holder's expense) of the books and records of the Group so required without such information being made available to all other Qualifying Information Holders (unless of general application to all Qualifying Information Holders);

(b) within a reasonable period of time (and in any event within 15 business days from the date of request) following the release of the Annual Accounts, access (on reasonable notice) to the management team of the Company provided, for the avoidance of doubt, this will only be available to the Qualifying Information Holders on one occasion per financial year; and

(c) upon request, the Company shall provide any information as may be reasonably requested to comply with any U.S. or non-US tax reporting requirements, including requirements under the US Foreign Account Tax Compliance Act.

Each holder of Ordinary Shares (other than MIP Shares and Warrant Shares) holding (together with its Affiliates) such percentage of the Ordinary Shares as shall be agreed in good faith between the parties prior to the Restructuring Effective Date shall be entitled to receive within a reasonable period of time (but in any event no later than it is provided to the Group's financial creditors, quarterly unaudited consolidated accounts of the Group for that financial quarter; provided that, prior to receiving any such information, the shareholder has entered into a restriction

| | agreement with the Company in a form reasonably satisfactory to the Board (such restriction agreement shall include, among other things, information barriers and other customary restrictions on the sharing of any such information). |
|---|---|
| | TopCo undertakes to each of the Qualifying Information Holders to use all reasonable endeavours to mark any information that it proposes or is required to deliver to any Qualifying Information Holder as "public" or "private" (where "private" information means information that is, or contains, "inside information") prior to providing it to each Qualifying Information Holder. Save for the foregoing, the Group shall be under no obligation to cleanse any information shared with Qualifying Information Holders until the time that it is provided to the Group's financial creditors (if the Group is required to provide such information to its financial creditors) provided that upon written request from a Qualifying Information Holder, TopCo shall use reasonable endeavours to effect cleansing of any information it is not required to provide to its financial creditors as part of its ongoing public reporting within 30 business days, unless the Board determines in good faith that cleansing would be materially damaging to the business of the Group, in which case, TopCo shall notify the requesting holder and effect cleansing as soon as reasonably practicable thereafter and in accordance with the insider trading policy of TopCo. |
| | A Qualifying Information Holder may give notice to TopCo that it elects (either for the duration of the Investment Agreement or for such period of time as the relevant Qualifying Information Holder notifies to the Company) only to receive "public" information and TopCo undertakes to use reasonable endeavours to provide only "public" information to each such electing Qualifying Information Holder. |
| **CFC/PFIC Testing** | The Company shall use commercially reasonable efforts to monitor its status, and the status of any Group Company, as a "controlled foreign corporation" (a "**CFC**") (as defined in section 957(a) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**")), or as a "passive foreign investment company" (a "**PFIC**") (as defined in Code section 1297(a)). Upon the written request of any Warrantholder and/or holder of Ordinary Shares that is a "United States person" (as defined in Code section 7701(a)(30)) (a "**U.S. Shareholder**"), the Company shall, within thirty (30) days following the end of the Company's taxable year, provide a written statement to such U.S. Shareholder regarding its determination of such CFC or PFIC status. If the Company determines it is either a CFC or a PFIC, the following provisions shall apply. |
| | If the Company is determined to be a CFC with respect to any U.S. Shareholder (and such U.S. Shareholder is a "United States shareholder" within the meaning of Code section 951(b)), the Company shall furnish to such U.S. Shareholder, upon request, all |

| | information necessary to satisfy its reporting obligations, including but not limited to, (i) the information required to complete U.S. Internal Revenue Service Form 5471, and (ii) its pro rata share of the Company's "subpart F income" (as defined in Code section 952) and "net CFC tested income" (as defined in Code section 951A). Each holder of Warrants and/or Ordinary Shares shall provide any information requested by the Company about such holder and such holder's partners (or direct or indirect equity owners of such partners), if applicable, that the Company needs in order for the Company's tax advisors to determine the status of such holder and/or any of such holder's partners (or direct or indirect equity owners of such partners), if applicable, as a "United States Shareholder" within the meaning of Code section 951(b). |
|---|---|
| | If the Company is determined to be a PFIC for any taxable year: |
| | (i) Upon request by a U.S. Shareholder (and at the sole expense of the requesting U.S. Shareholder), the Company shall provide such U.S. Shareholder with a "PFIC Annual Information Statement" (as described in U.S. Treasury Regulations § 1.1295-1(g)) that contains all information necessary to enable the U.S. Shareholder to make and maintain a "Qualified Electing Fund" election (such election as described in Code section 1295(b)); and |
| | (ii) The Company shall permit its books and records to be examined by the U.S. Shareholder's tax advisors to the extent reasonably necessary to verify the information in such statement. |
| **ABC, Sanctions & Export Control** | Customary anti-bribery and corruption, sanctions and export controls representations and undertakings will be given by all parties in the long-form equity and governance documentation, as appropriate. |
| **Fees and Expenses of Directors** | Each director will be entitled to receive from the Group a reasonable and customary director's fee in line with market practice, as may be proposed by the Board and approved by the Shareholder Simple Majority (subject to such consent including no fewer than three shareholders). |
| | Each director will receive reimbursement from the Group of reasonable and properly incurred out-of-pocket travel and accommodation expenses (and such other reasonable and properly incurred out-of-pocket expenses as may be approved by the Board acting reasonably and in good faith) in connection with performance of his/her duties and attendance of Board meetings. |
| | The fees and expenses of a director may be satisfied through such director's participation in an equity-based fee plan (which will form part of the MIP). |

| | |
|---|---|
| | Save for the foregoing, no director shall be entitled to receive any fees or other compensation for his or her role as director. |
| | The parties will work to determine the most tax efficient and legally permissible method for the payment of such fees, costs and expenses. |
| **D&O Insurance** | TopCo will pay (or procure payment by the Group) for, and maintain, a customary directors' and officers' liability insurance for the benefit of all current and former directors, including the Investor Directors. |
| **Board Meetings** | Meetings of the Board shall be held at least once per quarter. Any director may convene an additional meeting of the Board by delivering notice of such meeting to the other directors. |
| | Notice of any Board meeting shall be circulated at least five (5) calendar days before such meeting (unless (a) such notice period is shortened or waived by all of the directors or (b) the Board meeting relates to bona fide emergency purposes (in which case the nature and circumstances of such shall be set out in the notice) including impending insolvency/illiquidity, serious regulatory compliance matters, the potential requirement for an Accelerated Issuance or other bona fide emergency matters) and shall be accompanied by a meeting agenda. |
| | In the case of regular quarterly Board meetings, notice thereof shall be accompanied by a meeting agenda, board information pack and copies of the latest management accounts of the Group. |
| | Each Board member shall have one vote. The Chairperson shall not have a casting vote. |
| | The Board may also delegate powers to committees of the Board from time to time. |
| | Subject to any tax structuring requirements, the Board may also pass resolutions with the unanimous written consent of all the directors (without the need for a Board meeting). |
| | The Board may, from time to time (a) invite senior members of the Group's executive team (e.g. CEO, CFO, COO, etc. to the extent they are not already directors) to attend Board meetings in a non-voting capacity, and (b) establish such committees (including the composition and the rules of procedure thereof) as the Board may deem appropriate (provided that, if established, any such committee shall include each Investor Director, if appointed). |
| **Board Quorum** | The quorum for Board meetings shall be a majority of the directors then in office, provided that at least one director appointed by each Qualifying Shareholder (for so long as there is a Qualifying Shareholder) must be present (in person or by telephone or video conference) for a quorum to be constituted. |

| | |
|---|---|
| | If a quorum is not present within 30 minutes of the scheduled start time of a Board meeting, the meeting shall be adjourned to such other time as the Chairperson may determine on not less than 48 hours' notice. At such adjourned meeting, the quorum shall be the directors present with respect to those matters on the agenda for the original meeting. No matter may be discussed or resolved upon at any reconvened Board meeting other than the matters specified in the written agenda for the original Board meeting which was adjourned or reconvened. |
| | No business shall be transacted at any Board meeting unless a quorum is present at the time when the meeting proceeds to business and remains present during the transaction of business. |
| **Transfers and Exit** | |
| **Transfer Restrictions**[2] | The Shares and Warrants may be transferred or disposed of, directly or indirectly, only in accordance with the terms of, and processes set out in, this Equity Term Sheet (as subsequently set out in the articles of association and the Investment Agreement) and subject to restrictions pursuant to federal and state securities laws. For the avoidance of doubt, all transfer restrictions applicable to Shares as set out in this section shall apply equally to the Warrants. |
| | The holders of the Shares will, at any time, be entitled to transfer any of their Shares, as applicable, to: |
| | (a)   their respective Affiliates (subject to customary re-transfer provisions) (each a "**Permitted Transfer**"); and/or |
| | (b)   any Person pursuant to the exercise of their rights (or pursuant to their obligations under) a Tag-Along Sale, a Drag-Along Sale, an approved Exit or an approved Solvent Reorganisation; and/or |
| | (c)   any *bona fide* third party. |
| | and in each case subject always to the restrictions set out below in respect of transfers to Prohibited Transferees (as defined below). |
| | Save as may be agreed pursuant to any MIP and notwithstanding the other provisions of this section, the holders of any MIP Shares shall not be entitled to directly or indirectly transfer their shares, except pursuant to a Permitted Transfer, a Drag-Along Sale, an approved Exit or an approved Solvent Reorganisation or as may otherwise be approved by the Board. |
| | Any proposed transferee of, or subscriber for, any shares of |

[2] Long form documents to include a "restricted list" construct. Any amendments to such "restricted list" shall require the prior approval of a simple majority of Shareholders, subject to the consent including no fewer than three shareholders.

| | |
|---|---|
| | TopCo shall be required to satisfy customary KYC / AML checks proposed by the Board (acting reasonably) or any service / finance provider to the Group at the time. |
| | In any event, no shareholder may transfer its shares to either: (a) other than in connection with an Exit, a direct business competitor of the Group or any Person who holds, directly or indirectly, an interest of more than 25% in such a business competitor (subject to a carve out for banks or financial institutions which have an interest in a competitor business but which are acquiring shares in a different and unrelated business division, with appropriate bona fide and customary information barriers in place); (b) Persons subject to US/EU/UK sanctions; or (c) to any Person that is listed on a restricted list to be agreed ("**Prohibited Transferees**"). |
| | Except pursuant to an Exit or a Drag-Along Sale, any proposed transferee who is not already a party, shall be required to execute a deed of adherence to the Investment Agreement. |
| **Equity Agent** | An agent (the "**Equity Agent**") may be appointed by the Board to manage transfers of the shares and maintain a portal to deliver any information which shareholders are entitled to receive as described herein. |
| **Drag-Along Sale** | In connection with any transfer of Ordinary Shares which together represent more than 67% of the Ordinary Shares then in issue (whether in a single or a series of related transaction(s)), at any time, to a bona fide third party purchaser (being an unaffiliated Person that is not a current shareholder or an Affiliate of a current shareholder) on arm's length terms, the selling shareholder(s) shall have the right (but not an obligation) to require each other shareholder to sell all of its shares and Warrants upon any such transfer (a "**Drag-Along Sale**"). |
| | The dragged shareholders' and dragged Warrantholders' obligation to sell their shares and Warrants (as applicable) shall be on the same terms and conditions as the selling holders of shares, provided that: (a) no dragged shareholder or dragged Warrantholder shall be required to give any warranties, representations, indemnities (other than representations and warranties as to title (free from encumbrances), authority and capacity) or any restrictive covenants (save for customary leakage indemnities and undertakings on a several basis); (b) no holder of shares shall (in its capacity as a holder of shares, other than MIP Shares) be required to directly give any warranties, representations, or indemnities other than (x) in relation to title (free from encumbrances), binding obligation, capacity and authority and (y) customary leakage indemnities and undertakings on a several basis, or any restrictive covenants (but, for the avoidance of doubt and notwithstanding the foregoing, each participating holder of shares shall indirectly bear its *pro rata* portion of the economic exposure in respect of any warranties, |

– 15 –

|  | indemnities or escrow arrangements given by the selling shareholder(s) in relation to the liabilities of the Group via back-to-back contribution agreements, where relevant); (c) the liability of a dragged shareholder or dragged Warrantholder in connection with a drag-along transfer shall be several and (save in respect of leakage) capped at the aggregate amount of proceeds payable to it from such transfer (provided that, if the proceeds are cash and non-cash consideration, such liability shall be satisfied solely from such proceeds); and (d) the consideration payable to the dragged shareholders and dragged Warrantholders shall be: (A) in respect of the Warrants or Warrant Shares, in the same form of consideration as received by the selling holders of shares in the same proportion, unless (in the case of any non-cash proceeds in the form of illiquid securities) Warrantholders holding at least two-thirds of each class of the Warrants or Warrant Shares elect to receive the cash equivalent, in which case all Warrantholders of the relevant class shall receive cash; and (B) otherwise in the same form of consideration as received by the selling holders of shares in the same proportion, and in each case shall reflect: (i) in respect of the dragged shareholders, the dragged shares' pecuniary value by reference to their entitlements under the Waterfall; and (ii) in respect of the dragged Warrantholders, the Warrants' pecuniary value by reference to their entitlement under the Waterfall. |
|---|---|
|  | To the extent reasonably possible, the Group shall bear all selling shareholders' and Warrantholders' reasonable and properly incurred third party costs and expenses in connection with the sale under the sale agreement and the exercise of the drag-along right. If this is not possible, then all selling shareholders and Warrantholders shall bear the reasonable and properly incurred third party costs and expenses in connection with the sale under the sale agreement and exercise of the drag-along right *pro rata* to the percentage of the consideration that they are receiving (but for the avoidance of doubt, not any costs and expenses in connection with any shareholder's or Warrantholders' internal structuring arrangements related to such sale or the upwards flow of proceeds thereafter). |
|  | To facilitate a drag-along transaction, each shareholder or Warrantholder shall be required to give a customary power of attorney in this regard which shall only apply to the extent that they fail to comply with any of the drag requirements. |
| **Tag-Along Sale** | If any shareholder proposes to sell or transfer their shares to any unaffiliated Person (whether such Person is an existing shareholder or not) whether in a single or a series of related transaction(s) which results in such Person for the first time owning shares which represent more than 50% of the voting rights attaching to the shares then in issue, each holder of shares and each holder of Warrants will benefit from customary tag-along |

provisions which will entitle each such other shareholder or Warrantholder (at its sole election) to sell all of its shares and/or Warrants (as applicable) upon any such transfer (a "**Tag-Along Sale**").

The tagging shareholders' and tagging Warrantholders' exercise of the tag-along right shall be on the same terms and conditions as the selling shareholder(s), provided that: (a) no tagging shareholder or tagging Warrantholder shall be required to directly give any warranties, representations, indemnities or covenants which are not also provided by the selling shareholder(s); (b) no shareholder shall (in its capacity as a holder of shares, other than MIP Shares) be required to give any warranties, representations, or indemnities other than (x) in relation to title, capacity and authority and (y) customary leakage indemnities and undertakings on a several basis, or any restrictive covenants (but, for the avoidance of doubt and notwithstanding the foregoing, each participating shareholder shall indirectly bear its *pro rata* portion of the economic exposure in respect of any warranties, indemnities or escrow arrangements given by the selling shareholder(s) in relation to the liabilities of the Group via back-to-back contribution agreements, where relevant); (c) the liability of a tagging shareholder or tagging Warrantholder in connection with a tag-along transfer shall be several and (save in respect of leakage) capped at the aggregate amount of proceeds payable to it from such transfer; and (d) the consideration payable to the tagging shareholder and tagging Warrantholder shall be in the same form of consideration as received by the selling shareholder(s) and Warrantholder(s) and in the same proportion and shall reflect: (i) in respect of the tagging shareholder, the tagged shares' pecuniary value by reference to their entitlements under the Waterfall; and (ii) in respect of the tagging Warrantholder, the Warrants pecuniary value by reference to their entitlements under the Waterfall. All selling/tagging shareholders and tagging Warrantholders shall bear the selling shareholders' reasonable and properly incurred third party costs and expenses in connection with the sale under the sale agreement which triggers the exercise of the tag-along right *pro rata* to the percentage of the consideration that they are receiving (and for the avoidance of doubt, not any costs and expenses in connection with any shareholders' internal structuring arrangements related to such sale or the upwards flow of proceeds thereafter).

If the proposed tag sale is triggered by a series of related transactions, the consideration payable to the tagging shareholders and tagging Warrantholders shall, unless otherwise agreed by the holders of 50% or more of the shares and Warrants held by the tagging shareholders and tagging Warrantholders (respectively), be at a price equal to the average price per share paid to the relevant selling shareholder in respect of such related transactions over a period of twelve months prior to the transfer which triggers

| | |
|---|---|
| | the application of the tag-along right. |
| **Exit** | Commencement of any Exit process (other than a Drag-Along Sale) shall require the approval of the Shareholder Super Majority until four (4) years following the Restructuring Effective Date, from which point it shall require the approval of the Shareholder Simple Majority. |
| | An "**Exit**" shall mean: |
| | (a)  a direct or indirect sale or transfer, or a series of related sales or transfers, of (i) shares and/or instruments convertible into shares, in each case representing more than 50% of the voting rights attaching to (A) the shares of TopCo (excluding, for the avoidance of doubt, the MIP Shares and Warrant Shares), where any other Person(s) (excluding any other existing shareholder or any of its Affiliates) has the power to govern TopCo or its direct or indirect subsidiaries (whether through the ownership of the majority of voting securities, by contract or otherwise); or (B) all or substantially all of the assets of TopCo or the Group taken as a whole (either (A) or (B), a "**Sale**"); |
| | (b)  a listing of any of the shares in TopCo's direct or indirect subsidiaries or of any new holding company incorporated for such purposes (directly or indirectly through an IPO vehicle), on a regulated marketplace, multilateral trading facility or other exchange or facility for the public trading of shares ("**IPO**"); or |
| | (c)  a merger of TopCo or any or all of TopCo's direct or indirect subsidiaries (as applicable), or any other transaction that creates substantially the same effect as a Sale or an IPO. |
| | The Board shall cooperate (and shall, in so far as it is able, procure that all applicable members of the Group's management team will co-operate), in all respects with an Exit process (including exercising all voting rights to facilitate the Exit). |
| | TopCo shall procure (insofar as it is able to do so, including by exercising its shareholder rights) that all applicable members of the Group's management team will co-operate in all respects with an Exit process (including exercising all voting rights to facilitate an Exit), including, if required: (a) attending management presentations and due diligence meetings and (b) with respect to the relevant members of the Group's senior management, providing market standard business warranties in relation to the Group and its business, subject to customary protections such as a buyer warranty and indemnity insurance policy. |
| | The shareholders shall be required to use all reasonable efforts to facilitate an expeditious Exit process in line with the foregoing (including the hiring of an M&A advisor where applicable and exercising all voting rights and executing all such documents as |

| | |
|---|---|
| | may be reasonably required to give effect to the relevant Exit). A corresponding power of attorney will be included in the Investment Agreement. |
| | To the extent that an Exit is to take place by way of an IPO, the shareholders may be required to give customary undertakings in connection with such process (including, for example, lock-up and standstill undertakings where appropriate), provided that the Shareholders shall only be required to give undertakings that are customary and proportionate in light of (a) the size of their shareholdings, and (b) any lack of direct involvement in and influence over the running of the business, and provided that no shareholder shall be required to give any undertaking which it is reasonably unable to give for *bona fide* constitutional and/or regulatory reasons. |
| | For the avoidance of doubt, any Exit process shall be without prejudice to the rights of the relevant shareholders to initiate and give effect to a Drag-Along Sale on the terms contemplated by this Equity Term Sheet. |
| **Solvent Reorganisation** | The Board shall, subject to the prior approval of the Shareholder Simple Majority, be entitled to at any time (whether in connection with an approved Exit, a Drag-Along Sale or for other bona fide corporate purposes) cause a Solvent Reorganisation of the Group. |
| **Cooperation Undertakings** | In connection with any drag-along transfer or a tag-along transfer (in which the relevant shareholder is participating), each dragged/tagging shareholder shall be required to provide such cooperation and assistance to the selling shareholder as the selling shareholder may reasonably request in order to effect the relevant transfer in accordance with the relevant provisions. |
| | Each party will take all necessary and advisable steps to facilitate and effectuate an Accelerated Issuance, a Drag-Along Sale, a Tag-Along Sale, a Solvent Reorganisation or an Exit, as determined by the Board or the selling shareholder(s) (as applicable), including by voting or executing a written consent to approve such transaction, raising no objection to such transaction, refraining from the exercise of any statutory or other legal rights that may inhibit the full implementation of such transaction (including any statutory dissenter's rights, rights to fair value, appraisal rights or similar rights), and generally cooperating as security holders so that the transaction may be implemented as efficiently as possible. |
| | A power of attorney to secure the above undertakings will be included in the Investment Agreement. |
| **Other** | |
| **Key Transaction Documentation** | Articles of Association/bylaws of TopCo. |
| | Investment Agreement of TopCo to be entered into between |

| | |
|---|---|
| | TopCo and any other Person who, from time to time, acquires or subscribes for shares in the capital of TopCo. |
| | The Warrantholders shall be third party beneficiaries who shall be entitled to enforce the provisions of Key Transaction Documentation that apply to them as if they were parties thereto. |
| **Relationship Among Shareholders and Warrantholders** | Without prejudice to the express provisions of this Equity Term Sheet and the Restructuring Term Sheet, the shareholders and Warrantholders are not acting in concert and shall be entitled to exercise their: (a) in the case of shareholders, voting; and (b) other governance rights in TopCo as they see fit. |
| **Confidentiality** | No party shall disclose to any other person the contents of this Equity Term Sheet, other than a disclosure to any of its Affiliates and its and their respective directors, officers employees and professional advisors, and provided that each such recipient is made aware of and complies with the disclosing party's obligation of confidentiality under this Equity Term Sheet as if the recipient were a party to this Equity Term Sheet. |
| **Governing Law and Resolution of Disputes** | Investment Agreement to be governed by English law. |
| | TopCo's articles of association to be governed by the law of TopCo's jurisdiction of its incorporation. |
| **Legal Effect** | Nothing in this Equity Term Sheet shall be capable of giving rise to any legal obligations whatsoever, except for the "Confidentiality" and "Legal Effect" sections of this Equity Term Sheet, which are intended to be legally binding on the parties. |
| | This Equity Term Sheet does not constitute or imply any offer or commitment whatsoever on the part of parties. |
| | This Equity Term Sheet may be executed in any number of counterparts, each of which when executed and delivered is an original and all of which together evidence the same agreement. |
| | This Equity Term Sheet and all matters arising from it are governed by English law. The courts of England have exclusive jurisdiction to settle any dispute arising from or connected with this Equity Term Sheet. |
| **Definitions** | "**Affiliate**" means, when used with reference to any Person, any other Person (a) Controlled by such first Person, (b) who or which Controls such first Person, (c) with which such first Person is under the common Control of another, (d) any officer or director or investor of such first Person or such other Person; or (e) where such first Person is a fund, any individual partner or investor in such Person; provided that any Person serving as the investment advisor or sub-advisor to or manager of another Person shall be deemed an Affiliate of such other Person and vice versa; provided further that (A) any two Persons managed or advised by the same |

– 20 –

investment advisor or manager or an Affiliate thereof shall be deemed to be Affiliates of each other, and (B) no member of the Group shall be deemed an Affiliate of a shareholder (or any other Affiliate thereof) for the purposes of this Equity Term Sheet; provided further that where a shareholder enters into or adheres to the Investment Agreement through an identified business unit in respect of shares legally or beneficially owned in such capacity, the terms of the Investment Agreement shall apply only to that identified business unit and not to any other business unit within that legal entity which has not signed or adhered to the Investment Agreement separately in respect of any shares or other instrument which it legally or beneficially owns;

"**Control**" means, in respect of any Person, (a) the direct or indirect ownership of, or direct or indirect entitlement to exercise through contractual arrangements, more than 50% (fifty per cent.) of the issued share capital and/or the voting rights attaching to any securities of such Person; and/or (b) the right to elect or appoint, by any means and directly or indirectly, the majority of the members of the board of directors and/or any other governing body of such Person; and/or (c) the ability in any manner whatsoever to decisively influence and determine the management and decision making of such Person (and, in such respect, a limited partnership shall be deemed to be Controlled by its general partner);

"**Economic Term**" means: (a) the Strike Price; (b) the percentage of Ordinary Shares that the Warrants shall convert into; (c) the Class A Participation Cap; (d) Class B Participation Threshold; (e) the Warrantholder Pre-Emption Right; and (f) the "Priority of Distributions" section of this Equity Term Sheet;

"**Investor Director**" means any director who is nominated by a Qualifying Shareholder or a Qualifying Intermediate Shareholder (as applicable) and who is not (a) independent or (b) a member of the executive management team of the Group;

"**Person**" means an individual, a partnership, a fund, a corporation, a company, an association, a joint stock company, a trust, a joint venture, an unincorporated organisation or other corporate entity or a governmental, quasi-governmental, judicial or regulatory entity or any department, agency or political subdivision thereof, in each case whether or not having a separate legal personality;

"**Qualifying Shareholder**" means each shareholder holding (together with its Affiliates) more than 25% of the Ordinary Shares (other than MIP Shares and Warrant Shares);

"**Qualifying Minority Shareholder**" means each shareholder holding (together with its Affiliates) more than 7.5% of the Ordinary Shares (other than MIP Shares and Warrant Shares) who is not a Qualifying Shareholder or Qualifying Intermediate Shareholder, provided that: (a) this shall include Broad Peak; and

(b) any shareholder who, at the Restructuring Effective Date, held (together with its Affiliates) more than 7.5% of the Ordinary Shares (other than MIP Shares and Warrant Shares) and Broad Peak shall continue to be treated as a Qualifying Minority Shareholder notwithstanding any subsequent dilution of its shareholding below such threshold, provided that such shareholder has not transferred any Ordinary Shares (other than Permitted Transfers);

"**Shares**" or "**shares**" means the Ordinary Shares and any other shares in the capital of TopCo from time to time;

"**Shareholder**" or "**shareholder**" means a holder of Shares in the capital of TopCo from time to time;

"**Shareholder Simple Majority**" means the positive vote of the holders of more than 50% of the Ordinary Shares (other than the MIP Shares and Warrant Shares) which are voted on the relevant matter;

"**Shareholder Super Majority**" means the shareholders who together hold more than 67% of the Ordinary Shares (other than the MIP Shares and Warrant Shares) which are voted on the relevant matter;

"**Solvent Reorganisation**" means any solvent reorganisation of TopCo or any other member of the Group, including, without limitation, by merger, consolidation, recapitalisation, transfer or sale of securities or assets, or contribution of assets and/or liabilities, or any liquidation, scheme of arrangement, exchange of securities, conversion of entity, migration of entity, formation of new entity or any other transaction or group of related transactions (in each case other than to or with a third party that is not: (i) a member of the Group, or (ii) an entity formed for the purpose of such Solvent Reorganisation), in which: (a) all holders of the same class of securities (including the Warrants) are offered the same consideration in respect of such securities; (b) the *pro rata* indirect economic interests of the security holders in the relevant Group entity, vis à vis one another and all other holders of shares (other than the MIP Shares) and other equity securities (including the Warrants) in the Group (other than those held by entities within the Group), are preserved in all material respects; (c) the rights of the security holders (including Warrantholders) under the Restructuring Documents are preserved in all material respects (it being understood: by way of illustration and not limitation, that the relocation of a covenant or restriction from one instrument to another shall be deemed such a preservation if the relocation is necessitated, by virtue of any law or regulation applicable to TopCo or new entity following such Solvent Reorganisation, as a result of any change in jurisdiction or form of entity in connection with the Solvent Reorganisation; provided that such covenants and restrictions are retained in instruments that are, as nearly as practicable, equivalent to the instruments in which such

<table>
<tr>
<td></td>
<td>

restrictions or covenants were contained prior to the Solvent Reorganisation); provided that TopCo shall (subject always to, and without prejudice to, the directors' duties) use all reasonable endeavours to minimise the changes to the rights of the shareholders and Warrantholders under the Restructuring Documents; (d) no holder of shares or Warrants is required to make any capital contributions or other financial commitments; and the structure is designed so as to mitigate, to the extent reasonably practicable, any adverse tax consequences for the security holders (including the Warrants) taken as a whole;

"**Warrantholder**" means a holder of any Warrants in the share capital of TopCo from time to time; and

"**Waterfall**" means the priority of distributions set out in the section entitled "Distributions / Waterfall".

</td>
</tr>
</table>

**Schedule 1**

**TopCo Board Composition**

The Board shall comprise a maximum of seven (7) directors. The chief executive officer of the Group from time to time shall be a director.

Where no single Shareholder holds more than fifty percent (50%) of the Ordinary Shares (other than MIP Shares and Warrant Shares):

1.  Each Qualifying Shareholder shall be entitled to appoint two (2) directors:

    a.  one of which may be an Investor Director should such shareholder so elect; and

    b.  the other being an independent director meeting the Independence Requirements.

2.  The Qualifying Minority Shareholders, acting by simple majority calculated by reference to their respective shareholdings, shall be entitled to appoint one (1) independent director meeting the Independence Requirements (the "**Minority Director**").

3.  Where a Shareholder ceases to be a Qualifying Shareholder but holds more than fifteen percent (15%) of the Ordinary Shares (other than MIP Shares and Warrant Shares) (a "**Qualifying Intermediate Shareholder**"), such Qualifying Intermediate Shareholder shall be entitled to appoint one (1) director, who may be either an Investor Director or an independent director meeting the Independence Requirements (the "**Intermediate Director**").

4.  The Shareholders, acting by simple majority calculated by reference to their respective shareholdings, shall be entitled to appoint the remaining directors, which must meet the Independence Requirements.

5.  The chairperson of the Board (the "Chairperson") shall be one of the existing directors and shall be appointed by the Qualifying Shareholders acting jointly (to the extent there is one or more Qualifying Shareholders) or by the sole Qualifying Shareholder.

Where a single Shareholder holds more than fifty percent (50%) of the Ordinary Shares (other than MIP Shares and Warrant Shares) (a "**Majority Shareholder**"):

1.  The Majority Shareholder shall be entitled to appoint four (4) directors, two of which may be Investor Directors should such shareholder so elect.

2.  The remaining Shareholders (other than the Majority Shareholder), acting by simple majority calculated by reference to their respective shareholdings, shall be entitled to appoint two (2) independent directors meeting the Independence Requirements.

3.  The Chairperson shall be one of the existing directors and shall be appointed by the Majority Shareholder.

## Schedule 2
## Shareholder Simple Majority Reserved Matters

The following shall require the prior approval of the Shareholder Simple Majority:

1. Determining to make any issue of any new debt securities of any Group Company in an amount in excess of EUR 75,000,000 in any financial year, and the terms thereof.

2. Incurrence by the Group of any financial indebtedness in the principal amount in excess of EUR 75,000,000 in any financial year.

3. Any Solvent Reorganisation (including any change in domicile or tax residency of a Group Company other than TopCo), provided that where such Solvent Reorganisation disproportionately and adversely affects the Warrantholders as compared to the holders of the Ordinary Shares, it shall also require the prior written consent of 90% of the affected Warrantholders.

4. Approving the appointment, change or removal of the auditors of any material member of the Group.

5. Approval of dividends or other distributions by Topco, provided that such dividends or distributions are made on a *pro rata* basis in accordance with the Waterfall.

6. Approval of share buy-backs in respect of Topco, provided that such buy-backs are made on a *pro rata* basis in accordance with the Waterfall.

7. Introducing or adopting any other MIP or increasing or otherwise amending the terms of any existing or introduced MIP, provided that all Shareholders are diluted on a *pro rata* basis.

8. Commencement or termination of any Exit process (other than, for the avoidance of doubt, any Drag-Along Sale), provided that this shall be a Shareholder Super Majority matter until four (4) years following the Restructuring Effective Date.

9. Entering into any agreement or arrangement to do any of the foregoing or allowing or permitting any of the foregoing.

**Schedule 3**
**Shareholder Super Majority Reserved Matters**

The following shall require the prior approval of the Shareholder Super Majority:

1. Determining to make any issue of any new equity securities of any Group Company in an amount in excess of EUR 75,000,000 in any financial year, and the terms thereof.

2. Any voluntary change in domicile or residency (in each case for tax purposes) of TopCo, provided that, any such change which materially, adversely and disproportionately affects any shareholder (as compared to the holders of the majority of the same class of shares) shall require the prior written consent of the affected shareholder.

3. Making a proposal for the voluntary winding up, liquidation or dissolution of TopCo or the making of any voluntary application to have a liquidator, administrator, administrative receiver or similar office holder appointed to or in respect of TopCo or a material part of its assets (in each case, other than pursuant to a Solvent Reorganisation or in connection with an Exit).

4. Commencement or termination of any Exit process (other than, for the avoidance of doubt, any Drag-Along Sale), provided that this shall be a Shareholder Super Majority matter until four (4) years following the Restructuring Effective Date, at which point it shall become a Shareholder Simple Majority matter.

5. Any non-clerical amendments or modifications to the Investment Agreement, articles of association, by-laws or other constitutional documents of TopCo, provided that any amendment or modification relating to any matter which: (a) materially, adversely and disproportionately affects the rights attaching to the shares held by any shareholder (as compared to the holders of the majority of the same class of shares); or (b) materially and adversely affects the personal rights or obligations of a shareholder, shall require the prior written consent of the affected shareholder. For the avoidance of doubt, any issuance of pari passu or prior ranking securities shall not, in and of itself, be deemed to affect the rights attaching to any shares then in issue or the personal rights of any shareholder.

6. Making any material change to the nature, scope or geographic focus of the business of the Group.

7. Entering into any agreement or arrangement to do any of the foregoing or allowing or permitting any of the foregoing.

**Schedule 4**
**95% Reserved Matters**

The following shall require the prior approval of shareholders who together hold more than 95% of the Ordinary Shares (other than the MIP Shares and Warrant Shares):

1.  Entering into any agreement, commitment or understanding between (a) any Group Company and (b) any shareholder (or its Affiliates) or any Investor Director, which is not entered into in the ordinary course of the Group's business or on arm's length terms (as reasonably determined by the Board, excluding any conflicted Investor Director), provided that if such action adversely impacts any Economic Term of the Warrants, it shall also require the prior written consent of 90% of the adversely affected Warrantholders.

2.  Purchasing or redeeming any Group Company's share capital, including by way of reduction of capital, buy-back or redemption of shares, other than (a) in relation to a MIP, or (b) pursuant to an offer made on a *pro rata* basis to all holders of the same class (whether or not such offer is accepted by all such holders), provided that if such action adversely impacts any Economic Term of the Warrants, it shall also require the prior written consent of 90% of the adversely affected Warrantholders..

3.  Introducing or adopting any other MIP or increasing or otherwise amending the terms of any existing or introduced MIP, in each case where the MIP would not dilute all Shareholders from time to time on a *pro rata* basis.

4.  Issuance of shares or securities convertible into shares of any Group Company to a shareholder of Topco (other than pursuant to the Pre-Emption Rights or on a *pro rata* basis).

8.  Declaring, making or paying any dividend, distribution, return of capital or other payment to shareholders of Topco (whether in cash, in specie or otherwise), other than dividends or distributions made in accordance with the distribution waterfall set out in the Investment Agreement, provided that if such action adversely impacts any Economic Term of the Warrants, it shall also require the prior written consent of 90% of the adversely affected Warrantholders.

**Schedule 5**
**Baskets and Covenants**
**Table**

**Schedule 6**
**Holdco Term Sheet**

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER TO SELL OR BUY, OR THE SOLICITATION OF AN OFFER TO SELL OR BUY, ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE.   NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE PLAN EFFECTIVE DATE OF THE RESTRUCTURING SUPPORT AGREEMENT ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**PROJECT STRETCH**
**HOLDCO FINANCING TERM SHEET**

This term sheet contains a summary of the material terms of the Holdco Financing referred to in the restructuring term sheet contained in schedule 1 of the lock-up deed dated 13 March 2026, as may be amended or amended and restated from time to time, entered into between the creditors party thereto, certain holders of Class A shares issued by Eagle Investments Holdco, and Eagle Holding Co B.V. and certain of its subsidiaries (the "**Lock-Up Deed**"). Capitalised terms used in this term sheet shall have the meanings given to them in the Lock-Up Deed, the RG Intercreditor Agreement (as defined in the Lock-Up Deed) or in Annex 1 (*Defined Terms*) hereto, as applicable.

The definitive terms of the Holdco Financing will be set out in a notes purchase agreement (the "**Holdco Notes Purchase Agreement**") governed by English law, which will be in form and substance satisfactory to the Company and the Majority Euro Consenting Creditors, in accordance with the Lock-Up Deed. The matters set out in this term sheet are summary terms only and are not intended to include all the terms and conditions which will be set out in full in the final documentation. This term sheet remains subject to further tax and legal structuring and definitive documentation signed by the relevant parties.

Pursuant to a change of control which occurred on 5 September 2025, Eagle Holding Co B.V. ("**Holdco**") became the legal owner of all of the shares in the capital of Eagle Intermediate Global Holding B.V. (the "**Company**"), which are held on trust pursuant to the Trust Deed. Maturity extensions were granted in respect of the SS Term Loans, the USD Notes and the Euro Notes to 31 March 2026.

On the Restructuring Effective Date, amongst other things:

- Holdco will become a direct wholly-owned subsidiary of the new equity issuer, which will be a company incorporated in the United Kingdom ("**Topco**");

- Topco will issue the Holdco Notes together with certain common shares of Topco (the "**Common Equity**") as described below;

- Topco will issue the Holdco Notes and Common Equity pursuant to the Chapter 11 cases in order to:

  - exchange, on a cashless basis on the Restructuring Effective Date, each SS Term Loan Lender's portion of the SS Term Loan Debt (including accrued and uncapitalised interest)

1

into its *pro rata* share (based on its portion of the aggregate amount of SS Term Loan Debt as at the Restructuring Effective Date) of Holdco Notes; and

- issue to each holder of the Holdco Notes, Common Equity *pro rata* to their Holdco Notes holdings.

The Holdco Notes are to be structured in a way to ensure they do not constitute a liability of the Operating Group for rating purposes.

## SECTION 1
## The Financing

| | |
|---|---|
| **Documentation:** | Holdco Notes Purchase Agreement. |
| **Total Commitments:** | US$[●], being the amount equal to the outstanding amount of the SS Term Loan (inclusive of all principal and interest) at the Restructuring Effective Date[1] multiplied by an exchange factor of 1:0.95. |
| **Issue Date** | The Restructuring Effective Date. |
| **Issuer:** | Topco |
| **Holders:** | Each SS Term Loan Lender |
| **Agent:** | Such person selected by the Issuer and the Majority Euro Consenting Creditors. |
| **Currency:** | USD |
| **Guarantors:** | None |
| **Restricted Group:** | Issuer and Holdco. |
| **Security:** | Security over the shares of Holdco, Topco bank accounts from time to time, and intercompany receivables owed to Topco by Holdco. |
| **Maturity:** | The date that will be seven (7) years from the Restructuring Effective Date. |
| **Principal repayment:** | Single repayment at maturity. |
| **Rating:** | None |

## SECTION 2
## Economics

| | |
|---|---|
| **Interest:** | 13.500% per annum PIK. No default interest. |
| **Interest accrual:** | Every three months from the Restructuring Effective Date. |
| **Priority:** | The Holdco Notes will be the Issuer's senior obligations and will be effectively senior to all of the Issuer's existing and future obligations in right of payment, security, lien priority, relative rights and other creditors' rights issues. |

---

[1]   Kroll to confirm at Restructuring Effective Date.

EXECUTION VERSION

**SECTION 3**
**Other Key Terms**

| | |
|---|---|
| **Mandatory prepayment:** | Subject to always retaining sufficient cash on balance sheet to satisfy the Parent Holding Company Expenses projected to be incurred during the 12-month period following the relevant event, the Issuer shall apply the net cash proceeds received by it from any: |
| | (i)     dividend or other distribution on account of the share capital (or any class of share capital) in Holdco; |
| | (ii)    payment of any indebtedness owed to the Issuer by Holdco; |
| | (iii)   return on capital or return of economic value (howsoever described) (including by way of a loan, distribution or other payment) or equivalent payment; |
| | (iv)   other cash payment from Holdco that is not expressly contemplated or required to be used for another purpose pursuant to the Holdco Notes or Exit Notes, and/or |
| | (v)    Exit or sale of assets by the Issuer, |
| | in prepayment of the Holdco Notes, within ten (10) Business Days of receipt thereof. |
| **Holdco covenants** | Subject to always retaining sufficient cash on balance sheet to satisfy the Parent Holding Company Expenses projected to be incurred during the 12-month period following the relevant event, the Issuer shall procure that Holdco distribute any net cash proceeds received by it from any: |
| | (i)     dividend or other distribution on account of the share capital (or any class of share capital) in the Company; |
| | (ii)    payment of any indebtedness owed to the Holdco by the Company; |
| | (iii)   return on capital or return of economic value (howsoever described) (including by way of a loan, distribution or other payment) or equivalent payment; |
| | (iv)   other cash payment from the Company that is not expressly contemplated or required to be used for another purpose pursuant to the Holdco Notes or Exit Notes, and/or |
| | (v)    Exit or sale of assets by the Holdco, |
| | to the Issuer for distribution in accordance with the Mandatory prepayment provision above. |
| **Call protection:** | <u>Year one</u>: Before the first anniversary of the Restructuring Effective Date, any redemption of all or part of the Holdco Notes shall be subject to payment of a make-whole premium and accrued and unpaid interest. |

| | |
|---|---|
| | Year two onwards: At any time after the first anniversary of the Restructuring Effective Date, any redemption of all or any part of the Holdco Notes shall be at par plus accrued and unpaid interest. |
| **Payments:** | All payments will be paid free and clear of all liens, without deduction or withholding on account of taxes or otherwise, and with customary tax gross-up arrangements. |
| **Topco Exit:** | Subject to the paragraph below, the occurrence of a Topco Exit will entitle each Holder to require its commitments under the Holdco Notes to be repaid in full, together with all accrued and unpaid interest thereon. |
| | If the enterprise value of Topco and its Subsidiaries (the "**Group**") in relation to such Topco Exit is less than the amount required to discharge the Holdco Notes in full, then each Holder will, upon completion of the Topco Exit, receive its pro rata share of the net consideration paid by the buyer(s) for the enterprise value, less the outstanding amount of the debt of Holdco and its Subsidiaries, in full and final satisfaction of its claims in respect of the Holdco Notes, in accordance with the Limited Recourse provisions below as if the Recourse Assets had been realised in full. |
| **Limited recourse:** | The Holdco Notes will be a limited liability of the Issuer only. No direct or indirect Holding Company or Subsidiary of the Issuer shall have any obligations or liability in respect of the Holdco Notes. The obligations of the Issuer under the Holdco Notes shall be payable solely from, and recourse with respect thereto shall be limited to, the Recourse Assets and all proceeds thereof. |
| | The recourse of the Finance Parties to the Issuer and Holdco in respect of payment obligations under the Holdco Notes Purchase Agreement will be limited to the application of any Recoveries pursuant to paragraphs (i) and (ii) below: |
| | (i)   if, or to the extent that, after the Recourse Assets have been realised in full, the Recoveries are insufficient to discharge the Holdco Notes in full for any reason, the Issuer and Holdco: |
| |     a. will have no liability to pay or otherwise make good any such insufficiency and the rights of each Finance Party to claim any shortfall shall be waived and abandoned from the date that the Recourse Assets have been realised in full; and |
| |     b. each Finance Party undertakes that it will not (and will not give any instructions to the Agent to) at any time: |
| |         i. apply for any execution, attachment, sequestration, distress or other legal process in respect of any asset of the Issuer or Holdco; or |
| |         ii. petition for the winding-up, administration, liquidation or other analogous proceeding, petition for the appointment of an administrator, a liquidator or other similar officer or otherwise initiate any |

<table>
<tr>
<td></td>
<td>insolvency proceedings, in each case, in relation to the Issuer or Holdco in respect of any obligation arising under the Holdco Notes Purchase Agreement.

(ii)    nothing in paragraph (i) above will prevent or restrict, in each case if expressly permitted by the terms of the Holdco Notes Purchase Agreement:

     a.   a Finance Party proving or lodging a claim for the full amount of the amounts owed to such Finance Party in any insolvency proceeding in respect of the Issuer or Holdco, provided (x) that paragraph (i) above shall apply in respect of any such claim upon the realisation in full of the Recourse Assets and the application of any Recoveries in accordance with the terms of the Holdco Notes Purchase Agreement and (y) the relevant proof or claim shall, upon such realisation in full of the Recourse Assets and application of Recoveries in accordance with the terms of the Holdco Notes Purchase Agreement, be withdrawn or amended, to the extent legally permitted or, if not capable of being withdrawn or amended, be deemed withdrawn or amended, to the extent legally permitted, in order to reflect the fact that no further amount is owed by the Issuer or Holdco; or

     b.   a Finance Party taking proceedings to obtain a declaration or similar judgment order as to the obligations or liabilities of the Issuer or Holdco, provided (x) that paragraph (i) above shall apply in respect of any such proceedings, declaration or similar judgment upon the realisation in full of the Recourse Assets and the application of the Recoveries and (y) upon such realisation in full of the Recourse Assets and application of Recoveries, the relevant proceedings shall cease to be permitted and shall be withdrawn or amended and the relevant declaration or similar judgment shall be deemed to have been satisfied, in each case to the extent legally permitted, in order to reflect the fact that no further amount is owed by the Issuer or Holdco.</td>
</tr>
<tr>
<td><strong>Representations and warranties:</strong></td>
<td>Limited representations from the Issuer other than customary for structurally subordinated "holdco PIK" financings.</td>
</tr>
<tr>
<td><strong>Gross Up</strong></td>
<td>Holdco Notes Purchase Agreement to include customary tax gross up wording.</td>
</tr>
<tr>
<td><strong>Reporting:</strong></td>
<td>Reporting requirements based on the existing SS Term Loan.</td>
</tr>
<tr>
<td><strong>Financial covenants:</strong></td>
<td>None</td>
</tr>
<tr>
<td><strong>Negative covenants:</strong></td>
<td>Except as specified in "Anti-Short Circuit" below, the Issuer will only covenant in respect of itself and Holdco.</td>
</tr>
</table>

6

The Issuer and Holdco will be prohibited from the following activities:

(i) owning any assets other than shares in its Direct Subsidiary, permitted intercompany receivables, credit balances in any bank accounts or rights under any contracts that it enters into in its ordinary course holding company activities;

(ii) incurring any debt unless each Holder is offered a bona fide right to participate in the relevant financing on a pro rata basis (based on the principal amount of Holdco Notes owed to such Holder relative to the total amount of Holdco Notes) on the same terms and conditions (including with respect to fees (other than customary reasonable underwriting or arrangement fees)) as other lenders/financiers under the relevant financing on no less than ten (10) Business Days' notice prior to the deadline established by the Issuer for the Holder to elect to participate in such financing, subject to operational and other baskets to be agreed;

(iii) incurring any intragroup debt that is not subordinated in right of payment to the Holdco Notes;

(iv) investing in, or making restricted payments to, any of its Subsidiaries other than its Direct Subsidiary, including any Unrestricted Subsidiary;

(v) except as specified in the "Security" section above, granting any security or other encumbrance over any of its assets, unless such security is also granted equally and ratably in respect of Holdco Notes;

(vi) making any restricted payments to any of the shareholders of the Issuer before the Holdco Notes have been fully discharged or released (subject to a carveout to allow funds to be upstreamed in order for Topco and Holdco to pay Parent Holding Company Expenses and make Management Advances and other customary carveouts, provided that the upstreaming of funds is also permitted by the Operating Group debt in place at that time);

(vii) investing in, or making any other restricted payments, dividends, distributions, advances, capital contributions, or payments of principal or interest towards any indebtedness owed to any shareholders of the Issuer, provided that this shall not apply to the Holdco Notes;

(viii) undertaking any activities other than customary holding company activities to be agreed;

(ix) undertaking any merger, consolidation, demerger, corporate reorganisation or any other similar process, other than in connection with an Exit;

7

| | |
|---|---|
| | (x)  disposing of any assets to third parties other than in connection with an Exit; and |
| | (xi)  ceasing to own 100% of the shares in the capital of its Direct Subsidiary other than in connection with an Exit. |
| | Open market debt buy-backs by the Issuer at below par will be generally permitted through a broker. |
| **Anti-layering** | Neither the Issuer nor Holdco shall incur, create, assume or permit to exist any indebtedness that is senior to the Holdco Notes in right of payment or in respect of any security or guarantee, whether arising by contract, operation of law, or otherwise (including any contractual arrangement having the effect of conferring priority on other creditors), without offering the Holders a bona fide right to participate in such financing on a pro rata basis (based on the principal amount of Holdco Notes owed to such Holder relative to the total amount of Holdco Notes) on the same terms and conditions (including with respect to fees (other than customary reasonable underwriting or arrangement fees)) as other lenders/financiers under the relevant financing. |
| **Anti-Short Circuit:** | The Issuer shall procure that no member of the Operating Group, including any Unrestricted Subsidiary, will, directly or indirectly, receive any debt or equity investment provided by Topco or any of its shareholders (or their Affiliates or Related Funds), unless the proceeds of such debt or equity investment are first received by Holdco (in the case of an investment provided by Topco) or by Topco and then by Holdco (in the case of an investment provided by any Topco shareholder) before being passed through, directly or indirectly, to the relevant member of the Operating Group. The foregoing does not apply to: |
| | (i)  any unsecured financial indebtedness made available to a member of the Operating Group by (a) an Independent Debt Fund or (b) any Topco shareholder (or any of its Affiliates or Related Funds), that is permitted under the shareholder's agreement and relevant debt documents; |
| | (ii)  any secured financial indebtedness made available to a member of the Operating Group by (a) an Independent Debt Fund or (b) any Topco shareholder (or any of its Affiliates or Related Funds), that is permitted under the shareholder's agreement and relevant debt documents; |
| | (iii)  any financial indebtedness incurred by a member of the Operating Group under or pursuant to any contract for the provision of any lease, licence, goods or services, in each case provided on arm's length terms or better from the perspective of the Operating Group; or |

| | |
|---|---|
| | (iv)    any incentive plan, bonus programme or similar arrangement to be established for certain directors, officers and employees of Topco and its Subsidiaries. |
| **Anti-Liability Management:** | The Issuer shall not, and shall cause Holdco not to, consummate or agree to or enter into any Liability Management Transaction (to be defined as part of the Exit Notes). |
| **Transfers by Holders:** | The Holdco Notes are intended to be offered or sold under the Plan pursuant to section 1145 of the Bankruptcy Code and will be freely transferable, subject to transfers to competitors (to be defined) and restrictions pursuant to federal and state securities laws (including if the holder is an 'affiliate' of the Issuer (as defined in Rule 144(a)(1) in the Securities Act), or has been such an 'affiliate' within ninety (90) days of such transfer or is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code). <br><br> To the extent that section 1145 of the Bankruptcy Code is either not permitted or not applicable, the Holdco Notes may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and subject to any restrictions on the transferability of such Holdco Notes. <br><br> Notwithstanding the foregoing, the Holdco Notes will be exempt from (or not subject to) the qualification requirements under the Trust Indenture Act of 1939. <br><br> For the avoidance of doubt, following the Restructuring Effective Date, any Holder that wishes to assign or transfer any of its rights and/or obligations under the Holdco Notes Purchase Agreement after the Restructuring Effective Date is not required to also assign or transfer all or any part of its portion of the Common Equity. |
| **Events of default:** | Based on the Holdco Notes, with appropriate modifications to reflect the customary events of default for a post-restructuring "holdco PIK" facility and the principle that, except as specified in "Anti-Short Circuit" above, the Issuer will only give covenants in respect of itself and Holdco. The events of default will include cross-acceleration linked to (subject to a de minimis amount be agreed) any other debt incurred by the Company or any of its Restricted Subsidiaries. |
| **Enforcement Action:** | If a Distress Event occurs, the Holders will not be permitted to take any Enforcement Action with respect to the Holdco Notes until the secured debt of the Company have been fully discharged or released. |

9

| | |
|---|---|
| | The foregoing shall not prevent the Agent of the Holdco Notes from lodging a claim for the full amount of the amounts owed to any Finance Party in any insolvency proceeding in respect of the Issuer or Holdco. |
| **Pro rata sharing and turnover:** | Substantially as per Clause 28 (*Sharing Among the Finance Parties*) of the SS Term Loan Agreement. |
| **Amendments:** | Subject to (a) the consent matters listed below requiring consent of at least 66 2/3% in aggregate principal of the Holdco Notes; (b) the sacred rights listed below requiring consent of at least 90% in aggregate principal of the Holdco Notes; and (c) amendments that are materially adverse to any Holdco Noteholder as described below, any term of the Holdco Notes Purchase Agreement may be amended or waived with the consent of Holders holding more than 50% in aggregate principal of the Holdco Notes.<br><br>Consent of Holders holding at least 66 2/3% in aggregate principal amount of the Holdco Notes is required to make any changes to:<br><br>(i)    the "Security" provision;<br><br>(ii)    the "Negative covenants" provision (subject to certain covenants therein for which amendments will require 90% consent, as listed below); and<br><br>(iii)    the definition of "Parent Holding Company Expenses."<br><br>Consent of Holders holding more than 90% in aggregate principal of the Holdco Notes is required to make any changes to:<br><br>(i)    the "Anti-Liability Management" provision or the definition of Liability Management Transaction;<br><br>(ii)    the "Limited recourse" provision;<br><br>(iii)    the "Transfers by Holders" provision;<br><br>(iv)    the "Pro rata sharing and turnover" provision;<br><br>(v)    those certain covenants described under the "Negative covenants" provision above, prohibiting the Issuer and Holdco from:<br><br>    a.  owning of any assets other than shares in its Direct Subsidiary, permitted intercompany receivables, credit balances in any bank accounts or rights under any contracts that it enters into in its ordinary course holding company activities;<br><br>    b.  incurring any intragroup debt that is not subordinated in right of payment to the Holdco Notes; |

|  | |
|---|---|
| | c. investing in, or making restricted payments to, any of its Subsidiaries other than its Direct Subsidiary, including any Unrestricted Subsidiary; and<br><br>d. making any restricted payments to any of the shareholders of the Issuer before the Holdco Notes have been fully discharged or released;<br><br>(vi) the release of all or substantially all of the security granted by Issuer, other than (1) any release of security the board of TopCo determines (acting reasonably and in good faith) to be necessary or desirable to prevent or remedy an adverse effect on ratings of the Operating Group, which shall only require 66 2/3% in aggregate principal amount of the HoldCo Notes, or (2) in connection with an Exit;<br><br>(vii) the disposal of all or substantially all assets of the Issuer or Holdco, other than in connection with an Exit;<br><br>(viii) the requirement to offer to Holders a bona fide right to participate in any debt on a pro rata basis prior to the incurrence of such debt;<br><br>(ix) a reduction in the amount of any payment of principal, interest, fees, or commission or other amounts payable;<br><br>(x) the currency of payment of any amount or a redenomination into another currency;<br><br>(iv) the "Anti-Short Circuit" provision;<br><br>(xi) the "Maturity" provision;<br><br>(xii) the definition of "Recourse Assets";<br><br>(xiii) Topco's domicile and tax residency; and<br><br>(xiv) the "Amendments" provision.<br><br>Any amendment, modification, or waiver of the Holdco Notes documentation that is materially and disproportionately adverse to any Holdco Noteholder as compared to other Holdco Noteholders shall require the prior written consent of such affected Holdco Noteholder. Such consent shall be in addition to any other consent or approval otherwise required for amendments. |
| **Acceleration:** | Substantially as per Clause 23.9 (*Acceleration*) of the SS Term Loan Agreement. An acceleration may be revoked as per Clause 35.5(c) (*Exceptions*) of the SS Term Loan Agreement. |
| **Listing** | The Holdco Notes will be listed on the International Stock Exchange (or another exchange which may or may not be a 'regulated market' for purposes of the Market Abuse Regulation (596/2014/EU)). |

11

EXECUTION VERSION

|  | The Issuer shall use commercially reasonable efforts to procure the following within five (5) business days of the Restructuring Effective Date: (i) an ISIN in respect of the Holdco Notes, and (ii) the listing of the Holdco Notes on TISE. |
| --- | --- |
| **Miscellaneous:** | The Holdco Notes Purchase Agreement will contain standard indemnity provisions, waiver of set-off, illegality and similar provisions. |
| **Expenses** | Provisions consistent with the SS Term Loan Agreement. |
| **Governing law and jurisdiction:** | The Holdco Notes Purchase Agreement shall be governed in accordance with the laws of England. The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with the Holdco Notes. |
| **Counsel to certain Holders:** | Gibson, Dunn & Crutcher LLP (representing the Euro Notes Ad Hoc Committee). |

## ANNEX 1

## DEFINED TERMS

"**Common Equity**" has the meaning given to it in the preamble to this Term Sheet.

"**Direct Subsidiary**" means (a) in the case of Topco, Holdco or (b) in the case of Holdco, the Company and Eagle Finance Co B.V..[2]

"**Exit**" means the completion of:[3]

(a)     a direct or indirect sale or transfer, or a series of related sales or transfers, of all or substantially all of the shares in the capital of Holdco or the Company, the assets of the Company or the Operating Group taken as a whole (a "**Sale**");

(b)     a listing of all or substantially all of the shares in the capital of Holdco or the Company on a fully diluted basis or substantially all of the shares in the Company's Subsidiaries or any holding company incorporated for such purposes (directly or indirectly through an IPO vehicle) on a regulated marketplace, multilateral trading facility or other exchange or facility for the public trading of shares (an "**IPO**"); or

(c)     a merger of Holdco or the Company or any or all of the Company's Subsidiaries (as applicable) with any person, the result of which is that Topco no longer owns shares in Holdco or Holdco no longer owns shares in the Company, or any other transaction that creates substantially the same effect as a Sale or an IPO.

"**Finance Party**" means the Agent or a Holdco Noteholder.

"**Group**" has the meaning give to it under the heading 'Topco Exit'.

"**Holdco Noteholder**" means a holder of the Holdco Notes.

"**Holdco Notes**" means the notes to be issued by the Topco under and in accordance with the Holdco Notes Purchase Agreement.

"**Independent Debt Fund**" means any trust, fund or other entity which has been established primarily for the purpose of purchasing or investing in loans or debt securities and which is managed or advised independently from all other trusts, funds or other entities managed, advised or controlled by an Initial Investor or a manager or adviser of such Initial Investor or any of its affiliates which have been established for the primary or main purpose of investing in the share capital of companies (and, for the avoidance of doubt, but without limitation, an entity trust or fund shall be treated as being managed independently from all other trusts, funds, or other entities managed or controlled by an Initial Investor or any of its affiliates, if it has a different general partner (or equivalent)).

"**Initial Investor**" means a shareholder of Topco on the Restructuring Effective Date.

---

[2]     To be aligned with the definition in the Investment Agreement.
[3]     To be aligned with the definition in the Investment Agreement.

"**Management Advances**" means loans or advances made to, or Guarantees with respect to loans or advances made to, Management Investors:

(a)     in respect of travel, entertainment or moving-related expenses incurred in the ordinary course of business;

(b)     for purposes of funding any such person's purchase of Capital Stock of the Issuer, Company, Holdco, their Subsidiaries or any Parent Holding Company with (in the case of this sub-clause (b)) the approval of the Board of Directors of the Issuer or any Parent Holding Company; or

(c)     in respect of moving-related expenses incurred in connection with any closing or consolidation of any facility or office.

"**Management Investors**" means any future, present or former employee, officer, director, manager, consultant or independent contractor and other members of the management of or consultants to any Parent Holding Company, Issuer, Company, Holdco or any of their respective permitted transferees, Subsidiaries, or spouses or former spouses, family members or relatives thereof, or any trust, partnership or other entity for the benefit of or the beneficial owner of which (directly or indirectly) is any of the foregoing, or any of their heirs, estates, executors, successors and legal representatives, who at any date beneficially own or have the right to acquire, directly or indirectly, Capital Stock of the Issuer, Company, Holdco, or any other Restricted Subsidiary or any Parent Holding Company.

"**Operating Group**" means the Company and its Subsidiaries from time to time.

"**Parent Holding Company Expenses**" means:

(a)     costs (including all professional fees and expenses) incurred by Topco or Holdco in connection with maintenance by such entity of its corporate or other entity existence and performance of obligations including reporting obligations under or otherwise incurred in connection with compliance with applicable laws, rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, the Holdco Notes Purchase Agreement or any agreement or instrument relating to indebtedness of the Operating Group, including in respect of any reports filed with respect to the Securities Act, Exchange Act or the respective rules and regulations promulgated thereunder;

(b)     customary indemnification obligations of Topco or Holdco owing to directors, officers, employees or other persons under its articles of association or pursuant to written agreements with any such person to the extent relating to the Operating Group;

(c)     obligations of Topco or Holdco in respect of director and officer insurance (including premiums therefor) to the extent relating to the Operating Group;

(d)     general corporate overhead expenses, including (i) expenses related to auditing and other accounting matters, professional fees and expenses and other operational expenses (including in relation to any financial, advisory, financing, underwriting or placement services) of Topco or Holdco related to the ownership or operation of the business of the Operating Group; (ii) remuneration, salaries, bonuses, benefits, severance and indemnities of directors, officers, employees, managers, consultants or independent contractors of

14

Topco or Holdco related to the ownership or operation of the business of the Operating Group; or (iii) costs and expenses with respect to any litigation or other dispute relating to the Restructuring or the ownership, directly or indirectly, by Topco or Holdco;

(e)    other fees, expenses and costs relating directly or indirectly to activities of the Operating Group, Topco, Holdco or any other person established for purposes of or in connection with the Restructuring or which holds directly or indirectly any capital stock of the Company, in an amount not to exceed US$2.5 million in any fiscal year; and

(f)    expenses incurred by Topco or Holdco in connection with (i) any public offering or other sale of capital stock or indebtedness by Topco or Holdco (whether or not successful) and (ii) any disposition or acquisition or any investment transaction by any member of the Operating Group (or any acquisition of or investment in any business, assets or property that will be contributed to Operating Group as part of the same or a related transaction).

"**Recoveries**" means (a) all net proceeds received by the Issuer pursuant to or in connection with an Exit, (b) in the case of a Topco Exit, the net consideration paid by the buyer(s) for the enterprise value, less the outstanding amount of the debt of Holdco and its Subsidiaries, and (c) the net proceeds of the realisation of the Recourse Assets.

"**Recourse Assets**" means all assets of the Issuer.

"**Topco Exit**" means the completion of:[4]

(a)    a direct or indirect sale or transfer, or a series of related sales or transfers, of all or substantially all of the shares in the capital of Topco (a "**Topco Sale**");

(b)    a listing of all or substantially all of the shares in the capital of Topco on a fully diluted basis or substantially all of the shares in any holding company incorporated for such purposes (directly or indirectly through an IPO vehicle) on a regulated marketplace, multilateral trading facility or other exchange or facility for the public trading of shares (a "**Topco IPO**"); or

(c)    a merger of Topco with any person, the result of which is that Topco no longer owns shares in Holdco, or any other transaction that creates substantially the same effect as a Topco Sale or a Topco IPO.

---

[4]    To be aligned with the definition in Investment Agreement.

15

**EXECUTED** and **DELIVERED** as a **DEED**
by **THE LYCRA COMPANY**
**NEDERLAND B.V.**, a company incorporated
in the Netherlands, acting by:

DocuSigned by:

*Catherine Spicer*

········ 90FC8FF8BAD9447 ···············

Name:  Catherine Spicer

Title: Attorney

Who, in accordance with the laws of the
territory, is acting under the authority of that
company.

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **THE LYCRA COMPANY GLOBAL
HOLDINGS B.V.**, a company incorporated in
the Netherlands, acting by:

DocuSigned by:

*Catherine Spicer*

............90EC8FE8BAD9447..................

Name:   Catherine Spicer

Title: Attorney

Who, in accordance with the laws of the
territory, is acting under the authority of that
company.

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **THE LYCRA COMPANY MEXICO**
**HOLDINGS B.V.**, a company incorporated in
the Netherlands, acting by:

DocuSigned by:

*Catherine Spicer*

90FC8FF8BAD9447...

Name:   Catherine Spicer

Title: Attorney

Who, in accordance with the laws of the
territory, is acting under the authority of that
company.

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **EAGLE INTERMEDIATE GLOBAL
HOLDING B.V.**, a company incorporated in
the Netherlands, acting by:

DocuSigned by:

*Catherine Spicer*

.........................90FC8FF8BAD9447..........

Name:      Catherine Spicer

Title: Attorney

Who, in accordance with the laws of the
territory, is acting under the authority of that
company.

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **THE LYCRA COMPANY BRAZIL**
**HOLDINGS B.V.**, a company incorporated in
the Netherlands, acting by:

DocuSigned by:

*Catherine Spicer*

90FC8FF8BAD9447...

·······································

Name:      Catherine Spicer

Title: Attorney

Who, in accordance with the laws of the
territory, is acting under the authority of that
company.

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **EAGLE GLOBAL HOLDING B.V.**, a
company incorporated in the Netherlands,
acting by:

DocuSigned by:

*Catherine Spicer*

90FC8FF8BAD9447...

Name:      Catherine Spicer

Title: Attorney

Who, in accordance with the laws of the
territory, is acting under the authority of that
company.

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **EAGLE HOLDING CO B.V.**, a company
incorporated in the Netherlands, acting by:

DocuSigned by:

*Catherine Spicer*

·················· 90EC8EF8BAD9447·······

Catherine Spicer

Name:

Title: Attorney

Who, in accordance with the laws of the
territory, is acting under the authority of that
company.

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **EAGLE FINANCE CO B.V.**, a company
incorporated in the Netherlands, acting by:

DocuSigned by:

*Catherine Spicer*

90FC8FF6BAD9447

Name:      Catherine Spicer

Title: Attorney

Who, in accordance with the laws of the
territory, is acting under the authority of that
company.

[*Signature page – Stretch LUA 2026*]

**SIGNED** and **DELIVERED** as a deed
by The LYCRA Company UK Limited

DocuSigned by:

*Catherine Spicer*

····················90FC8FF8BAD9447······

Director        Catherine Spicer

Signed by:

*Dean Williams*

················79D127A13DEF4F4···

Director        Dean Williams

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **EAGLE FINANCE UK LIMITED**, a
company incorporated in Jersey, acting by:

DocuSigned by:

*Catherine Spicer*

................................90FC8FF8BAD9447................

Name:        Catherine Spicer

Title: Attorney

Who, in accordance with the laws of the
territory, is acting under the authority of that
company.

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **CHINA HOLDINGS, LLC**, a limited
liability company organized in the State of
Delaware, United States of America, acting
by:


DocuSigned by:

*Catherine Spicer*

90FO8FF6BAD9447

Name:     Catherine Spicer

Title: Authorized Person

Who, in accordance with the laws of the
territory, is acting under the authority of that
limited liability company.

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **THE LYCRA COMPANY ASIA
PACIFIC LLC**, a limited liability company
organized in the State of Delaware, United
States of America, acting by:

DocuSigned by:

*Catherine Spicer*

90FC8FF8BAD9447...

Name:          Catherine Spicer

Title: Authorized Person

Who, in accordance with the laws of the
territory, is acting under the authority of that
limited liability company.

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **THE LYCRA COMPANY LLC**, a
limited liability company organized in the
State of Delaware, United States of America,
acting by:

DocuSigned by:

*Catherine Spicer*
90FC8FF8BAD9447...

..............................................

Name:          Catherine Spicer

Title: Authorized Person

Who, in accordance with the laws of the
territory, is acting under the authority of that
limited liability company.

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **EAGLE US ACQUISITION PARENT**
**CORP.**, a corporation organized in the State
of Delaware, United States of America, acting
by:

DocuSigned by:

*Catherine Spicer*

····················90FC6FF8BAD9447·············

Name:     Catherine Spicer

Title: Authorized Person

Who, in accordance with the laws of the
territory, is acting under the authority of that
corporation.

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **EAGLE US ACQUISITION CORP.**, a
corporation organized in the State of
Delaware, United States of America, acting
by:

DocuSigned by:

*Catherine Spicer*

........................—90FC8FF8BAD9447..........

Name:        Catherine Spicer

Title: Authorized Person

Who, in accordance with the laws of the
territory, is acting under the authority of that
corporation.

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **CCS HOLDING, LLC**, a limited liability
company organized in the State of Delaware,
United States of America, acting by:

DocuSigned by:

*Catherine Spicer*

90FC8FF8BAD9447

Name:        Catherine Spicer

Title: Authorized Person

Who, in accordance with the laws of the
territory, is acting under the authority of that
limited liability company.

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **THE LYCRA COMPANY**
**SWITZERLAND SÀRL**, a company
incorporated in Switzerland, acting by:

Signed by:

*Dean Williams*

................................79D127A13DEF4F4................

Name:    Dean Williams

Title: Authorised Signatory

Who, in accordance with the laws of the
territory, is acting under the authority of that
company.

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **THE LYCRA COMPANY PRODUCTS
SA**, a company incorporated in Switzerland,
acting by:



Signed by:

Dean Williams

79D127A13DEF4F4...

Name:      Dean Williams

Title: Authorised Signatory

Who, in accordance with the laws of the
territory, is acting under the authority of that
company.

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a **DEED**
by **FIBERS MEXICO HOLDINGS, S. DE
R.L. DE C.V,** a company incorporated in
Mexico, acting by:

DocuSigned by:

*Catherine Spicer*

90FC8FF8BAD9447...

Name:   Catherine Spicer

Title: Attorney

Who, in accordance with the laws of the
territory, is acting under the authority of that
company.

[*Signature page – Stretch LUA 2026*]

Signed as a deed by **The LYCRA Company Indústria e Comércio Têxtil Ltda.** acting by ___Dean Williams___ in the presence of:

Signed by:

*Dean Williams*

79D127A13DEF4F4...

Attorney-in-Fact

Signed by:

AE6983B44F5B4B5...

Witness

Name: Chris hood

Occupation: Director of Supply Chain

Address:

835 Easkey Ln Avondale PA

Signed by:

*Liz williams*

E87735CA4FE14EE...

Witness

Name: Liz williams

Occupation: Homemaker

Address:

838 Easkey lane

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a deed by
**THE LYCRA COMPANY SINGAPORE**
**HOLDING PTE. LTD.**, a company
incorporated in Singapore, and signed on
behalf of the company by two directors:



Wai Fan Siew
Director

Kok Beng Chew
Director

**EXECUTED** and **DELIVERED** as a deed by
**THE LYCRA COMPANY SINGAPORE**
**TRADING PTE. LTD.**, a company
incorporated in Singapore, and signed on
behalf of the company by two directors:


Wai Fan Siew
Director


Catherine Spicer
Director

**EXECUTED** and **DELIVERED** as a deed by
**THE LYCRA COMPANY SINGAPORE
PTE. LTD.**, a company incorporated in
Singapore, and signed on behalf of the
company by two directors:

DocuSigned by:

*Wai Fan Siew*

9848A0CD7FA344C...

Wai Fan Siew
Director

DocuSigned by:

*Catherine Spicer*

90FC8FF8BAD9447...

Catherine Spicer
Director

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a deed by **THE LYCRA COMPANY HONG KONG LIMITED**, a company incorporated in Hong Kong, and signed on behalf of the company by two directors:

DocuSigned by:

*Wai Fan Siew*

.............9848A0CD7FA344C...........

Wai Fan Siew
Director

DocuSigned by:

*Catherine Spicer*

.............90FC8FF8BAD9447...........

Catherine Spicer
Director

**EXECUTED** and **DELIVERED** as a deed by
**CH HONG KONG HOLDINGS II**
**LIMITED**, a company incorporated in Hong
Kong, and signed on behalf of the company by
the director:

DocuSigned by:

Wai Fan Siew

9848A0CD7FA344C...

Wai Fan Siew
Director

[*Signature page – Stretch LUA 2026*]

**EXECUTED** and **DELIVERED** as a deed by
**THE LYCRA COMPANY TAIWAN**
**LIMITED**, a company incorporated in Hong
Kong, and signed on behalf of the company by
two directors:


DocuSigned by:

*Wai Fan Siew*

9848A0CD7FA344C...

Wai Fan Siew
Director


Signed by:

*Choo Yang Teo*

4FE85EFD88B3409...

Choo Yang Teo
Director

**Exhibit C**

**Financial Projections**

**Financial Projections[1]**

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code because confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan. This confirmation condition is referred to as the "feasibility" of the Plan. In connection with the planning and development of the Plan, and for the purposes of whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources to operate their business.

For purposes of demonstrating the feasibility of the Plan, the Debtors have prepared the forecasted, consolidated (as set forth herein) balance sheet, income statement, and statement of cash flows (the "Financial Projections" or the "Projections") for the second half of the year ended December 31, 2026 through December 31, 2028 (fiscal year 2028) (the "Projection Period"). The Financial Projections were prepared based on assumptions made by the Debtors' management team ("Management"), in consultation with their advisors, as to the future performance of the Reorganized Debtors, and reflect the Debtors' judgment and expectations regarding their future operations and financial position. The Financial Projections have been prepared on a consolidated basis, except for Unconsolidated Joint Ventures (as defined below), in sufficient detail, as far as is reasonably practicable, based on the Debtors' books and records.

The Financial Projections are based on the following: (a) current and projected market conditions of the Debtors; (b) the ability to maintain sufficient liquidity and working capital to fund operations; and (c) confirmation of the Plan.

Although Management has prepared the Financial Projections in good faith based upon information available to them as of the date hereof and believes the assumptions are reasonable, there can be no assurance that the assumptions in the Financial Projections will be realized. Management continues to monitor the macroeconomy, the industry, and their business results and reserves the right (but is under no obligation) to modify the Financial Projections to reflect, among other things, any revised assumptions regarding the overall industry growth rates, revised assumptions regarding developments in the macroeconomy, and/or revised assumptions based on the Debtors' business results during the Projection Period. While the Debtors' management believes that the assumptions were reasonable when the Financial Projections were prepared, the Debtors can provide no assurance that such Financial Projections and assumptions will be realized.

INFORMATION CONTAINED IN THE FINANCIAL PROJECTIONS IS DELIVERED FROM THE COMPANY'S CURRENTLY AVAILABLE BOOKS AND RECORDS AND MAY NOT REFLECT IN ALL CIRCUMSTANCES ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES OF AMERICA ("U.S. GAAP"), INTERNATIONAL FINANCIAL REPORTING STANDARDS ("IFRS"), OR ANY OTHER ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN UNIQUE COUNTRIES ("INTERNATIONAL GAAP") FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED, REVIEWED, OR SUBJECTED TO ANY PROCEDURES DESIGNED TO PROVIDE ANY LEVEL OF ASSURANCE BY THE DEBTORS' INDEPENDENT PUBLIC ACCOUNTANTS. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE FINANCIAL PROJECTIONS ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED AND ARE SUBJECT TO BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

CONTROL OF MANAGEMENT. THESE UNCERTAINTIES INCLUDE, AMONG OTHER THINGS, THE ULTIMATE OUTCOME AND CONTENTS OF A CONFIRMED PLAN OF REORGANIZATION AND THE TIMING OF THE CONFIRMATION OF SUCH PLAN. ACTUAL RESULTS MAY VARY FROM THOSE PRESENTED IN THE FINANCIAL PROJECTIONS. HOLDERS OF CLAIMS OR EQUITY INTERESTS MUST MAKE THEIR OWN ASSESSMENT AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN MAKING THEIR DETERMINATION OF WHETHER TO ACCEPT OR REJECT THE PLAN.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. ALTHOUGH MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.

THE SIGNIFICANT ASSUMPTIONS USED IN THE PREPARATION OF THE FINANCIAL PROJECTIONS ARE STATED BELOW. THE FINANCIAL PROJECTIONS ASSUME THAT THE DEBTORS WILL EMERGE FROM CHAPTER 11 ON THE ASSUMED EFFECTIVE DATE. THE FINANCIAL PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH (1) THE DISCLOSURE STATEMENT, INCLUDING ANY OF THE EXHIBITS THERETO OR INCORPORATED REFERENCES THEREIN, AS WELL AS THE RISK FACTORS SET FORTH THEREIN, AND (2) THE SIGNIFICANT ASSUMPTIONS, QUALIFICATIONS, AND NOTES SET FORTH BELOW.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH OR DISCLOSE THEIR FINANCIAL PROJECTIONS. ACCORDINGLY, THE DEBTORS RESERVE THE RIGHT TO, BUT DISCLAIM ANY OBLIGATION TO, (A) FURNISH UPDATED FINANCIAL PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS AT ANY TIME IN THE FUTURE, (B) INCLUDE UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION, OR (C) OTHERWISE MAKE UPDATED INFORMATION OR FINANCIAL PROJECTIONS PUBLICLY AVAILABLE. THE SUMMARY FINANCIAL PROJECTIONS AND RELATED INFORMATION PROVIDED IN THE DISCLOSURE STATEMENT AND THE EXHIBITS THERETO HAVE BEEN PREPARED BY MANAGEMENT. THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. SOME ASSUMPTIONS MAY NOT MATERIALIZE AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE FINANCIAL PROJECTIONS AND RELATED INFORMATION, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING

CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS, INCLUDING WITHOUT LIMITATION THOSE SET FORTH HEREIN. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS ARE AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS.

**1) General Assumptions**

**A. Overview**

The Debtors innovate and produce fiber and technology solutions for the apparel and personal care industries and owns leading consumer and trade brands: LYCRA®, LYCRA HyFit®, LYCRA® T400®, COOLMAX®, THERMOLITE®, ELASPAN®, SUPPLEX® and TACTEL®. Headquartered in Wilmington, Delaware, the Debtors are recognized worldwide for its sustainable products, technical expertise, and marketing support. The Debtors focus on adding value to its customers' products by developing unique innovations designed to meet the consumer's need for comfort and lasting performance.

**B. Presentation**

The Financial Projections are based on the Debtors' business plan. The Financial Projections were informed by current and projected conditions in the Debtors' markets and prepared on a holistic basis to reflect the combined results of their entire business, inclusive of Debtor and non-Debtor activity. The Financial Projections consist of the following non-GAAP unaudited pro forma financial statements: (i) projected income statement, (ii) projected balance sheet, and (iii) projected cash flow statement.

The Debtors manage the capital position of certain joint ventures ("Unconsolidated Joint Ventures") separately from the rest of the business. Because of this, the impact of Unconsolidated Joint Ventures on EBITDA is reversed and line items below EBITDA exclude the financials of Unconsolidated Joint Ventures. Cash impacts of the Unconsolidated Joint Ventures are reflected in the Cash Flow Statement under Unconsolidated Joint Venture Contributions. Unconsolidated Joint Ventures are not consolidated on the Balance Sheet or Cash Flow Statement. This presentation method is consistent with how the Debtors manage and project their business.

The post-emergence balance sheet as of December 31, 2026, was prepared utilizing the preliminary December 31, 2025 balance sheet and projected results of operations and cash flows. Actual balances may vary from those reflected in the opening balance sheet due to variances in projections and potential changes in cash need to consummate the Plan. The reorganized pro forma balance sheets for the Projection Period contain certain pro forma adjustments as a result of consummation of the plan. The projected income statement reflects post-emergence projections beginning in 2H26. The Company currently estimates $20mm of EBITDA for 1H26, which represents a more than threefold increase in Q2 relative to the expected Q1 results.

**C. Accounting Policies**

The Financial Projections have been prepared using accounting policies that are materially consistent with those applied in the Company's historical financial statements. The Financial Projections do not reflect the formal implementation of reorganization accounting pursuant to FASB Accounting Standards Codification Topic 852, Reorganizations ("ASC 852").

**D. Methodology**

In developing the Financial Projections, the Debtors reviewed their product portfolio on both a regional and product-level basis and made an assessment of whether or not current pricing, volume and variable cost trends were representative of the long-run outlook. The forecast was further developed based on input from procurement, sales, FP&A, and other areas across the organization.

**E. Plan Consummation**

The operating assumptions assume that the Plan will be confirmed and consummated by May 15, 2026 and reflect the estimated cash impact of claim class treatments.

**2) Assumptions With Respect to the Projected Income Statement**

**A. Revenue**

Revenues are forecasted on a product-level basis based on expected pricing and volume trends within the various regions that the Debtors operate in. These projections were informed primarily by input from sales and customer leadership.

**B. COGS and Other Operating Expenses**

COGS and Other Operating Expenses are projected based on expected variable costs at the manufacturing plant level (which was informed by input from procurement and other functional areas), as well as historical trends in plant operating costs and distribution & warehousing.

**C. SG&A & Other Income**

Selling, General, and Administrative Costs ("SG&A") & Other Income are primarily comprised of labor costs, advertising expenses, legal expenses, and other expenses associated with the Debtors' corporate overhead. Projected SG&A is based primarily on historical SG&A costs.

**D. Reversal of Unconsolidated Joint Ventures' EBITDA, net of NCI**

Certain joint ventures have been unconsolidated in the income statement, with the corresponding operating cash requirements of these joint ventures shown separately in the cash flow statement.

**E. Depreciation & Amortization**

Depreciation & Amortization reflects the anticipated depreciation and amortization of the existing facilities, based on historical and projected capex levels.

**F. Net Interest Expense**

Net Interest Expense post-emergence is forecasted based on the Debtors' proposed capital structure as more fully described in the Plan and the exhibits thereto.

**G. Income Tax**

Income Tax is estimated based on historical cash tax payments. The impact of the restructuring on tax attributes has not been evaluated for purposes of these projections.

**H. Other Income**

Other Income consists of professional fees and the reversal of elevated COGS expense from historical BIO BDO purchases. The Debtors chose to exclude this expense to better represent the economic reality of the company.

**3) Assumptions with Respect to the Projected Balance Sheet and Projected Statement of Cash Flows**

**A. Working Capital**

Working capital assumptions are based on movements in accounts receivable, inventory, and accounts payable, which are assumed to continue performing according to the historical relationship with respect to revenue and expense activity. Revenues are collected on a ~40 day lag period, inventory stabilizes at ~105 days from purchase to sale, and expenses are paid on a ~30 day lag period.

**B. Pro Forma Adjustments Related to Emergence**

The balance sheet ("Balance Sheet") included in the Financial Projections presents a pro forma view of December 2026, assuming the effect of certain adjustments related to the Debtors' emergence from bankruptcy. The adjustments are based on estimates; actual adjustments will be based on the determined fair value and may be materially different from those presented herein.

**C. Property, Plant, and Equipment**

Property, Plant, and Equipment ("PP&E") reflects the book value of the Debtors' facilities. Upon emergence, the asset value may be written down as part of the fresh start accounting adjustments.

**D. Investments in Equity Affiliates**

Investments in Equity Affiliates reflects ownership interests in entities not consolidated on the Debtors' balance sheet. Carrying balance is increased by contributions to non-consolidated entities. Upon emergence, the asset value may be written down as part of the fresh start accounting adjustments.

**E. Capital Structure**

The pro forma Balance Sheet reflects the following key post-emergence capital structure assumptions:

- $80 million Exit Secured Notes ███████████████████████████████████████████ ████████████

- $203 million HoldCo Notes with a maturity date of May 2033 and 13.50% PIK interest;
- $10 million Junior HoldCo Notes with no maturity and no interest

**F. Capital Expenditures**

The Financial Projections for capital expenditures were prepared with consideration of the needs of the Debtors' fixed assets. Capital expenditures primarily relate to sustaining capital needs to maintain each facility in proper working condition as well as capital required for compliance and growth purposes. Capital expenditures also include capitalized

corporate expenditures such as certain information technology expenditures required to maintain the Debtors' information technology equipment and software.

**G. Unconsolidated Joint Venture Contributions**

Unconsolidated Joint Venture Contributions are based on separately forecasted cash flows for the Unconsolidated Joint Ventures. Once existing bank lines of Unconsolidated Joint Ventures have been consumed, the Debtors are assumed to fund 100% of ongoing capital needs.

**H. Capital Lease Payments**

The Financial Projections for Capital Lease Payments are based on contractual payments the Debtors have under current capital leases.

Income Statement

| | H2 2026 | FY27 | FY28 |
|---|---|---|---|
| Revenue | $396 | $881 | $952 |
| COGS and Other Operating Expenses | (304) | (669) | (716) |
| **Gross Profit** | **$92** | **$212** | **$236** |
| SG&A & Other Income | (69) | (138) | (143) |
| **EBITDA** | **$23** | **$74** | **$93** |
| Reversal of Unconsolidated Joint Ventures' EBITDA, net of NCI | 5 | (5) | (15) |
| Depreciation & Amortization | (14) | (29) | (29) |
| Net Interest Expense | (20) | (44) | (49) |
| Income Tax | (10) | (20) | (20) |
| Other Income | 2 | – | – |
| **Net Income (excl. Unconsolidated Joint Ventures)** | **($15)** | **($23)** | **($19)** |

Balance Sheet

| | FY26 | FY27 | FY28 |
|---|---|---|---|
| Cash | $86 | $81 | $84 |
| Restricted Cash | 7 | 7 | 7 |
| Accounts Receivable | 98 | 102 | 108 |
| Inventory | 163 | 168 | 180 |
| Prepaid Exp. and Other | 11 | 11 | 11 |
| **Total Current Assets** | **$364** | **$369** | **$390** |
| | | | |
| PP&E | 215 | 216 | 215 |
| Right-of-Use Assets | 52 | 52 | 52 |
| Other Intangible Assets | 311 | 311 | 311 |
| Investments in Equity Affiliates | 147 | 160 | 163 |
| Deferred Income Tax Assets | 17 | 17 | 17 |
| Other | 3 | 3 | 3 |
| **Total Assets** | **$1,110** | **$1,128** | **$1,151** |
| | | | |
| Accounts Payable | 70 | 72 | 76 |
| Lease Liabilities, current | 6 | 6 | 6 |
| Acc. Exp. And Other | 54 | 54 | 54 |
| **Total Current Liabilities** | **$130** | **$132** | **$136** |
| | | | |
| Long-Term Debt | 322 | 360 | 398 |
| Accrued Interest | 5 | 6 | 6 |
| Lease Liabilities, long term | 31 | 31 | 31 |
| Foreign Pension and Other Post-Retirement Benefit Liabilities | 10 | 10 | 10 |
| Deferred Income Tax Liabilities | 43 | 43 | 43 |
| Other | 2 | 2 | 2 |
| **Total Liabilities** | **$543** | **$584** | **$626** |
| | | | |
| **Total Shareholders Equity** | **$567** | **$544** | **$525** |
| | | | |
| **Total Liabilities and Shareholder Equity** | **$1,110** | **$1,128** | **$1,151** |

<u>Cash Flow Statement</u>

| | H2 2026 | FY27 | FY28 |
|---|---|---|---|
| <u>Cash Flow from Operations</u> | | | |
| Net Income | ($15) | ($23) | ($19) |
| Depreciation & Amortization | 14 | 29 | 29 |
| PIK Interest | 20 | 41 | 40 |
| Capital Lease Payments | (1) | (1) | (1) |
| Unconsolidated Joint Venture Contributions | (4) | (13) | (3) |
| Change in Working Capital | 18 | (8) | (14) |
| **Cash Flow from Operations** | **$32** | **$24** | **$31** |
| | | | |
| <u>Cash Flow from Investing</u> | | | |
| Capital Expenditures | (8) | (29) | (28) |
| **Cash Flow from Investing** | **($8)** | **($29)** | **($28)** |
| | | | |
| <u>Cash Flow from Financing</u> | | | |
| Borrowings / Repayment | – | – | – |
| **Cash Flow from Financing** | **$ –** | **$ –** | **$ –** |
| | | | |
| **Net Change in Cash** | **$24** | **($5)** | **$3** |
| | | | |
| **Beginning Cash** | **$62** | **$86** | **$81** |
| **Ending Cash** | **$86** | **$81** | **$84** |

**Exhibit D**

**Liquidation Analysis**

**Exhibit D to the Disclosure Statement**

## LIQUIDATION ANALYSIS

### I.      Overview

For a chapter 11 plan to be confirmed, the bankruptcy court must find that such chapter 11 plan is in the "best interests" of all holders of claims and interests that are impaired by the chapter 11 plan. The "best interests" test requires a bankruptcy court to find either that (i) all members of an impaired class of claims or interests have accepted the chapter 11 plan or (ii) the chapter 11 plan will provide a member who has not accepted the chapter 11 plan with a recovery of property of a value, as of the effective date of the chapter 11 plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

### II.     Underlying Assumptions and Disclaimer

This liquidation analysis (the "Liquidation Analysis") was prepared in connection with the development of the *Joint Prepackaged Plan of Reorganization of the LYCRA Company LLC and Its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and supplements thereto, the "**Plan**")[1] and Disclosure Statement to which this Liquidation Analysis is attached as Exhibit D. The Debtors have prepared this Liquidation Analysis based on a hypothetical liquidation under chapter 7 of the Bankruptcy Code. The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation.

This Liquidation Analysis presents the Debtors' determination of hypothetical liquidation value of their business if a chapter 7 trustee were appointed and charged with winding down the estates. Under a chapter 7 liquidation, it is assumed that the chapter 7 trustee would sell all of the Debtors' major assets or surrender them to the applicable lien holders, and the cash proceeds, net of liquidation related costs, would then be distributed to holders of Claims in accordance with relevant law.

The Debtors filed for bankruptcy protection under chapter 11 of the Bankruptcy Code on March 17, 2026 (the "Petition Date"). This Liquidation Analysis assumes conversion of the Debtors' chapter 11 cases to chapter 7 liquidation cases on May 31, 2026 (the "Conversion Date"). On the Conversion Date, it is assumed that the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") to oversee the liquidation of the estates. As a baseline, the Liquidation Analysis used each of the Debtors' unaudited assets and liabilities as of December 31, 2025, and then, as set forth herein, (i) the Debtors' forecasted balance of cash and cash equivalents was adjusted to take into account the projected cash flows between December 31, 2025 and the Conversion Date and (ii) the book values of certain assets and liabilities were adjusted, where appropriate, when more recent and accurate valuation information was available (in particular, the balances of the Debtors' cash). The Liquidation Analysis is prepared on a debtor-by-debtor basis. The lenders under the SSTL, Euro Notes, Dollar Notes, and the DIP Facility (collectively, the "Credit Facilities") have a security interest in the same collateral (*i.e.*, the collateral that the DIP Facility has a priming first lien on, the SSTL, Euro Notes, and Dollar Notes each have second liens on, with the SSTL and Euro Notes Priority Tranche (in that order) having priority of collection of collateral proceeds pursuant

---

[1]     Capitalized terms used but not defined herein have the meanings ascribed to them in the disclosure statement to which this exhibit is attached (the "**Disclosure Statement**") or in the Plan, as applicable.

1

**Exhibit <span style="color:red">D to the Disclosure Statement</span>**

to the Intercreditor Agreement).  Each of the Debtors are either borrowers or guarantors under the SSTL, Euro Notes, Dollar Notes, and the DIP Facility.

The Liquidation Analysis assumes that the Trustee does not possess the operational expertise or capability to continue to operate the Debtors' businesses efficiently for the extended period required to conduct a going-concern sale process.  As a result, the Liquidation Analysis assumes the Trustee would manage the liquidation in stages.  The first stage occurring immediately after the Conversion Date is to collect outstanding trade receivables and sell all outstanding finished goods inventory to regional distributors who would warehouse the inventory and later sell such inventory to individual customers.  The next stage would involve a sale of the Debtors' intellectual property, machinery and equipment, and transfers and / or winddowns of the Debtors' interests in their Non-Debtor affiliates.  The final stage involves the demolition of the Debtors' owned properties in preparation for sales of the related land.  This orderly liquidation process is assumed to occur over a nine-month period.

The Debtors have majority ownership interests in several Non-Debtor subsidiaries, which are not borrowers or guarantors under the Credit Facilities.  It is assumed that the assets of wholly-owned Non-Debtor subsidiaries will be liquidated concurrently with the Debtors' assets. The proceeds from the liquidation of the Non-Debtor subsidiaries would first go to satisfy the creditors of the Non-Debtor subsidiaries,  and any remaining proceeds after satisfying such creditors would then be available on account of the Non-Debtor subsidiaries' equity interests.  If the proceeds generated by the Non-Debtor subsidiaries are not enough to satisfy their creditors, then the creditors will receive their *pro-rata* share of the net proceeds, with no recovery to the Debtors on account of their equity interest.

The Debtors also have equity interests in joint ventures in which certain China-based Non-Debtors maintain greater that 50.1% ownership interests (the "Majority Owned JVs").   For the Majority-Owned JVs, it is assumed that the Non-Debtors' joint venture interest will transfer to the minority partner, with consideration returning to the Non-Debtors only if the value of joint venture assets transferred exceeds the value of joint liabilities transferred, including contingent liabilities.

THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY PURPOSE OTHER THAN AS EXPLAINED ABOVE.  THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING-CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE CONCLUSIONS REACHED IN THIS LIQUIDATION ANALYSIS AND THE ACTUAL VALUES THAT MAY BE REALIZED IN A LIQUIDATION.   THIS ANALYSIS ASSUMES "LIQUIDATION VALUES" BASED ON THE DEBTORS' BUSINESS JUDGEMENT IN CONSULTATION WITH THE DEBTORS' ADVISORS. WHILE THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM GOING CONCERN SALE(S) OF THE DEBTORS' ASSETS OR BUSINESS UNITS WOULD BE MORE THAN HYPOTHETICAL LIQUIDATION VALUE, THE COSTS ASSOCIATED WITH THE SALE(S) WOULD BE LESS, FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES AND/OR CERTAIN ORDINARY COURSE CLAIMS WOULD BE ASSUMED BY THE BUYER OF THE DEBTORS' BUSINESS.  THE UNDERLYING FINANCIAL INFORMATION IN THIS LIQUIDATION ANALYSIS WAS NOT COMPILED OR EXAMINED BY ANY INDEPENDENT ACCOUNTANTS. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS.  ACTUAL RESULTS COULD VARY MATERIALLY.

**Exhibit <span style="color:red">D to the Disclosure Statement</span>**

### III.      Summary Notes to This Liquidation Analysis

(i)  <u>The Liquidation Analysis Depends on Estimates and Assumptions</u>.  The determination of the hypothetical proceeds from, and costs of the liquidation of the Debtors' assets, is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business and economic uncertainties and contingencies beyond the control of the Debtors.  Inevitably, some assumptions in this Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation.  The Debtors prepared the Liquidation Analysis for the sole purpose of establishing a reasonable good-faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code, and this Liquidation Analysis is not intended and should not be used for any other purpose.  The underlying financial information in this Liquidation Analysis was not compiled or examined by any independent accountants.  Accordingly, while deemed reasonable based on the facts currently available, neither the Debtors nor their advisors make any representations or warranties that the actual results would or would not approximate the estimates and assumptions set forth in this Liquidation Analysis.

(ii)  <u>Estimate of Gross Proceeds.</u>  This Liquidation Analysis (i) assumes a liquidation of all of the Debtors' assets (described in more detail below); (ii) assumes that the Trustee does not possess the operational expertise or capability to continue to operate the Debtors' global businesses efficiently for the extended period required to conduct a going-concern sale process; and (iii) estimates gross proceeds on a debtor-by-debtor basis.  Since the assets of a number of the Debtors are located outside the U.S. (the "<u>Non-U.S. Debtor Assets</u>"), it is assumed that applicable country-specific withholding taxes are levied on the cash proceeds resulting from the liquidation of such Non-U.S. Debtor Assets.

3

**Exhibit D to the Disclosure Statement**

**Consolidated Summary (Debtors + Non-Debtors)**

| | Estimated Book Value | Estimated Recovery $ | | Estimated Recovery % | |
| --- | --- | --- | --- | --- | --- |
| | | Low | High | Low | High |
| **Summary of Assets & Liquidation Proceeds** | | | | | |
| Cash & Cash Equivalents | $ 59.3 | $ 59.3 | $ 59.3 | 100.0% | 100.0% |
| Accounts Receivable | 70.9 | 39.1 | 48.8 | 55.1% | 68.8% |
| Inventory | 141.9 | 56.6 | 88.9 | 39.9% | 62.7% |
| Prepaid Expenses & Deposits | 9.7 | 0.4 | 1.7 | 4.3% | 17.3% |
| Property, Plant & Equipment | 208.1 | 33.8 | 56.1 | 16.2% | 27.0% |
| Intangible Assets & Other Proceeds | 309.3 | 11.6 | 36.7 | 3.8% | 11.9% |
| Equity in Affiliates | 142.6 | 6.6 | 10.6 | 4.6% | 7.4% |
| Other Assets | 2.8 | - | - | 0.0% | 0.0% |
| Non-Debtor Value | 235.9 | 4.9 | 12.4 | 2.1% | 5.2% |
| **Total Liquidation Proceeds** | **$ 1,180.5** | **$ 212.3** | **$ 314.4** | **18.0%** | **26.6%** |
| | | | | | |
| **Wind Down Costs & Other Fees** | | | | | |
| Withholding Tax on Non-US Recoveries | n/a | (18.4) | (24.4) | n/a | n/a |
| Wind-Down Costs | n/a | (61.0) | (56.3) | n/a | n/a |
| Trustee Fees | n/a | (6.4) | (9.4) | 3.0% | 3.0% |
| Trustee Professionals | n/a | (2.5) | (4.5) | n/a | n/a |
| **Total - Wind Down Costs & Other Fees** | **n/a** | **$ (88.3)** | **$ (94.6)** | **n/a** | **n/a** |
| **Total Proceeds - After Wind-Down Costs** | **n/a** | **$ 124.0** | **$ 219.8** | **n/a** | **n/a** |
| | | | | | |
| **Secured Claim Distributions From Proceeds** | | | | | |
| Super Priority DIP Claims | 77.5 | 77.5 | 77.5 | 100.0% | 100.0% |
| SSTL Claims | 219.6 | 46.5 | 142.3 | 21.2% | 64.8% |
| Euro Priority Claims | 120.0 | - | - | 0.0% | 0.0% |
| Euro Pari Claims | 403.8 | - | - | 0.0% | 0.0% |
| Dollar Pari Claims | 770.3 | - | - | 0.0% | 0.0% |
| **Net Remaining Distributable Value for Admin / Unsecured Claims** | **n/a** | **$ -** | **$ -** | **n/a** | **n/a** |
| | | | | | |
| **Admin / Unsecured Claim Recovery From Remaining Proceeds** | | | | | |
| Administrative / Priority Claims | 88.5 | - | - | 0.0% | 0.0% |
| SSTL Deficiency Claim | 125.2 | - | - | 0.0% | 0.0% |
| Other Deficiency Claims | 1,294.1 | - | - | 0.0% | 0.0% |
| General Unsecured Claims | 60.0 | - | - | 0.0% | 0.0% |
| **Total Admin / Unsecured Claims** | **$ 1,567.8** | **$ -** | **$ -** | **0.0%** | **0.0%** |
| | | | | | |
| **Claim Recovery by Type** | | | | | |
| Superpriority DIP Claims | 77.5 | 77.5 | 77.5 | 100.0% | 100.0% |
| SSTL Claims | 219.6 | 46.5 | 142.3 | 21.2% | 64.8% |
| Euro Priority Claim | 120.0 | - | - | 0.0% | 0.0% |
| Euro Pari Claim | 403.8 | - | - | 0.0% | 0.0% |
| Dollar Pari Claim | 770.3 | - | - | 0.0% | 0.0% |
| Administrative Claims | 88.5 | - | - | 0.0% | 0.0% |
| General Unsecured Claims | 60.0 | - | - | 0.0% | 0.0% |
| **Total Recoveries - Consolidated** | **$ 1,739.6** | **$ 124.0** | **$ 219.8** | **7.1%** | **12.6%** |

**Notes to the Liquidation Analysis**

**Note A - Cash and Cash Equivalents**

The cash balance on the Conversion Date is based on the Debtors' DIP Budget, adjusted for recoverable amounts from the Funded Reserve Account, less unfunded Adequate Protection Fees and Expenses as of the Conversion Date. The estimated recovery for this asset category is 100% of net book value. In addition, cash and cash equivalents are assumed to be entirely available for use to fund wind-down costs.

4

**Exhibit D to the Disclosure Statement**

**Note B - Accounts Receivable**

The accounts receivable on the Conversion Date are comprised of Trade Receivables and Non-Trade Receivables.

Trade Receivables consist of balances owed by customers on products shipped prior to the Conversion Date, and are assumed to be recovered net of contractual liabilities such as rebates and reserving for aged receivables.  The estimated recovery on Trade Receivables is 75 – 88%.

Non-Trade Receivables consist of primarily of non-income tax receivables (which are not recoverable unless used to offset against future tax liabilities) and advances /guarantees are considered to be offset by the related creditors against amounts owing, and thus are estimated to have recoveries of 0 – 15%.  In aggregate, the estimated recovery for the Accounts Receivable asset category is 55 – 69%.

**Note C - Inventory**

Inventory consists of raw materials, work-in-process, and finished goods, which are assumed to be monetized as follows:

Raw materials are assumed to be sold to brokers in bulk and / or disposed of, with buyers bearing the cost of transportation.  Since the Debtors' primary raw material is PTMEG, raw material monetization is assumed in geographies in which competitors are proximate to the Debtors' operations, otherwise raw materials are assumed to be disposed of.  Estimated recoveries for raw materials are 1 – 10%.

Semi-finished goods are assumed to be sold to competitors and brokers and / or disposed of, with buyers bearing the cost of transportation.  Estimated recoveries for semi-finished goods are 6 – 14%.

Finished goods are assumed to be sold to brokers regionally.  Since an active market exists for spandex in the regions in which the Debtors' operate, finished goods inventory is assumed to be salable, and in some cases generating a premium over net book value depending on the product type.  Estimated recoveries for finished goods are 74 – 110%.

In the aggregate, the estimate recovery for the Inventory category is 40 – 63%.

**Note D - Prepaid Expenses & Deposits**

Prepaid Expenses primarily consist of amounts on deposit with vendors.  It is assumed the vendors would offset these amounts against amounts that the Debtors owe to the vendors holding the deposits and therefore minimal proceeds would be generated from these assets in a chapter 7 liquidation.

The estimated recovery for the Prepaid Expense & Deposits category is 4 – 17%.

**Note E - Property Plant & Equipment**

Property, Plant, and Equipment ("PP&E") primarily includes assets specific to the Debtors' operations in Brazil, Northern Ireland, the Netherlands, Mexico, Singapore, and the United States (collectively, the "Plant Locations").  Recoveries from PP&E were estimated in two primary categories:

5

**Exhibit D to the Disclosure Statement**

Property and Land:  The Debtors' own property and land in Brazil, Northern Ireland, the Netherlands, Mexico, and the United States (collectively, the "Owned Geographies").  Due to the age and customized nature of its manufacturing plants, along with limited demand for spandex manufacturing equipment and capacity in the Owned Geographies, it is assumed that recoveries can be realized only after equipment has been removed, and the buildings have been demolished, such that then vacant land can be sold for alternate uses.  Recoveries are net of estimated property demolition and clean-up costs, as well as brokerage fees.  All other property and land carrying costs are included in the Winddown Costs described later.   The estimated recoveries for Properties and Land are 53 – 62%.

Machinery and Equipment:  The machinery and equipment (the "M&E") at the Plant Locations is assumed to have limited marketability due to the age and customized nature of the M&E.  The M&E is assumed to either be disposed of or sold for scrap metal value.  The estimated recoveries for M&E are 0 – 20%.

Other PP&E categories including construction-in-process and right-of-use lease accounting assets were assumed to have no recoverable value.

In the aggregate, the estimated recovery for the Property, Plant, and Equipment category is 16 – 27%.

**Note F - Intangible Assets**

The Debtors' intangible assets (the "Intangibles") consist primarily of trademarks, patents on technology, and customer relationships.  The Intangibles were established pursuant to purchase accounting at the time of the Ruyi Acquisition in 2019.

1. For liquidation analysis purposes, because the customer relationships are not supported by long-term contracts with stated purchase requirements, they assumed to have no value as there is no benefit to a third-party given that they are not obtaining any tangible assets to monetize the customer relationships.
2. The liquidation analysis estimates the value of the Debtors' trademarks based on benchmarking against chapter 11 and chapter 7 transactions involving the sale of trademarks and intangible assets to develop a value multiple as a percentage of revenue.
3. Intangibles value was further enhanced to consider the royalty revenue received from existing third-party licensing of certain Company technology.  Intangibles recovery includes 1.5 years of annual royalty revenue specific to existing third-party licensing.
4. It is assumed that the Trustee would run an auction to sell the Intangibles to a third-party buyer, who would then be left to identify other third-parties to license its newly-purchased Intangibles.  The proceeds from the Debtors' trademarks in the liquidation analysis are assumed to approximate $11.6 million - $36.7 . million or 4 – 12% of net book value.

**Note G – Equity in Affiliates**

The Debtors have non-controlling interests in joint ventures in Japan and Taiwan (collectively the "JV Interests").  Historically, the Debtors have realized operating income through distributions from these JV Interests.  Both of the JV Interests also license the Debtors technology in their production.  Shortly after the Conversion Date, it is assumed that the Trustee will negotiate the sale of the JV Interests to the JV partners.  Based on an assumed sale value of 3 – 4x annual historical income realized by the Debtors, net

6

**Exhibit <span style="color:red">D to the Disclosure Statement</span>**

of post-petition payables outstanding, estimated recoveries on the JV Interests are $6.6 - $10.6 million, or 5 – 7% of net book value.

Factors that could negatively impact the recoveries set forth in the Liquidation Analysis, include, but are not limited to: (a) turnover of key personnel, (b) customers taking advantage of the liquidation to avoid paying their receivables, (c) actual ability to monetize existing inventory, (d) customers transitioning away from the Debtors more quickly than assumed, (e) challenging economic conditions, and (f) delays in the liquidation process.  These factors may limit the amount of the proceeds generated by the liquidation of the Debtors' assets (the "Liquidation Proceeds") available to the Trustee.

**Note H – Non-Debtor Value**

It is assumed that the Non-Debtors would be liquidated concurrently with the Debtors. The proceeds from the liquidation of the Non-Debtor subsidiaries would first go to satisfy their respective third-party creditors and any remaining proceeds would be available on account of the Non-Debtor subsidiaries' equity interests.  Recoveries from the liquidation of Non-Debtor is estimated to be $4.9 - $12.4 million, or 2 – 5% of net book value.

In the case of two Non-Debtors noted below, it was assumed that the Trustee would pursue the transfer of the Debtors' equity interests as opposed to effectuating a liquidation:

Lycra Fiber (Yinchuan) Co Ltd – This is a joint venture (the "Yinchuan JV") whose operations are expected to start-up, with initial sales generation beginning in 2026.  Due to its start-up nature, the Yinchuan JV has limited owned tangible assets.  As opposed to pursuing a liquidation, it is assumed that the Trustee will allow the JV partner to assume all Yinchuan JV liabilities and assets, in order to minimize its potential legal exposure.  Since Yinchuan JV liability value exceeds asset value, no recoveries are estimated.

Chuanglai Fiber (Foshan) Co Ltd ("CFF") – CFF is the Non-Debtor operating subsidiary which also has an equity interest in the Foshan JV.  It is assumed that the Trustee does not have the resources or the time to continue to pursue the China Litigation.  Further, it is assumed that a unilateral liquidation of CFF would result in significant legal exposure to the Trustee.  As such, it is assumed that the Trustee will negotiate an orderly transfer of all CFF liabilities and assets to Wanzhong to minimize any legal exposure. Estimated recoveries on this liability and asset transfer range from $0 - $5.0 million.

In the aggregate, the estimate recovery from equity positions in the Non-Debtors, prior to withholding taxes, is $4.9 - $12.4 million, or 2 – 5% of net book value.

**Note I - Litigation & Avoidance Actions**

The Debtors have not been presented with any documents and are not otherwise aware of any evidence to support any litigation or avoidance actions. Accordingly, the litigation and avoidance actions have been estimated at zero ($0) for purposes of the distributions set forth in this Liquidation Analysis. We note that this estimate does not include the possibility of a recovery from Helm in an amount up to $4.75 million under the Helm Settlement Agreement in a chapter 7 liquidation.

**Note J - Liquidation Costs**

7

**Exhibit D to the Disclosure Statement**

This Liquidation Analysis assumes a Trustee would take approximately 9 months from the Conversion Date to sell and facilitate the transition of all Debtor assets.  Liquidation costs consist of (i) the operating costs to manage the wind-down, (ii) Trustee fees, and (iii) costs of any Trustee professionals retained to assist with the liquidation process.  Liquidation costs are assumed to be paid in full from asset recovery proceeds before the balance of these proceeds would be available to creditors.  Key liquidation cost assumptions are as follows:

Withholding Taxes are estimated as a percentage of gross liquidation proceeds, and are applicable to both Debtors and Non-Debtors located outside the U.S.  It is assumed that taxing authorities in jurisdictions outside the U.S. would levy withholding taxes on proceeds that are being moved out of their jurisdiction to pay creditors in a different jurisdiction.

Winddown Expenses include the Debtors' facility shutdown and decommissioning costs related to the liquidation of inventory, equipment, and real property, and other administrative costs required to wind down the Debtors' estates.  These costs include, but are not limited to, payroll and benefits, retention payments, taxes, IT-related, insurance, facility costs, and administration and overhead costs.  It is assumed that the Trustee will retain Debtor personnel to facilitate the liquidation of the remaining assets, decommissioning and demolition of the facilities, marketing and selling of assets, collection of accounts receivable, and general administration of the Estates.  Since severance payments upon separation is a statutory requirement in many of the Debtors' operating jurisdictions, severance equal to two to three months of salary is assumed for all employees active as of the Conversion Date.

Trustee Fees are assumed to be 3.0% of gross proceeds.

Chapter 7 Professional Fees consist of legal and financial professionals assumed to be retained by the Trustee and are assumed to be 2.0% of net proceeds.

**Claims**

In preparing this Liquidation Analysis, the Debtors estimated Allowed Claims based on (1) the estimated principal  and accrued interest for the SSTL, Euro Notes, Dollar Notes, and the DIP Facility on the Conversion Date, (2) a review of the liabilities recorded in the Debtors' books and records as of December 31, 2025, adjusted as appropriate, and (3) an estimate of the administrative claims at the Conversion Date.  This Liquidation Analysis also includes estimates for Claims that could be asserted and allowed in a chapter 7 liquidation, including Administrative Expenses, Winddown Costs (as detailed herein), Trustee fees, and other Allowed Claims.  To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims.  For purposes of this Liquidation Analysis, the Debtors have estimated the amount of Allowed Claims and provided ranges of projected recoveries based on certain assumptions.  Therefore, the Debtors' estimates of Allowed Claims set forth in this Liquidation Analysis should not be relied upon for any purpose other than considering the hypothetical distributions under a chapter 7 liquidation.  Nothing contained in this Liquidation Analysis is intended to be or constitutes a concession or admission by the Debtors.  The actual amount of Allowed Claims in the Chapter 11 Cases could materially differ from the estimated amounts set forth in the Liquidation Analysis.

**Note K – Secured Claims**

DIP Claims are assumed to be $77.5 million as of the Conversion Date, pursuant to the DIP Budget.  The DIP Claims are assumed to constitute super-priority claims secured by priming liens over all of the

8

**Exhibit D to the Disclosure Statement**

Debtors' assets.  Since every Debtor is either a borrower or guarantor under the DIP Facility, the DIP Claims are asserted against all Debtors.  The estimated recovery for the DIP Claims is 100%.

SSTL Claims are assumed to be $219.6 million as of the Conversion Date, which includes accrued interest through the Conversion Date.  Since every Debtor is either a borrower or guarantor under the SSTL, the SSTL Claims are assumed to be asserted against all Debtors.  The SSTL, along with the Euro Notes and the Dollar Notes, are secured by the Shared Collateral.  Although the SSTL, Euro Notes, and Dollar Notes rank pari passu in terms of lien priority and payment priority, pursuant to the waterfall in the Intercreditor Agreement, proceeds from the enforcement of the Shared Collateral is to be distributed first to the SSTL until it is repaid in full, and before any proceeds are shared on account of the Euro Priority claim and then to the balance of the Euro Notes and Dollar Notes.  The estimated recovery for SSTL claims is 21 - 65%.

Priority Euro Note Claims are assumed to be $120.0 million as of the Conversion Date.  Since every Debtor is either a borrower or guarantor under the Priority Euro Notes, the Priority Euro Note Claims are asserted against all Debtors.  The estimated recovery for Priority Euro Note claims is 0%.

Pari Euro Note Claims are assumed to be $403.8 million as of the Conversion Date, which includes accrued interest through the Conversion Date.  Since every Debtor is either a borrower or guarantor under the Pari Euro Notes, the Pari Euro Note Claims are asserted against all Debtors.  The estimated recovery for Pari Euro Note claims is 0%.

Dollar Note Claims are assumed to be $770.3 million as of the Conversion Date, which includes accrued interest through the Conversion Date.  Since every Debtor is either a borrower or guarantor under the Dollar Notes, the Dollar Note Claims are asserted against all Debtors.  The estimated recovery for Dollar Note claims is 0%.

**Note L - Administrative Expense and Priority Claims**

Administrative Expense and Priority Claims primarily consist of post-petition trade and other related claims forecast to be incurred but not yet paid by the Debtors as of the Conversation Date, and are assumed to be approximately $88.5 million.  The estimated recovery for Administrative Expense and Priority Claims is 0%.

**Note M - General Unsecured Claims**

General Unsecured Claims are comprised of deficiency claims on secured debt, unsecured local lines of credit, the Promissory Note, and other general unsecured claims.  The liquidation is expected to result in several damages claims resulting from the Debtors' inability to continue to perform under existing executory contracts.  While estimates are not included herein, any such damages claims would also be part of the general unsecured claims pool.   The estimated recovery for General Unsecured Claims is 0%.

**Exhibit E**

**Organizational Chart**



Legend:

- Debtor Entities
- Non-Debtor Entities
- Outstanding Debt

Linklaters

Private & Confidential